## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARIANO ERRICHIELLO, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION, MICHAEL F. MAHONEY, JOSEPH M. FITZGERALD, and DANIEL J. BRENNAN,<br><br>Defendants. | Civil Action No.:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mariano Errichiello ("Plaintiff"), by his attorneys, on behalf of himself and all others similarly situated, alleges the following based upon the investigation of Plaintiff's counsel, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge. The investigation of counsel included, among other things, a review of Boston Scientific Corporation's ("BSX", "Boston Scientific" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases issued by the Company, media, news and analyst reports about the Company, conference calls with Company executives and investors, and other publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Boston Scientific securities.

## I.    INTRODUCTION

1.    This action is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the SEC, brought by Plaintiff on behalf of all persons and entities who purchased or sold the publicly traded securities of Boston Scientific from April 24, 2019 through November 16, 2020 inclusive, and were damaged thereby.

2.      Boston Scientific is a company known for manufacturing medical devices used in interventional medical specialties.  According to the Company's annual report for the year ended December 31, 2019 filed with the SEC on Form 10-K on February 25, 2020 ("2019 10-K"), the Company purported to be in the business of marketing its LOTUS Edge, which is a transcatheter aortic valve replacement device (hereinafter "TAVR"). A TAVR is a medical device to treat patients with aortic valve stenosis, which occurs when the heart's aortic valve thickens and calcifies, preventing the valve from opening fully, which limits blood flow from the heart to the rest of the body. The FDA approved the LOTUS Edge in April 2019 for patients with severe aortic stenosis, and the Company launched sales during the quarter ended June 30, 2019.

3.      Throughout the Class Period, Company executives stated that the LOTUS Edge was a source of revenue growth, that medical centers were using the device consistently, and the number of accounts/medical centers using the device was growing.

4.      For example, on a July 29, 2020 earnings call with industry analysts and investors, Defendant Michael F. Mahoney, the Company's President and Chief Executive Officer ("Mahoney") stated that "LOTUS Edge continues to see strong utilization within existing accounts…" and that "the current centers are using the device quite consistently." Further, on that same earnings call, Defendant Mahoney stated "[s]o we are starting to see the gates open up a bit more in terms of new account openings with LOTUS…"  Moreover, on an October 15, 2020 conference call with analysts and investors, Defendant Joseph M. Fitzgerald, Executive Vice President, and President of Interventional Cardiology ("Fitzgerald") stated that "[t]his is now a ground game where we are expanding our footprint in the U.S. each month, we're growing actual procedures per center, per month."

5.      However, unknown to investors, Defendants' representations were materially false and misleading because: 1) that the LOTUS Edge required additional product development work,

2

an enhanced delivery system, reduced training and case support; 2) the Company was facing increases in both manufacturing complexity and the investment required for clinical scalability of the LOTUS Edge; and 3) as a result of material manufacturing and product delivery difficulties, the Company's commercial efforts to expand LOTUS Edge market share were unsustainable and failing.

6.      Then, on November 17, 2020, before the market opened, Boston Scientific announced "it initiated a global, voluntary recall of all unused inventory of the LOTUS Edge Aortic Valve System due to complexities associated with the product delivery system." Further, the Company disclosed that "[g]iven the additional time and investment required to develop and reintroduce an enhanced delivery system, the company has chosen to retire the entire LOTUS product platform immediately. All related commercial, clinical, research and development and manufacturing activities will also cease."

7.      Boston Scientific stated that its decision "is expected to result in estimated total pre-tax GAAP charges of approximately $225 million to $300 million due to inventory, fixed asset, intangible asset and certain other exit charges and approximately $100 million to $150 million of these charges will impact the company's adjusted results."

8.      Also on November 17, 2020, on a special conference call to discuss the recall, Defendant Fitzgerald explained:

> [t]he complexity of the LOTUS Edge delivery system has resulted in the valve's current niche role in the market despite our commercial efforts. Given the additional product development work required to reintroduce an enhanced delivery system to the market and reduce the training and case support necessary to scale clinical use and ensure competitiveness, we've made the difficult decision to retire the entire LOTUS platform immediately… we've determined that it's not prudent to sustain the level of investment required for delivery system change and the increasing burden of training and case support requirements. In addition, we faced increases in both manufacturing complexity and the investments, including all commercial, clinical, R&D and manufacturing activities on the LOTUS product platform.

