UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re BOSTON SCIENTIFIC CORPORATION : 
SECURITIES LITIGATION                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x      Master File No.: No. 1:20-cv-12225-DPW
                                                             :
This Document Relates To:                        **LEAVE TO FILE 35 PAGES**
                                                             :    **GRANTED ON JULY 14, 2021**
          ALL ACTIONS
                                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT**

Dated:  July 19, 2021                          James R. Carroll
                                                             Alisha Q. Nanda
                                                             Yaw A. Anim
                                                             SKADDEN, ARPS, SLATE,
                                                                 MEAGHER & FLOM LLP
                                                             500 Boylston Street
                                                             Boston, Massachusetts 02116
                                                             (617) 573-4800

                                                             *Counsel for Defendants*
                                                             *Boston Scientific Corporation,*
                                                             *Michael F. Mahoney, Joseph M. Fitzgerald,*
                                                             *Daniel J. Brennan, Shawn McCarthy,*
                                                             *Ian Meredith, Kevin Ballinger and*
                                                             *Susan Vissers Lisa*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...........................................................................................................6

    A.     Boston Scientific Applied For And Obtained FDA Pre-Market
          Approval For Lotus, Which Imposed Numerous Regulatory Duties .....................6

    B.     Boston Scientific Expressed Tempered
          Optimism Following The April 2019 Launch Of Lotus ........................................8

    C.     On November 17, 2020, Boston Scientific
          Announced The Withdrawal Of Lotus From The Market .....................................8

ARGUMENT..................................................................................................................9

I.     THE COMPLAINT SHOULD BE DISMISSED IN ITS
      ENTIRETY BECAUSE IT DOES NOT ALLEGE SPECIFIC
      FACTS SUPPORTING A "STRONG INFERENCE" OF SCIENTER...........................10

    A.     The Allegations Attributed to "Former Employees" Are Vague And
          Conclusory, And Do Not Give Rise To A Strong Inference Of Scienter .............11

         1.     Statements About Allegedly Stagnant Lotus Sales Are Insufficient ........13

         2.     Statements About The Alleged
              Complexity Of Lotus Are Insufficient......................................................16

         3.     Statements About Manufacturing Problems Are Insufficient....................18

    B.     Plaintiff's "Additional Allegations Of Scienter" Are Insufficient.........................19

         1.     Plaintiff's Allegations Concerning Defendants' "Status Based"
              Access To Information Fail To Give Rise To A Strong Inference
              Of Scienter .................................................................................................19

         2.     Plaintiff's Allegations Of Insider Stock Sales
              Do Not Give Rise to A Strong Inference Of Scienter...............................22

              (a)     Mr. Mahoney's Sales Do Not
                     Support A Strong Inference Of Scienter.......................................23

              (b)     Sales By Other Executives
                     Do Not Support A Strong Inference Of Scienter ..........................25

          3.     Plaintiff's Remaining Allegations Of Motive And
              Opportunity Also Fail To Support A Strong Inference Of Scienter .........26

        4.    A Nonculpable Inference
              Under *Tellabs* Is More Compelling Than Scienter ...................................27

II.    THE COMPLAINT SHOULD BE
       DISMISSED IN ITS ENTIRETY BECAUSE IT DOES
       NOT ALLEGE AN ACTIONABLE MISSTATEMENT OR OMISSION.......................28

       A.    Truthful Statements Are Not Actionable ................................................28

       B.    Statements Of Corporate Optimism Are Not Actionable .....................29

       C.    Statements Of Opinion Are Not Actionable ..........................................30

       D.    Forward-Looking Statements Are Protected Under The PSLRA..........31

       E.    Statements About Financial Results Are Not Actionable......................33

       F.    There Was No Duty To Disclose Additional Information About Lotus................34

CONCLUSION.................................................................................................................35

**TABLE OF AUTHORITIES**

<u>CASES</u>                                                                                          <u>PAGE(S)</u>

*ACA Financial Guaranty Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008) ..................................................................................9, 10

*In re Analogic Corp. Shareholder Litigation*,
    No. 18-cv-11301-ADB, 2019 WL 4804800 (D. Mass. Sept. 30, 2019) ...........................31

*In re Ariad Pharmaceuticals, Inc. Securities Litigation*,
    842 F.3d 744 (1st Cir. 2016) ..................................................................................11

*Battle Construction Co. v. InVivo Therapeutics Holdings Corp.*,
    101 F. Supp. 3d 135 (D. Mass. 2015), *aff'd sub nom. Ganem v. InVivo
    Therapeutics Holdings Corp.*, 845 F.3d 447 (1st Cir. 2017) ............................................27

*In re Biogen Inc. Securities Litigation*,
    193 F. Supp. 3d 5 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017) ...........................10

*In re Biogen Inc. Securities Litigation*,
    857 F.3d 34 (1st Cir. 2017) ...................................................................................13

*In re Boston Scientific Corp. Securities Litigation*,
    No. 10-10593-DPW, 2011 WL 4381889 (D. Mass. Sept. 19, 2011),
    *aff'd*, 686 F.3d 21 (1st Cir. 2012)...........................................................................29

*In re Boston Scientific Corp. Securities Litigation*,
    686 F.3d 21 (1st Cir. 2012)....................................................................................11

*In re Boston Technology, Inc. Securities Litigation*,
    8 F. Supp. 2d 43 (D. Mass. 1998) .......................................................................28, 30

*Carney v. Cambridge Technology Partners, Inc.*,
    135 F. Supp. 2d 235 (D. Mass. 2001) ........................................................................20

*Corban v. Sarepta Therapeutics, Inc.*,
    No. 14-cv-10201-IT, 2015 WL 1505693 (D. Mass. Mar. 31, 2015), *aff'd*, 868 F.3d
    31 (1st Cir. 2017) ................................................................................................31

*Coyne v. Metabolix, Inc.*,
    943 F. Supp. 2d 259 (D. Mass. 2013) ........................................................................33

*Cozzarelli v. Inspire Pharmaceuticals Inc.*,
    549 F.3d 618 (4th Cir. 2008) ..................................................................................27

*In re Cytyc Corp.*,
No. CIV.A. 02-12399-NMG, 2005 WL 3801468 (D. Mass. Mar. 2, 2005) .....................30

*Erste-Sparinvest Kapitalanlagegesellschaft MBH v. Seres Therapeutics, Inc.*,
No. CV 16-11943, 2018 WL 1567614 (D. Mass. Mar. 30, 2018) ....................................30

*Fire & Police Pension Association v. Abiomed, Inc.*,
778 F.3d 228 (1st Cir. 2015) ..........................................................................13, 22, 24, 26

*Glassman v. Computervision Corp.*,
90 F.3d 617 (1st Cir. 1996) ..........................................................................................30

*Greebel v. FTP Software, Inc.*,
194 F.3d 185 (1st Cir. 1999) .....................................................................................25, 28

*Harrington v. Tetraphase Pharmaceuticals Inc.*,
No. 16-10133-LTS, 2017 WL 1946305 (D. Mass. May 9, 2017) .....................................17

*Hensley v. Imprivata*,
260 F. Supp. 3d 101 (D. Mass. 2017) ............................................................................35

*Hill v. Gozani*,
638 F.3d 40 (1st Cir. 2011) ..........................................................................................32

*In re iRobot Corp. Securities Litigation*,
No. 19-cv-12536, 2021 WL 950675 (D. Mass. Mar. 12, 2021) .................................13, 20

*Kader v. Sarepta Therapeutics, Inc.*,
No. 14-cv-14318-ADB, 2016 WL 1337256 (D. Mass. Apr. 5, 2016),
*aff'd*, 887 F.3d 48 (1st Cir. 2018) ..................................................................................27

*Leavitt v. Alnylam Pharmaceuticals, Inc.*,
451 F. Supp. 3d 176 (D. Mass. 2020) ............................................................................23

*Leavitt v. Alnylam Pharmaceuticals, Inc.*,
No. CV 18-12433-NMG, 2021 WL 965052 (D. Mass. Mar. 12, 2021) ...........................22

*Lirette v. Shiva Corp.*,
27 F. Supp. 2d 268 (D. Mass. 1998) ..............................................................................20

*Liu v. Intercept Pharmaceuticals, Inc.*,
No. 17-cv-7371, 2020 WL 5441345 (S.D.N.Y. Sept. 9, 2020) ........................................16

*Local No. 8 IBEW Retirement Plan v. Vertex Pharmaceuticals Inc.*,
140 F. Supp. 3d 120 (D. Mass. 2015), *aff'd*, 838 F.3d 76 (1st Cir. 2016) ...................10, 11

*LSI Design & Integration Corp. v. Tesaro, Inc.*,
No. 18-cv-12352-LTS, 2019 WL 5967994 (D. Mass. Nov. 13, 2019)..............................10

iv

*Luna v. Carbonite, Inc.*,
No. 19-CV-11662-LTS, 2020 WL 6205786 (D. Mass. Oct. 22, 2020) .................23, 24, 26

*Mahoney v. Foundation Medicine, Inc.*,
342 F. Supp. 3d 206 (D. Mass. 2018) ...................................................................................11

*Maldonado v. Dominguez*,
137 F.3d 1 (1st Cir. 1998) ....................................................................................................20

*Metzler Asset Management GMBH v. Kingsley*,
305 F. Supp. 3d 181 (D. Mass. 2018), *aff'd*, 928 F.3d 151 (1st Cir. 2019) .......................17

*Metzler Asset Management GmbH v. Kingsley*,
928 F.3d 151 (1st Cir. 2019) ..................................................................................................9

*In re Montreal, Maine & Atlantic Railway, Ltd.*,
888 F.3d 1 (1st Cir. 2018) ..................................................................................................6, 23

*New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
537 F.3d 35 (1st Cir. 2008) ...........................................................................................11, 12

*In re Parametric Technology Corp. Securities Litigation*,
300 F. Supp. 2d. 206 (D. Mass. 2001) .................................................................................30

*Pension Trust v. J.Jill, Inc.*,
360 F. Supp. 3d 17 (D. Mass. 2018) ....................................................................................31

*Philco Investments, Ltd. v. Martin*,
No. C 10-02785 CRB, 2011 WL 4595247 (N.D. Cal. Oct. 4, 2011)................................16

