**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re BOSTON SCIENTIFIC CORPORATION SECURITIES LITIGATION | Master File No.: No. 1:20-cv-12225-DPW<br><br>**LEAVE TO FILE 35 PAGES GRANTED ON JULY 14, 2021** |

**LEAD PLAINTIFF UNION ASSET MANAGEMENT HOLDING AG'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................... iii

DEFINED TERMS ................................................................................................... vii

I.      INTRODUCTION ............................................................................................ 1

II.     PLAINTIFF'S COMPLAINT........................................................................... 4

      A.     Lotus Edge's Importance to Boston Scientific ....................................... 4

      B.     Defendants Falsely Reassure Investors They Had "Fixed" Purportedly
           "Technical" Manufacturing Issues That Had Triggered A Series of Recalls ........ 4

      C.     The Company Repeatedly Touts Its "Strong," "Very High" and Increasing
           Lotus Sales and Success in Obtaining 150 Accounts .............................. 5

      D.     In Reality, The Lotus Launch Was A Disaster and In Crisis .................. 6

      E.     Boston Scientific Holds An Emergency Companywide Lotus Sales Force
           Meeting Over Thanksgiving Because the Launch Was in Crisis .......................... 9

      F.     After Receiving "No Orders," the Company Shut Down A Key Lotus
           Manufacturing Facility and Determined to Discontinue the Franchise ................. 9

      G.     In Danger of Defaulting, Defendants Continue to Mislead Investors in
           Order to Raise Capital and Renegotiate the Company's Debt.............................. 9

      H.     After Touting 138 Accounts, Defendant Mahoney Engineers the Sale of
           $9 Million of His Personally Held Shares in a Highly Suspicious Insider
           Trade ..................................................................................................... 10

      I.     Defendants Stun Investors by Recalling Lotus Edge and Disclosing the
           Business Shutdown in An Abrupt Abandonment of the Dual-Valve
           Strategy ................................................................................................. 11

III.    ARGUMENT.................................................................................................. 12

      A.     Defendants Made Materially False and Misleading Statements........................... 12

      B.     Defendants' Falsity Arguments Are Meritless ..................................... 14

           1.     Defendants' Misrepresentations Are Actionably False and
                 Misleading............................................................................... 14

           2.     Defendants' Misrepresentations Are Not Puffery..................... 16

i

|   |   | 3. | Defendants' Misrepresentations Are Not Protected Opinions | 17 |
|   |   | 4. | Defendants' Statements Are Not Protected By The Safe Harbor | 18 |
|   |   | 5. | Defendants' Financial Results Statements Are Actionable | 19 |
|   |   | 6. | Defendants Were Obligated to Be Complete and Accurate | 19 |
|   | C. |   | The Complaint Adequately Alleges A Strong Inference of Scienter | 20 |
|   |   | 1. | The Pleading Standard Under the PSLRA | 20 |
|   |   | 2. | The Complaint Adequately Alleges Scienter | 20 |
|   |   | 3. | Defendants' Scienter Arguments Are Meritless | 25 |
|   |   | 4. | The Complaint's Other Allegations Also Establish Scienter | 32 |
| IV. | CONCLUSION |   |   | 35 |

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<small>CASES</small>

*In re 2U, Inc. Sec. Class Action*,
  2021 WL 3418841 (D. Md. Aug. 5, 2021) .......................................................................13

*In re Acadia Pharms. Sec. Litig.*,
  2020 WL 2838686 (S.D. Cal. June 1, 2020)...................................................................30

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002)...........................................................................12, 15, 20, 22

*In re Allaire Corp. Sec. Litig.*,
  224 F. Supp. 2d 319 (D. Mass. 2002) ...............................................................14, 21, 34

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
  2021 WL 1264027 (E.D. Pa. Apr. 6, 2021) ..............................................................14, 24

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ..................................................................21

*In re Ariad Pharms., Inc. Sec. Litig.*,
  842 F.3d 744 (1st Cir. 2016)...........................................................................................33

*Ark. Pub. Emp. Ret. Sys. v. GT Solar Int'l, Inc.*,
  2009 WL 3255225 (D.N.H. Oct. 7, 2009) ......................................................................19

*Bartelt v. Affymax, Inc.*,
  2014 WL 231551 (N.D. Cal. Jan. 21, 2014) ...................................................................30

*Battle Const. Co. v. InVivo Therapeutics Holdings Corp.*,
  101 F. Supp. 3d 135 (D. Mass. 2015) .............................................................................35

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017).............................................................................14

*Blatt v. Muse Techs., Inc.*,
  2002 WL 31107537 (D. Mass. Aug. 27, 2002) (Woodlock, J.).......................................20

*Brumbaugh v. Wave Sys. Corp.*,
  416 F. Supp. 2d 239 (D. Mass. 2006) .............................................................16, 24, 33, 34

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002).............................................................................. *passim*

*City of Brockton Ret. Sys. v. CVS Caremark Corp.*,
  2013 WL 6841927 (D.N.H. Dec. 30, 2013).....................................................................12

*Collier v. ModusLink Glob. Sols., Inc.*,
  9 F. Supp. 3d 61 (D. Mass. 2014) ...................................................................................25, 29

*Cozzarelli v. Inspire Pharms. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ....................................................................................35

*In re Cytyc Corp.*,
  2005 WL 3801468 (D. Mass. Mar. 2, 2005)...........................................................17

*Dahhan v. OvaScience, Inc.*,
  321 F. Supp. 3d 247 (D. Mass. 2018) .....................................................................22

*Dep't of Treasury of the State of N.J. and Div. of Invest. v. Cliffs Nat'l Res., Inc.*,
  2015 WL 6870110 (D.N.J. Mar. 5, 2015).................................................................24

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)......................................................................................33

*Erste-Sparinvest Kapitalanlagegesellschaft MBH v. Seres. Therapeutics, Inc.*,
  2018 WL 1567614 (D. Mass. Mar. 30, 2018)..........................................................17

*Friedberg v. Discreet Logic, Inc.*,
  959 F. Supp. 42 (D. Mass. 1997) ......................................................................25, 33

*Hatamian v. Advanced Micro Devices, Inc.*,
  87 F. Supp. 3d 1149 (N.D. Cal. 2015) .....................................................................13

*Hedick v. The Kraft Heinz Co.*,
  2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ................................................12, 13, 17

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)......................................................................................21

*In re Intuitive Surgical Sec. Litig.*,
  65 F. Supp. 3d 821 (N.D. Cal. 2014) .......................................................................14

*In re iRobot Corp. Sec. Litig.*,
  2021 WL 950675 (D. Mass. Mar. 12, 2021).............................................................32

*Khoja v. Orexigen Therapeutics, Inc.*,
  2018 WL 3826298 (9th Cir. Aug. 13, 2018).............................................................34

*Leavitt v. Alnylam Pharms.*,
  451 F. Supp. 3d 176 (D. Mass. Mar. 23, 2020) ......................................................34

*Levy v. Gutierrez*,
  2017 WL 2191592 (D.N.H. May 4, 2017)......................................................33, 34, 35

*Liu v. Intercept Pharm., Inc.*,
    2020 WL 5441345 (S.D.N.Y. Sept. 9, 2020) ........................................................................30

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
    716 F.3d 229 (1st Cir. 2013) .............................................................................................12

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ...............................................................................................................30

*Miss. Pub. Emps' Ret. Sys. v. Boston Scientific Corp.*,
    523 F.3d 75 (1st Cir. 2008) ................................................................................... *passim*

*Omnicare v. Laborer Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ......................................................................................................16, 18

*In re Oxford Health Plans, Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ...................................................................................33, 34

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
    874 F. Supp. 2d 341 (S.D.N.Y. 2012) .................................................................................27

*In re Parametric Tech. Corp. Sec. Litig.*,
    300 F. Supp. 2d 216 (D. Mass. 2001) .................................................................................17

*In re PerkinElmer, Inc. Sec. Litig.*,
    286 F. Supp. 2d 46 (D. Mass. 2003) ...................................................................................23

*Philco Invs. Ltd. v. Martin*,
    2011 WL 4595247 (N.D. Cal. Oct. 4, 2011) .......................................................................30

*Pub. Emps' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
    2018 WL 844420 (N.D. Ill. Feb. 12, 2018) ........................................................................17

*In re Raytheon Sec. Litig.*,
    157 F. Supp. 2d 131 (D. Mass. 2001) .................................................................................22

*Schaffer v. Timberland Co.*,
    924 F. Supp. 1298 (D.N.H. 1996) .......................................................................................17

*Scritchfield v. Paolo*,
    274 F. Supp. 2d 163 (D.R.I. 2003) ......................................................................................16

*In re Sepracor, Inc. Sec. Litig.*,
    308 F. Supp. 2d 20 (D. Mass. 2004) ..............................................................................16, 17

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020) ...........................................................................................14, 19

*Shaw v. Digital Equip. Corp.*,
 82 F.3d 1194 (1st Cir. 1996) ........................................................................19, 25

*Simon v. Abiomed, Inc.*,

37 F. Supp. 3d 499 (D. Mass. 2014) ........................................................................34

*Simon v. Am. Power Conversion Corp.*,
 945 F. Supp. 416 (D.R.I. 1996) ........................................................................21

*Sloman v. Presstek, Inc.*,
 2007 WL 2740047 (D.N.H. Sept. 18, 2007) ..................................................19, 20

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
 604 F. Supp. 2d 332 (D. Mass. 2009) ......................................................16, 17, 22

*In re Stone & Webster Inc. Sec. Litig.*,
 414 F.3d 187 (1st Cir. 2005) ........................................................................18, 19

*Tabak v. Canadian Solar Inc.*,
 549 F. App'x 24 (2d Cir. 2013) ........................................................................35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) ........................................................................20, 27, 29, 32

*In re Venator Materials PLC Sec. Litig.*,
 2021 WL2980581 (S.D. Tex. July 7, 2021) ........................................................13

*Wasson v. LogMeIn, Inc.*,
 496 F. Supp. 3d 612, 639 (D. Mass. 2020) ........................................................34

## OTHER AUTHORITIES

Beatriz Mariano, *Creditor Intervention, Investment, and Growth Opportunities*,
 J. of Fin. Services Research, 47(2) ........................................................................24

Messod D. Beneish & Eric Press, *The Resolution of Technical Default*,
 Acct. Rev., 1995, Vol. 70, No. 2 ........................................................................24

Steven Balsam, et al., *Creditor Influence and CEO Compensation: Evidence from Debt Covenant Violations*, Acct. Rev., 2018, Vol. 93, No. 5 ........................................................................24

