UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re BOSTON SCIENTIFIC CORPORATION :
SECURITIES LITIGATION                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x    Master File No.: No. 1:20-cv-12225-DPW
                                                                   :

This Document Relates To:                          **LEAVE TO FILE GRANTED**
                                                   :    **ON JULY 14, 2021**

        ALL ACTIONS
                                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

Dated:  September 20, 2021

James R. Carroll
Alisha Q. Nanda
Yaw A. Anim
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800

*Counsel for Defendants*
*Boston Scientific Corporation,*
*Michael F. Mahoney, Joseph M. Fitzgerald,*
*Daniel J. Brennan, Shawn McCarthy,*
*Ian Meredith, Kevin Ballinger and*
*Susan Vissers Lisa*

**TABLE OF AUTHORITIES**

**CASES**                                                                                        **PAGE(S)**

*In re Acadia Pharmaceuticals Inc. Securities Litigation*,
    No. 18-CV-01647-AJB-BGS, 2020 WL 2838686 (S.D. Cal. June 1, 2020) ...................... 6

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ................................................................................................ 7

*Arkansas Public Employee Retirement System v. GT Solar International, Inc.*,
    No. 08-cv-312-JL, 2009 WL 3255225 (D.N.H. Oct. 7, 2009) .......................................... 10

*Bartelt v. Affymax, Inc.*,
    No. 13-cv-01025-WHO, 2014 WL 231551 (N.D. Cal. Jan. 21, 2014) ......................... 6, 7

*In re Cabletron Systems, Inc.*,
    311 F.3d 11 (1st Cir. 2002) ................................................................................................ 2

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Waters Corp.*,
    632 F.3d 751 (1st Cir. 2011) .............................................................................................. 5

*Collier v. ModusLink Global Solutions, Inc.*,
    9 F. Supp. 3d 61 (D. Mass. 2014) .................................................................................. 3, 8

*Dahhan v. OvaScience, Inc.*,
    321 F. Supp. 3d 247 (D. Mass. 2018) ............................................................................... 7

*Fire & Police Pension Association of Colorado v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015) ........................................................................................... 3, 6

*In re Gildan Activewear, Inc. Securities Litigation*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009) ............................................................................... 6

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) .............................................................................................. 5

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ........................................................................................... 7, 9

*In re Intuitive Surgical Securities Litigation*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014) ................................................................................ 9

*Kader v. Sarepta Therapeutics, Inc.*,
    No. 1:14-cv-14318-ADB, 2016 WL 1337256 (D. Mass. Apr. 5, 2016) ............................ 7

*Leavitt v. Alnylam Pharmaceuticals, Inc.*,
    451 F. Supp. 3d 176 (D. Mass. 2020) ............................................................................... 4

*Levy v. Gutierrez*,
    No. 14-cv-443-JL, 2017 WL 2191592 (D.N.H. May 4, 2017) .......................................... 5

*Maguire Financial, LP v. PowerSecure International, Inc.*,
    876 F.3d 541 (4th Cir. 2017) ....................................................................................... 2

*Mahoney v. Foundation Medicine, Inc.*,
    342 F. Supp. 2d 206 (D. Mass. 2018) ........................................................................ 8

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ....................................................................................................... 6

*Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*,
    523 F.3d 75 (1st Cir. 2008)....................................................................................... 7, 8

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)..................................................................................................... 9

*In re Oxford Health Plans, Inc.*,
    187 F.R.D 133 (S.D.N.Y. 1999) .................................................................................. 5

*In re Raytheon Securities Litigation*,
    157 F. Supp. 2d 131 (D. Mass. 2001) ......................................................................... 7

*Shaw v. Digital Equipment Corp.*,
    82 F.3d 1194 (1st Cir. 1996)...................................................................................... 10

*Simon v. Abiomed, Inc.*,
    37 F. Supp. 3d 499 (D. Mass. 2014) , *aff'd sub nom. Fire & Police Pension
    Association v. Abiomed, Inc,* 778 F.3d 228 (1st Cir. 2015) ....................................... 4

*In re Smith & Wesson Holding Corp. Securities Litigation*,
    604 F. Supp. 2d 332 (D. Mass. 2009) ......................................................................... 7