9.     During this conference call, one analyst questioned the timing of the disclosure of

the recall, and Fitzgerald responded:

> "So I think – I'll put it in perspective. So we just rounded the corner right around
> TCT of a 1-year anniversary of launching in the U.S. We're going through our
> annual operating plan process, an we're really challenging – we're trying to figure
> out what's our global number, what's our U.S. number. And we're  -- we have done
> a really good job of training and retraining around the complexities of the delivery
> system. But we came to the conclusion that to scale this, to go from sub-100
> accounts today in the United States to hundreds of accounts, right, we really were
> going to struggle in replicating that deep technical, clinical support as we scale
> cases and go 2, 3, 4, 5x without a design enhancement. So I think it was the proper
> thing for us to do to really be our own worst critics after the first full year of having
> Lotus Edge on the market and commercialized in the U.S. And it became very
> apparent that without a design enhancement, that our program wasn't scalable and
> that LOTUS would ultimately remain as a niche device in a pretty expensive space
> to operate."

10.    On November 17, 2020, Boston Scientific shares declined from a closing price on

November 16, 2020 of $38.03 per share, to close at $35.07 per share, a decline of $2.96 per share

or approximately 8%, on heavier than usual volume.

11.    Analysts were surprised by the Company's disclosure and noted that the

Company's decision to recall the LOTUS Edge damaged management's credibility with investors

and will result in the Company losing market share to competitors.  For example, on November

17, 2020, Piper Sandler released an analyst report that stated that the Company's "announcement

no doubt comes as a big surprise as LOTUS was once billed as a primary growth driver for BSX's

Interventional Cardiology business."  BITG released an analyst report that stated "this  decision

comes just a month after BSX expressed confidence in its dual-valve TAVR strategy at the

Transcatheter Cardiovascular Therapeutics medical meeting . . . .", and Raymond James issued a

report stating that "[t]he discontinuation of LOTUS is a credibility ding to management, which

will weigh on the stock."

12.     Also on November 17, 2020, Canaccord Genuity released an analyst report that stated "Long term impacts – US TAVR gap until 2024: The immediate consequence of this decision is that Boston [Scientific] will no longer have a TAVR platform in the US until 2024E." Also on November 17, 2020, Cowen and Company released aa report that stated that "the discontinuation of Lotus creates a near-term hole in BSX's U.S. TAVR initiatives."

13.     During the Class Period, Defendant Mahoney sold 259,207 shares of BSX stock at artificially inflated prices for proceeds of over $9 million, Defendant Fitzgerald sold 207,911 shares of BSX stock at artificially inflated prices for proceeds of over $8.9 million and Defendant Daniel J. Brennan ("Brennan"), the Company's Executive Vice President and Chief Financial Officer, sold 40,925 shares of BSX stock at artificially inflated prices for proceeds of over $1.6 million.

14.     BSX shares have not recovered, closing at $34.67 per share on December 15, 2020.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market valve of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

16.     The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Jurisdiction is conferred by Section 27 of the Exchange Act.

17.     Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b) and 27 of the Exchange Act.  Boston Scientific's corporate headquarters are located in this District and the Company transacts business in this District.

18.     In connection with the facts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.   PARTIES

19.     Plaintiff purchased Boston Scientific securities as detailed in the certification attached hereto and was damaged thereby.

20.     Defendant Boston Scientific is incorporated in Delaware, and the Company's principal executive offices are located at 300 Boston Scientific Way, Marlborough, Massachusetts 01752.  Boston Scientific's common stock trades on the New York Stock Exchange under the symbol "BSX."

21.     Defendant Mahoney served at all relevant times as the Company's Chairman, President, and Chief Executive Officer. As set forth below, Defendant Mahoney made representations alleged herein that were materially false and misleading. Defendant Mahoney, by virtue of his position in the Company, possessed material non-public information.

22.     Defendant Fitzgerald served at all relevant times as the Company's Executive Vice President and President of Interventional Cardiology. As set forth below, Defendant Fitzgerald made representations alleged herein that were materially false and misleading. Defendant Fitzgerald, by virtue of his position in the Company, possessed material non-public information which rendered his statements false and misleading at the time they were made.