*In re Praecis Pharmaceuticals Inc. Securities Litigation*,
No. 04-12581-GAO, 2007 WL 951695 (D. Mass. Mar. 28, 2007) ....................................33

*Shaw v. Digital Equipment Corp.*,
82 F.3d 1194 (1st Cir. 1996)................................................................................................29

*Shemian v. Research in Motion Ltd.*,
No. 11 Civ. 4068, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F.
App'x 32 (2d Cir. 2014) ......................................................................................................14

*Simon v. Abiomed, Inc.*,
37 F. Supp. 3d 499 (D. Mass. 2014), *aff'd sub nom. Fire & Police Pension
Association v. Abiomed, Inc*, 778 F.3d 228 (1st Cir. 2015) ............................11, 22, 23, 26

*Sousa v. Sonus Networks, Inc.*,
261 F. Supp. 3d 112 (D. Mass. 2017) ..................................................................................20

*Tabak v. Canadian Solar Inc.*,
    549 F. App'x 24 (2d Cir. 2013) ..............................................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................................5

*In re The First Marblehead Corp. Securities Litigation*,
    639 F. Supp. 2d 145 (D. Mass. 2009) ....................................................................35

*Wasson v. LogMeIn, Inc.*,
    496 F. Supp. 3d 612 (D. Mass. 2020) .....................................................................27

*Watterson v. Page*,
    987 F.2d 1 (1st Cir. 1993)...................................................................................6, 23

*Whitehead v. Inotek Pharmaceuticals Corp.*,
    No. 17-cv-10025, 2018 WL 4732774 (D. Mass. Jun. 27, 2018) ...........................10

## STATUTES, RULES & REGULATIONS

15 U.S.C. § 78t.......................................................................................................................10

15 U.S.C. § 78u-4 ......................................................................................................10, 13, 28

15 U.S.C. § 78u-5 ......................................................................................................31, 32, 33

Fed. R. Civ. P. 9(b) ........................................................................................................9, 10, 21

Fed. R. Civ. P. 12(b)(6)...............................................................................................................4

17 C.F.R. § 240.10b5 ..................................................................................................................4

17 C.F.R. § 240.10b5-1.............................................................................................................25

21 C.F.R. § 803.50.......................................................................................................................2

21 C.F.R. § 803.52.......................................................................................................................2

**PRELIMINARY STATEMENT**

On April 24, 2019, Boston Scientific Corporation ("Boston Scientific" or the "Company") announced the launch of Lotus Edge ("Lotus"), a transcatheter heart valve that, unlike those of its well-established market rivals, was fully repositionable within the blood vessel prior to final deployment. It was an innovative but complex device with potential for great market success. However, after months of enormous effort to penetrate the highly competitive heart valve market, on November 17, 2020, the Company announced that it would no longer sell Lotus, having concluded that it could not and would not develop into a commercially successful product. No one in Company leadership, including the seven individual defendants, ever promised that it would succeed commercially, none ever profited from stock sales based on any such representations, and Plaintiff has made no specific allegations of fact to the contrary. Yet despite that, Plaintiff demands that this Court allow it to move forward on claims that require it to plead *specific* facts showing scienter and showing that the complained-of statements were false and misleading *when they were made,* but *no such facts appear in the Complaint*.[1] The Court should reject this effort and dismiss this action in its entirety.

Boston Scientific is a global developer, manufacturer and marketer of medical devices that are used in a broad range of interventional medical specialties, including Lotus, a transcatheter aortic valve replacement ("TAVR") device that is delivered via a minimally-invasive procedure and that was approved by the Food and Drug Administration ("FDA") for patients who suffer from a form of heart disease called aortic stenosis. (AC ¶ 2; Tab 4 (2018 Form 10-K at 3.) The publicly-available, FDA-approved label for Lotus provides that Lotus is indicated for use in patients with "symptomatic heart disease due to severe native calcific aortic

---

[1]      "AC" and "Complaint" refer to the Amended Consolidated Complaint, ECF No. 44.

stenosis . . . who are judged by a heart team, including a cardiac surgeon, to be at high or greater risk for open surgical therapy."[2]  It is an unfortunate reality that patients who require TAVR intervention are severely ill and susceptible to serious adverse health events when undergoing TAVR procedures, including death.  Accordingly, the FDA heavily regulates TAVR devices like Lotus and requires manufacturers to report information about adverse events involving patients who use their devices.[3]  Those reports are publicly available on the FDA's Manufacturer and User Facility Device Experience ("MAUDE") database.[4]

At the time of its launch, Boston Scientific was optimistic about Lotus's prospects for success in the market and its potential to improve patient outcomes, particularly in light of its capacity to be fully repositioned during procedures, a feature that the Company believed would appeal to doctors and differentiate its product in the market.  Ultimately, Lotus did not turn out to be the success that Boston Scientific hoped it would be.  On November 17, 2020, it announced that it had determined to voluntarily recall all unused Lotus inventory and to shut down the Lotus platform, citing the complexity of the Lotus delivery system and associated clinical support challenges, the additional work and expense that would be needed to improve the delivery system, and challenges with the device's manufacturing process.  (Tab 42 (11/17/20 Special Call at 4-5).)  At the close of trading on the day of the disclosure, Boston Scientific's stock price dropped by approximately 8%, from $38.03 per share to $35.03 per share.  (AC ¶ 192.)  As night follows day, a putative class action lawsuit was filed shortly thereafter against Boston Scientific,

---

[2]     *Available* at https://www.accessdata.fda.gov/cdrh_docs/pdf18/P180029C.pdf (listing nearly 40 potential adverse events potentially associated with use of Lotus, including cardiac arrest, respiratory failure and death).

[3]     *See* 21 C.F.R. §§ 803.50, 803.52.

[4]     *Available at* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm.

as well as Michael Mahoney (the Company's CEO), Daniel Brennan (the Company's CFO) and Joseph Fitzgerald (the head of the Company's Interventional Cardiology business), alleging that each of them committed securities fraud in connection with the Lotus launch.[5]

Seizing on Boston Scientific's business decision to discontinue the Lotus product, Plaintiff alleges that Boston Scientific's earlier-in-time optimistic statements about Lotus and the state of the commercial launch *must have been* knowingly false when made because Defendants did not disclose that Lotus sales "struggled from the start," that the launch was "clinically unsafe," that the device was difficult to use, and that the Company was never able to get the manufacturing process to an acceptable commercial production state.  (AC ¶¶ 8-11.) Notwithstanding the prolix nature of the Complaint—due to page after page of rote quotation from dozens of Boston Scientific's many conference calls and SEC filings (*see, e.g.*, *id.* ¶¶ 226-320)—it fails in multiple respects to meet the statutorily heightened pleading requirements for a securities fraud suit.  When those dozens of statements are read in context, Plaintiff's claim of fraud is exposed as nothing more than impermissible "fraud by hindsight."

Plaintiff has not alleged (and, indeed, could not allege) that Boston Scientific concealed any required information from the FDA concerning the design or manufacturing of Lotus or patient outcomes.  And, critically, the purportedly undisclosed risks concerning Lotus were indeed disclosed to investors, repeatedly.  In particular, the Company cautioned investors that "**[t]here can be no assurance that . . . we will be able to . . . gain market share or compete effectively on the basis of price or that the number of procedures in which our**

---

[5]    The Amended Complaint adds Kevin Ballinger (former head of Interventional Cardiology), Shawn McCarthy (former general manager of Structural Heart Valves, a sub-unit of Interventional Cardiology), Ian Meredith (Chief Medical Officer) and Susan Vissers Lisa (former Vice President of Investor Relations) (together with Messrs. Mahoney, Brennan and Fitzgerald, the "Individuals").

**products are used will increase above existing levels**," that "**[t]here can be no assurance that any products now in development . . . will achieve technological feasibility . . . or gain market acceptance**," and that "**[f]ailure to meet growth projections [and] poor clinical outcomes**" could adversely impact the Company's operations. (Tab 4 (2018 Form 10-K at 19, 25).) Moreover, much of what Plaintiff complains of—for example, an unsuccessful commercial production manufacturing process—is inherently unknowable until a new product has been up and running for some time and must be produced in commercial quantities.

Accordingly, Plaintiff's claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78a et seq.) and Rule 10b-5 (17 C.F.R. § 2401.10b-5) are fatally deficient and, pursuant to Rule 12(b)(6), should be dismissed with prejudice for the following independently-dispositive reasons:

*First*, Plaintiff fails to plead particularized facts demonstrating a "strong inference" of scienter. (*Infra* Section I.) The Complaint relies principally on statements attributed to nine "Former Employees," but none are alleged to have even spoken with or had any access to the Individuals, much less be able to substantiate any plausible inference of scienter. Their "facts" are replete with conclusory statements and lack the specificity that the First Circuit requires for allegations attributed to confidential witnesses to be sufficient under the PSLRA. For example, one Former Employee alleges that Defendants made false and misleading statements about Lotus based on a *pre-Class Period* market survey showing that Lotus could expect to penetrate 5-10% of the market in the New York/New Jersey region. (AC ¶¶ 104-05.) But the Complaint alleges no specific facts that come close to tying knowledge of those limited, pre-Class Period results to any Individual. Another Former Employee alleges that the Company was intently focused on remedying a malfunction of the Lotus device "termed internally" as

"Twisted Post" (*id.* ¶¶ 108-10), but those allegations lack factual specificity and, further, ignore that the Company informed the FDA of adverse patient outcomes, including those related to Twisted Post, and those reports are *publicly available* on the MAUDE database.  And while Plaintiff makes conclusory allegations that the Company decided to shut Lotus down by no later than March 2020 based on the statements of a number of these Former Employees (*id.* ¶¶ 160, 212), the Complaint contains no particularized allegations that *any* Individual or member of the Company's senior management had decided to terminate Lotus by that time.