**DEFINED TERMS**

| Term | Description |
|---|---|
| ¶__ | Citations to the paragraphs in the Amended Consolidated Complaint For Violations Of The Federal Securities Laws (ECF No. 44). |
| Ballinger, Kevin or "Ballinger" | Defendant; served as Boston Scientific's Executive Vice President and President of the Interventional Cardiology division until he resigned on July 3, 2020.  ¶33. |
| Brennan, Daniel or "Brennan" | Defendant; served at all relevant times as Boston Scientific's Executive Vice President and Chief Financial Officer.  ¶30. |
| "Boston Scientific" | Boston Scientific Corporation, which is incorporated in Delaware, with its principal executive offices located in Marlborough, Massachusetts.  ¶28. |
| Class Period | February 6, 2019 through November 16, 2020 (inclusive). |
| Complaint | Amended Consolidated Complaint For Violations Of The Federal Securities Laws (ECF No. 44). |
| Control Period | The period from April 28, 2017, through February 5, 2019, i.e., the period of time immediately preceding the Class Period that is the same number of days as the Class Period. |
| DB or "Defendants' Brief" | Memorandum Of Law In Support Of Defendants' Motion To Dismiss The Amended Consolidated Complaint, (ECF No. 54). |
| Defendants | Defendant Boston Scientific and Executive Defendants. |
| Edwards | Edwards Lifesciences Corporation, a medical device manufacturer producing the SAPIEN TAVR device.  ¶¶52-54. |
| Exchange Act | The Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78jj. |
| Executive Defendants | Defendants Brennan, Ballinger, Fitzgerald, Mahoney, McCarthy, Meredith, and Lisa.  ¶37. |
| Ex. __ | Exhibits to the accompanying Declaration of Michael D. Blatchley. |
| FDA | The U.S. Food and Drug Administration. |
| FE 1 | Principal Therapy Consultant at Boston Scientific employed from 2000 to January 2021 and serving the New York/New Jersey area.  ¶104. |
| FE 2 | Principal Clinical Field Manager in Boston Scientific's Structural Heart division from January 2017 through January 2021.  ¶106. |

| Term | Description |
|---|---|
| FE 3 | Therapy Consultant at Boston Scientific in the Structural Heart Division in San Diego employed from February 2017 through January 2021.  ¶108. |
| FE 4 | Interventional Cardiology Territory Manager at Boston Scientific responsible for Lotus sales employed from January 2016 to January 2021.  ¶112. |
| FE 5 | Salesperson for Boston Scientific in the Southern Germany region from 2017 until October 2020.  ¶114. |
| FE 6 | Principal Human Factors Engineer at Boston Scientific from February 2019 to April 2020.  ¶122. |
| FE 7 | Senior Financial Analyst working on the operating expenses team at Boston Scientific from January 2019 to August 2020.  ¶132. |
| FE 8 | Financial Analyst at Boston Scientific's Maple Grove plant from April 2016 until July 2019.  ¶140. |
| FE 9 | Manufacturing Engineer at Boston Scientific's manufacturing facility in Penang, Malaysia employed from 2018 through March 2020.  ¶142. |
| Fitzgerald, Joseph or "Fitzgerald" | Defendant; served as Boston Scientific's Executive Vice President and President of Rhythm Management starring in February 2014 and became Executive Vice President and President of the Interventional Cardiology division effective July 6, 2020 after the departure of Defendant Ballinger.  ¶31 |
| Foster, Dan | Chief Engineer who worked on the Lotus Edge.  ¶124. |
| Frawley, Chris | Product Engineer in charge of the Lotus Edge.  ¶114. |
| Lang, Michael | Served as Vice President of Global Structural Heart Valves Marketing at Boston Scientific prior to and during the Class Period. ¶¶104, 136. |
| "Lotus" or "Lotus Edge" | TAVR device marketed and sold by Boston Scientific during the Class Period and touted as the only "fully repositionable" TAVR device.  ¶¶1-3. |
| Mahoney, Michael or "Mahoney" | Defendant; Chairman, President and Chief Executive Officer of Boston Scientific.  ¶29. |
| MAUDE | The Manufacturer and User Facility Device Experience database maintained by the FDA and which is used to monitor and track information concerning adverse events caused by medical devices.  ¶116. |
| McCarthy, Shawn or "McCarthy" | Defendant; served as Boston Scientific's Vice President and General Manager of Structural Hearth Valves from July 2017 through January 2020.  ¶32. |

| Term | Description |
|---|---|
| Medtronic | Medtronic PLC, a medical device manufacturer producing the CoreValve TAVR device.  ¶¶52-54. |
| Meredith, Ian or "Meredith" | Defendant; at all relevant times, served as Boston Scientific's Executive Vice President and Global Chief Medical Officer.  ¶34. |
| SEC | U.S. Securities and Exchange Commission. |
| Symetis | Symetis SA, a Swiss TAVR medical device manufacturer that Boston Scientific announced it would acquire on March 30, 2017.  ¶¶71-74. |
| TAVR | Transcatheter Aortic Valve Replacement, a procedure to treat aortic stenosis using a catheterized delivery of an artificial heart valve replacement.  ¶¶2, 50-51. |
| Tengler, Lauren | At all relevant times served as Boston Scientific's Director of Investor Relations.  ¶¶99, 249. |
| Vissers Lisa, Susan or "Lisa" | Defendant; at all relevant times, served as Boston Scientific's Vice President of Investors Relations.  ¶35. |

## I.      INTRODUCTION

Defendants' motion should be denied.  Plaintiff's Complaint provides detailed evidence, including Defendants' own admissions, citations to internal Company documents, and numerous witness accounts demonstrating that Defendants' misrepresentations concerning the Lotus Edge—Boston Scientific's "biggest investment" and most promising medical device in recent years—were knowingly or recklessly false when made.  Defendants falsely told investors that Lotus was "on track" to secure the Company's publicly announced goal of 150 Lotus accounts—about a quarter of the market—within the first year of its launch, and had contributed meaningfully to the impressive 50% year-over-year revenue growth reported in the Company's Structural Heart division.  According to Defendants, Lotus's success had been driven by its unique "ease of use" features and increasing surgeon adoption cultivated through a careful and "methodical" product launch focused on proctoring, training and ensuring "exceptional" outcomes and patient safety using the "exact" standards the Company demanded as a "world-class organization."

Over the course of 2020, Boston Scientific told investors it had successfully navigated the pandemic and met its goal to secure 150 U.S. Lotus accounts—telling investors that the re-order rates by physicians were "strong," "very high," and growing.  On October 15, 2020, Defendant Fitzgerald told investors that "I'm proud to report that we have opened more than 150 accounts in the United States," that "I like what I see in terms of us being now in 150 accounts" and that "we are expanding our footprint in the U.S., each month we're growing actual procedures per center, per month."  And on October 28, Defendant Mahoney reassured investors that "we're seeing strong results" with Lotus and reiterated the Company's confidence in the platform.

But just two weeks later—after Boston Scientific's CEO Defendant Mahoney unloaded $9 million worth of his personally held shares under a highly unusual 10b5-1 plan that was unlike any plan ever entered into by any other Boston Scientific executive—the Company disclosed that it

was shutting down the Lotus platform because of its complexity, clinical challenges, unsustainable costs, and lack of surgeon adoption.  In doing so, Defendants revealed that rather than achieve 150 accounts, there was in fact just "sub-100" accounts—or a third less than Defendants told investors just weeks before, and that actual sales were in fact half of analysts' estimates.  Defendants also admitted they decided the franchise was unsalvageable at "sub-100" accounts, revealing that the Company had months before concluded the franchise was doomed and would be shut down.  In response, the price of Boston Scientific shares collapsed, causing substantial damages to the Class.

In addition to Defendants' admissions, the Complaint provides extensive detail demonstrating that Defendants' Class Period statements were knowingly false, and that the Lotus launch had been a disaster.  Contrary to Defendants' statements, former employees reported that Defendants' statements were "deceiving" and false because sales never got off the ground, the launch was "clinically unsafe" and resulted in an alarming rate of patient injuries and deaths, and the product never approached a viable commercial production state.  In fact, rather than offer "ease of use," the Lotus was the "most complicated device on the planet" and Boston Scientific representatives were woefully ill-equipped to handle its complexities because they received inadequate training that was a fraction of what the Company required for "super easy" devices.  And unknown to investors, Defendants convened an emergency meeting over Thanksgiving 2019 because the launch was in crisis and then shut down a key manufacturing facility in March 2020 because the Company was getting "zero orders" for the product.  These facts state a claim under Section 10(b) of the Exchange Act.  *See In re Cabletron Sys., Inc.*, 311 F.3d 11 (1st Cir. 2002).

Ignoring these allegations and their own admissions, Defendants improperly seek dismissal by mischaracterizing the Complaint and offering implausible excuses for their misconduct.  The PSLRA may impose heightened pleading requirements, but it does not permit Defendants to

disclaim their own admissions or entitle them to implausible inferences on a motion to dismiss.

For instance, Defendants contend the Complaint fails to allege a single actionable misstatement because, Defendants claim, the detailed accounts of nine former Boston Scientific employees and numerous other well-pled allegations only show Lotus did not turn out how Defendants "hoped."  Setting aside the fact that Defendant Fitzgerald admitted the Company only opened "sub-100" accounts—direct proof that his statement that the Company had opened 150 is false—the Complaint provides a litany of facts demonstrating Defendants' statements were false when made.  Those include the facts showing that Defendants knew, in real time, Lotus's actual sales figures, the actual number of Lotus accounts, and internal documents reflecting only a handful of centers reordered Lotus at all.  Indeed, Defendants continued to tout Lotus's supposed success and expressly denied any problems—<u>after</u> they convened an emergency meeting to address the Lotus crisis over Thanksgiving and <u>after</u> they shut down the Penang facility after receiving "zero orders"—and cannot now claim Lotus simply fell short of their aspirations.

Next, again ignoring their own admissions, Defendants argue the Complaint fails to allege a strong inference of scienter, primarily by attacking as "insufficient" the nine witness accounts.  But the witnesses provide first-hand accounts of the dismal volume of Lotus sales and reorder rates, the device's complexities, the "clinically unsafe" rollout, and Defendants' efforts to keep these facts a secret.  These witnesses were at the center of the Lotus launch, directly interacted with named Defendants and other senior executives, and tell a consistent story that is corroborated by Defendants' admissions, internal Company documents, and Defendants' highly suspicious insider trades.  These allegations easily give rise to a strong inference of scienter and satisfy the PSLRA.  *See Cabletron*, 311 F.3d at 34.

The motion should be denied.