*In re Vertex Pharmaceuticals Inc. Securities Litigation*,
    357 F. Supp. 2d 343 (D. Mass. 2005) ......................................................................... 3

**Other Authoritites**

David F. Larcker, et al., *Gaming the System: Three 'Red Flags' of Potential
    10b5-1 Abuse*, Stanford Closer Look (Jan. 19, 2021)................................................... 5

Plaintiff's Opposition[1] confirms that the Complaint lacks specific facts to support its conclusory fraud allegations and should be dismissed with prejudice.  Defendants further reply as follows:

**1.      *Plaintiff's selective quotations omit critical context that undermines its misrepresentation claims.***  For example, the Opposition repeatedly states that "Mahoney reassured investors that '<u>we're seeing strong results</u>' with Lotus and reiterated the Company's confidence in the platform."  (Opp. at 1; *see also id.* at 11, 23, 33.)  But the full statement makes clear that Lotus's "strong results" were limited to "the sites that are using Lotus in the U.S." and Plaintiff tactically omits Mr. Mahoney's statement—*in the very next sentence*—that "[o]pening new sites has been a challenging exercise."[2]  Similarly, the Opposition repeatedly states that Boston Scientific touted Lotus as "easy to use," as though discussing a screwdriver as opposed to a complex, FDA-regulated medical device.  (Opp. at 6, 16.)  The actual statements make clear that Boston Scientific was referring to the fact that Lotus was "fully repositionable, fully retrievable," not that it was an uncomplicated device that was "easy" to use.[3]  Again, Plaintiff simply omits that part of the statement that undermines its theory.  In any event, Plaintiff elsewhere in its Opposition concedes this context.  (*See* Opp. at 4 ("[T]he Lotus Edge offered 'superior ease of use' by being 'fully repositionable.'").)  Plaintiff's attempt to mischaracterize public statements should be soundly rejected.

---

[1]      Capitalized terms have the same meaning as in the Memorandum Of Law In Support Of Defendants' Motion To Dismiss The Amended Consolidated Complaint (ECF No. 54) ("Moving Brief" (cited as "Mov. Br. at __")).  Plaintiff's Opposition To Defendants' Motion To Dismiss The Consolidated Complaint (ECF No. 61) is referred to as the "Opposition" (cited as "Opp. at __").

[2]      (Tab 40 at 13 ("And we've obviously had the two-valve strategy, and we're seeing strong results in the sites that are using Lotus in the U.S.  Opening new sites has been a challenging exercise for us given the pandemic, but the sites that are using Lotus in the U.S. are using it quite regularly.").)

[3]      (*E.g.*, Tab 1 at 8 ("Really the two selling features for Lotus Valve that have been driving the share gains . . . are one, on that very low paravalvular leak . . . [a]nd then secondly, the ease of use, which I think maybe gets underestimated sometimes, so our device is fully repositionable, fully retrievable.").)

       ***2.***      ***Plaintiff's Opposition fails to rehabilitate its CWs.***  Plaintiff's Opposition merely rehashes at length the same deficient allegations contained in the Complaint, which are insufficiently particularized and lack connecting detail to any challenged statement as required under First Circuit law.  (*See* Mov. Br. 11-19.)  Plaintiff relies on *In re Cabletron* in an attempt to rehabilitate its CWs, but that case involved specific and particularized accounts from former employees alleged to have *directly engaged in conversations with senior management*, including the defendants, and which provided "specific descriptions of the precise means through which [the fraud] occurred."  311 F.3d 11, 25, 30 (1st Cir. 2002); *id.* at 31 ("The level of specific detail about the fictitious sales is significant.").  The CWs' allegations here do not come close to the specificity of those in *Cabletron*.  Instead, they impermissibly attempt to "stack[] inference[s]" in such a way as to "read the scienter element out of the analysis in contravention of the PSLRA's exacting pleading standard."  *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017) (holding that plaintiff "allege[d] facts that permit an inference that [the defendant] knew his statement was false, and then asks us to *infer from that inference* that [the defendant] acted with scienter.  We decline to do so because stacking inference upon inference in this manner violates the [PSLRA's] mandate that the strong inference of scienter be supported by facts, not other inferences.").  Here, as in *Maguire*, Plaintiff attempts (and fails) to allege facts permitting an inference that Defendants had knowledge of the alleged falsity of the challenged statements, then asks the Court to *infer from that inference* that Defendants acted with scienter. That is insufficient under the PSRLA.