23.     Defendant Brennan served at all relevant times as the Company's Executive Vice President and Chief Financial Officer. As set forth below, Defendant Brennan made representations alleged herein that were materially false and misleading. Defendant Brennan, by virtue of his position in the Company, possessed material non-public information which rendered his statements false and misleading at the time they were made.

24.     Because of their position and access to material non-public information available to them, Defendants Mahoney, Fitzgerald and Brennan knew, or disregarded with at least recklessness, that material, adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations, which were being made, were materially false and misleading. Defendants Mahoney, Fitzgerald, and Brennan, because of their respective positions with Boston Scientific, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional and individual investors.  Defendants Mahoney, Fitzgerald, and Brennan were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

25.     Defendants Mahoney, Fitzgerald and Brennan are referred to as the "Individual Defendants".  Defendants Boston Scientific and the Individual Defendants are collectively referred to as "Defendants".

## IV.    CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons and entities who purchased or sold the publicly traded securities of Boston Scientific from April 24, 2019 through November 16, 2020, inclusive (the "Class Period"), and were damaged thereby.

27.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at the present time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  As of October 30, 2020, Boston Scientific had 1,431,921,459 shares of common stock outstanding.

28.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether Defendants violated the federal securities laws;

(b)     whether Defendants' statements omitted and/or misrepresented material facts;

(c)     whether the prices of Boston Scientific securities were artificially inflated; and

(d)     the extent of damage sustained by Class members and the appropriate measure of damages.

29.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class have sustained damages because of Defendants' unlawful activities alleged herein.  Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff.  Plaintiff has no interests which are contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

30.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## V.     FALSE AND MISLEADING STATEMENTS

31.     The Class Period starts on April 24, 2019. On April 23, 2019, after the market closed, Defendants caused the Company to issue a press release announcing the FDA's approval for the LOTUS Edge (the "April 2019 Press Release"). The April 2019 Press Release represented that "[t]he LOTUS Edge valve system is the only FDA-approved aortic valve that gives physicians

the option to reposition and completely recapture the valve once it has been fully deployed"; and that the product "also features a braided valve frame and an adaptive seal that minimizes paravalvular regurgitation for leaking (PVL) by conforming to the patient's native aortic valve."

32.     Furthermore, the April 2019 Press Release touted the LOTUS Edge's product delivery system and nature, stating, respectively, that:

> "[b]ringing the much – anticipated LOTUS Edge valve system to market allows us to provide patients who aren't good candidates for traditional surgery a safe and effective treatment alternative to restore proper function to their severely narrowed aortic valve," which "is a fundamental component of our expanding portfolio and demonstrates our continuing commitment to category leadership within the fast-growing Structural Heart treatment landscape'; and that Boston Scientific is "thrilled to offer physicians in the U.S. and Europe the clinical benefits of the LOTUS Edge valve system for the treatment of their high-risk patients with severe aortic stenosis," which "provides physicians a high level of control over the delivery and deployment of the device and offers surgical-like PVL results to help ensure the best patient outcomes."

33.     Between June 6 and July 1, 2019, Defendant Fitzgerald sold 21,769 BSX shares at artificially inflated prices for proceeds of over $900,000.

34.     On July 24, 2019, Defendants caused Boston Scientific to issue a press release announcing its results for the second quarter of 2019, stating, in relevant part, that the Company "[c]ommenced controlled launch in the U.S. and Europe of the LOTUS Edge Aortic Valve System, a minimally invasive TAVR technology for patients with severe aortic stenosis considered to be at high risk for surgical valve replacement via open heart surgery."

35.     On October 2, 2019, Defendant Brennan sold 20,462 BSX shares at artificially inflated prices for proceeds of over $807,000.

36.     On October 23, 2019, Defendants caused Boston Scientific to issue a press release announcing its results for the third quarter of 2019.

37.     Also on October 23, 2019, the Company hosted a conference call in which Defendants Mahoney and Brennan participated.  During the conference call, Defendant Mahoney

represented that the "Lotus Edge launch is going extremely well and we're building momentum in both the US and Europe. We remain on pace to open 150 accounts in our first 12 months in the US . . . ."

38.     On December 13, 2019, Defendant Fitzgerald sold 107,692 BSX shares at artificially inflated prices for proceeds of over $4 million.