Plaintiff's "Additional Allegations of Scienter" do not fill the gap.  They rely on the same flawed confidential witness allegations and other allegations that courts routinely dismiss as insufficient.  For example, Plaintiff asks this Court to infer scienter from allegations that the Individuals were intently focused on Lotus and must have known that their statements were wrong due to their positions within the Company and access to unspecified internal data. But those conclusory allegations—without more—do not support a strong inference of scienter. Further, the public record refutes Plaintiff's characterization of Messrs. Mahoney's, Brennan's, Fitzgerald's and Ballinger's stock sales between February 6, 2019 and November 16, 2020 (the "Class Period") as "suspicious":  the vast majority were executed pursuant to Rule 10b5-1 trading plans, Mr. Mahoney's plan was not "unusual," and the facts and circumstances of each sale show that none were at all suspicious.  Indeed, the Complaint's allegations are bereft of a cogent and compelling inference of fraudulent intent, as required by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  To the contrary, the Complaint best supports the inference that Boston Scientific launched a new product offering, eventually determined that the business case for continuing to market the product no longer made sense, and withdrew it from the market after working hard to improve it.  The Complaint's criticisms reflect nothing more

than hindsight-inspired second guessing of management's business judgments.

*Second*, Plaintiff does not adequately plead any actionable misstatement or omission.  (*Infra* Section II.)  The Complaint identifies seventy-five statements plucked from earnings call and investor conference transcripts that allegedly misled investors, but when reviewed in context, it is clear that none are actionable.  The vast majority are non-actionable statements of corporate optimism or opinion, and numerous others are not even alleged to be false.  Many are also protected by the PSLRA safe harbor as they are forward-looking statements accompanied by meaningful cautionary language.  Indeed, Boston Scientific repeatedly warned investors throughout the Class Period of the very risks that ultimately materialized:  namely, that Lotus might not ever "achieve technological feasibility" or "gain market acceptance."  Accordingly, the Complaint should be dismissed in its entirety, with prejudice.

## BACKGROUND

### A.    Boston Scientific Applied For And Obtained FDA Pre-Market Approval For Lotus, Which Imposed Numerous Regulatory Duties

On August 8, 2018, Boston Scientific publicly announced that it had submitted its premarket approval ("PMA") application for Lotus to the FDA.[6]  (AC ¶¶ 41, 80.)  On April 23, 2019, the FDA approved Boston Scientific's application.  (Tab 6 (PMA Approval Letter).)[7]  As

---

[6]    Per the FDA's website, "[p]remarket approval (PMA) is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices."  Class III medical devices are devices that "support or sustain human life, are of substantial importance in preventing impairment of human health, or which present a potential, unreasonable risk of illness or injury."  Before going to market, Class III medical devices, like Lotus, must obtain PMA, which "is the most stringent type of device marketing application required by the FDA."  *See* https://www.fda.gov/medical-devices/premarket-submissions/premarket-approval-pma.

[7]    The facts set forth herein are primarily drawn from the allegations of the Complaint, as well as to other materials which the Court may properly consider on this motion.  *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) (on a 12(b)(6) motion courts may consider "documents the authenticity of which are not disputed by the parties; … documents central to plaintiffs' claim; . . . [and] documents sufficiently referred to in the complaint"); *accord In re Montreal, Maine & Atlantic Railway, Ltd.*, 888 F.3d 1, 7 n.2 (1st Cir. 2018) (on motion to dismiss, considering agreement not attached to complaint where complaint repeatedly referenced it).

an approved device, Lotus was heavily regulated by the FDA.[8]  The Complaint has not (and cannot) allege that Boston Scientific did not comply with the FDA's rigorous requirements designed to monitor the safety of the Lotus device, thus undercutting Plaintiff's complaints that Lotus's launch was "clinically unsafe."

The FDA-approved label for Lotus includes extensive information about the device, including nearly 40 potential adverse events associated with use of the device, such as cardiac arrest, respiratory failure, and death.  (Tab 9 (Lotus Label at 2-3).)  Patients in need of treatment with devices like Lotus are severely ill, and while the potential occurrence of these types of adverse events is certainly unfortunate, it is not at all surprising and was disclosed to the FDA and to the public.  The Complaint cannot credibly allege that such risks were undisclosed.

The FDA also issued a "Summary of Safety and Effectiveness Data" for Lotus, which noted that Boston Scientific's "manufacturing facilities have been inspected and found to be in compliance with the device Quality System (QS) regulation (21 CFR 820)."  (Tab 7 at 43.)[9] The Complaint has not (and cannot) allege that the FDA ever found Boston Scientific to be out of compliance.  The FDA was aware of, and approved of, the Lotus manufacturing process, thus undercutting Plaintiff's complaints about the same.

---

[8]     In particular, the FDA required Boston Scientific to submit annual reports regarding ongoing clinical investigations involving Lotus, reports regarding developments with patients who participated in Lotus premarket clinical trials, and Medical Device Reports ("MDRs") upon becoming aware of information suggesting that Lotus may have been associated with an adverse health event.  (Tab 6 (PMA Approval Letter at 2-4.)  MDRs are publicly available through the FDA's MAUDE database.  (AC ¶ 116.)

[9]     *Also available* at https://www.accessdata.fda.gov/cdrh_docs/pdf18/P180029B.pdf.  Medical device manufacturers like Boston Scientific "who intend to commercially distribute medical devices" are required to follow the QS regulation, which identifies the "essential elements that a quality system shall embody."  *See* https://www.fda.gov/medical-devices/postmarket-requirements-devices/quality-system-qs-regulationmedical-device-good-manufacturing-practices.

7

**B.    Boston Scientific Expressed Tempered**
**Optimism Following The April 2019 Launch Of Lotus**

On April 23, 2019, Boston Scientific publicly announced the FDA's premarket

approval of Lotus.  (AC ¶ 86; Tab 5 (4/23/19 Press Release).)  The next day, the Company

announced a controlled launch of Lotus in the United States.  (AC ¶ 87; Tab 8 (4/24/19 Earnings

Call at 7).)  In the press release, the Company noted that "[t]his technology is a fundamental

component of our expanding portfolio and demonstrates our continuing commitment to category

leadership within the fast-growing Structural Heart treatment landscape."  (Tab 5 (4/23/19 Press

Release).)  The press release further stated that the "LOTUS Edge valve system is the only FDA-

approved aortic valve that gives physicians the option to reposition and completely recapture the

valve once it has been fully deployed," which gives "physicians a high level of control over the

delivery of and deployment of the device."  (AC ¶ 86; Tab 5 (4/23/19 Press Release).)

At subsequent earnings calls and investor conferences, Boston Scientific made

additional optimistic statements about the roll-out of Lotus, while also acknowledging potential

hurdles to success.  For example:

- At an August 8, 2019 investor conference, Ms. Lisa stated that "[w]e're really excited, early days with LOTUS," and also noted that "we have essentially 0% market in the U.S." but that she believed that there was "still a very healthy market to us."  (Tab 13 (8/8/19 Canaccord Conf. Tr. at 11-12).)

- At the September 27, 2019 Transcatheter Cardiovascular Therapeutics conference, Dr. Meredith noted that "even though there was a higher pacemaker rate" with Lotus Edge, that "an economic study show[ed] that the costs associated with LOTUS were significantly less" than those associated with a competing product. (Tab 15 (9/27/19 TCT Conf. Tr. at 8).)

**C.    On November 17, 2020, Boston Scientific**
**Announced The Withdrawal Of Lotus From The Market**

On November 17, 2020, Boston Scientific issued a press release announcing that

it had initiated a global, voluntary recall of all unused Lotus devices and had decided to retire the

8

Lotus product platform.  (AC ¶ 181; Tab 43 (11/17/20 Press Release).)  The press release noted

that "[w]hile we have been pleased with the benefits the LOTUS Edge valve has provided to

patients . . . [t]he complexity of the delivery system, manufacturing challenges, the continued

need for further technical enhancements, and current market adoption rates led us to the difficult

decision to stop investing in the Lotus Edge platform."  (Tab 43 (11/17/20 Press Release).)

The Company held a special conference call that day on which Mr. Mahoney

noted that "[t]he LOTUS Chapter ha[d] been a difficult one for the company" and that the

decision to recall and retire Lotus was arrived at "[a]fter much analysis and careful

consideration."  (AC ¶ 182; Tab 42 (11/17/20 Special Call at 5, 8).)  Mr. Fitzgerald explained

that "the manufacturing challenges, the clinical support challenges, the repeatability, the

scalability [and] the overall COGS profile" factored into the decision and that "it was the proper

thing for us to do to really be our own worst critics after the first full year of having LOTUS

Edge on the market and commercialized in the U.S.  And it became very apparent that without a

design enhancement, that our program wasn't scalable and that LOTUS would ultimately remain

as a niche device in a pretty expensive space to operate."  (Tab 42 (11/17/20 Special Call at 13).)

That day, Boston Scientific's stock dropped by approximately 8% from the prior

day's close.  (AC ¶ 192.)  This putative securities fraud class action was filed shortly thereafter.

## ARGUMENT

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5(b),

Plaintiff must plead:  (i) a material misrepresentation or omission; (ii) scienter; (iii) a connection

with the purchase or sale of a security; (iv) reliance; (v) economic loss; and (vi) loss causation.

*Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 158 (1st Cir. 2019); *see also ACA Fin.*

*Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008).  Securities fraud pleadings are also

subject to the rigorous requirements of Rule 9(b) and the PSLRA.  Rule 9(b) requires that the

9

circumstances constituting the fraud be stated "with particularity." Fed. R. Civ. P. 9(b). Under the PSLRA, Plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). Plaintiff must also allege specific facts giving rise to a "strong inference" of scienter. *Id.* § 78u-4(b)(2)(A). Plaintiff has failed to do so. This failure to plead a primary violation of Section 10(b) requires dismissal of the Section 20(a) claim. *Id.* § 78t(a); *Local No. 8 IBEW Ret. Plan v. Vertex Pharm. Inc.*, 140 F. Supp. 3d 120, 137 (D. Mass. 2015), *aff'd*, 838 F.3d 76 (1st Cir. 2016).

## I.   THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY BECAUSE IT DOES NOT ALLEGE SPECIFIC FACTS SUPPORTING A "STRONG INFERENCE" OF SCIENTER

Scienter is a "conscious intent to defraud," or, at a minimum, "a high degree of recklessness." *ACA Fin.*, 512 F.3d at 58 (citation omitted). Recklessness means a "highly unreasonable omission, involving not merely simple, or even inexcusable[ ] negligence but an extreme departure from the standards of ordinary care." *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 44 (D. Mass. 2016) (alteration in original) (citation omitted), *aff'd*, 857 F.3d 34 (1st Cir. 2017). To plead scienter, Plaintiff must "with respect to each act or omission . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). "To qualify as 'strong,' 'an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *LSI Design & Integration Corp. v. Tesaro, Inc.*, No. 18-cv-12352-LTS, 2019 WL 5967994, at *3 (D. Mass. Nov. 13, 2019). Courts "must weigh not only inferences urged by the plaintiff but also competing inferences rationally drawn from the facts alleged." *Whitehead v. Inotek Pharm. Corp.*, No. 17-cv-10025, 2018 WL 4732774, at *3 (D. Mass. Jun. 27, 2018) (citation omitted).