## II.     PLAINTIFF'S COMPLAINT

### A.     Lotus Edge's Importance to Boston Scientific

The Lotus Edge was touted by Boston Scientific as the Company's "biggest investment" over the past years and its most promising revenue driver in the Company's most important and fastest-growing division.  ¶202.  The Lotus Edge is a medical device that addresses heart disease—aortic stenosis, or the narrowing of the aortic valve—through a procedure called transcatheter aortic valve replacement, or TAVR.  ¶¶44-51.  Boston Scientific's Lotus was a late-comer to the burgeoning TAVR market, which was dominated by Edwards and Medtronic, and so the Company differentiated the product as providing unique advantages over their devices. ¶¶52-58.[1]

Specifically, according to Boston Scientific, the Lotus Edge offered "superior ease of use" by being "fully repositionable," which enabled surgeons to ensure a better "seal" and implantation positioning to minimize one of the most prominent risks of TAVR procedures—paravalvular leakage ("PVL"), or blood flowing through the space between an implanted valve and the cardiac tissue anchoring it.  ¶¶56-61.  The Company represented that the Lotus's superior "ease of use" would enable the device to become a "workhorse" valve—i.e., suitable for use in virtually all TAVR procedures—and capture market share.  ¶¶60, 87.  Analysts credited these representations about the device's "ease of use" and "more simple implementation procedure" (¶61), and estimated Lotus would contribute up to $4 to the price of Boston Scientific shares.  ¶¶40-43, 158-60.

### B.     Defendants Falsely Reassure Investors They Had "Fixed" Purportedly "Technical" Manufacturing Issues That Had Triggered A Series of Recalls

Before its commercial launch in the United States, Lotus suffered a series of setbacks that put Defendants on direct notice of the device's severe flaws—and in particular, the complexities

---

[1] References to ¶__ are to the Complaint and all defined terms herein have the same meanings as in the Complaint and Defined Terms chart.  All emphasis has been added and internal citations omitted unless otherwise noted.  References to "Ex. __" are to the accompanying Declaration of Michael Blatchley.

involving the device's delivery system.  ¶¶62, 64-65.  However, in response to three recalls of the device (which was then available only in Europe), Defendants reassured investors these setbacks were due to minor, technical manufacturing issues that the Company had identified and fixed.  ¶67. Similarly, when Boston Scientific acquired Symetis, another TAVR manufacturer, in March 2017, Defendants reassured investors that the acquisition did not reflect any doubts about Lotus.  Instead, Defendants told investors it was part of the Company's "dual-valve" strategy and that they were "very confident" about Lotus and had fixed the "technical" manufacturing issues.  ¶¶72-74.

Analysts credited these explanations, praising Boston Scientific's "very conservative approach…in getting this right" (¶70) and were reassured the delays were not the result of any critical design or other flaw.  ¶79.  When the Company disclosed that it was readying Lotus for its U.S. launch in August 2018, analysts estimated it would "add $400-500M to BSX's top line by 2021" and make the Company "one of the best fundamental stories in [] MedTech."  ¶80.

C.     **The Company Repeatedly Touts Its "Strong," "Very High" and Increasing Lotus Sales and Success in Obtaining 150 Accounts**

On the first day of the Class Period, February 6, 2019, Boston Scientific announced a timeline for the Lotus Edge launch, with Defendant Mahoney telling investors that the Company was executing a "smartly planned," "controlled launch" focused on delivering "excellent" patient outcomes.  ¶¶84, 238.  On April 23, 2019, Boston Scientific announced that, as expected, the FDA approved Lotus Edge, and the next day, Defendant Mahoney said the Company would begin "a controlled U.S. launch immediately" and released guidance for the Structural Heart division of $700 million to $725 million, with Lotus Edge a significant driver of these results.  ¶¶87-88.

In connection with the launch, Defendants made numerous claims specifically highlighting a key purported benefit of the Lotus Edge—that it was a "simple" device, "not a complicated device," and offered superior "ease of use."  ¶¶61, 258.  For example, Defendant Ballinger

highlighted that the "engineers have done a really good job making something that is very complex feel really simple" (¶226), and another executive explained it was "a simpler device to use."  ¶228.

Over the ensuing months, Defendants repeatedly told investors that the Lotus Edge launch was a resounding success, that the Company was "on track" to open in 150 accounts, and had been experiencing "very high" and "strong reorder rates."  ¶¶91-97.  By the end of 2019, Boston Scientific claimed Lotus sales were contributing materially to the Company's financial results, pointing to "mid-teens" growth in interventional cardiology as "evidence" of the device's success. ¶97.  And while the Company reported an initial slow-down due to the onset of the COVID-19 pandemic in March 2020, Boston Scientific continued to report strong sales throughout 2020 as "the reorder rate for existing users [remained] quite high."  ¶98.  In August 2020, Boston Scientific reported it had opened 138 accounts, including new centers that had never before used the device—a strong signal that the launch had been a success.  ¶99.

And by October 2020, Defendants claimed that Boston Scientific had achieved its 150-account goal, and that Boston Scientific was "expanding our footprint in the U.S. each month" and "growing actual procedures per center, per month."  ¶100.

### D.    In Reality, The Lotus Launch Was A Disaster and In Crisis

Contrary to Defendants' Class Period statements, Boston Scientific never fixed the problems with the Lotus, the launch was a disaster, carried out in a reckless and "clinically unsafe" manner, and as a result, sales never got off the ground.  ¶¶101-80.

**Lotus Was Complex and Impossible to Use.**  Far from being "easy to use," in reality, witnesses reported that the Lotus Edge was "the most complicated device on the planet" involving an inherently complicated TAVR procedure.  Indeed, the Company abandoned Lotus precisely because of the "complexities" associated with its delivery system and the extraordinary "time and investment required" to redesign it—facts that were known throughout the Class Period by

Executive Defendants, who were "throwing" money at trying to find a Lotus replacement precisely because it was so difficult to use, had "such [a] crappy design," and required surgeons to navigate 35 complicated steps (when competitors only had two).  ¶¶113, 181, 224.

**Lotus Complexities and "Clinically Unsafe" Launch Led to Injuries and Deaths.**  The complexities with the Lotus Edge led to frequent device malfunctions that were closely tracked by the Executive Defendants—including Defendant Meredith, Ballinger, and McCarthy, who attended quarterly sales meetings where adverse events were addressed—that were orders of magnitude greater than competitors Edwards' and Medtronic's devices.  Specifically, even though the Lotus accounted for only 2% of sales, the Lotus Edge was responsible for 12% of all adverse events reported to the FDA.  ¶118.  These adverse events were addressed in internal Company training materials as presenting life-threatening risks occurring at an alarming and increasing rates.  Indeed, twisted post—a life-threatening malfunction that was identified internally as the "main problem" with the device—"happened in 50% of all cases."  ¶112.

These adverse events were directly related to the inherent complexity of the device's delivery system and compounded by two other stunning failures by Boston Scientific.  First, unlike other medical device companies, Boston Scientific failed to gather and maintain basic information concerning surgeons' experiences with Lotus Edge, fearing that asking surgeons about bad experiences and how to prevent mistakes would inhibit sales.  ¶126.  For example, a Boston Scientific engineer who used to work in aviation reported that the Company disregarded human factor engineering the same way Boeing did in connection with the 737 Max crashes, with basic information about what the device's problems "near impossible" to find in the Company's databases.  ¶¶126-29. Second, making matters worse, Boston Scientific did not adequately train the Lotus sales force on how to handle the "most complicated device on the planet"—a failure that

led to a "clinically unsafe" launch and patient deaths and injuries.   ¶113.   Boston Scientific representatives received a fraction of the training on Lotus as they did on "easy" Boston Scientific devices and those Medtronic and Edwards required on their far simpler products.  ¶¶112-13.

**Lotus Edge Was Prohibitively Expensive to Manufacture.**  At the same time, Boston Scientific never fixed the manufacturing problems it disclosed prior to launch, and the Lotus <u>never</u> reached a viable commercial production state.  ¶138.  As former employees reported, the product had a yield rate of around 20% in an industry where a yield rate of 50% would be considered "extraordinarily low" and industry baselines are 85% or higher.  ¶¶140-41; *see also* ¶142.  These dismal manufacturing yields resulted in unsustainably expensive margins of around 30%, where industry standards (and those of other Boston Scientific products) were around 90% or more.  ¶144.

**Defendants Knew Lotus's Limited Potential and Closely Monitored Dismal Sales.**  But even before the Class Period, Boston Scientific confirmed Lotus had limited market in light of its higher incidence of pacemaker implants—and concluded the device would be able to capture at most 5% to 10% of all TAVR procedures.  ¶¶103-06.  Unfortunately for investors, actual Lotus sales were far worse than this market research projected.   As former employees reported, Defendants' claims that the launch was "going extremely well" were "<u>deceiving</u>" and false because in truth, sales were dismal and less than half of repeatedly reduced targets.  In fact, rather than experience "strong" and "very high" reorder rates, internal documents showed that by mid-2020, "<u>to date, only 12 accounts are implanting 2 / month or more (9 at a rate of 2.5+)</u>"—demonstrating only handful of the supposedly 150 accounts were reordering any Lotus Edge at all.  ¶131.

In reality, Boston Scientific management "freaked out" because the "orders just weren't coming in," and the Executive Defendants could see on sales dashboards that "there was no one ordering more product based on usage so there was no organic growth in the sales."  ¶¶134, 268.

As witnesses recounted, the Executive Defendants and "C-Suite" were "absolutely aware" of the true sales, as they spent "a lot of time" about "how to turn it around," with Defendant Mahoney "constantly" asking questions of the division's controller about Lotus's performance.  ¶136.

**E.    Boston Scientific Holds An Emergency Companywide Lotus Sales Force Meeting Over Thanksgiving Because the Launch Was in Crisis**

Following dismal sales and a spike in Lotus patient injuries and deaths, the Company's senior leadership convened an emergency meeting over the 2019 Thanksgiving weekend because the launch was in crisis.  In that meeting, which was attended by Defendants Ballinger, McCarthy, Meredith, and the head of Structural Heart sales, senior management provided additional training, discussed the poor sales, and reinforced talking points on how to respond to the criticisms about the device (including its higher pacemaker rates, higher risk indication, and complexity). ¶137.

**F.    After Receiving "No Orders," the Company Shut Down A Key Lotus Manufacturing Facility and Determined to Discontinue the Franchise**

Just months after Thanksgiving meeting, Defendants decided to shut down a key Lotus manufacturing facility in March 2020 given that the facility had received "zero orders" for Lotus in the second half of 2019.  ¶146.  This shutdown is highly significant, and confirms Defendants' decision to terminate the franchise occurred no later than that date—because, in light of the Lotus's expiration dates, there would be no product left to sell in just several months.  ¶¶146-47.  At the same time, the key senior executives responsible Lotus headed for the exits—including Defendant McCarthy, the Company's Lotus spokesperson, and Defendant Ballinger (¶209), who months earlier told investors that Lotus was "going to really transform our company and our division in ways that many don't see in an entire career."  ECF No. 55-1 at 59.