       Plaintiff's suggestion that some of the CWs had "direct interactions" with "senior executives" who are "sufficiently senior that their state of mind can be imputed to the Company" (Opp. at 27 & n.10) is nonsense.  Those "executives" titles are, respectively, Vice President of

Sales and Marketing (Lang, AC ¶ 104), "chief engineer" (Foster, *id.*¶ 124) and "product engineer" (Frawley, *id.* ¶ 114). Plaintiff points to no authority suggesting that these employees' knowledge may be imputed to the Company, and in any event the law in the First Circuit is clear that CW allegations should be accorded minimal weight where those witnesses are not "in senior management positions, and they appear to have had relatively little [or no] ongoing contact with senior management." *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 245 (1st Cir. 2015). Plaintiff's own case supports this conclusion. *Collier v. ModusLink Global Sols., Inc.*, 9 F. Supp. 3d 61, 70-72 (D. Mass. 2014) (reliability of CW allegations bolstered where former employees either reported directly to defendants and were members of executive leadership team or were at most two levels removed, and all directly interacted with defendants).[4] No allegations akin to those in *Collier* are present here.

> **3.      *The Opposition confirms that Plaintiff's allegations fail to raise any inference of scienter as to any Defendant, let alone the requisite "strong" one.***

> **a.      *Mr. Fitzgerald's statements about the Lotus launch do not help Plaintiff.***
The Opposition relies upon Mr. Fitzgerald's statements regarding the Company's target of opening 150 accounts, but those statements are not the smoking gun that Plaintiff makes them out to be. The distinction between Mr. Fitzgerald's October 15, 2020 statement that "we have opened more than 150 accounts in the United States" (Tab 38 at 8) and his November 17, 2020 statement referencing "sub-100 accounts" (Tab 42 at 13) is readily apparent. Read in context, Mr. Fitzgerald prefaced his later statement with a reference to "training and retraining" physicians and later references "scal[ing] cases" [for those physicians] up, plainly indicating that he was specifically discussing those sites that were regularly completing Lotus procedures (*i.e.*,

---

[4]      *Cf. In re Vertex Pharm. Inc., Sec. Litig.*, 357 F. Supp. 2d 343, 354 (D. Mass. 2005) (discrediting CW allegations based on multi-layer hearsay).

3

"active" accounts) and not *all* accounts that had been opened throughout the launch.  Indeed, industry analysts appear to have understood the distinction, as none raised any questions about it, which would have been expected if the statements were, in fact, inconsistent.

Plaintiff also repeatedly references Mr. Fitzgerald's "post-Class Period admissions that the Company determined to shut down Lotus in the middle of the Class Period" (*e.g.*, Opp. at 27), in reliance on his statement during a November 18, 2020 meeting that the decision was made "about 12 months after full launch."  (Carroll Reply Decl. Ex. 1 at 5.)  But during that same conference, Mr. Fitzgerald clearly stated that the "full launch" of Lotus did not take place until "this time last year" (*i.e.*, November) confirming that the decision to discontinue Lotus very closely preceded the date of the announcement.  (*Id.*)[5]  Again, Plaintiff's argument is based—impermissibly—on omitting those parts of the statements that undermine its theory.