39.     On February 5, 2020, Defendants caused Boston Scientific to issue a press release announcing its results for the fourth quarter and year ended December 31, 2019, stating, in relevant part, that the Company "[r]eceived Japanese Pharmaceuticals and Medical Devices Agency (PMDA) approval and positive reimbursement in Japan for the LOTUS Edge™ Aortic Valve System, a minimally invasive [TAVR] technology for patients with severe aortic stenosis."

40.     On February 13, 2020, Defendant Brennan sold 20,630 BSX shares at artificially inflated prices for proceeds of over $860,000.

41.     On February 25, 2020, Defendants caused Boston Scientific to file the 2019 10-K. The 2019 10-K was signed by Defendants Mahoney and Brennan.  The 2019 10-K reported net sales from the Company's Interventional Cardiology subsegment, which includes the LOTUS Edge, stating in part, that "net sales of Interventional Cardiology products of $2.816 billion represented 26 percent of [the Company's] consolidated net sales in 2019," which "increased $226 million, or 8.7 percent, in 2019, as compared to 2018," and that "[t]his year-over-year increase was primarily related to growth in [the Company's] structural heart therapies including [*inter alia*]… [its] TAVR products including [its]… LOTUS™ Edge Valve."

42.     Further, discussing Boston Scientific's market for the LOTUS Edge, the 2019 10-K stated that "[s]tructural heart therapies are one of the fastest growing areas of the medical technology market and are highly synergistic with [the Company's] Interventional Cardiology… business[,]" including the "LOTUS Edge™ Aortic Valve System, which is based on mechanical-

expanding architecture… is well suited for intra-annular cases and was launched commercially in the U.S. and Europe in the first half of 2019."

43.     Appended as exhibits to the 2019 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Defendants Mahoney and Brennan certified that "the [2019 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the" Exchange Act, and that "the information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of Boston Scientific."

44.     On July 29, 2020, the Company hosted an earnings call with industry analysts and investors, in which Defendants Mahoney and Brennan participated, to discuss the Company's financial results for the quarter ended June 30, 2020.  Defendant Mahoney, in his prepared remarks, stated, in pertinent part, that:

> "LOTUS Edge **continues to see strong utilization within existing accounts** while new account openings and geographic expansion did slow in the second quarter due to COVID impacts and physician training. June and July results with LOTUS Edge are encouraging, . . . **we expect to get back to our regular cadence of account openings in the U.S.** and continue our launch in Japan in the second half of '20."

(Emphasis added).

45.     On the same call, Defendant Mahoney stated "current centers are using the [LOTUS Edge] quite consistently", and "[s]o we are starting to see the gates open up a bit more in terms of new account openings with LOTUS . . .".

46.     On September 11, 2020, Defendant Fitzgerald sold 77,640 BSX shares at artificially inflated prices for proceeds of over $3.1 million.

47.     On September 16, 2020, Defendants Mahoney and Brennan participated in Morgan Stanley's virtual Global Healthcare Conference with industry analysts and investors. Defendant Mahoney, in response to an analyst's question stated that:

> "*certainly **LOTUS will continue to be an important product for us***. It's a significant market, as you know, and even small share gains are significant for us. ***And so LOTUS will continue to be an important growth driver for us,*** supported by our whole platform with ACURATE neo 2…
>
> ***
>
> ***"So overall, LOTUS remains a key growth driver for us***. And we're not going to give you share estimates, but we're continuing to invest along those lines. ***We're starting to do more account openings. The reorder rate for existing users is quite high, and we're slowly being able to penetrate some new accounts with some new training***. So LOTUS is important for us, but we have other tailwinds to support the company."

(Emphasis added).

48.     On October 15, 2020, Boston Scientific executives, including Defendant Fitzgerald, hosted an investor update on the company's transcatheter cardiovascular therapeutics business.   During his prepared remark, Defendant Fitzgerald made several statements regarding the LOTUS Edge, stating in pertinent part:

> "And then, of course, in our Structural Heart Valves Group, continuing our LOTUS Edge launch in the U.S. and Japan and getting neo2 launched and through our LMR in Europe. ***So I'm really, really excited about our ability to do this, despite the challenges with COVID around the globe***… Now ***turning to LOTUS Edge, I'm proud to report that we have opened more than 150 accounts in the United States***. We are just starting to wrap up our limited market release in Japan with the LOTUS Edge...".