10

Complaints satisfying the pleading standard for scienter frequently include "clear allegations, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendants were aware that they were withholding vital information." *Mahoney v. Found. Med., Inc.*, 342 F. Supp. 3d 206, 213 (D. Mass. 2018) (citation omitted); *see also In re Boston Sci. Corp. Sec. Litig.*, 686 F.3d 21, 31 (1st Cir. 2012). Such knowledge must be alleged to have been had *contemporaneously* with the allegedly false statements; *after-acquired* awareness and allegations of fraud by hindsight do not suffice. *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 751-52 (1st Cir. 2016).

Here, the Complaint "contains no specific allegations . . . that any defendant actually *knew* that the statements were false." *Vertex*, 140 F. Supp. 3d at 132-33. Instead, Plaintiff "assert[s] an entirely circumstantial case, essentially alleging that [Defendants] must have known" that their statements regarding Lotus were wrong. *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 522 (D. Mass. 2014) (dismissing complaint), *aff'd sub nom. Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015). There are *no* facts supporting *any inference* (much less a strong inference) of scienter as to any Defendant.

**A.    The Allegations Attributed to "Former Employees" Are Vague And Conclusory, And Do Not Give Rise To A Strong Inference Of Scienter**

In the First Circuit, "there must be a hard look at [confidential witness] allegations to evaluate their worth." *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 51 (1st Cir. 2008). This "hard look" requires such allegations to comply with the heightened pleading requirements of the PSLRA, and a court to "evaluate . . . factors such as 'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations . . . and similar indicia.'" *Vertex*, 130 F. Supp. 3d at 127 n.5 (quoting *N.J. Carpenters*, 537 F.3d at 51).

11

Plaintiff's confidential witness allegations originate from nine low-level, non-management former employees (*see* AC ¶¶ 104-47) who are not described with sufficient particularity to "support the probability that a person in the position occupied by the source would possess the information alleged." *N.J. Carpenters*, 537 F.3d at 51.

| | Title | Alleged Responsibilities And Location | Employed | Reported To |
|---|---|---|---|---|
| CW 1 | Principal Therapy Consultant, Structural Heart Division | Conducted market research out of and focused on New York/New Jersey area | 2000 to 01/2021 | *No reporting line alleged at all, let alone to any Individual* |
| CW 2 | Principal Clinical Field Manager, Structural Heart Division | *No responsibilities nor location alleged* | 01/2017 to 01/2021 | *No reporting line alleged at all, let alone to any Individual* |
| CW 3 | Therapy Consultant, Structural Heart Division | Lotus market development and customer education / training out of and focused on San Diego | 02/2017 to 01/2021 | *No reporting line alleged at all, let alone to any Individual* |
| CW 4 | Interventional Cardiology Territory Manager | Vaguely alleged to be responsible for "Lotus sales"; *location not alleged* | 01/2016 to 01/2021 | *No reporting line alleged at all, let alone to any Individual* |
| CW 5 | Salesperson | Vaguely alleged to be responsible for "selling Lotus Edge" in Southern Germany (*i.e.*, not even in the United States, the location of the relevant product launch) | 2017 to 10/2020 | *No reporting line alleged at all, let alone to any Individual* |
| CW 6 | Principal Human Factors Engineer | Development of next-generation TAVR device; *location not alleged* | 02/2019 to 04/2020 | *No reporting line alleged at all, let alone to any Individual* |
| CW 7 | Senior Financial Analyst | Projected sales commissions for North American sales staff; *location not alleged* | 01/2019 to 08/2020 | *No reporting line alleged at all, let alone to any Individual* |
| CW 8 | Financial Analyst | *No responsibilities nor location alleged* | 01/2019 to 08/2020 | *No reporting line alleged at all, let alone to any Individual* |
| CW 9 | Manufacturing Engineer | *No responsibilities nor location alleged* | 2018 to 03/2020 | *No reporting line alleged at all, let alone to any Individual* |

None of the Former Employees is alleged to have directly reported to any of the Individuals (or even to have reported to anyone who themselves reported to an Individual), none "were in senior management positions, and they appear to have had relatively little [or no] ongoing contact with senior management." *Abiomed, Inc.*, 778 F.3d at 245 (rejecting reliability of confidential witnesses who were not described with sufficient particularity); *see also In re iRobot Corp. Securities Litig.*, No. 19-cv-12536, 2021 WL 950675, at *10 (D. Mass. Mar. 12, 2021) (fact that confidential witnesses had little or no ongoing contact with defendant's senior management "undercut[] the Plaintiffs' reliance upon them in the pleadings, particularly when the PSLRA requires that confidential witnesses allege 'with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind'") (quoting 15 U.S.C. § 78u-4(b)(2)(A)).  In short, the allegations by the nine confidential witnesses lack the "specific descriptions of the precise means through which [the defendants' alleged fraud] occurred," *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 43 (1st Cir. 2017) (alteration in original) (citation omitted). The First Circuit's mandated "hard look" demonstrates that the allegations attributed to the nine confidential witnesses are conclusory, vague and "so lacking in connecting detail" to any challenged statement that they do not give rise to a strong inference of scienter. *Id.* at 42.

### 1.    <u>Statements About Allegedly Stagnant Lotus Sales Are Insufficient</u>

The allegations attributed to CW 1, CW 2, CW 7 and CW 9 regarding Lotus's sales (AC ¶¶ 104-06, 132-34, 136-37, 147, 204, 206, 252, 259, 268, 273, 285) are not pled with specificity and are otherwise lacking in connecting detail to any challenged statement.  CW 1 alleges that market surveys conducted in 2017 and 2018 showed that Lotus could achieve at most a 5-10% market share.  (*Id.* ¶¶ 104-05.)  But there are no allegations that any of the Individuals was even aware of those survey results—*which pre-date the start of the Class Period in February 2019*—or when those results were communicated to them.  CW 1 and CW 2 also

allege that Boston Scientific sales representatives consistently missed their targets and that the Individuals were aware of that fact because (i) they had access to a "dashboard" that reflected those figures and which Messrs. McCarthy, Ballinger and Meredith discussed at quarterly company-wide sales meetings, and (ii) those Defendants attended an "emergency" meeting over Thanksgiving 2019 at which those issues were discussed. (*Id.* ¶¶ 134, 137.) As to the sales "dashboard," there are no allegations about *what* sales data it included or *whether* and *when* any Individual actually accessed it. Similarly, regarding the meetings at which such data was allegedly discussed, Plaintiff fails to allege *what* was said, *when* such statements were made, or *whether* these alleged discussions occurred before any challenged statements were made. As to the "emergency" Thanksgiving meeting, the Complaint makes no specific allegations regarding *what* any Defendant said or did during that meeting—only that "sales representatives were provided additional retraining" and that "poor sales results for Lotus" were "addressed" by unidentified individuals (*id.* ¶ 137)—and so does not support any suggestion that the information discussed at the meeting was at all contrary to that shared with investors.[10] CW 1 and CW 2 also allege that Boston Scientific was "desperately pushing sales by providing discounts" at the end of 2019 (*id.* ¶¶ 147, 259), but there is nothing nefarious about offering discounts to boost sales, and Plaintiff does not allege that any Individual had knowledge of those discounts.

CW 7 alleges that Lotus sales were "consistently underperforming" compared to internal targets and that the "C-Suite" was "absolutely aware" of those issues, a fact allegedly

---

[10]    *Accord Shemian v. Research in Motion Ltd.*, No. 11 Civ. 4068, 2013 WL 1285779, at *15 (S.D.N.Y. Mar. 29, 2013) (dismissing securities fraud claims premised on allegations of failure to disclose delays with product rollouts where "Plaintiff marshal[ed] evidence from eleven low-level, confidential informants to loosely establish that a general atmosphere of delay and lackluster delivery existed at RIM. The informants attest to the existence of frequent status meetings where higher[]level officials would learn of product delays [and] the common occurrence of such delays . . . [b]ut these statements, though damaging to a claim of managerial competence, do not support a strong inference of reckless disregard for the truth"), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).

14

learned from Mike Lang, Vice President of Global Structural Heart Valves Marketing (who also relayed that Mr. Mahoney was "constantly" asking questions about Lotus sales). (AC ¶¶ 132, 136, 204.) Absent from the Complaint are specific allegations as to *what* Boston Scientific senior management was specifically told about allegedly underperforming sales or *when* they were told about them, or *what* questions Mr. Mahoney asked about Lotus (which is not surprising given that CW 7 acknowledges a lack of a direct connection to Boston Scientific senior management and that this non-specific information was learned at least second-hand).

CW 9 alleges that the Company's Penang, Malaysia plant shut down because there were "zero orders" for Lotus Edge through the end of 2019 and the first quarter of 2020 (AC ¶¶ 145-46). This allegation appears to be the single piece of "evidence" upon which Plaintiff hinges its unsupported allegation that the Company had decided to exit the Lotus business earlier than November 2020. (*Id.* ¶¶ 160, 206, 212.) But Plaintiff has made no particularized allegation suggesting that *anyone* in senior management at Boston Scientific—let alone any of the Individuals—decided to terminate Lotus before November 2020, thus that argument necessarily fails. Additionally, the Complaint fails to allege *any* facts regarding what CW 9's responsibilities at Boston Scientific were or how CW 9 would have been in a position to have any insight into the number of orders coming into the Penang plant or the level of manufacturing output that was occurring at the plant at any point in time. Further, this allegation also suffers from a timing problem—Plaintiff offers it to show that Mr. Mahoney's *June 2019* statement that the Penang facility "was ramping up right now with Lotus valve" was false when made (*id.* ¶ 146), but CW 9 expressly alleges that it was only later, "*at the end of 2019*," when the plant was getting "zero orders" and subsequently shut down in March 2020 (*id.*).