**G.    In Danger of Defaulting, Defendants Continue to Mislead Investors in Order to Raise Capital and Renegotiate the Company's Debt**

While the Company had determined by the first quarter of 2020 that Lotus was a failure

and would be abandoned, the onset of COVID-19 pandemic provided a powerful motive for the Company to conceal that fact.  Specifically, following a string of acquisitions, the Company had a debt leverage ratio in excess of what its loan covenants allowed and, with the pandemic sales slow-down, the Company would breach its loan covenants by the fourth quarter of 2020, if not earlier. ¶¶152-53.  But Boston Scientific could not disclose to its lenders that the "biggest investment" at the Company had been an utter failure, would generate zero revenues, and require the Company to incur hundreds of millions of dollars in restructuring charges.   Instead, Boston Scientific determined to keep the Lotus failure a secret—and instead touted the launch's supposed success— enabling the Company to renegotiate $4 billion in debt and raise $2 billion from public investors in Boston Scientific's largest-ever secondary equity offering.  ¶¶155-56.  And even though the Company concluded that the business was unsalvageable by the first half of 2020, when analysts questioned whether this unprecedented capital raise signaled problems with Lotus Edge, Defendant Mahoney lied, stating the "Lotus will continue to be an important growth driver," pointing to "more account openings" and the "quite high" reorder rate.  ¶¶158-59.

### H.    After Touting 138 Accounts, Defendant Mahoney Engineers the Sale of $9 Million of His Personally Held Shares in a Highly Suspicious Insider Trade

Following the capital raise, on August 19, 2020, Defendants told investors the launch was "going well" and that the Company "hit 138 accounts"—a demonstrably false claim in light of the subsequent admission that Boston Scientific only landed "sub-100" accounts.  ¶¶99-100.  Just one week later, Defendant Mahoney entered into a highly unusual Rule 10b5-1 trading plan that was unlike any other he, or any other Boston Scientific executive, had ever adopted so that he could sell over $9 million in shares before the truth about Lotus was revealed.  That highly suspicious plan contained numerous features deemed "red flags" for Rule 10b5-1 plan abuse, including that it had an extraordinary short duration "cooling off" period and operated as a "single trade plan,"

where all shares were sold at once.  ¶¶163-64, 166.  The plan itself—which Defendants improperly submitted on this Rule 12(b) motion—in fact <u>corroborates</u> Defendant Mahoney's powerful motive to delay disclosure of the truth about Lotus until after October 29 (the first day he could sell under the plan) and keep the stock price inflated (so the plan would trigger and sell).  ¶¶168, 180.

On October 15, 2020, at the Transcatheter Cardiovascular Therapeutics Conference—the most important TAVR industry conference of the year—Defendant Fitzgerald announced, "<u>we have opened more than 150 accounts in the United States</u>," that "<u>I like what I see in terms of us being now in 150 accounts in the United States</u>," and that Boston Scientific was "<u>growing actual procedures per center, per month</u>."  ¶¶ 100, 169.   And, on Company's October 28, 2020 third quarter earnings call two weeks later—the day before the plan could execute a trade—Defendant Mahoney touted Lotus's "<u>strong results</u>," surgeons using the device "<u>quite regularly</u>," and that the "<u>two-valve strategy makes sense</u>." ¶177.   Two business days later, on November 3, 2020, Mahoney's plan was triggered, enabling to reap $9 million in insider sales.  ¶161.

## I.    <u>Defendants Stun Investors by Recalling Lotus Edge and Disclosing the Business Shutdown in An Abrupt Abandonment of the Dual-Valve Strategy</u>

Exactly fourteen days later, Defendants stunned investors by disclosing a global recall of the Lotus Edge and revealing they were shutting down the business entirely.  ¶181.  On a conference call to address the Lotus closure, Defendant Fitzgerald admitted that rather than open "<u>more than 150 accounts</u>" as he represented in October, in truth, <u>the Company never obtained 150 accounts</u>.  In fact, Defendants Fitzgerald admitted that Boston Scientific had decided to shut down the franchise months before, stating that Boston Scientific determined that to go from "sub-100 accounts <u>today</u> in the United States to hundreds of accounts [] we really were going to struggle." ¶187.  Defendant Brennan further disclosed that Lotus was in reality an "overall a drag on the bottom line," revealing that Lotus's 2020 sales were only half of analysts' estimates.  ¶183.

Analysts reacted with disbelief, questioned how this disclosure could be reconciled with the Company's statements just weeks before, and criticized the announcement as a "credibility ding to management." ¶¶169-70.  In response, Boston Scientific's stock price fell over 8% on the second-largest single-day trading volume for the Company's stock since 2015.  ¶¶188-89, 192.

On February 23, 2021, Boston Scientific revealed that the Boston Regional Office of the SEC had commenced an investigation into Lotus Edge.  The SEC has since issued at least two sets of document requests to the Company, and the investigation remains pending.  ¶200.

## III.    ARGUMENT

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 237 (1st Cir. 2013).   To state a claim under Section 10(b), Plaintiff must allege: (1) a material misrepresentation of fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Id.*  Defendants here challenge only (1) falsity and (2) scienter, and thus concede all other elements.

### A.    <u>Defendants Made Materially False and Misleading Statements</u>

To plead falsity under the PSLRA and Rule 9(b), a complaint need only "'specify each allegedly misleading statement or omission' including its time, place and content" and provide facts showing "'why the statements or omissions were misleading.'" *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002).  And when "at least one allegedly false statement" is sustained, a court can deny a motion to dismiss on those grounds alone.  *City of Brockton Ret. Sys. v. CVS Caremark Corp.*, 2013 WL 6841927, at \*4 (D.N.H. Dec. 30, 2013); *Hedick v. The Kraft Heinz Co.*, 2021 WL 3566602, at \*3 (N.D. Ill. Aug. 11, 2021) (same).  Defendants here made four categories of false and misleading statements about the Lotus Edge.

First, Defendants misrepresented that the Company was on track to reach 150 Lotus accounts, and had in fact reached that goal. For example, Defendant Fitzgerald told investors on October 15, 2020 that, "I'm proud to announce that we have opened more than 150 accounts," that "I like what I see in terms of us being now in 150 accounts." These statements were false because, as Defendant Fitzgerald admitted several weeks later, Boston Scientific was at "sub-100 accounts today" and had previously determined to exit the business when it was at "sub-100" accounts.

Similarly, throughout the Class Period, Defendants claimed that the Lotus launch was going "extremely well," "on pace to open 150 accounts," "seeing very high reorder rates," "gaining share from both the competitors in the U.S. market," and was a "big driver" of the Company's results. ¶¶243, 245, 251, 260, 271, 276, 286. These statements were false and misleading because rather than being "on track" to open 150 accounts, experiencing high reorder rates and strong results, in truth, the Lotus launch was a disaster (¶288), TAVR centers were not reordering Lotus (¶252), sales were less than half of substantially reduced internal targets (¶259), and the Company shut down Lotus at sub-100 accounts and never reached 150. ¶187. As noted above, many of these statements are admittedly false, and all are actionable. *See, e.g., Kraft*, 2021 WL 3566602, at *6 ("on track"); *In re 2U, Inc. Sec. Class Action*, 2021 WL 3418841, at *10, *15 (D. Md. Aug. 5, 2021) (progress statements); *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1158-59 (N.D. Cal. 2015) (product faring well, "on target," and "in line with expectations"); *In re Venator Materials PLC Sec. Litig.*, 2021 WL2980581, at *20 (S.D. Tex. July 7, 2021) ("on track").

Second, Defendants' statements touting the Lotus Edge as superior to its competitors because it was "simple," offered "superior ease of use," and "not a complicated device" were materially false and misleading. In truth, Lotus was "the most complicated device on the planet," required three hands to operate and 35 steps to implant (as opposed to only two for its competitors),

and so complex the Company had to recall it.  ¶¶229-35.  These statements are actionable.  *See In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 328-29 (D. Mass. 2002) ("ease of use" statements actionable); *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014) (same).

Third, Defendants statements' describing the Lotus launch as measured, "controlled," and focused on delivering "quality, strong patient outcomes, and proctoring" (¶¶84, 248) were false and misleading because, in truth, the launch was "clinically unsafe" and jeopardized patient safety. ¶254.  Courts routinely hold similar statements actionable.  *See In re Intuitive Surgical*, 65 F. Supp. 3d at 834 (safety statements actionable); *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 2021 WL 1264027, at \*12-\*13 (E.D. Pa. Apr. 6, 2021) ("statements about safety implied an underlying prioritization of resources" and were false in light of cost-cutting); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80, 83 (S.D.N.Y. 2017) (similar).

Fourth, Defendants reported false and misleading financial results by failing to disclose the Lotus shutdown and impairment, a decision management reached at "sub-100 accounts." ¶187. The failure to disclose the shutdown while touting Lotus's purported success is actionable.  *See, e.g., Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 (2d Cir. 2020) (company was "duty-bound" to disclose facts that made financial performance statements misleading).

## B.   Defendants' Falsity Arguments Are Meritless

Defendants argue that their misstatements are not actionable because they are either literally true, puffery, opinion, or forward-looking.  Defendants' arguments are meritless.[2]

### 1.   Defendants' Misrepresentations Are Actionably False and Misleading

First, Defendants ask the Court to disregard Defendant Fitzgerald's admission that the Company never opened 150 accounts, contending that he was actually only referring to "active"

---

[2] While Defendants' submission of their Exhibit B, which provided additional argument concerning the false statements, was improper, Plaintiffs respectfully submit herewith a chart addressing the points therein as Ex. A.

accounts when he said Boston Scientific had "<u>sub-100 accounts today</u>" at the end of the Class Period.  ¶¶187, 194.  This argument is made up from whole cloth and improper.  *Aldridge*, 284 F.3d at 79.  First, Fitzgerald did not say that he was referring only to "active" accounts—whatever that may mean—when he admitted to only achieving "100 accounts" in two separate instances after the Class Period, and Defendants are not entitled to put words in his mouth on a motion to dismiss.  ¶¶187, 194.  Second, Fitzgerald nowhere stated that when he told investors that "<u>I like what I see in terms of us being now in 150 accounts</u>" a month before, he was actually referring to both "active" and "inactive" accounts—a distinction never made in any public statement prior to Defendants' motion here.  Indeed, if Fitzgerald actually was including 50 "inactive" accounts in the 150 total, that would be a highly material and actionable omission.  ¶170.  And if Defendants had in fact somehow lost more than 50 "active" accounts (that switched to "inactive") between October 15 and November 17, they surely would have said so when analysts repeatedly asked them what possibly could have explained how Lotus went from "gaining momentum" in October to a total failure in November.  Defendants' revisionist and implausible inferences cannot be credited.[3]

Defendants' contention that the Complaint insufficiently alleges the falsity of Defendants' statements about Lotus sales figures and its purported "ease of use" is similarly meritless. Defendant Fitzgerald's admission confirms Defendants' sales-figure statements were false, as do the witness accounts reporting that Lotus sales "weren't coming in," "missing big" by more than 50%, and that there were "zero orders" for the product (¶¶133-36, 146, 204); that the Company secretly engaged in drastic discounting to get surgeons to buy it (¶147); and the internal documents

---

[3] Defendants state that Plaintiff acknowledged that Boston Scientific "tracked" "active" accounts—pointing to the internal documents cited in the Complaint showing that only a handful of accounts reordered Lotus at all.  DB 29 (citing ¶¶131, 203).  This explanation is just as implausible and improper given that "sub-100" (¶187) or "about 100" (¶194) is not how someone would refer to the number "9" or "12."  ¶131.  Moreover, it would be incompatible with the context of Fitzgerald's statements for him to be referring to just these few accounts when describing the difficulty in "scaling" the product (¶187) and the timing of Defendants' decision to abandon Lotus. ¶194.

showing only a handful of centers reordered the product at all.  ¶131.[4]  And Defendants' argument that they "sincerely desired" to make the product easy to use does not inoculate their statements describing the device as <u>in fact</u> "easy to use."  To the extent Defendants claim these statements are "sincerely held" opinions, they are actionable under *Omnicare* (discussed below) because they omitted material facts—including that the Boston Scientific engineers and clinicians responsible for Lotus considered it the "most complicated device on the planet."  ¶¶61, 122-24, 181.