> **b.      *The Opposition confirms that Plaintiff has not met its burden of showing that the alleged insider stock sales contribute to a strong inference of scienter.***

Plaintiff's assertion that scienter is not weakened by the fact that the identified trades were executed pursuant to Rule 10b5-1 trading plans is simply incorrect.  *See Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 524 (D. Mass. 2014), *aff'd sub nom. Fire & Police Pension Association v. Abiomed, Inc,* 778 F.3d 228 (1st Cir. 2015); *Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 188 (D. Mass. 2020).  Further, Plaintiff makes no particularized allegations that Mr. Mahoney (or any other Individual) was in possession of material non-public information at the time those plans were entered into.  As to Mr. Mahoney's stock sales specifically, Plaintiff contends that he was motivated to conceal the "truth" about Lotus to artificially inflate the stock

---

[5]      In light of this fact, Plaintiff's assertion that "full launch" occurred in the "July and August timeframe" (Opp. at 16 n.4) is plainly incorrect, as is its contention that the Company made false statements about its discounting practices (*id.*), which relies on Plaintiff's erroneous timeline for when full launch began.

price until his sale could be effected.  (Opp. at 33.)  But on August 25, 2020, the day on which

Mr. Mahoney entered into his plan, Boston Scientific stock was trading at just under $39/share,[6]

undercutting the notion that he was withholding information to keep the stock price "inflated"

when the plan's trigger price was a considerably lower $35/share.[7]  Plaintiff also fails to rebut

the indisputable fact that Mr. Mahoney *increased* his holdings of Boston Scientific stock over the

Class Period, negating any inference of scienter.  *See City of Dearborn Heights Act 345 Police &*

*Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 760-61 (1st Cir. 2011).  Contrary to Plaintiff's

suggestion, it is of no legal or factual import that Mr. Mahoney "did not spend a single penny to

acquire these shares."[8]  And Plaintiff points to no legal authority barring the use of so-called

single-trade plans, which are recognized as commonplace.[9]

As to the other executives' stock sales, Plaintiff offers only self-serving

conclusions to argue that Mr. Ballinger's sales support scienter:  *i.e.*, "it is of course suspicious

that he sold $4.8 million and $3.2 million in shares—his largest single-block sales in history—

immediately after he left Boston Scientific because he knew Lotus was a failure."  (Opp. at 34.)

There is "of course" nothing suspicious about a departing employee selling shares, as the

authority cited in the Moving Brief (which Plaintiff ignores) establishes.  *See Greebel v. FTP*

*Software, Inc.*, 194 F.3d 185, 207 (1st Cir. 1999) (stating it is "not unusual for individuals

---

[6]      *See* https://finance.yahoo.com/quote/BSX/history.

[7]      Following the November 17, 2020 announcement of Lotus's discontinuation, Boston Scientific's stock price dropped to $35.03/share (AC ¶ 192), still above the $35/share trigger price in Mr. Mahoney's plan.

[8]      The cases on which Plaintiff relies here are easily distinguishable.  *Levy v. Gutierrez* correctly recognized that "the [First Circuit] has ruled that 'it is appropriate to consider not only the shares of stock that [defendants] held prior to their sales, but also the shares that they could have sold through the exercise of options," but gave weight to the drastic differences between the defendants' class period and control period sales to find scienter.  No. 14-cv-443-JL, 2017 WL 2191592, at *14 (D.N.H. May 4, 2017) (quoting *City of Dearborn Heights*, 632 F.3d at 760-61).  *In re Oxford Health Plans, Inc.*, 187 F.R.D 133, 140 (S.D.N.Y. 1999) is an out-of-Circuit decision that did not follow this clear First Circuit precedent in concluding that vested options may not count in the scienter analysis.

[9]      *See* Larcker, et al., Stanford Closer Look (Jan. 19, 2021) (analyzing over 20,000 Rule 10b5-1 trading plans covering trades executed between January 2016 and May 2020, nearly half of which were single-trade plans).

leaving a company[] to sell shares" and finding no scienter where 690,000 shares worth $19 million sold after leaving company).  Contrary to Plaintiff's contention that Mr. Brennan's and Mr. Fitzgerald's trades during the Class Period were "way out-of-line with prior practice" (Opp. at 35), Exhibit A to the Moving Brief plainly dispels that notion.  Further, the fact that they may have received more "proceeds" from their Class Period trades than their earlier trades is irrelevant—Plaintiff points to no authority suggesting that any difference in the amount of proceeds (as opposed to volume of shares traded) is probative of scienter.  *See Abiomed*, 778 F.3d at 246 (merely listing amounts of stock sales inadequate to plead scienter).  Additionally, like Mr. Mahoney, Mr. Fitzgerald *increased* his holdings of Boston Scientific stock over the Class Period. And the absence of any allegations that Mr. McCarthy or Mr. Meredith traded Boston Scientific stock during the putative class period further weakens any inference of scienter as to the other Individuals.[10]