(Emphasis added).

49.     Also on the October 15, 2020 conference call, Defendant Fitzgerald stated the following in response to an analyst's question:

> ***I like what I see in terms of us being now in 150 accounts in the United States. I think our launch is – I know our launch is gaining momentum***. We've got an improved version of iSLEEVE that will hit the U.S. for an LMR in November. So we'll – we think that will have sort of an improvement in the ease of use and the overall implant experience as well… We continue to iterate the LOTUS Edge implant techniques from learnings all over the globe. And I really like what I see Sam Conway's team doing there. So we're going to continue this. ***This is now a ground game where we are expanding our footprint in the U.S. each month, we're growing actual procedures per center, per month***. And I probably don't want to give a point estimate, ***but we are going to continue to improve our ground***

***game*** and then add on things like improved iSLEEVE and continue to make every implant and every next case better than the last case.

(Emphasis added).[1]

50.     On October 28, 2020, Defendants caused Boston Scientific to disclose the Company's financial results for the quarter ended September 30, 2020. During a conference call with investors and analysts in which Defendants Mahoney and Brennan participated, Defendant Mahoney stated that "we're seeing strong results in the sites that are using LOTUS in the U.S." and that "***Lotus Edge offers predictable control*** with a platform that may be fully recaptured and repositioned at any time. We believe both valves offer distinct benefits." (Emphasis added).

51.     On November 3, 2020, Defendant Mahoney sold 259,207 shares at artificially inflated prices for proceeds of over $9 million.

52.     Defendants' statements alleged in paragraphs 31-51 contained untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading, for the following reasons: 1) that the LOTUS Edge required additional product development work, an enhanced delivery system, reduced training and case support; 2) the Company was facing increases in both manufacturing complexity and the investment required for clinical scalability; and 3) as a result of material manufacturing and product delivery difficulties, the Company's commercial efforts to expand LOTUS Edge market share and grow, or scale, product sales and accounts were unsustainable.

## VI.     THE TRUTH BEGINS TO EMERGE

53.     On November 17, 2020, before the market opened, Defendants caused Boston Scientific to announce that the Company "initiated a global, voluntary recall of all unused

---

[1] Sam Conway is the President – Interventional Cardiology Sales at Boston Scientific.

inventory of the LOTUS Edge Aortic Valve System due to complexities associated with the product delivery system." Further, the Company disclosed that:

"[g]iven the additional time and investment required to develop and reintroduce an enhanced delivery system, the company has chosen to retire the entire LOTUS product platform immediately. All related commercial, clinical, research and development and manufacturing activities will also cease." Boston Scientific stated that its decision "is expected to result in estimated total pre-tax GAAP charges of approximately $225 million to $300 million due to inventory, fixed asset, intangible asset and certain other exit charges and approximately $100 million to $150 million of these charges will impact the company's adjusted results."

54.     Also on November 17, 2020, on a special conference call to discuss the recall in which Defendants Mahoney, Fitzgerald, and Brennan participated, Fitzgerald explained:

"The complexity of the LOTUS Edge delivery system has resulted in the valve's current niche role in the market despite our commercial efforts. Given the additional product development work required to reintroduce an enhanced delivery system to the market and reduce the training and case support necessary to scale clinical use and ensure competitiveness, we've made the difficult decision to retire the entire LOTUS platform immediately. . . we've determined that it's not prudent to sustain the level of investment required for delivery system change and the increasing burden of training and case support requirements. In addition, we faced increases in both manufacturing complexity and the investment required for clinical scalability, which has led us to decide to stop all investments, including all commercial, clinical, R&D and manufacturing activities on the LOTUS product platform."