15

### 2.    Statements About The Alleged Complexity Of Lotus Are Insufficient

The allegations attributed to CW 3, CW 4, CW 5 and CW 6 regarding the alleged complexity of the Lotus device and the impact of that complexity on sales are similarly not pled with sufficient specificity and otherwise do not give rise to a strong inference of scienter.  For example, CW 3 alleges that Lotus's complexity caused the device to malfunction, including in the form of a "Twisted Post."  (AC ¶¶ 108-10.)  But as Plaintiff acknowledges (*id.* ¶¶ 117-21), such malfunctions were reported to the FDA and publicly available on the MAUDE database; the existence of those events was thus in the public domain and available to investors, and Defendants did not fail to disclose them.  (*See* Tab 48 (MAUDE reports referencing "Twisted Post").)  Indeed, as another district court held in dismissing similar allegations regarding serious adverse events ("SAEs") that were associated with use of the defendants' FDA-approved drug and that were reported and publicly available on the FDA's Adverse Event Reporting System ("FAERS") database, "the fact that the reported adverse events were available on the FDA's public database" does not demonstrate scienter; instead, the "public availability of the SAE reports *undermines* an inference of scienter."  *Liu v. Intercept Pharms., Inc.*, No. 17-cv-7371, 2020 WL 5441345, at *7 & n.57 (S.D.N.Y. Sept. 9, 2020) (emphasis added); *see also Philco Invs., Ltd. v. Martin*, No. C 10-02785 CRB, 2011 WL 4595247, at *6 (N.D. Cal. Oct. 4, 2011) (publicly available FAERS data undercut inference that drug company acted with scienter in concealing adverse events).

CW 3 further alleges that the Individuals were involved in efforts to improve the Twisted Post issue (AC ¶ 110), but this shows that the Company was dedicated to fixing the issue and making the product commercially viable.  Indeed, CW 3 alleges that the issue was addressed on "almost every weekly training call in the last six months" of their tenure at Boston

Scientific, meaning that the Company was intently focused on, and devoting resources toward, improving the problem at least as late as July 2020 through November 2020, thus undercutting Plaintiff's allegation that the Company had decided to shut Lotus down as early as March 2020.

CW 4 alleges that Twisted Post malfunctions were common, that Lotus clinical support staff were insufficiently trained to address the problem, and that executives in charge of Lotus began departing because they "did not want to be affiliated or associated" with Lotus. (AC ¶¶ 112-13, 148-49, 209.) Putting aside that device malfunctions were reported to the FDA as required and those reports were publicly available, the Complaint does not allege *whether* or *how* any Individual was involved in or had knowledge of the process through which clinical staff were trained to work with Lotus. Moreover, as to the allegation that Boston Scientific employees involved with Lotus left the Company because of problems with the product, Plaintiff alleges *no* facts to show that the identified departures were suspicious or tied to any alleged fraud. Courts routinely reject such rank speculation as insufficient to support scienter.[11]

CW 5 (a salesperson based in Germany) alleges that they were aware of the alleged problems with Lotus that were occurring in the United States (which were "regularly discussed at firm-wide conference calls" conducted by the product engineer in charge of Lotus), and that Lotus sales targets were also not being met in Germany. (AC ¶¶ 114, 135.) There is not even any attempt to connect those "firm-wide conference calls" to any Individual or specific allegations as to *whether* any of them attended those or *when* they occurred. As to CW 5's allegations regarding sales in Germany, no specific allegations are made about *whether* any of

---

[11]     *See, e.g.*, *Metzler Asset Mgmt. GMBH v. Kingsley*, 305 F. Supp. 3d 181, 219 (D. Mass. 2018) (rejecting allegation of abrupt resignation as alone insufficient to support inference of scienter), *aff'd* 928 F. 3d 151 (1st Cir. 2019); *Harrington v. Tetraphase Pharm. Inc.*, No. 16-10133-LTS, 2017 WL 1946305, at *7 (D. Mass. May 9, 2017) (holding that allegations that resignations were "[c]uriously [t]imed," "sudden," and "suspicious" were insufficient without facts "to support the conclusion that the resignations indicate scienter").

17

the Individuals were even aware of those figures or *how* those figures relate in any way to Lotus's United States launch.  Additionally, CW 5's allegations regarding Lotus malfunctions are of no moment because the Complaint does not allege with any particularity that those alleged malfunctions were not reported to the FDA and publicly disclosed on MAUDE.

CW 6 alleges that "senior management" was aware that Lotus was difficult for physicians to use, that the Company intended to release a next generation system to replace it as soon as possible, and that the Company did not sufficiently test Lotus to assure that the product would actually be easy for physicians to use.  (AC ¶¶ 122-29.)  CW 6 further alleges that these concerns were raised with superiors "but was told to work within the system and how they did things at Boston Scientific" and was ultimately terminated from the Company.  (*Id.* ¶ 129.) Absent from CW 6's allegations, however, are any specific facts establishing how CW 6 was in a position to know Boston Scientific's product strategy or "senior management's" views of the same, or *whether* or *how* any Individual came to know about any purported shortfalls in Lotus's development process.  Further, CW 6 makes no allegation whatsoever that any Individual was involved in their termination or that any Individual expressed or shared the view regarding how "things" were supposedly done at Boston Scientific.  Finally, CW 6's allegations regarding Boston Scientific's development of a next generation Lotus device are self-discrediting—the fact that such a device was in development was publicly disclosed and was well-known in the market. (*See* Tab 11 (6/26/19 Investor Day Tr. at 52) ("[I]n addition to the dedication and effort by so many Boston Scientific employees . . . to bring LOTUS Edge to the market, we've also been moving forward. . . . [T]he next-generation valve we're focused on is LOTUS Mantra.").)

### 3.  <u>Statements About Manufacturing Problems Are Insufficient</u>

The confidential witnesses' statements regarding alleged manufacturing issues with Lotus are so thin that they add nothing to support an inference of scienter.

18

CW 3, CW 8 and CW 9 allege that Lotus was beset by technical challenges and that the Company never achieved commercially acceptable manufacturing yields, and that these issues were "closely tracked" by "senior management."  (AC ¶¶ 140-44.)  But CW 8 left Boston Scientific five months into the Class Period and expressly observed yield rates that occurred "prior to the Class Period, from 2016 to the end of 2018" (*id.* ¶ 141), and those rates are not alleged to have remained static throughout time.  And in any event, CW 8 makes no allegations as to *whether* or *when* any Individual ever became aware of those figures.  The allegations attributed to CW 3 and CW 9 are also insufficient:  not only does the Complaint not even attempt to link those confidential witnesses' observations of manufacturing problems to any Individual, the Company repeatedly disclosed the possibility of those very types of manufacturing problems throughout the Class Period.  (*See, e.g.*, Tab 4 (2018 Form 10-K at 25) (disclosing risk of potential "inability to effectively scale manufacturing").)

In sum, Plaintiff's allegations attributed to "confidential witnesses" are vague, concluslory and implausible and therefore cannot give rise to a strong inference of scienter.

### B.    Plaintiff's "Additional Allegations Of Scienter" Are Insufficient

Plaintiff's "Additional Allegations Of Scienter" (AC ¶¶ 201-24) add nothing and are the kind of weak allegations that have been repeatedly rejected in this District.

#### 1.    Plaintiff's Allegations Concerning Defendants' "Status Based" Access To Information Fail To Give Rise To A Strong Inference Of Scienter

The Complaint purports to allege that when Defendants made certain statements, they knew or recklessly disregarded the "fact" that Lotus did not work as well as it should have worked and that the launch of the product was not going as well as planned.  In an effort to allege scienter, the Complaint states that:

> Because of their position and access to material non-public information available
> to them, Defendants Mahoney, Fitzgerald, Brennan, McCarthy, Ballinger, Meredith

19

and Lisa knew, or recklessly disregarded, that material adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations, which were being made, were materially false and misleading.

(AC ¶ 36; *see also id.* ¶¶ 202-04, 207-08 (given Lotus's importance to the Company, Defendants were "intently focused" on the launch and "intimately familiar" with its actual performance and sales).)  The Complaint never specifies which "adverse facts" were known by any specific Individual nor when they knew them.  The Complaint merely alleges that due to their positions, they all knew everything and at all times.[12]  But "[a]ttempts to plead scienter by general allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss." *Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 255 (D. Mass. 2001) (citation omitted) (granting motion to dismiss).[13]  For example, in *In re iRobot*, the Honorable Denise J. Casper rejected the plaintiff's invitation to infer scienter based on the defendants' positions as "hands-on managers" who "spoke at length about iRobot's financials" and who allegedly possessed "intimate knowledge" of iRobot's sales and market share figures, which they constantly tracked, holding that "it is expected that responsible management will engage in such monitoring, and absent any further information regarding what [defendants] learned from such monitoring, and whether what they learned was at odds with iRobot's disclosures . . . a generalized statement about their monitoring is not sufficient indicia of scienter."  2021 WL 950675, at *9 (alteration and internal quotation marks omitted).  Here, similarly, Plaintiff fails to

---

[12]     The notion that the Individuals, each among the Company's most senior executives, would have been so "intimately familiar" with Lotus—a new product that was only beginning to generate revenue during the Class Period—strains credulity considering that Boston Scientific is a global enterprise with 36,000 employees working in seven different businesses that collectively offer dozens of different product lines, and whose net revenue in 2019 exceeded $10.7 billion.  (Tab 25 (2019 Form 10-K at 3-8, 15, 36).)

[13]     *See Maldonado v. Dominguez*, 137 F.3d 1, 10 (1st Cir. 1998) (rejecting that defendants "must have known" of facts due to their positions; "these are precisely the types of inferences which this court, on numerous occasions, has determined to be inadequate to withstand Rule 9(b) scrutiny"); *Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 120 (D. Mass. 2017) ("vague[ness] as to when the defendants became aware of facts that should have made them aware of the falseness of their optimistic statements . . . weigh[s] against a finding of a strong inference of scienter"); *Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 283 (D. Mass. 1998) (same).

allege with particularity *whether* or *when* any Individual learned of each alleged fact or *how* they responded, and otherwise inadequately pleads under Rule 9(b) and the PSLRA.