### 2.      Defendants' Misrepresentations Are Not Puffery

Next, Defendants seek dismissal by arguing many of their statements about Lotus were protected corporate "puffery."  But statements of corporate optimism are inactionable only when they are "so vague, so general, or so loosely optimistic that a reasonable investor would find [them] unimportant," and courts warn that dismissal on this ground should be exceedingly rare.  *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 342 (D. Mass. 2009); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 & n.11 (D. Mass. 2006).

That is particularly true in this case, as Defendants here excise words accompanying their misstatements to contend those cherry-picked words—by themselves—are "puffery," a tack that has been repeatedly rejected in this Circuit.  *See In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 33 (D. Mass. 2004) (statements expressing "confidence" must be read in context); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 176 (D.R.I. 2003) (defendants cannot "pluck[] the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague'").  Worse, most of the "puffery" language Defendants attack is not alleged to be false.  Rather, the misrepresentations concerned verifiably false statements of fact separate and apart from the

---

[4] Defendants try to minimize the fact that Boston Scientific engaged in bulk discounting of Lotus—when Defendants told investors Lotus would not discount or compete on price (¶¶241, 249)—by claiming the Company never promised not to change strategies.  But the Complaint alleges discounting was occurring <u>at the time these statements were made</u>. ¶¶96, 250, 259 (discounting began at "full launch"); 256 ("full launch" started July and August timeframe).

cherrypicked "optimism" terms Defendants cite.  For example, Defendants miscite irrelevant "optimism" terms in defending statements about (i) Boston Scientific's pricing strategy for Lotus as not involving "discounting" (when the Company was in fact discounting) (¶249); (ii) the "strong reorder rates" for Lotus (when there were "zero orders") (¶251), and progress in "opening the 150 accounts" (when the Company never reached 100) (¶261)—all of which are verifiably false.

To the extent Defendants actually challenge the portions of the statements alleged as false, they ignore the critical context demonstrating that such statements are clearly actionable here.  For example, Defendants describe as "puffery" statements touting Lotus's "momentum" in March 2020 in describing Lotus as on-goal for "150 accounts" by April (¶296) and the claim that it was "gaining momentum" in October because it had achieved "150 accounts" by then.  ¶319.  But the Company never achieved 100 accounts, and any claims of "momentum" based on that false assertion are actionable.  *See, e.g., Smith & Wesson*, 604 F. Supp. 2d at 342 (statements regarding "strength" of demand actionable); *Sepracor*, 308 F. Supp. 2d at 34 ("confidence" about FDA approval actionable); *Schaffer v. Timberland Co.*, 924 F. Supp. 1298, 1314 (D.N.H. 1996) ("brand remains strong"); *Pub. Emps' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2018 WL844420, at *2 (N.D. Ill. Feb. 12, 2018) ("gaining momentum"); *Kraft*, 2021 WL 3566602, at *10.[5]

### 3.   Defendants' Misrepresentations Are Not Protected Opinions

Defendants' contention that many statements are non-actionable opinions also fails.  First, Defendants' statements are not opinions.  A statement is an opinion only when it is expressly stated as such, and here the vast majority of statements contained no such qualifying language.  *See*

---

[5] Defendants' cases are entirely inapposite, and held the challenged statements were actually not puffery (*Erste-Sparinvest Kapitalanlagegesellschaft MBH v. Seres. Therapeutics., Inc.*, 2018 WL 1567614, at *8 (D. Mass. Mar. 30, 2018)), not sufficiently alleged as false and in fact sustained where sufficiently quantified (*In re Cytyc Corp.*, 2005 WL 3801468, at *22, *24 (D. Mass. Mar. 2, 2005)), or forward-looking and so indefinite and generic as to be meaningless.  *In re Parametric Tech. Corp. Sec. Litig.*, 300 F. Supp. 2d 216, 217-18, 221 (D. Mass. 2001).

*Omnicare v. Laborer Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185 (2015); *see, e.g.,* ¶¶287 ("we're on track we said to hit 150 centers"); 301 ("Lotus Edge continues to see strong utilization within existing accounts"); 305 ("we hit 138 accounts").   Second, even if certain statements could be considered opinions, they are actionable because they omitted material facts. For example, the supposed "opinion" that "we're really excited about Lotus Edge and how it's going" because the Company was "on track to hit 150 centers" (¶¶286-87) noted in Defendants' brief is clearly actionable.   At the time this statement was made, it omitted the highly material facts that the Company (i) was <u>not</u> "on track" to hit 150 and never reached "sub-100," (ii) had earlier convened an emergency meeting over Thanksgiving because the launch was in crisis, (iii) decided to shut down the manufacturing facility in Penang because of a lack of sales, and (iv) was in the process of exiting the business completely.  *See Omnicare*, 575 U.S. at 189 (opinion actionable if it "omits material facts [that] a reasonable investor would take from the statement itself").[6]

### 4.    Defendants' Statements Are Not Protected By The Safe Harbor

Defendants also argue that several challenged statements are not actionable because they are forward-looking—but all are statements of present fact to which the safe harbor does not apply.

The example Defendants highlight—that the Company "remained on track to open 150 accounts" in February 2020—is directly on-point.  DB at 32.  This is a present-tense statement describing the then-current status of the Lotus launch, and was accompanied by Defendant Mahoney's and Brennan's specific present-tense and historical factual statements responding to analyst questions concerning the "cadence" of the launch and the Company's "confidence" in it. ¶¶279-91 ("Lotus is doing very well," is "on plan," with a "very controlled rollout that we've had").  These statements are not forward-looking, and are actionable.  *See In re Stone & Webster*

---

[6] While it is difficult to understand how Defendants can claim they sincerely believed their statements in light of Fitzgerald's admissions, the Complaint provides ample facts showing they were not sincerely believed. ¶¶202-24.

*Inc. Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005) (safe harbor does not protect statement "whose falsity consists of a lie about a present fact"); *Sloman v. Presstek, Inc.*, 2007 WL 2740047 at \*5 (D.N.H. Sept. 18, 2007) ("on track" statements not protected).

And even if these statements were forward-looking (they are not), the meaningless cautionary language Defendants highlight about the risks of <u>all</u> product launches did not permit them to lie about the current status of the Lotus launch. *See, e.g., Shaw v. Digital Equip. Corp*., 82 F.3d 1194, 1214 (1st Cir. 1996) (requiring "unambiguous warning"); *Ark. Pub. Emp. Ret. Sys. v. GT Solar Int'l, Inc.*, 2009 WL 3255225, at \*9-10 (D.N.H. Oct. 7, 2009) (general risks insufficient). And given Defendants' admissions, the Complaint pleads actual knowledge.

### 5.    Defendants' Financial Results Statements Are Actionable

Defendants' argument that their failure to timely disclose an impairment for the Lotus business shut-down is not actionable also fails. Citing no law, Defendants' argument on this point relies solely on their incorrect contention that Plaintiff has not adequately alleged that the decision to shut down Lotus was made prior to November 2020. But Defendants' own admissions refute this argument. Defendant Fitzgerald admitted management concluded to terminate the franchise at "sub-100" accounts, i.e., the first quarter 2020 based on Defendants' statements. Indeed, a witness who worked in the Penang facility corroborated this admission and confirmed that a key Lotus facility was shut down in March 2020 precisely because there were "zero orders" for Lotus. These facts are more than sufficient. *Omega Healthcare*, 968 F.3d at 214.[7]

### 6.    Defendants Were Obligated to Be Complete and Accurate

Last, although Defendants agree that they were required to be complete and accurate once

---

[7] Defendants seek to minimize their motive to conceal the shut-down by citing to two pre-commercial businesses (nVision's R&D line and Apama) that the Company did write down. DB at 33-34. But these two development-stage businesses do not remotely compare to the loss of the "biggest investment" and hundreds of millions in revenues with Lotus and, if anything, only bolster the materiality of Defendants' failure to disclose the Lotus impairment.

they chose to speak, they wrongly claim that none of their misstatements are actionable because they provided generic risk warnings about <u>all</u> product launches and contend everything was disclosed.  DB 34-35.  But Defendants' generic risk disclosures are irrelevant, as most of Defendants' statements were verifiably false—e.g., Defendants said there were 150 accounts when in truth there were 100—none were forward-looking, and all of them concealed highly material facts concerning the Company's most important product.  *See, e.g., Blatt v. Muse Techs., Inc.*, 2002 WL 31107537, at *8 (D. Mass. Aug. 27, 2002) (Woodlock, J.) ("difficult to conclude that the market would have been indifferent" to concealed facts).  The argument should be rejected.

### C.    <u>The Complaint Adequately Alleges A Strong Inference of Scienter</u>

#### 1.    <u>The Pleading Standard Under the PSLRA</u>

The Complaint pleads a strong inference of scienter.  *Miss. Pub. Emps' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 (1st Cir. 2008).  The inference of scienter "need not be irrefutable" (i.e., of the "'smoking-gun' genre"), nor "even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); *Aldridge*, 284 F.3d at 82 ("Inferences must be reasonable and strong – but not irrefutable"); *Presstek, Inc.*, 2007 WL 2740047, at *7 ("a tie [ ] goes to the plaintiff").  Rather, a complaint will survive when <u>all</u> allegations, "<u>taken collectively</u>" give rise to a strong inference, not "whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.