c.      *Plaintiff's contention that the reporting of adverse events involving Lotus somehow supports scienter misses the mark.*   Plaintiff confusingly asserts that the reference to that reporting is offered in support of a "truth-on-the-market" defense, but Defendants have not raised such a defense (which relates to the materiality of alleged misrepresentations, not scienter) on this motion.  Here, Defendants argue (correctly, and with substantial authority) that such reporting undercuts any inference of scienter.  (Mov. Br. at 16.) Further, Plaintiff's cases in support of this argument are readily distinguishable.[11]

---

[10]      *See In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271-72 (S.D.N.Y. 2009) (where plaintiff alleged two insiders made sales but other individual defendants did not, "the absence of any allegations of other insider trades . . . undercuts any finding of the requisite strong inference of scienter").

[11]      In *Matrixx Initiatives, Inc. v. Siracusano*, the Court deemed the defendant's *failure* to report adverse events to be suggestive of scienter, whereas here there are no allegations that the Company failed to make any reports.  563 U.S. 27, 48-49 (2011).  In *In re Acadia Pharms. Inc. Sec. Litig.*, in finding scienter the court accorded weight to the fact that the FAERS reports raised "red flags" with the FDA, a key fact absent from this case.  No. 18-CV-01647-AJB-BGS, 2020 WL 2838686, at *6-8 (S.D. Cal. June 1, 2020).  And in *Bartelt v. Affymax, Inc.*, the fact that

6

#### d.     Plaintiff's remaining arguments that it has established scienter fail.

*First*, the Individuals' responses to analyst questions indicating that the Lotus launch was "on track" do not support scienter because Plaintiff has not alleged specific facts showing that those statements were made with intent to defraud, and Plaintiff's cases are inapposite.[12]  *Second*, the Individuals' alleged "personal involvement" and "access to contrary information" does not support scienter—Plaintiff makes no particularized allegations as to *any* Individual (*e.g.*, *what* knowledge each had or *when* they acquired it, or whether such knowledge was acquired prior to making any challenged statement), and Plaintiff's cases involved far more specific allegations of involvement and are thus inapposite.[13]  *Third*, the alleged desire to raise capital and the resignations of certain executives is insufficient.  A strong inference of fraud does not arise merely from seeking capital.  *See Kader v. Sarepta Therapeutics, Inc.*, No. 1:14-cv-14318-ADB, 2016 WL 1337256, at *18 (D. Mass. Apr. 5, 2016).[14]  As to the resignations, Plaintiff's

---

adverse events were reported to the FDA was evidence that the defendant CEO's statements touting the unqualified safety of the subject device were false when made.  No. 13-cv-01025-WHO, 2014 WL 231551, at *13 (N.D. Cal. Jan. 21, 2014).  There are no such facts at issue here.

[12]     For example, *Institutional Investors Group v. Avaya, Inc.* involved repeated questions posed to the defendant corporation's CFO regarding specific pricing practices, in which the corporation happened to be engaged, but the CFO's responses failed to disclose that fact.  564 F.3d 242, 270 (3d Cir. 2009).  Here, Plaintiff has not alleged any particularized facts showing that statements about the Company's progress in reaching 150 accounts were belied by contrary facts.  Further, Plaintiff's attempt to bolster this argument with statements loosely suggesting that some Individuals were generally aware of Lotus sales fails—the cases Plaintiff cites involve far more specific allegations of monitoring.  *See Miss. Pub. Empls.' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) (company expressly stated it was "monitoring, analyzing, and investigating" manufacturing issues related to adverse patient outcomes); *Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 255 (D. Mass. 2018) (express admission that individuals tracked "all aspects of treatment").