55.     One analyst questioned the timing of the disclosure of the recall, noting the opportunities to discuss the issues at the 10/15 conference or 10/28 earnings call, and Defendant Fitzgerald responded:

"So I think, -- I'll put in perspective. So we just rounded the corner right at around TCT of a 1-year anniversary of launching in the U.S. [Launch was in Q2 2019]. We're going through our annual operating plan process, and we're really challenging -- we're trying to figure out what's our global number, what's our U.S. number. And we're – we have done a really good job of training and retraining around the complexities of the delivery system. But we came to the conclusion that to scale this, to go from sub-100 accounts today in the United States to hundreds of accounts, right, we really were going to struggle in replicating that deep technical, clinical support as we scale cases and go 2, 3, 4, 5x without a design enhancement. So I think it was the proper thing for us to do to really be our own worst critics after the first full year of having LOTUS Edge on the market and commercialized in the

U.S. And it became very apparent that without a design enhancement, that our program wasn't scalable and that LOTUS would ultimately remain as a niche device in a pretty expensive space to operate. So let me pull up there, Chris. Maybe that was – that's not it."

56.     On November 17, 2020, Boston Scientific shares declined from a closing price of November 16, 2020 of $38.03 per share, to close at $35.07 per share, a decline of $2.96 per share or approximately 8%, on heavier than usual volume.

57.     Analyst reports issued after the truth about the LOTUS Edge emerged confirmed the negative effect that Defendants' false and misleading statements, and the subsequent announcement that the LOTUS Edge would be recalled, had on Boston Scientific stock.

58.     For example, on November 17, 2020, BITG released an analyst report which discussed the Company's recall of the LOTUS Edge and the impact it would have on Boston Scientific stock (the "BITG Report"). The BITG Report states, in pertinent part, that "[T]his decision comes just a month after BSX expressed confidence in its dual-valve TAVR strategy at the Transcatheter Cardiovascular Therapeutics medical meeting . . . ."

59.     On the same day, Canaccord Genuity released its own analyst report regarding the Company's recall of the LOTUS Edge (the "Canaccord Report"). The Canaccord Report discusses the long term effects of the recall, stating in pertinent part, "Long term impacts – US TAVR gap until 2024: The immediate consequence of this decision is that Boston [Scientific] will no longer have a TAVR platform in the US until 2024E."

60.     Raymond James likewise released its own analyst report in reaction to the news that the Company decided to recall the LOTUS Edge (the "Raymond James Report"). The Raymond James Report discusses the impact the decision has on investors' confidence in the Company's management, stating that "The discontinuation of LOTUS is a credibility ding to management, which will weigh on the stock."

61.     Cowen and Company also released an analyst report on November 17, 2020, in reaction to Boston Scientific's decision to recall the LOTUS Edge (the "Cowen Report"). The Cowen Report focused on the impact the Company's decision had on its stock as well as the impact the decision will likely have on the Company's position in the TAVR market. The Cowen Report states, in pertinent part, that "BSX shares are down 9% following today's news that Lotus will be discontinued. The decline erases nearly $5B in market cap for a product that we expected to generate $150M in sales next year…" The Cowen Report also stated that "[T]he discontinuation of Lotus creates a near-term hole in BSX's U.S. TAVR initiatives."

62.     Another analyst report, released by Morgan Stanley on November 17, 2020, also focused on the impact Boston Scientific's decision is likely to have on its TAVR market share (the "Morgan Stanley Report"). The Morgan Stanley Report stated that "Edwards and Medtronic benefit equally from the recall… Medtronic takes ~2/3 of share while Edwards takes ~1/3 given the perception Lotus was a greater risk for Medtronic than Edwards."

63.     Finally, Piper Sandler released its own analyst report in reaction to the news that Boston Scientific would be recalling the LOTUS Edge (the "Piper Report"). The Piper Report discussed the surprise of the announcement as well as the impact it is likely to have on the TAVR market. The Piper Report states, in pertinent part, that:

> "The announcement no doubt comes as a big surprise as LOTUS was once billed as a primary growth driver for BSX's Interventional Cardiology business." The Piper Report also stated that "We suspect BSX will be able to recoup some of its Lotus Edge business with its Acurate Ne02 platform in Europe. However, we think this amount will likely be relatively small and with the lack of an alternative product in the U.S. likely until the 2024 timeframe – this creates a multi-year product gap for the company in the domestic TAVR market… We think both EW and MDT should benefit here."

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

64.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Boston Scientific, their control over, and/or receipt and/or modification of Boston Scientific's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Boston Scientific, participated in the fraudulent scheme alleged herein.

65.    Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

66.    Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were senior officers of Boston Scientific, issued statements and press releases on behalf of Boston Scientific and had the opportunity to commit the fraud alleged herein.