In particular, the Complaint alleges that Boston Scientific's 2017 acquisition of medical device company Symetis, and its efforts to develop a next generation TAVR device to replace Lotus Edge, show that the Company had lost "confidence" in Lotus Edge and thus that its statements during the Class Period regarding Lotus's performance in the market were knowingly false.  (AC ¶¶ 210-11.)  *First*, it is simply not plausible (and, indeed, is illogical) that Boston Scientific acquired Symetis in *2017* due to "a loss of confidence" in Lotus, when, as Plaintiff admits, the Company expended considerable resources to launch Lotus Edge years later in 2019.  (*Id.* ¶¶ 78, 80-84.)  *Second*, there is nothing nefarious about a medical device company, whose very survival depends on innovation,[14] expending resources to develop a new product; this does not suggest an intent to defraud investors (and, as noted above, the fact that a next generation Lotus device was in development was public knowledge).  Indeed, as CW 3 admits, at the same time the Company was working to develop a next generation TAVR device, it was still simultaneously working with an "absolute laser focus" on remediating the Twisted Post issue. (*Id.* ¶ 110.)  Boston Scientific's efforts to improve Lotus Edge and to develop a next generation Lotus product plainly demonstrate that the Company had no intent to shut the Lotus platform down (as it ultimately later did), but rather was working to enhance it.  *Third*, Plaintiff fails to even allege *who* lost confidence in Lotus or *when* any Individuals lost that confidence (and whether they lost confidence in Lotus prior to any of the challenged statements being made).

The Complaint also alleges that "the fact that the size and scope of the Lotus

---

[14]    (*See* Tab 4 (2018 Form 10-K at 25) ("Our future growth is dependent upon the development of new products and enhancement of existing products . . . .").)

21

business shut-down was a substantial undertaking that required months of advance planning and approval by senior management supports scienter." (AC ¶ 212.)  Plaintiff tries to tie the alleged March 2020 shutdown of the Penang facility to the decision to exit Lotus, but Plaintiff has not alleged specific facts showing that any Individual intended to shut down Lotus at that time. Plaintiff's allegations regarding the timing of the decision to exit Lotus are purely speculative and entirely circumstantial:  there are no allegations about *which* Individuals decided that terminating Lotus was the best course or *when* any of them reached such a decision.  Those allegations are thus insufficient to give rise to a strong inference of scienter.

### 2.      Plaintiff's Allegations Of Insider Stock Sales Do Not Give Rise to A Strong Inference Of Scienter

The Complaint alleges that trading activity by certain executives supports a strong inference of scienter.  (AC ¶¶ 217-24.)  To bolster an inference of scienter, Plaintiff must allege trading that is "at a minimum, . . . unusual, well beyond the normal patterns of trading by those defendants." *Abiomed, Inc.*, 778 F.3d at 246 (citation omitted); *Leavitt v. Alnylam Pharms., Inc.*, No. CV 18-12433-NMG, 2021 WL 965052, at *6 (D. Mass. Mar. 12, 2021).  Plaintiff bears the burden of showing that sales by insiders were unusual or suspicious by comparing insiders' class period sales to their sales during an equal period prior to the class period, or showing that insiders sold large percentages of their holdings.  *Simon*, 37 F. Supp. 3d at 523 (dismissing Section 10(b) claim, finding insider stock sales failed to raise a strong inference of scienter). Defendants may offer in rebuttal alternative explanations for their sales, including the existence of Rule 10b5-1 trading plans.  *Id.*  Here, Defendants' stock sales do not support a strong inference of scienter.[15]

---

[15]      *See* Exhibit A for a table reflecting the Boston Scientific executives' relevant sales based upon their publicly-available filings and Tabs 44-47 for copies of those filings.

22

### (a)    Mr. Mahoney's Sales Do Not
### Support A Strong Inference Of Scienter

Plaintiff's allegation that Mr. Mahoney's Class Period stock sale was suspicious fails for several reasons. *First*, as Plaintiff acknowledges, Mr. Mahoney's stock sales both during the Control Period and the Class Period were made automatically pursuant to a Rule 10b5-1 stock trading plan.[16]  "[T]he presence of a Rule 10b5-1 trading plan rebuts an inference of scienter and supports the reasonable inference that stock sales were prescheduled and not suspicious." *Luna v. Carbonite, Inc.*, No. 19-CV-11662-LTS, 2020 WL 6205786, at *5 (D. Mass. Oct. 22, 2020) (citation omitted).  This is so even when those plans were adopted during the putative class period. *See Simon*, 37 F. Supp. 3d at 524 (no strong inference of scienter for trades pursuant to 10b5-1 plans adopted both before and during the class period); *Leavitt v. Alnylam Pharmaceuticals, Inc.*, 451 F. Supp. 3d 176, 188 (D. Mass. 2020) (same).

*Second*, Plaintiff alleges that the shares were sold at prices "below the share price over the preceding week" which purportedly suggests that the sales under the plan were triggered by a date threshold (which directs a stock sale to occur on a certain date) as opposed to a price threshold (which directs a stock sale to occur at some point during a specified time period if the stock price is higher than the specified threshold). (AC ¶¶ 163, 219.)  This is demonstrably false. The trading plan in question states that if a price is specified then the specified number of shares shall be sold at "prices that are equal to or better than the Price specified." (Carroll Decl. Ex. 2 at 11.)  The plan further provides for an "Earliest Sell Date" of 10/29/2020 or 10/30/2020 and sets the minimum stock price at "$35.00." (*Id.*)  Thus, the earliest date that the stocks could be

---

[16]    *See* Carroll Decl. Ex. 2; *see also* Tab 47 (Mr. Mahoney's SEC Forms).  The Court may properly consider Mr. Mahoney's Rule 10b5-1 trading plan (referenced at AC ¶¶ 16-18, 161-68, 180, 218-22) because its authenticity cannot be disputed, it is central to Plaintiff's claim, and it is repeatedly referred to (and relied upon) in the Complaint. *See supra* note 7 (citing *Watterson*, 987 F.2d at 3 and *In re Montreal*, 888 F.3d at 7 n.2).

sold under the terms of the plan was November 3, 2020, because that was the first day after the

"Earliest Sell Date" that the stock price was equal to or higher than $35.00:

| Date | Open | High | Low | Close |
|---|---|---|---|---|
| Oct. 29, 2020 | 33.98 | 34.25 | 33.14 | 33.50 |
| Oct. 30, 2020 | 33.31 | 34.66 | 33.31 | 34.27 |
| Oct. 31, 2020 | N/A, Saturday | | | |
| Nov. 1, 2020 | N/A, Sunday | | | |
| Nov. 2, 2020 | 34.66 | 34.91 | 34.34 | 34.55 |
| *Nov. 3, 2020* | *35.06* | *35.64* | *34.80* | *35.15* |

(available at https://finance.yahoo.com/quote/BSX/history.)

*Third*, it is a matter of public record that Mr. Mahoney *increased* his holdings of

Boston Scientific stock by over 120,000 shares or 6.8% over the Class Period,[17] which "negates

any inference that he had a motive to artificially inflate . . . stock during that period." *See*

*Abiomed, Inc.*, 778 F.3d at 246 (no inference of scienter where defendant increased his stock

holdings during the class period); *Carbonite*, 2020 WL 6205786, at *6 (same).

*Fourth*, the term of Mr. Mahoney's Rule 10b5-1 trading plan was not unusual and

is alleged to be within only 13 trading days of other Rule 10b5-1 trading plans referenced in the

Complaint.  Plaintiff alleges that Mr. Mahoney's Rule 10b5-1 trading plan was scheduled to

terminate 50 trading days after the adoption of the plan while other 10b5-1 plans adopted by

Boston Scientific executives terminated after at least three months.  (AC ¶¶ 162, 221.)  In fact,

Mr. Mahoney's 10b5-1 trading plan was scheduled to terminate 53 trading days after adoption.[18]

A comparable three-month period, from August 25, 2020 to November 25, 2020, includes 66

trading days.  Plaintiff's allegation that a 13-day difference between trading plan terms is

---

[17]    At the beginning of the Class Period, Mr. Mahoney owned 1,835,542 shares. *See* Tab 47 (Mr. Mahoney's SEC Forms at 16-19).  At the end of the Class Period, Mr. Mahoney owned 1,960,421 shares. *See id.* at 38.

[18]    Mr. Mahoney adopted the Rule 10b5-1 plan on August 25, 2020, with a termination date of November 6, 2020.  (Carroll Decl. Ex. 2 at 1, 11).)

24

"unusual" finds no support in this Circuit's case law.  Further, although Plaintiff complains about the length of the trading plan's cooling off period, as its own authority acknowledges (*see* AC ¶ 220 n.4), there is currently no requirement that a 10b5-1 plan include *any* cooling off period, yet Mr. Mahoney's plan did, further undercutting the notion that his plan was suspicious.

*Fifth*, "single-trade" Rule 10b5-1 plans, which direct stock sales to occur one time as opposed to over the course of several months, are entirely proper under the law.  Plaintiff's citation to certain disapproving academics (AC ¶¶ 164, 220), does not change the fact that Rule 10b5-1 trading plans are not required to include multiple trades.  17 C.F.R. § 240.10b5-1.

### (b)    Sales By Other Executives Do Not Support A Strong Inference Of Scienter

The allegations concerning sales by other executives also fail to support a strong inference of scienter.  *First*, Plaintiff alleges that Mr. Ballinger sold 209,833 shares during the Class Period, including two large "single-block" sales after leaving Boston Scientific in July 2020, but Mr. Ballinger sold fewer shares during the Class Period than during the Control Period (223,379).[19]  (AC ¶¶ 223-24.)  To the extent that Plaintiff relies on the timing of those trades, *i.e.*, after his departure from Boston Scientific, it is "not unusual for individuals leaving a company[ ] to sell shares."  *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 207 (1st Cir. 1999) (no inference of scienter where former executive sold 690,000 shares worth $19 million after leaving company).

Mr. Brennan's and Mr. Fitzgerald's trades are also unremarkable.  The Class Period sales by Mr. Brennan and Mr. Fitzgerald were all made pursuant to Rule 10b5-1 plans,[20] which rebuts an inference of scienter and supports the reasonable inference that stock sales were

---

[19]     (*See* Tab 44 (Mr. Ballinger's SEC Forms).)