#### 2.    <u>The Complaint Adequately Alleges Scienter</u>

Here, Plaintiff alleges with particularity facts that give rise to a strong inference that Defendants knew or were reckless in not knowing the truth of Lotus.  These include:

<u>**Defendants' Admissions "Easily" Establish Scienter**</u>.  After declaring the Company opened more than 150 accounts on October 15, 2020, just one month later Defendant Fitzgerald admitted the Company never achieved that goal, was in fact still at "sub-100 accounts," and that

Boson Scientific had made the decision to exit Lotus months before.  ¶187.  Defendant Fitzgerald said that the decision to discontinue the Lotus Edge was made "about 12 months after full launch" and at "about 100" accounts—i.e., around the first quarter 2020.  ¶194.

These statements establish that Boston Scientific never achieved its earlier publicly touted "150 account" milestone and decided to shut down the Lotus in the middle of the Class Period. There could hardly be any more direct proof of scienter than an admission that Defendants knew contrary facts at the time of the false statements, and thus effectively "knew it all along."  *See, e.g., Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 434 (D.R.I. 1996) (scienter "easily satisfied" in light of admissions that defendants knew of problems); *Alliaire*, 224 F. Supp. 2d at 329-31 ("inconceivable" management was unaware); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10 (N.D. Cal. Nov. 4, 2020) (statement that defendant "'saw'—using the past tense that suggests contemporaneous knowledge—troubling signs in China 'as the quarter went on'…constitutes an 'I knew it all along' type of admission'").

**Defendants' Denials and Responses to Analyst Questions Support Scienter.**  Scienter is also supported by the fact that Defendants, in response to repeated and pointed analyst questions about the 150-account progress, falsely claimed the Company was "on track" and "on plan" to meet that goal.  *See, e.g.,* ¶¶99, 205, 243, 246, 249, 251, 256, 258, 261, 263, 267, 275, 280-81, 291-93, 296, 303, 308, 316, 319; *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) (scienter where executives were "specifically asked, directly and repeatedly" about topic). And when responding to analysts, Defendants professed to closely track Lotus sales, with Defendant Mahoney reassuring investors "[w]e're seeing very high reorder rates of Lotus" (¶95), Defendant Ballinger reporting new accounts were at the rate "we predicted" (¶96), and Defendant Fitzgerald stating "I like what I see in terms of us being now in 150 accounts."  ¶100; *Boston*

*Scientific*, 523 F.3d at 91 (scienter where company was "monitoring, analyzing, and investigating" issue); *Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 251, 255-56 (D. Mass. 2018) ("Defendants themselves claimed . . . to closely track all aspects of the treatment").

    **Defendants' Personal Involvement and Access to Contrary Information**. Consistent with above facts, Defendants had access to internal data showing Lotus's poor sales and discussed these figures at regular sales meetings—with Lotus sales coming in at 50% of targets in 2019, far below drastically reduced targets thereafter, and internal documents confirming that only a handful accounts were implanting more than two devices per month.  ¶¶131, 133.  The Executive Defendants had a years-long involvement in bringing the device to market (¶207) and could access sales numbers through a sales dashboard (¶134), Defendants McCarthy, Ballinger, and Meredith discussed them at quarterly sales meetings (¶¶110, 208), and the numbers were so alarmingly bad that Defendant Mahoney was "constantly" asking about them.  ¶136.  *See Boston Scientific*, 523 F.3d at 91-92; *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 148 (D. Mass. 2001) (scienter considerably strengthened by "divergence between the losses recognized on Raytheon's internal documents").  The launch was so disastrous that over Thanksgiving senior Company leadership convened an emergency meeting to address it—an extraordinary measure that is incompatible with Defendants' positive public statements.  ¶137; *see In re Smith & Wesson*, 604 F. Supp. 2d at 344 (scienter supported by executives' participation in sales meetings); *Albridge*, 284 F.3d at 83 (contrary internal information is "classic evidence of scienter").

    **Defendants' Suspicious Insider Sales Supports Scienter**.  The suspicious insider sales by the Executive Defendants—which departed substantially from prior practice—further supports scienter.  The Executive Defendants adopted 10b5-1 trading plans during the Class Period covering roughly twice the amount of equity as compared to the amount covered by plans during the prior

Control Period—showing that they were expecting to sell far more shares while the stock was artificially inflated (¶217)—and the proceeds reaped from sales by Defendants Ballinger, Brennan, and Fitzgerald were over 150% greater than proceeds garnered during the Control Period.  ¶224.

Further, Defendant Mahoney's scienter is strongly supported by the fact he entered into a highly unusual 10b5-1 trading plan to sell over $9 million of stock <u>after</u> Boston Scientific determined Lotus would be discontinued, <u>after</u> closing the Penang facility, and <u>just one week after</u> Boston Scientific falsely told investors the Company had obtained 138 Lotus accounts.  ¶¶161-68.  This trading plan was unprecedented—it was the first "single-trade plan" (as opposed to a plan that spaces sales over multiple trades) adopted by a Boston Scientific executive, had a termination date just 50 trading days after adoption (the shortest of any Boston Scientific executive ever), and numerous other "red flags" identified by academics as indicating a potential for abuse.  ¶221.  And Defendant Mahoney's sale of over $9 million worth of stock pursuant to the plan occurred just <u>three days</u> after he personally assured investors of Lotus's "strong results" and a mere 14 days before disclosing that Lotus Edge would be discontinued and recalled.  ¶¶218, 319.  This is strong evidence of scienter.  *See Boston Scientific*, 523 F.3d at 92-93 (scienter where defendant sold prior to product recall); *In re PerkinElmer, Inc. Sec. Litig*., 286 F. Supp. 2d 46, 55 (D. Mass. 2003) (scienter where defendants sold when problems were "increasingly apparent").

**<u>Defendants Were Highly Motivated to Delay Disclosing the Lotus Failure</u>.**  Defendants were highly motivated to conceal the Lotus failure in light of the Company's precarious financial condition.  At the beginning of 2020, Boston Scientific was facing a financial crisis because the pandemic had drastically curbed revenues as the Company's debt load was threatening a default.  ¶¶151-54.  By keeping the Lotus failure secret, Defendants were able to, and did, renegotiate the Company's debt and raised over $4 billion—including $2 billion from the largest secondary public

equity offering in the Company's history.  ¶156.  This would have been all but impossible had Defendants disclosed the truth and recorded the approximately $200 million in charges it would be (and eventually was) forced to incur.  ¶¶202, 215.  In fact, the fourth quarter was the only quarter in which Boston Scientific could have recorded the Lotus charge and still have showed a profit. ¶216.  The severe personal consequences facing Defendants in a default scenario, and the evidence they gamed the disclosure, strongly supports scienter.  *See In re Cabletron*, 311 F.3d at 39 (scienter where company "on the line"); *Brumbaugh*, 416 F. Supp. 2d at 248, 253 (scienter where company "desperate for cash"); *Dep't of Treasury of the State of N.J. and Div. of Invest. v. Cliffs Nat'l Res., Inc.,* 2015 WL 6870110, at *4 (D.N.J. Mar. 5, 2015) (motive to retain jobs).[8]

Moreover, in response to pointed analyst questions about whether the unprecedented capital raise reflected a lack of confidence in Lotus, Defendant Mahoney flatly rejected that concern, stating that the "Lotus will continue to be an important growth driver for us" and "the reorder rate for existing users is quite high" (¶¶158-59)—when in fact management had already decided to discontinue the product and had shut down the Malaysian facility due to a lack of orders. This is strong evidence of scienter.  *See Energy Transfer LP*, 2021 WL 1264027, at *21 (scienter evidenced by defendant's denials in response to analyst questions).

**The Resignations Of Key Executives Support An Inference Of Scienter**.  The resignations of key executives involved in the Lotus launch—including Defendants Ballinger and McCarthy—further support scienter.  ¶149.  Rather than follow through on the years-long project they led to bring Lotus Edge to market, both of these executives resigned just months into the

---

[8] It is well documented that defaults are associated with stock declines, executive terminations, and a reduction in compensation, earnings, and shareholder investment.  *See, e.g.*, Beatriz Mariano, *Creditor Intervention, Investment, and Growth Opportunities*, J. of Fin. Services Research, 47(2), at 203-28; Messod D. Beneish & Eric Press, *The Resolution of Technical Default*, Acct. Rev., 1995, Vol. 70, No. 2, at 337-53; Steven Balsam, et al., *Creditor Influence and CEO Compensation: Evidence from Debt Covenant Violations*, Acct. Rev., 2018, Vol. 93, No. 5, at 23-50.

launch, for Defendant McCarthy, shortly after the emergency Thanksgiving meeting (¶137) and, for Defendant Ballinger, after the Penang facility was shut down and at the time management determined to exit the franchise.   ¶¶187, 194.   These suspicious resignations show Defendants knew Lotus had failed, and support scienter.   *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 76 (D. Mass. 2014) (scienter supported by defendants' resignations).[9]

**The Close Temporal Proximity Between False Statements And Disclosures**. Scienter is also strongly supported by the short temporal proximity between Defendants' false statements that the Company had obtained 150 accounts and Lotus was "gaining momentum" in October 2020 and its about-face in November that the product would be recalled and the Company never secured 100 accounts.   *See Boston Scientific*, 523 F.3d at 91 (short time between false statement and recall "is strong evidence" of scienter); *Shaw*, 82 F.3d at 1224-25 (one-month proximity supports scienter); *Friedberg v. Discreet Logic, Inc.*, 959 F. Supp. 42, 51 (D. Mass. 1997) (same).

### 3.   Defendants' Scienter Arguments Are Meritless

In the face of these allegations, Defendants' scienter "strategy" is to improperly attack each allegation in isolation, instead of looking at the totality of facts collectively as required, to wrongly argue this case is "fraud by hindsight."   *Collier*, 9 F. Supp. 3d at 72-76.   In so doing, Defendants urge the Court to draw the improbable inference that Defendants "still believed in the Lotus's benefits" until the end of October and suddenly decided to recall product—with all that entails—in the two weeks after Defendant Mahoney sold $9 million in shares.   DB at 27.   But this version of events finds no support in the Complaint and is contrary to common sense.   Moreover, this inference is flatly contradicted by Defendants' admissions that (i) senior management concluded, months before this fact was disclosed, that Lotus would be discontinued (¶¶187, 194); (ii) that

---

[9] Two other key executives who had spent their careers on Lotus resigned or moved positions shortly after the launch began in 2019 (¶149), further corroborating it was a failure long before that fact was disclosed.