[13]     *See, e.g.*, *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 147 (D. Mass. 2001) (scienter found based on internal documents which plaintiff used to "allege[] *with great detail* the manner in which the defendants improperly recognized revenue") (emphasis added); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 344 (D. Mass. 2009) (alleging details of witness "*interactions*" with executives at sales meetings (emphasis added)); *Boston Scientific*, 523 F.3d at 91-92 (crediting allegations regarding "point person" for product who claimed issues had been "fixed" just days before product recall).  Plaintiff also cites *Aldridge v. A.T. Cross Corp.*, but that case only states the unremarkable proposition that knowingly making a false or misleading statement is "classic evidence" of scienter.  284 F.3d 72, 83 (1st Cir. 2002).

[14]     This is so even where there are allegations of suspicious timing.  *Id.*  In any event, Plaintiff fails to allege with particularity that any Individual had reached a decision to discontinue Lotus in early 2020 (when the Company was conducting its capital raise), and has thus failed to establish any motivation to delay announcing the

7

speculative argument should not be credited for the reasons stated in the Moving Brief (at 17), and for the additional reasons that the assertion that both Mr. Ballinger and Mr. McCarthy departed Boston Scientific because of the performance of a single product in their entire portfolio is implausible,[15] and the single case Plaintiff cites in support of this argument is inapposite. *Collier*, 9 F. Supp. 3d at 76 (D. Mass. 2014) (generally, resignations in isolation insufficient to support strong inference of scienter, and finding scienter primarily because of credible and particularized confidential witness accounts).  *Fourth*, although Plaintiff points to the temporal proximity between certain statements and the November 2020 announcement of Lotus's discontinuation, "[t]emporal proximity alone is insufficient to establish a claim of fraud." *Boston Scientific*, 523 F.3d at 91.

> ***4.     The Opposition confirms that the challenged statements are not actionable.***[16]

The Opposition identifies four categories of allegedly false statements (Opp. at 12-14), yet none are actionable.  *First*, as to statements that the launch was "on track," the out-of-Circuit district court cases Plaintiff cites are distinguishable and in another of its cases, *Avaya*, the Third Circuit confirmed that "on track" projections are not actionable.  564 F.3d at 255-56 (holding "on track" projections "cannot meaningfully be distinguished from the future projection of which they are a part" and thus are protected under the PSLRA safe harbor, and distinguishing Plaintiff's cases). Further, as shown in Exhibit A, attached hereto, the statements about sales volume are not

---

discontinuation, as that decision had not yet even been made.

[15]     The Structural Heart division alone, which Mr. McCarthy headed, was developing at least seven different products on four separate platforms, and the Interventional Cardiology business, under which the Structural Heart division falls and which Mr. Ballinger headed, was developing nearly a dozen products in addition to Lotus.  (Tab 25 (2019 Form 10-K at 6-7).)

[16]     To assist the Court in analyzing the 75 challenged statements in Plaintiff's 357-paragraph Complaint, Defendants submitted a chart identifying why they are not actionable.  Plaintiff contends that the submission of the chart was "improper" (Opp. at 14 n.2), but Plaintiff is incorrect.  *See Mahoney v. Found. Med., Inc.*, 342 F. Supp. 3d 206, 212 (D. Mass. 2018) (finding "helpful" a 45-page exhibit identifying alleged misstatements and arguments). Plaintiff alternatively asks the Court to consider its Exhibit A, which adds Plaintiff's responses to Defendants' chart. Defendants added a reply to Plaintiff's chart for the Court's convenience, attached hereto as Exhibit A.

sufficiently alleged to be false or misleading (and *all* are also statements of opinion, puffery, and/or forward-looking statements). *Second*, as to statements about Lotus being "easy" to use, as discussed above, Plaintiff is mistaken that anyone ever asserted that the product was "easy" to use; rather, statements concerning Lotus's "ease-of-use" were made in reference to its ability to be fully repositioned and retrieved, and Plaintiff has not alleged that Lotus did not in fact have those features. *Third*, as to statements about the safety of the Lotus launch, Plaintiff ignores that Lotus was heavily regulated by the FDA and that the Complaint does not allege that Lotus was not in compliance with any FDA requirements. Additionally, the cases Plaintiff cites to show that statements concerning safety are actionable are inapposite.[17] *Fourth*, as to the Company's financial statements, Plaintiff is incorrect that the Company "fail[ed] to disclose the [Lotus] shutdown while touting Lotus's purported success." (Opp. at 14.) As discussed above, the decision to shut Lotus down was not made until later and did not render any of the Company's financial statements inaccurate.