67.    Defendants were motivated to conceal the fraud alleged herein in order to inflate the price of Boston Scientific's shares, which harmed purchasers and others that transacted in Boston Scientific's shares at inflated prices following the Defendants' issuance of false and

misleading statements.  As the truth was revealed, the artificial inflation in the share price was removed.

68.     Additionally, during the Class Period Defendants Mahoney, Fitzgerald, and Brennan sold shares of Boston Scientific at artificially inflated prices for profits of over $9 million, $8 million and $1 million respectively.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

69.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Boston Scientific securities and operated as a fraud or deceit on Class Period purchasers of Boston Scientific securities.

70.     Later, however, when Defendants' prior misrepresentations were disclosed and became apparent to the market, the price of Boston Scientific's securities fell precipitously as the prior artificial inflation came out of Boston Scientific's share price.

71.     As a result of their transactions in Boston Scientific securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

72.     As a direct result of the public revelations regarding the truth about the condition of Boston Scientific's business and the negative adverse factors that had been impacting Boston Scientific's business during the Class Period, the price of Boston Scientific's securities materially declined.  This drop removed the inflation from Boston Scientific's share price, causing real economic loss to investors who transacted in Boston Scientific securities during the Class Period.

73.     The decline in the price of Boston Scientific securities was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the artificial inflation and the subsequent decline in the price of Boston

Scientific securities negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## IX.    FRAUD-ON-THE-MARKET DOCTRINE

74.    At all relevant times, the market for Boston Scientific's securities was an efficient market for the following reasons, among others:

(a)    The Company's common stock met the requirements for public listing and was listed and actively traded on the NYSE, a highly efficient market;

(b)    As a regulated issuer, the Company filed periodic public reports with the SEC; and

(c)    The Company regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

75.    As a result, the market for the Company's publicly traded securities promptly digested current information with respect to Boston Scientific from all publicly available sources and reflected such information in the price of the Company's securities.  Under these circumstances, all purchasers of the Company's publicly traded securities during the Class Period suffered similar injury through their purchase of the publicly traded securities of Boston Scientific at artificially inflated prices and a presumption of reliance applies.

## X.    NO SAFE HARBOR

76.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by Mahoney, Fitzgerald, and Brennan who knew that those statements were false when made.

## XI.   CLAIMS FOR RELIEF

<u>Count I</u>

**For Violation of Section 10(b) of the Exchange Act
And Rule 10b-5 Against All Defendants**

77.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

78.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

79.     Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Boston Scientific's publicly traded securities during the Class Period.

80.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Boston Scientific's publicly traded securities. Plaintiff and the Class would not have transacted in Boston Scientific's securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated and manipulated by Defendants' misleading statements.

81.      As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases and/or sales of Boston Scientific's securities during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

82.      Plaintiff repeats and re-alleges each and every allegation contained above as if full set forth herein.

83.      The Individual Defendants acted as controlling persons of Boston Scientific within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level position, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC or disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff alleges are false and misleading.  The Individual Defendants were provided with or had unlimited access

to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

84.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the representations giving rise to the securities violations as alleged herein, and exercised the same.

85.     As set forth above, Boston Scientific, and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Mahoney, Fitzgerald, and Brennan are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Boston Scientific's and the Individual Defendants wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases and/or sales of the Company's securities during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein;

B.     Awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and

C.     Awarding such equitable/injunctive relief as the Court may deem proper.

## XIII.  JURY DEMAND

Plaintiff demands a trial by jury.

Dated: December 16, 2020              By: * /s/ Jeffrey C. Block*
                                              Jeffrey C. Block (BBO #600747)
                                              **BLOCK & LEVITON LLP**
                                              260 Franklin Street, Suite 1860
                                              Boston, MA 02110
                                              Tel: (617) 398-5600
                                              Fax: (617) 507-6020
                                              Email: jeff@blockleviton.com

                                              **KAPLAN FOX & KILSHEIMER LLP**
                                              Jeffrey P. Campisi
                                              850 Third Avenue, 14th Floor
                                              New York, NY 10022
                                              Tel: (212) 687-1980
                                              Fax: (212) 687-7714
                                              Email: jcampisi@kaplanfox.com

                                              *Counsel for Plaintiff Mariano Errichiello*