[20]     (*See* Tab 45 (Mr. Brennan's SEC Forms at 18-43); Tab 46 (Mr. Fitzgerald's SEC Forms at 23-51).)

prescheduled and nonsuspicious, even when adopted during the putative class period. *See Carbonite, Inc.*, 2020 WL 6205786, at *5; *Simon*, 37 F. Supp. 3d at 524. Four of the five Class Period sales by Mr. Brennan were made pursuant to a Rule 10b5-1 plan that was adopted *prior* to the Class Period, and the remaining trade was not suspicious because it sold only 8.2% of his shares and the total number of shares sold was almost identical to the most recent prior sale.[21] And like Mr. Mahoney, it is a matter of public record that Mr. Fitzgerald *increased* his holdings of Boston Scientific stock by over 23,000 shares or 11.7% over the Class Period,[22] which "negates any inference that he had a motive to artificially inflate . . . stock during that period." *See Abiomed, Inc.*, 778 F.3d at 246.

### 3. Plaintiff's Remaining Allegations Of Motive And Opportunity Also Fail To Support A Strong Inference Of Scienter

Plaintiff's remaining allegations also miss the mark. Plaintiff alleges that Boston Scientific was motivated to raise money in a public equity offering and renegotiate the terms of its debt agreements, and that it delayed the public announcement of the Lotus shutdown to permit it to raise that money and prevent a greater negative impact on the Company's earnings sheet. (AC ¶¶ 213-16.) "But a strong inference of fraud does not arise merely from seeking capital. . . . Indeed, the motivation[] to raise capital . . . [is] common to every company and thus add[s] little to an inference of fraud." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) (holding that "[i]f we inferred scienter from every bullish statement by a pharmaceutical company that was trying to raise funds, we would choke off the lifeblood of innovation in

---

[21]    (*See* Tab 45 (Mr. Brennan's SEC Forms); Ex. A at 4-5.)

[22]    At the beginning of the Class Period, Mr. Fitzgerald owned 197,940 shares. *See* Tab 46 (Mr. Fitzgerald's SEC Forms at 19-24). At the end of the Class Period, Mr. Fitzgerald owned 221,046 shares. *See id.* at 50.

medicine by fueling frivolous litigation").[23]  Moreover, not one of Plaintiff's confidential witnesses supports this theory with any facts.

### 4.      A Nonculpable Inference Under *Tellabs* Is More Compelling Than Scienter

The Complaint itself demonstrates that Boston Scientific launched Lotus with the optimistic belief that it could be made safe, clinically effective, and commercially viable.  As issues arose, the Company worked internally to improve the device and disclosed adverse events and other risk factors.  Although the Company still believed in Lotus's benefits, it ultimately determined to discontinue Lotus and voluntarily recall unused Lotus inventory due to concerns related to the cost required to improve the product.  Plaintiff primarily alleges that Boston Scientific's optimistic statements about Lotus and the commercial launch were knowingly false; but the far more compelling inference is that Boston Scientific anticipated and disclosed risks related to market share and competition, technological feasibility, poor clinical outcomes, and failure to meet growth projections, and that, over time, despite Boston Scientific's best efforts to avoid it, those risks manifested and were ultimately disclosed.  *See, e.g.*, *Wasson v. LogMeIn, Inc.*, 496 F. Supp. 3d 612, 639 (D. Mass. 2020) (finding nonculpable inference more compelling where defendant company disclosed anticipated risk and then disclosed those risks when they actually manifested).  The Complaint should be dismissed.

---

[23]      *Accord Kader v. Sarepta Therap., Inc.*, No. 14-cv-14318-ADB, 2016 WL 1337256, at *18 (D. Mass. Apr. 5, 2016), *aff'd*, 887 F.3d 48 (1st Cir. 2018) ("Standing alone, the existence of a public offering during the period of alleged misrepresentations cannot itself lead to an inference of scienter."); *Battle Const. Co. v. InVivo Therap. Holdings Corp.*, 101 F. Supp. 3d 135, 141 n.6 (D. Mass. 2015) (finding that a medical device company's "desire to raise capital is possessed by virtually all corporations and is too generic to support a strong inference of motive"), *aff'd sub nom. Ganem v. InVivo Therap. Holdings Corp.*, 845 F.3d 447 (1st Cir. 2017); *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 28 (2d Cir. 2013) (finding a desire to raise capital insufficient to establish a strong inference of fraud because it is a goal "possessed by virtually all corporate insiders").

## II.    THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY BECAUSE IT DOES NOT ALLEGE AN ACTIONABLE MISSTATEMENT OR OMISSION

Plaintiff challenges seventy-five statements as materially false or misleading when made (AC ¶¶ 226-323), yet none is actionable as a matter of law for the reasons described below.  The Complaint should be dismissed for this independent reason.[24]

### A.    Truthful Statements Are Not Actionable

A complaint brought under Section 10(b) must plead specific facts that show *why* the statements or omissions were misleading.  15 U.S.C. § 78u-4(b)(1); *Greebel*, 194 F.3d at 193. "A statement is not . . . misleading by omission merely because the undisclosed fact bears some relation to the subject matter of the statement."  *In re Boston Tech. Sec. Litig.*, 8 F. Supp. 2d 43, 53 (D. Mass. 1998) (dismissing complaint failing to plead statements were false when made). Viewed in context, at least fifteen of the challenged statements are not adequately alleged to be false or misleading and thus are not actionable as a matter of law.  (*See* Ex. B entries 3-4, 13, 21-22, 32, 36, 45-46, 49, 57, 60, 65-66, 68; AC ¶¶ 228, 241, 249, 251, 265, 271, 281, 284, 291, 302, 307, 314-15, 318.)  Those statements generally relate to Boston Scientific's desire to make Lotus easy-to-use and to the volume and pace of Lotus sales, but Plaintiff does not adequately allege that Boston Scientific did not sincerely desire to make Lotus easy-to-use, and a careful look at the allegations about the other challenged statements reveals that a number suffer from timing problems and otherwise fail to establish that the statements are false and misleading.[25]

---

[24]    Exhibit B attached hereto lists the challenged statements and why they are not actionable.  As indicated therein, a number of the challenged statements were made prior to the Class Period and thus are not actionable for that independent reason.

[25]    For example, Plaintiff challenges the statement that "I think you've seen very good price discipline in the TAVR market and that is always our playbook as well, is not to use discounting as a strategy."  (AC ¶ 249; Tab 13 (8/8/19 Canaccord Conf. Tr. at 12)), but Plaintiff alleges that Boston Scientific did not use discounting to increase Lotus sales *until the end of 2019*.  (AC ¶ 147 (CW 1 "recounted" that "Boston Scientific was desperately pushing sales by providing discounts for TAVR centers to purchase Lotus in bulk at the end of 2019").)  Moreover, merely noting in August 2019 that discounting was not a strategy does not amount to a promise never to use discounting.

28

Plaintiff makes much of the public statements about the Company's goal of opening 150 Lotus accounts within a year of the launch, particularly Mr. Fitzgerald's statement following the announcement of Lotus's discontinuation that the Company had "sub-100 accounts today in the United States," after the Company had announced the previous month that it had met its 150-account goal.  (AC ¶¶ 20, 187.)  But the statement referencing "sub-100" accounts "today" is not alleged with particularity to be about *all* Lotus accounts opened since Lotus's launch, as opposed to active accounts at that point in time (which, as Plaintiff acknowledges, Boston Scientific also tracked, *see id.* ¶¶ 131, 204).  Plaintiff has thus failed to allege that Mr. Fitzgerald's prior statement that the 150-account goal had been met was false and misleading.

**B.      Statements Of Corporate Optimism Are Not Actionable**

General statements of corporate optimism are immaterial as a matter of law, and therefore cannot give rise to Section 10(b) liability.  *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996) ("loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available" are immaterial).  This includes vaguely optimistic statements "about both a company's current state of affairs and its future prospects."  *In re Boston Sci. Corp. Sec. Litig.*, No. 10-10593-DPW, 2011 WL 4381889, at *11 (D. Mass. Sept. 19, 2011), *aff'd*, 686 F.3d 21 (1st Cir. 2012) (citation omitted).  In particular, optimistic statements concerning new products are non-actionable even if a company does not disclose all issues with the product that might affect its success in the market:  "[T]he fact that a new product might face problems in the market is obvious to a reasonable investor, and therefore omission of it is not culpable."  *In re Boston Tech.*, 8 F. Supp. 2d at 62-63.  Indeed, the "securities laws presume that skilled investors are aware that a corporation's performance with a new product . . . is unlikely to replicate past successes."  *Glassman v. Computervision Corp.*, 90

29

F.3d 617, 636 (1st Cir. 1996) (alteration in original) (citation omitted).

The vast majority—at least fifty-two—of the statements Plaintiff challenges are precisely the sort of corporate optimism that is incapable of objective verification and immaterial as a matter of law. (*See* Ex. B, 10-24, 26-31, 33-45, 47-50, 53-59, 62-65, 67-69; AC ¶¶ 237-38, 240-41, 243-46, 249, 251, 253, 255-56, 258, 260-61, 263, 267, 269, 271, 274-75, 277, 279-81, 286-87, 291-92, 296, 299, 301-03, 305 308-09, 311, 314, 316, 318-19.) Plaintiff repeatedly complains of statements that use general optimistic language to describe Lotus's business prospects, such as "positive," "pleased," "excited," "great," "confident," "momentum," "strong" (*see id.* ¶¶ 244, 249, 255, 261, 267, 271, 286, 296, 301, 309, 315, 319). These are classic statements of non-actionable corporate optimism that provide no objectively verifiable facts on which a reasonable investor would rely and thus are immaterial as a matter of law.[26]

### C.  Statements Of Opinion Are Not Actionable

Statements of opinion or belief are not actionable unless it is alleged "that (1) the company's opinions were both objectively and subjectively false, *i.e.*, that the person holding the opinion did not subjectively believe in it, (2) self-embedded facts within the opinion are untrue, or (3) 'material facts about the [opinion holder's] inquiry into or knowledge concerning a statement of opinion' were omitted." *Corban v. Sarepta Therap., Inc.*, No. 14-cv-10201-IT, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015), *aff'd*, 868 F.3d 31 (1st Cir. 2017) (alteration in original) (citation omitted) (dismissing complaint); *Pension Tr. v. J.Jill, Inc.*, 360 F. Supp. 3d

---

[26]    *Erste-Sparinvest Kapitalanlagegesellschaft MBH v. Seres Therap., Inc.*, No. CV 16-11943, 2018 WL 1567614, at *8 (D. Mass. Mar. 30, 2018) ("statements that amount to 'rosy affirmation' of a company's prospects or products are not actionable statements for a securities fraud claim") (citation omitted); *In re Cytyc Corp.,* No. CIV.A. 02-12399-NMG, 2005 WL 3801468, at *22, *24 (D. Mass. Mar. 2, 2005) (statements concerning "momentum" "on track" and "consistent" growth non-actionable); *In re Parametric Tech. Corp. Sec. Litig.*, 300 F. Supp. 2d. 206, 217-18, 221 (D. Mass. 2001) (statements that company "expects more revenue growth" and "our strong competitive position" non-actionable).