Boston Scientific never opened more than 100 accounts in November when it falsely claimed to have secured 150 accounts in October (¶¶187, 194); and that (iii) insurmountable "manufacturing challenges, the clinical support challenges," and the device's complexity drove the Company to kill it.  ¶185.  Defendants cannot obtain dismissal by running from these facts.

**_Former Employee Accounts Provide Powerful Evidence of Scienter_.**  Defendants' lead scienter argument is that the Court must disregard every allegation from nine Boston Scientific former employees because their accounts are not sufficiently detailed enough.  But accounts like those here are routinely accepted and courts accord them great weight when, as here, they are detailed, corroborated, coherent, plausible, and numerous. *See, e.g., Cabletron*, 311 F.3d at 29.

Defendants argue, for example, that in order for the allegations to count, the witnesses must have interacted directly with a named defendant, and that the Complaint was required to allege the specific words Defendant Mahoney used when he questioned employees about poor Lotus sales. DB 14-15.  But this is not the law—witness allegations satisfy the PSLRA when the complaint provides "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Cabletron*, 311 F.3d at 29-30.  The former employee accounts here do just that, and are supported by their extensive detail, the "corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.*  For example, rather than tangentially involved with Lotus, the former employees were directly involved in selling it (¶¶112, 114, 104, 108), analyzing sales numbers (¶132), manufacturing the product (¶¶138-41), attending Lotus procedures and meetings with the Defendants (¶¶110, 134, 137), and developing its replacement.  ¶¶122, 125; *Cabletron,* 311 F.3d at 30 (employees were

"familiar with the activities discussed" and thus have "a strong basis of knowledge").  And the Complaint provides the titles and tenures of each.  ¶¶104, 106, 108, 112, 114, 122, 132, 140, 142.

Indeed, the witness allegations are coherent, corroborate each other, and provide compelling evidence of scienter when considered with the other facts alleged—in particular, Defendant Fitzgerald's post-Class Period admissions that the Company determined to shut down Lotus in the middle of the Class Period.  *Cabletron,* 311 F.3d at 30 ("consistent accounts reinforce one another").  And while the law does not require any "direct" reporting, Defendants' argument about a lack of "direct" interaction with the Executive Defendants ignores that at least six former employees (FE 1, FE 2, FE 3, FE 5, FE 6, and FE 7) had direct interactions with Defendants and other senior executives whose state of mind may be imputed to the Company, and each of the other witnesses describe with particularly important details concerning the fraud.[10]

**The Witness Accounts Corroborate Defendants' Admissions About Poor Lotus Sales.**

Disregarding the analysis required by *Tellabs,* Defendants cherry-pick several allegations to claim they had no idea about the true pace and volume of Lotus sales—even though this was a topic Defendants discussed on every conference call during the Class Period.  For example, Defendants ask the Court to discount the survey described by FE 1 and FE 2 demonstrating that Lotus was only capable of capturing a 5% to 10% market share because the survey was conducted before the Class Period.  But that timing bolsters, rather than undermines, scienter.  Defendants then ask the Court to draw the implausible inference that the Executive Defendants ignored the survey's

---

[10] These executives include Defendants Mahoney, Ballinger, McCarthy, and Meredith (¶¶110, 137), as well as executives Michael Lang (¶¶104-05, 136), Dan Foster (¶124), and Chris Frawley (¶¶110, 114, 137), all of whom were sufficiently senior that their state of mind can be imputed to the Company. *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.,* 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012) ("an individual whose knowledge is imputed to the corporation [need not] also 'make' the material misstatement").

findings—despite their professed knowledge of and involvement with Lotus and the Company's decision to abandon the device because of surgeon feedback.  ¶¶124, 194, 208, 233.

Next, Defendants claim that the Complaint provides insufficient detail about when and what Defendants saw when they reviewed the Company dashboards that provided up-to-the-minute Lotus sales figures, the figures Defendants McCarthy, Ballinger and Meredith discussed at quarterly sales meetings, and the talking points used at the emergency Thanksgiving meeting. DB at 14.  But the Complaint alleges the detail Defendants claim is missing—the dashboards showed that sales were "50% short" in 2019, targets were cut in half and sales came in 25% short thereafter, sales for 2020 were $40 million when the target was $220 million, and only a handful of accounts reordered Lotus at all.  ¶¶131, 133-34.  And while the Complaint also alleges specific detail about the Thanksgiving meeting (¶137), the fact that such an extraordinary meeting was called on short notice over the holiday weekend because the franchise was in crisis alone establishes scienter.

Similarly meritless is Defendants' attempt to discount FE 9's account that the Penang facility was "getting zero orders" at the end of 2019 and was shut down in 2020 (¶146) because of a purported lack of detail about FE 9's job responsibilities.  The Complaint provides the exact detail the First Circuit requires (see Cabletron, 311 F.3d at 30), and of course a Lotus engineer who worked at the facility would know that it was shut down and why.  Defendants are also wrong to suggest this is the "sole" piece of evidence concerning the timing of Defendants' decision to abandon Lotus.  To the contrary, the Lotus shut-down is not only confirmed by FE 9, but by many other allegations, including (i) Fitzgerald's admission that Boston Scientific decided to abandon Lotus when it reached "sub-100 accounts," i.e., by the first quarter of 2020 (¶¶187, 194); (ii) the resignations of the senior-most Lotus executives around this same time (¶209), and (iii) the

substantial advance planning required to shut down this business line (¶198).[11]

*Tellabs* permits court to consider competing plausible inferences—not implausible ones. Defendants are not entitled to the implausible inference that they failed to access the dashboard, ignored the survey the Company conducted, disregarded the sales of the product they told investors they closely tracked, or had no idea the Company shuttered one of the key Lotus manufacturing facilities. While discovery will address exactly what Defendant Mahoney was "constantly" asking about and the details concerning the Penang facility shut-down, these allegations, considered collectively, are more than sufficient to state a claim. *See Collier*, 9 F. Supp. 3d at 73 (witnesses not expected to "recall all possible details from their former positions" in complaint).[12]

**The Witnesses Corroborate That Defendants Knew Lotus Was Complex and Unsafe.**
Defendants next claim the accounts of FE 3, FE 4, FE 5, and FE 6 are "insufficient" to plead Defendants knew Lotus was complex and unsafe—even though they are entirely consistent with Defendants' post-Class Period admissions that Boston Scientific abandoned the device in the middle of the Class Period because of the complexities with its delivery system. ¶187.

Defendants are wrong, as these witnesses provide compelling and corroborating evidence that senior management knew the Lotus device was complex and unsafe—including (i) FE 3's account that the complexities of the delivery system were discussed by Defendants Meredith, Ballinger, and McCarthy in sales meetings (¶¶108-010); (ii) FE 4's account that sales training

---

[11] Defendants wrongly contend that Defendant Mahoney's June 2019 statement that the Penang facility was "ramping up right now with the Lotus valve" was pleaded as false, and that FE 9's account that the facility was getting "zero orders" in late 2019 and was shut down in 2020 thus presents a "timing problem." DB at 15. Defendant Mahoney's June 2019 statement about the Penang facility was not pleaded as false—but rather demonstrates Mahoney obviously would have known it was shut down in March 2020 given his public statements about the facility's importance.

[12] Defendants also try to downplay FE 1 and FE 2's accounts that the Company by claiming there is nothing "nefarious" about providing sales discounts. DB at 14; ¶¶133-36, 204. But this ignores discounts were provided even though Defendants said they would not engage in discounting, and reflects sales were so bad the Company deviated from publicly-reported practice (a course that could only have been undertaken with senior management approval).

departed drastically from industry standards and prior Company practice and was woefully insufficient to address the difficulties posed by the "most complicated device on the planet" (¶113); (iii) FE 5's report that delivery system problems were addressed by a Lotus engineer on sales calls throughout the Class Period (¶114); (iv) FE 6's report that Boston Scientific was "throwing" money at trying to develop a replacement because Lotus was so complex (¶¶122-29), and (v) FE 1 and FE 2's description of the emergency Thanksgiving meeting to address the Lotus crisis. ¶137.

Defendants argue none of these facts matter because Lotus adverse events were reported publicly through the FDA's MAUDE database. DB at 16. But contrary to Defendants' suggestion, courts routinely reject this truth-on-the-market defense and routinely credit allegations that a defendant's tracking of adverse events provides compelling evidence of scienter. *See, e.g., In re Acadia Pharms. Sec. Litig.*, 2020 WL 2838686, at *6-7 (S.D. Cal. June 1, 2020) (finding scienter based on tracking of events and rejecting truth-on-the-market defense); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48-49 (2011) (finding scienter based on adverse event reporting); *Bartelt v. Affymax, Inc*., 2014 WL 231551, at *13 (N.D. Cal. Jan. 21, 2014) (same).[13]

Defendants' other arguments seeking to discount these allegations similarly fail. For example, Defendants claim that the fact that FE 3 reported that the Company held weekly sales meetings addressing Lotus adverse events throughout 2020 somehow undermines Defendants' admissions that they had determined to shutdown Lotus earlier in 2020. But Plaintiff alleges that the decision to shut down Lotus was made in early 2020—not that the Company stopped selling the product or holding meetings to address the adverse events that continued to occur.

---

[13] Defendants' cases, *Liu v. Intercept Pharm., Inc*., 2020 WL 5441345, at *7 & n.57 (S.D.N.Y. Sept. 9, 2020) and *Philco Invs. Ltd. v. Martin*, 2011 WL 4595247, at *6 (N.D. Cal. Oct. 4, 2011) actually reject Defendants' truth-on-the-market defense (*see, e.g., Liu*, 2020 WL 5441345, at *7 n.57) and neither had the level of detail—including citations to internal documents addressing adverse events—that Plaintiff alleges here. ¶¶107-13; 121; *cf. Acadia*, 2020 WL 2838686, at *6-7 (distinguishing *Philco*).

Defendants next ask the Court to adopt the implausible inference that none of the Executive Defendants knew how the staff had been trained on Lotus when Defendants were responsible for bringing Lotus to market, regularly attended and spoke at meetings addressing Lotus safety risks, spoke repeatedly about the launch, and pulled the product because of "clinical support challenges." ¶185.  Moreover, crediting Defendants' argument—that they had no idea Lotus representatives only had to attend a couple procedures to be certified when "super easy" devices at Boston Scientific required 75 procedures—only shows they were reckless in claiming the launch was consistent with "the exact work we will as a world-class organization."  ¶¶110-29, 244, 246.