Plaintiff's remaining arguments about the actionability of the challenged statements fail. Contrary to Plaintiff's contention, opinion statements do not need to be accompanied by "qualifying language"—*Omnicare* does not state any such principle, and Defendants are not aware of any authority stating as much. Additionally, Plaintiff is incorrect that the identified opinion statements omitted material information. Plaintiff's chosen example, a February 2020 statement by Ms. Lisa that "we're really excited about Lotus Edge and how it's going," is instructive.[18] Plaintiff argues that this statement omitted certain material facts,

---

[17]     Only one of those cases, *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821 (N.D. Cal. 2014), even involved an FDA-approved product, and that case involved allegations that the defendant corporation *intentionally misclassified and failed to report numerous adverse events*, allegations which are absent here.

[18]     It is also another example of Plaintiff's selective quotation from public statements about Lotus. Plaintiff attempts to link Ms. Lisa's expressed "excite[ment]" to the Lotus launch being "on track" (Opp. at 18), but a review

9

including that the Company was not "on track" to hit 150 accounts, that the Company held a sales meeting over Thanksgiving weekend, that the Company had decided to shut down its Penang facility, and that the Company was in the process of exiting the business completely. (Opp. at 18.)  Even crediting Plaintiff's insufficiently particularized allegations, this statement was made in *February* 2020, prior to the shutdown of the Penang facility and the alleged corollary decision to shut Lotus down in *March* 2020 (AC ¶ 146).  Plaintiff has also not alleged any specific facts suggesting that the Company was not "on track" to open 150 accounts in February 2020, nor has it alleged any facts showing that Ms. Lisa's opinion about the launch at that time was not sincerely held when expressed (and the notion that she was also obligated to disclose the occurrence of a single sales meeting held months earlier is nonsense).

*Second*, although Plaintiff complains that the Company's cautionary language was not sufficiently meaningful, those disclosures were sufficient.  The risk disclosure language in the Company's public filings (*see* Mov. Br. at 32-33; Tab 4 at 19, 25; Tab 25 at 20, 24) is far more detailed and specific than the ambiguous language at issue in *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1213-14 (1st Cir. 1996) (company's statement that its reserves were "adequate" actionable because its disclosure that it would "continue to take actions" was ambiguous and did not clearly relate to actions drawing on those reserves) and *Ark. Pub. Emp. Ret. Sys. v. GT Solar Int'l, Inc.*, No. 08-cv-312-JL, 2009 WL 3255225 (D.N.H. Oct. 7, 2009) (similar).

## CONCLUSION

For the reasons above and in the Moving Brief, the Complaint should be dismissed with prejudice.

---

of the investor transcript from that conference reveals that the statement about being "on track" was in response to a separate inquiry and was separate from Ms. Lisa's opinion statement about being "excited," notwithstanding Plaintiff's attempt to link the two.  (Tab 26 at 7-8.)

Dated:    September 20, 2021          Respectfully submitted,
          Boston, Massachusetts
                                      /s/ James R. Carroll
                                      James R. Carroll (BBO #554426)
                                      Alisha Q. Nanda (BBO #657266)
                                      Yaw A. Anim (BBO #569512)
                                      SKADDEN, ARPS, SLATE,
                                         MEAGHER & FLOM LLP
                                      500 Boylston Street
                                      Boston, Massachusetts 02116
                                      (617) 573-4800
                                      james.carroll@skadden.com
                                      alisha.nanda@skadden.com
                                      yaw.anim@skadden.com

                                      *Counsel for Defendants*
                                      *Boston Scientific Corporation,*
                                      *Michael F. Mahoney, Joseph M. Fitzgerald,*
                                      *Daniel J. Brennan, Shawn McCarthy,*
                                      *Ian Meredith, Kevin Ballinger and*
                                      *Susan Vissers Lisa*