17, 27 (D. Mass. 2018) (dismissing complaint, holding opinion statements were not actionable); *In re Analogic Corp. S'holder Litig.*, No. 18-cv-11301-ADB, 2019 WL 4804800, at *9-11 (D. Mass. Sept. 30, 2019) (same).

At least sixty-three of the challenged statements discussed above are not actionable because they are opinions. (*See* Ex. B, entries 1-2, 4-31, 33-45, 47-54, 56-59, 61-65, 67-69; AC ¶¶ 226-31, 237-38, 240-41, 243-46, 249, 251, 253, 255-56, 258, 260-61, 263, 267, 269, 271, 274-75, 277, 279-81, 286-87, 291-93, 296, 301-03, 305, 308-09, 311, 314, 316, 318-19.)  For example, Plaintiff claims that statements such as the following are misleading: "[w]e think the mechanical ease of use properties are differentiated" (AC ¶ 229); "we believe there will be adequate demand for Lotus in the marketplace" (*id.* ¶ 237); "I think that we're really excited about Lotus Edge and how it's going and the opportunity in front of it" (*id.* ¶ 286).  The Complaint does not allege with particularity that any of Defendants' opinions were insincerely held, that self-embedded facts within the opinion are untrue, or that any material facts concerning the opinion-holder's knowledge were omitted.

**D.     Forward-Looking Statements Are Protected Under The PSLRA**

Under the PSLRA's safe harbor, a forward-looking statement[27] cannot be a basis of a Section 10(b) claim if it is (i) "identified as forward-looking, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ" *or* (ii) immaterial *or* (iii) plaintiff does not plead "actual knowledge" of falsity.  15 U.S.C. § 78u-5(i)(l); *Hill v. Gozani*, 638 F.3d 40, 54 (1st Cir. 2011) (affirming dismissal of complaint). Although the Complaint purports to challenge a number of Boston Scientific's forward-looking

---

[27]    The PSLRA defines forward-looking statements to include (i) projections of revenue, income, or earnings, (ii) management's plans and objectives, (iii) statements of future economic performance and (iv) statements concerning the assumptions underlying the foregoing.  15 U.S.C. § 78u-5(i)(1).

31

statements, such statements are non-actionable for two independent reasons:  (i) they were accompanied by meaningful cautionary language; and (ii) Plaintiff does not allege facts giving rise to a strong inference that Boston Scientific had actual knowledge of their purported falsity. (*See* Ex. B, entries 10-13, 15-19, 26-32, 42-46, 55-58, 65, 67-69; AC ¶¶ 237-38, 240-41, 244-46, 255-56, 258, 260-61, 263, 265, 277, 279-81, 284, 299, 301-03, 314, 316, 318-19.)

*First*, a number of Boston Scientific's forward-looking statements are accompanied by meaningful cautionary language.  For example, Plaintiff alleges that Mr. Mahoney's statement during the Q4 2019 earnings call held February 5, 2020, that Lotus "remain[ed] *on track* to open 150 accounts in the first 12 months post-approval" was false and misleading because "in truth, Defendants already knew that the Lotus was performing poorly by the end of 2019, when Boston Scientific missed its sales targets and reorder rate goals for Lotus." (AC ¶¶ 279-80, 283 (emphasis added); Ex. B, entry 43.)  However, at the outset of that earnings call, Ms. Lisa expressly noted that "this call contains forward-looking statements within the meaning of federal securities laws" covering, "among other things . . . new product approvals and launches," and further emphasized that "[a]ctual results may differ materially from those discussed in the forward-looking statements" and cautioned investors to refer to the "[f]actors that may cause such differences include[d] in the Risk Factors section of our most recent 10-K and subsequent 10-Qs filed with the SEC."  (Tab 24 (2/5/2020 Earnings Call at 4).)  Those Risk Factors included "no assurance that any products now in development . . . will achieve technological feasibility . . . or gain market acceptance," "no assurance . . . that we will be able to regain or gain market share or compete effectively on the basis of price," and that "[f]ailure to meet growth projections, poor clinical outcomes . . . and inability to effectively scale manufacturing . . . may materially adversely impact on our business, financial condition, and

32

results of operations." (Tab 4 (2018 Form 10-K at 19, 25).) Thus Boston Scientific disclosed the very risks that Plaintiff alleges ultimately happened; *i.e.*, that a new product ultimately failed to achieve commercial success in the market due to technological and manufacturing challenges. Substantially similar risks were also disclosed in Boston Scientific's 2019 Form 10-K filed with the SEC on February 25, 2020. (Tab 25 at 20, 24.)[28]

  *Second*, Boston Scientific's forward-looking statements are not actionable for the additional, independent reason that Plaintiff does not allege facts giving rise to a strong inference that any Defendant had actual knowledge that any such forward-looking statement was false when made. 15 U.S.C. § 78u-5(c)(1)(B); *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 268 (D. Mass. 2013) (dismissing complaint). Recklessness is not enough to overcome the "known falsity" safe harbor; rather, "the facts pled by the plaintiffs must be sufficient to raise a strong inference that the issuer of the statement had *actual knowledge* of the statement's falsity." *In re Praecis Pharm., Inc. Sec. Litig.*, No. 04-12581-GAO, 2007 WL 951695, at \*9 (D. Mass. Mar. 28, 2007) (emphasis in original) (dismissing complaint). As discussed above, the Complaint does not plead particularized facts of actual knowledge. (*See supra* Section I.)

## E.   Statements About Financial Results Are Not Actionable

  Plaintiff also alleges that by "concealing Lotus Edge's failure until November 17, 2020," Boston Scientific made "false statements" regarding its financial results. (AC ¶¶ 321-23; *see* Ex. B, entries 70-75.) In particular, Plaintiff alleges that although Boston Scientific decided to shut down Lotus in March 2020, it held off on publicly announcing that decision until

---

[28]   Either the Risk Factors in the 2018 Form 10-K or the 2019 Form 10-K were referenced in all of Boston Scientific's Class Period public filings and earnings calls, including those referenced in the Complaint that contained challenged statements. (*See, e.g.*, Tab 3 (2/6/2019 Earnings Call at 4); Tab 8 (4/24/2019 Earnings Call at 4); Tab 12 7/24/2019 Earnings Call at 4); Tab 16 (10/23/2019 Earnings Call at 4); Tab 17 (Form 10-Q, filed 11/5/2019 at 55); Tab 24 (2/5/2020 Earnings Call at 4); Tab 30 (4/29/20 Earnings Call at 4); Tab 33 (7/29/2020 Earnings Call at 4); Tab 40 (10/28/2020 Earnings Call at 4).)

November, which permitted the Company to avoid recording a substantial charge associated with the shutdown until that time, and which thus rendered the Company's reported financial results prior to the public announcement false and misleading. (*Id.*) As discussed above, however (*see supra* at 15, 22), Plaintiff failed to allege with particularity that the decision to shut Lotus down was made earlier than November 2020, nor has it alleged with particularity that any Defendant intentionally delayed announcing the shutdown to avoid certain charges and mislead investors. Thus, Plaintiff's allegations with respect to purported financial misstatements fail.

Moreover, in both its Q1 2020 and Q3 2020 Forms 10-Q (Tab 31 at 41; Tab 41 at 14), Boston Scientific disclosed large charges ($198 million and $219 million, respectively) that it incurred in connection with the discontinuation of two of its other businesses, thus undercutting the notion that the Company was seeking to avoid reporting negative financial results associated with unsuccessful product launches during that time period.

### F.    There Was No Duty To Disclose Additional Information About Lotus

In an attempt to escape its inability to plead any affirmative misstatements, Plaintiff alleges that all of the challenged statements were rendered misleading because Boston Scientific failed to disclose that Lotus sales "struggled from the start," that the launch was "clinically unsafe," that the device was complex and difficult to use, and that the Company was never able to get the manufacturing process to an acceptable commercial production state. (AC ¶¶ 8-11.) But Rule 10b-5 does not create an affirmative duty to disclose unless disclosure is necessary to make the statements made not misleading in light of the undisclosed information. *See Hensley v. Imprivata*, 260 F. Supp. 3d 101, 116 (D. Mass. 2017). "A plaintiff fails to plead an actionable [Section] 10(b) claim predicated on the concealment of information if that information was, in fact, disclosed." *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155 (D. Mass. 2009) (dismissing claim).

Here, Boston Scientific disclosed to investors at numerous points throughout the Class Period risks related to market share and competition, technological feasibility, poor clinical outcomes, and failure to meet growth projections. (*See supra* Preliminary Statement and Section II.D.) Nothing more was required. Contrary to the Complaint, none of the challenged statements created a duty to disclose more information about Lotus.

## CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss should be granted, and the Complaint (ECF No. 44) dismissed with prejudice.

Dated: Boston, Massachusetts
July 19, 2021

Respectfully submitted,

/s/ James R. Carroll
James R. Carroll (BBO #554426)
Alisha Q. Nanda (BBO #657266)
Yaw A. Anim (BBO #569512)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
alisha.nanda@skadden.com
yaw.anim@skadden.com

*Counsel for Defendants*
*Boston Scientific Corporation,*
*Michael F. Mahoney, Joseph M. Fitzgerald,*
*Daniel J. Brennan, Shawn McCarthy,*
*Ian Meredith, Kevin Ballinger and*
*Susan Vissers Lisa*

35