Defendants similarly fail to undermine FE 5's account.  Rather than lacking specificity, FE 5 corroborates the reports of FE 1 and FE 2 that the Company held firm-wide conference calls on a "<u>weekly</u>" basis run by the same engineer (Frawley), and were at times attended by Defendants Ballinger, McCarthy and Meredith.  ¶¶87, 110, 114, 117, 137, 296.  Defendants' complaint that FE 6 was not in a position to know that senior management understood Lotus was too difficult for surgeons to use (despite the corroborating accounts from FE 1, FE 2, FE 3, FE 4, FE 5, FE 7, and Defendants' post-Class Period admissions) is similarly meritless.  The fact that FE 6 was tasked with developing a replacement for Lotus makes clear FE 6's basis for believing senior management knew about the device's problems and complexity.[14]

**<u>Witness Accounts Show Defendants Knew Lotus Was Not Commercially Viable</u>.**
Defendants also seek to disclaim knowledge of Lotus's extraordinarily expensive manufacturing profile (despite their admissions this was one of the reasons the product was abandoned) by claiming the accounts of FE 3, FE 8, and FE 9 are too "thin."  *See, e.g.,* ¶185.  But each provides specific detail—including specific manufacturing yield rates and COGS figures—that is consistent

---

[14] Not does the fact that the Company disclosed work on the next-generation Lotus Mantra discredit FE 6's account given that investors were unaware that push was driven by Lotus's complexity and safety concerns.

with Fitzgerald's admission that Lotus was discontinued due to "manufacturing challenges" and "overall COGS profile" (¶185), and Defendants' own statements confirming they were intently focused on Lotus's manufacturing challenges.  ¶¶75-80.

### 4.    The Complaint's Other Allegations Also Establish Scienter

Defendants' other arguments, which similarly attack the allegations in isolation, are also meritless.  DB 19-27; *Tellabs,* 551 U.S. at 326.

**Scienter Is Based On Facts Known and Admitted by Defendants, Not Status.** Defendants' contention that the Complaint merely alleges "Status Based" access to material adverse information is wrong.  DB at 19-20.  The Complaint's allegations are nothing like those in *In re iRobot Corporation Securities Litigation*, where "a generalized" account of defendants' monitoring of sales trends was insufficient.  2021 WL 950675, at *9 (D. Mass. Mar. 12, 2021). Here, by contrast, Defendants admitted that Lotus account openings stalled at 100—and their scienter is corroborated by internal Company documents, Defendants' attendance at an emergency Thanksgiving meeting, as well as their own professed knowledge about Lotus.  ¶¶202-12.

Ignoring these facts, Defendants argue that Boston Scientific's acquisition of Symetis before the Class Period undermines the notion that Defendants knew about Lotus's problems.  But the Complaint alleges that the Symetis was acquired because Defendants needed a back-up plan for Lotus due to its flaws—but at the same time falsely denied the acquisition reflected any lack of confidence in Lotus.  ¶210.  And, as FE 1 and FE 6 explained, Boston Scientific continued investing and marketing Lotus because, without doing so, the Company would have fallen even further behind its competitors in capturing TAVR market share.  ¶¶123, 137, 251.

**Scienter Is Supported By Defendants' Highly Suspicious Insider Trading.** Defendants' attempts to minimize their highly suspicious insider trading also fail.  First, Defendants are incorrect that 10b5-1 trading plans undercut an inference of scienter, particularly

since Defendants entered into the plans during the Class Period and, for Defendant Mahoney, <u>after</u> management decided to discontinue Lotus. *In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 754 (1st Cir. 2016); *Levy v. Gutierrez*, 2017 WL 2191592, at *14 (D.N.H. May 4, 2017).

In fact, Defendants' improper attempt to introduce nonpublic documentary evidence—Mahoney's 10b5-1 trading plan—to undercut his scienter actually <u>bolsters</u> the inference. The plan reveals that the plan had an "Earliest Sell Date" of October 29, 2020, a price trigger of $35.00 per share, and only a week in which the price had to reach or exceed $35.00 per share—which provided a powerful incentive for Defendant Mahoney to keep the Lotus failure a secret during the October 28 earnings call, when analysts were asking about it.  DB at 23.  Rather than disclose the truth, Defendant Mahoney told investors on that call that "we're seeing strong results" for Lotus (¶319)—which continued to artificially inflate the stock, which two days later hit $35 per share and triggered the $9 million sale.  This is powerful evidence of scienter.  *Friedberg*, 959 F. Supp. at 51 (scienter alleged where defendants sold shares "while aware of the pending announcement"); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) ("Trades made a short time before a negative public announcement are suspiciously timed.").

That Defendant Mahoney knew the dates and price at which trades would be executed and was in a position to, and did, make misleading public statements the <u>day before</u> the eligible sell date strongly supports scienter.  *See Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (scienter found where defendants made statements right before trades and "knew the dates of their scheduled sales"); *Brumbaugh*, 416 F. Supp. 2d at 239 ("sales occurred after an announcement that caused the price of the stock to *rise* and came at a time when

they possessed material non-public information"); *Allaire*, 224 F. Supp. 2d at 331 ("very strong inference" of scienter where timing of statements appeared designed to inflate stock).[15]

  Third, Defendants' observation that Defendant Mahoney's holdings increased by a modest 6.8% (DB at 24) during the Class Period does nothing to undercut scienter since he did not spend a single penny to acquire these shares (which were awarded via vesting stock options, not open market purchases). *See, e.g.*, *Oxford*, 187 F.R.D. at 140 (rejecting argument to discount scienter by considering holdings of vested options and shares gained by exercising options); *Gutierrez*, 2017 WL 2191592, at *14 (rejecting argument scienter undermined by fact that defendants "increased their holdings during the class period, via vesting stock options").

  Fourth, Defendants' argument that the fact that there is no "current" requirement that 10b5-1 plans have a "cooling off" period and there is no "current" prohibition on "single-trade" plans also fails. DB at 24-25. The case law, history of Rule 10b5-1, and recent comments by the SEC all strongly support the suspicious nature of Defendant Mahoney's plan.[16]

  Fifth, Defendants' arguments seeking to negate scienter based on Defendant Ballinger, Brennan and Fitzgerald's trades also fail. For Defendant Ballinger, it is of course suspicious that he sold $4.8 million and $3.2 million in shares—his largest single-block sales in history— immediately after he left Boston Scientific because he knew Lotus was a failure. ¶224. And

---

[15] Defendants' attempt to minimize the highly suspect nature of Mahoney's plan by pointing out that it is "only" 13 days shorter than others undermines their argument (DB at 24)—indeed, Mahoney was able to benefit from the plan because the sale occurred just two weeks before the disclosure of the Lotus recall. In any event, although Mahoney's trading plan corroborates his scienter, Defendants improperly cite it here to draw factual inferences in their favor— the very practice criticized in *Khoja v. Orexigen Therapeutics, Inc.,* 2018 WL 3826298, at *7 (9th Cir. Aug. 13, 2018). The Court should reject this tack out of hand.

[16] *See, e.g., Boston Scientific*, 523 F.3d at 92-93; Dave Michaels & Mark Maurer, SEC Chairman Calls for New Restrictions on Executive Stock-Trading Plans, The Wall St. J. (June 7, 2021) (commenting on abuses of single-trade plans and plans with short 60-day cooling off periods); David F. Larcker, et al., Gaming the System: Three 'Red Flags' of Potential 10b5-1 Abuse, Stanford Closer Look (Jan. 19, 2021) (same). Defendants' cases (DB at 23, 27)—*Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 524 (D. Mass. 2014), *Leavitt v. Alnylam Pharms*., 451 F. Supp. 3d 176 (D. Mass. Ma. 23, 2020) and *Wasson v. LogMeIn, Inc*., 496 F. Supp. 3d 612, 639 (D. Mass. 2020)—did not have similarly suspicious trading and lacked the kind of contemporary facts demonstrating defendants' knowledge alleged here.

Defendants Fitzgerald and Brennan's sales were way out-of-line with prior practice—garnering five and two times as much than they had in the prior period—which is probative of scienter.[17]

      **<u>Defendants' Had A Powerful Motive to Avoid Default</u>.** Defendants' argument that the fact that they concealed the Lotus failure in order to renegotiate the Company's debt and raise capital does not add to an inference of scienter is wrong.  Indeed, it is difficult to fathom how the Company would have renegotiated its debt and raised capital had it disclosed the truth—providing a powerful motive to mislead.  ¶¶187, 194, 202, 215; *Cabletron*, 311 F.3d at 39.[18]

      **<u>Defendants' Opposing Inference Is Implausible and Backed By Nothing</u>.** Defendants' contention that the more plausible inference that they timely disclosed the problems with the Lotus cannot be squared with the Complaint's allegations or Defendants' admissions.  Defendants' proposed inference—that the Lotus went from the Company's most promising product in October to a total failure in November—was not believed by the analysts who questioned the Company about this remarkable about-face at the time, and cannot be credited by this Court on a motion to dismiss.  ¶¶184-89, 196-99.  The motion should be denied.

## IV.    CONCLUSION

      Plaintiff respectfully request that the Court deny Defendants' Motion in its entirety.

Dated:  August 30, 2021          Respectfully submitted,

                                       /s/ *Michael Blatchley*      
                         **BERNSTEIN LITOWITZ BERGER**
                             **& GROSSMANN LLP**

---

[17] *See Gutierrez*, 2017 WL 2191592, at *14 (increased selling during class period supported scienter and fact that holdings increased overall did not undermine scienter).

[18] Defendants' cases stand for the unremarkable proposition that not every capital raise supports scienter.  *Cf. Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 626-27 (4th Cir. 2008) (defendants omitted information to protect competitive position, not mislead, and urged scienter inference "ignore[d] reality"); *Battle Const. Co. v. InVivo Therapeutics Holdings Corp*., 101 F. Supp. 3d 135, 142 (D. Mass. 2015) (generic "desire to raise capital" insufficient); And in *Tabak v. Canadian Solar Inc*., 549 F. App'x 24, 28-29 (2d Cir. 2013), the plaintiffs did not allege disclosure of the truth would have prevented the company from raising funds—i.e., the opposite of what Plaintiff alleges here.

SALVATORE GRAZIANO
salvatore@blbglaw.com
MARK LEBOVITCH
markl@blbglaw.com
MICHAEL BLATCHLEY
michaelb@blbglaw.com
JAMES M. FEE (BBO #693589)
james.fee@blbglaw.com
ALEXANDER T. PAYNE
alex.payne@blbglaw.com
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Telephone: (212) 554-1400
1251 Avenue of the Americas
New York, New York
(212) 554-1400

*Lead Counsel for Lead Plaintiff and the Class*


T. Christopher Donnelly (BBO #129930)
Peter E. Gelhaar (BBO #18830)
Peter K. Levitt (BBO #565761)
**DONNELLY, CONROY & GELHAAR LLP**
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
(617) 720-2880
tcd@dcglaw.com
peg@dcglaw.com
pkl@dcglaw.com

*Liaison Counsel for Lead Plaintiff*

36

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those identified as non-registered participants.

Date: August 30, 2021

/s/ *Michael D. Blatchley*
Michael D. Blatchley