IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re BOSTON SCIENTIFIC                )
CORPORATION SECURITIES                 )  CA No. 20-12225-DPW
LITIGATION                             )  Pages 1 – 67
                                       )


**MOTION HEARING**

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES SENIOR DISTRICT JUDGE


                              United States District Court
                              1 Courthouse Way, Courtroom 1
                              Boston, Massachusetts  02210
                              November 19, 2021, 10:58 a.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
leemarz@aol.com

A P P E A R A N C E S:

     MICHAEL DAINS BLATCHLEY, ESQ., Bernstein Litowitz Berger & Grossman LLP, 1251 Avenue of the Americas, New York, New York, 10020, for the Lead Plaintiff, Union Asset Management Holding AG.

     SALVATORE J. GRAZIANO, ESQ., Bernstein Litowitz Berger & Grossman, 1285 Avenue of the Americas, 38th Floor, New York, New York, 10019, for the Lead Plaintiff, Union Asset Management Holding AG.

     ALISHA QUINTANA NANDA, ESQ., JAMES R. CARROLL, ESQ., and YAW ANIM, ESQ., Skadden, Arps, Slate, Meagher & Flom LLP, 500 Boylston Street, Boston, Massachusetts, 02116, for the Defendant, Boston Scientific Corporation.

P R O C E E D I N G S

THE CLERK:  This Honorable Court is now in session.  Please be seated.

THE COURT:  Well, let me outline what I hope to accomplish today.  I think I have allocated an hour and a half to this, so we'll complete at 12:40, maybe 12:45, and that will be an hour and 45 minutes.  I've outlined this to encourage people to be concise and responsive to questions I have.  This is a matter of literary deconstruction, I think. It's not the occasion for jury argument or other forms of rhetorical flourish.  And to the degree that I'm not getting the responses that I need, I'll keep pressing for them. That just compresses the amount of time that will be remaining for you to offer whatever additional views you want to offer.  I'm not foreclosing those, but I have some things on my mind, and I want to be sure that I've given you the opportunity at least to respond.  And if you take it, that's fine; if you don't, your loss.

So let me start in this fashion.  I'm going to want to know what statements or misrepresentations each of the specific executive defendants made separately and identifiably that the parties will contend with.  I look first, obviously, to the plaintiff on this, and I'm really focused on this idea of, what is it that I can say is false or what any material by specific named defendants?  I

recognize that there may be statements that can be attributed to them in various sorts of ways, and we'll get to that in a moment, but I really want to focus on what are the statements.

And let me suggest that you're wasting your time if you focus on the capillaries. I'm looking at the jugular here. So if what you do is, you tell me, "Look at Paragraphs 166 and 167 and 168," it doesn't help me very much and doesn't help you in the argument.

The second set of issues, I guess, is whether there are any other statements that can be attributed to individual named defendants here other than their presence when some statements were made by somebody else, and here I'm interested in this proposition: You've named executive defendants. I assume it's because they are people who can bind the company in some fashion, either formally or informally, because of their access to information and that they've been delegated to make statements; but I'm going to want to know fundamentally, I think, what these people could be said to do to bind the corporation itself. I don't think the corporation really can speak without identifiable human beings doing it. The law is not that clear on that, but I think that's where I want to focus, anyway, to understand this more specifically.

And that then leads me to the more fundamental question, I suppose, at the end is, once we've identified statements that I want to explore a bit more with you, how I

find the scienter evidence here as to the individual defendant.

Let me use as an example, not that I've made this decision yet, but insider trading by somebody else who didn't make the statements seems to me not scienter as to the person who did. And, of course, it has to be improper insider trading. Insider trading is permitted, but it has to be -- maybe I'd better say "not improper." But, in any event, the Commission has made it possible to do certain kinds of insider -- and the statute -- certain kinds of insider information, but it may give an aroma that can provide some basis for finding scienter.

So that's, very briefly stated, what I want to focus on here, and I do not foreclose, once we've dealt with the things that I've raised, the parties making whatever additional arguments they make. But, again, I urge you to do it in a fashion that avoids rhetorical flourish, since reference and flourishes have a tendency to consume time without advancing understanding, at least for me dealing with something like this.

So let me start then with the plaintiff.

MR. GRAZIANO: Good morning, your Honor. It's Salvatore Graziano from Bernstein Litowitz on behalf of the lead plaintiff, Union Investment. So I think I got all the questions, but I'm certainly going to start with the statements by defendants, and I'm going to focus on what I thought of as

the more important statements, maybe if that's what your Honor referred to as the "jugular."

THE COURT: Right.

MR. GRAZIANO: In preparing for today, I made a list of those statements. I didn't do it by defendant, but I can here now. I just ask the Court to bear with me because I did it chronologically, but I can take it one person at a time.

The most prevalent speaker, the person who made the most false statements was the Defendant Mahoney, the Chairman and CEO of the company. And I just want to highlight for your Honor the most significant false statements he made, and he made statements that were false about the purported ease of use of this LOTUS device.

THE COURT: Yes, in this connection, when you're doing that, if you could identify the paragraph of the complaint.

MR. GRAZIANO: Yes, so he in Paragraph 229 said that "With the LOTUS device, Boston Scientific had at least an on-par offering but with superior ease of use," and that's in Paragraph 229. He made many more statements about how purportedly well this product was doing, both in terms of how many times it was being reordered, how fast it was being adopted. I'm going to take you through some of these more specifically, and those include, starting with Paragraph 245, in July, 2019, he said -- and this is just a false statement, your Honor, it's very hard to see this as anything but false --

"The LOTUS Edge launch is going extremely well.  Positive physician feedback highlights the benefit of complete control and drama-free TAVR."

There was a lot of drama here.  These were very difficult devices to use.  The company eventually --

THE COURT:  Enough of the rhetoric.

MR. GRAZIANO:  Sure.  Then in July, again he talks about how the LOTUS was delivering on its promise.  Perhaps that one is a little softer.  September 5, 2019, Paragraph 251, "LOTUS is going very well.  We're seeing very high reorder rates of the LOTUS, and the launch is going as planned.  We're seeing high reorder rates with it."

Then again October 23, 2019, Paragraph 260, "The LOTUS Edge launch is going extremely well.  We remain on pace to open 150 accounts in our first 12 months in the U.S."

Then in February of 2020, Paragraphs --

THE COURT:  In that connection, where is the evidence that they didn't open those accounts?

MR. GRAZIANO:  There is substantial evidence that they did not open those accounts.

THE COURT:  Paragraph, please?

MR. GRAZIANO:  Sure.  I think the most significant was in -- just bear with me for the paragraph number.

In Paragraph 181, when they withdrew the product --

THE COURT:  This is post the statement that you say is

false?

MR. GRAZIANO:  Yes.

THE COURT:  Right, so maybe I'll make this more precise.  Where is the evidence that at the time that the statement was made, they knew it to be false?

MR. GRAZIANO:  Okay, now, I'm sorry, forgive me, your Honor, but I am losing the thread.  Okay, so we're going to go back to the statement, which was from October of 2019.

THE COURT:  Right, October of 2019, and you've pointed me to November of 2020, which is afterwards, and now I'm asking you to tell me and focus me on statements or evidence that would show that at the time that the statement was made, that it was known by Mr. Mahoney to be false.

MR. GRAZIANO:  Okay, I misunderstood, your Honor.  I thought you were asking me where the evidence was that they didn't reach 150 accounts.  As of this date, they haven't yet claimed to reach 150 accounts, so the falsity here is the claim that the launch is going extremely well.

THE COURT:  Well, but so that leads to a larger question, and that's why I'm asking these more specific questions of why this isn't a form of puffery or opinion, forward-looking opinion, that kind of stuff.

MR. GRAZIANO:  Right, so --

THE COURT:  I really am looking for hard stuff here. You've made the point, and I think it's valid, that some

statements are softer than others, and the question is, which ones are firm enough to support the case?

MR. GRAZIANO:  Okay, so in Paragraph 136 and Paragraph 204, we know that the sales for the device are continually coming in at half of their internal targets.

THE COURT:  Hold on a second.  That's a statement of opinion, a conclusory statement of opinion referring to FE-7.

MR. GRAZIANO:  Right, but it's not just FE-7, your Honor.  When they withdraw the product, they actually for the first time ever give the sales numbers.  The numbers were shockingly low.

THE COURT:  If I can just get back to what they knew at the time that those statements were made.  You've gone back from November of 2020 to 136, which is this conclusory statement, and you tell me that they're shockingly low.  When were they known to be shockingly low, and where do I find that?

MR. GRAZIANO:  Okay, so the second paragraph I gave you, your Honor, was Paragraph 204, and then I will have the admission that they were shockingly low, but let's continue with 204.

THE COURT:  Okay.  When were these internal documents generated?

MR. GRAZIANO:  Right, so 204 is the internal documents they were regularly getting showing --

THE COURT:  By "they," this is a problem of stating

with specificity.  That's what we're talking about here. That's what 9(b) means.  It's what the PSLRA means.  So saying that there were internal documents isn't enough.  Where are they?  What are they?  When were they generated?  What do you know?

MR. GRAZIANO:  Your Honor, we are absolutely not just saying they were internal documents.  If you look at Page 80 of Paragraph 204 --

THE COURT:  Got it.

MR. GRAZIANO:  -- we are saying that sales came in in 2019 that were 50 percent less than estimates.  We know the company eventually admits this in Paragraph 183.

THE COURT:  Let's just start with that allegation. Where is the basis for that allegation?  You say "we know" but I don't, and you've got to tell me.

MR. GRAZIANO:  What I'm going to tell you is that the complaint says, which must be accepted as true at this stage, is that --

THE COURT:  Don't give me that stuff.

MR. GRAZIANO:  Well, it's the law.

THE COURT:  No, let me just be clear about it.  I understand the law on that.  Now, I'm asking you very specific questions, and that's why I framed this so that you get to respond to it.  So you told me that read in the light most favorable to you, a conclusory statement should be accepted.  I

don't.  So show me where I find in this allegation, this allegation, the underlying basis for coming in at less than half expected for 2019, documents, something, somebody in specific who's in a position to say that.

MR. GRAZIANO:  Right, so in this particular paragraph, we have a former employee No. 7, who is a senior financial analyst at the company.

THE COURT:  Right, and what's he relying on?

MR. GRAZIANO:  And he has the data.

THE COURT:  What do you mean "he has the data"?  What's he relying on?  You talked to him.  He's got documents?  Okay, let me know what those documents are.

MR. GRAZIANO:  Yes, your Honor, I would appreciate those documents as well.

THE COURT:  Well, if that's another way of saying "We don't have them now," I understand that.  I understand the problems that are created by the obligation to make the showing at an earlier stage, but I really want candor about this.  I don't want back-and-forth kind of "If we had them, we'd use them, but we don't have them, and we'd like to have them, and this guy says they're out there somewhere.  We've talked to him, however, and he hasn't provided them for us."

MR. GRAZIANO:  Yes, yes, we have talked to him, and I was first trying to say what we do know from him before I say what we don't know from him.

THE COURT:  And I don't want to know what you don't know first.  I want to know what it is that you've alleged.  Just a moment.  I can't be as clear, any more clear than I have been.  I hope I don't have to keep doing this over and over again.  I tried to do it softly and gently at the outset.  Now I'll be a little bit harder, and when I'm a little bit harder, I'm taking up your time.  So why don't you address the issues that I've raised here directly.

MR. GRAZIANO:  What we do know from him is what is in quotes, which we verified with him repeatedly before putting it into this complaint, and that is that there were internal sales quotas; the executive defendants knew about them; "They were absolutely aware of them," quote, and they came in 50 percent short of targets.

THE COURT:  Okay, so let's take it piece by piece.  Which executive defendants knew about them?

MR. GRAZIANO:  We know that Mr. Mahoney knew about them because the paragraph continues, "Defendant Mahoney knew that LOTUS was missing sales targets every quarter by at least 25 percent, even after management reduced quotas."  We know that this witness told us Mahoney himself was constantly --

THE COURT:  You know, how do we know that?  I mean, you say that he says he knew, he knew because he received some documents.  What are those documents?

MR. GRAZIANO:  Those documents are the internal

financial metrics that he was reviewing as a financial analyst at the company at the time.

THE COURT:  Okay, and so where does it say that?

MR. GRAZIANO:  It says it -- just bear with me, your Honor.  It says it in the Paragraph 204, the same paragraph --

THE COURT:  204 now?

MR. GRAZIANO:  It's the same paragraph.  I'm just in the beginning of it.  I'm on Page 79 instead of Page 8, and it refers to the sales dashboard information that the defendants reviewed and received on a regular basis.  I do not have copies of the dashboards, but I do know that that person told us that the dashboards were reviewed by the executives, including specifically Mr. Mahoney.

THE COURT:  Okay, so let me pause for that.  Let's assume that I say he doesn't have those, but he reviewed them at the time and was aware of them.  I'll accept that as your basis for saying that there were such documents, that this is the best you can do under these circumstances because you didn't walk away with them.  "He reviewed them at the time" would be like, you know, best evidence in the document under circumstances, but then how do I know that he knows that these executive defendants reviewed such documents, the dashboard information?

MR. GRAZIANO:  Well, with regard to Mr. Mahoney who we're talking about, it's probably the easiest because he says

that Mr. Mahoney was constantly asking questions.  With regards to Defendants Meredith, McCarthy, and Ballinger, we know that they --

THE COURT:  Hold on a second.  So where is it that, apart from asking questions here, that Mahoney, Meredith, McCarthy, or Ballinger had access to the dashboard, which I think is what you're saying is the underlying document?

MR. GRAZIANO:  With regard to those three, they used the dashboards on monthly sales meetings.

THE COURT:  That's four people, but, in any event, they used them during monthly meetings, where do I see that?

MR. GRAZIANO:  It's in the same paragraph that we're looking at, Paragraph 204.

THE COURT:  Where does it say that they have the dashboards?

MR. GRAZIANO:  It says -- I was referring to three, Meredith, McCarthy, and Ballinger.  I wasn't referring to Mr. Mahoney.  I don't believe he participated on the monthly meetings.  But it says that "Discussed the performance of the LOTUS Edge with internal LOTUS Edge sales staff on monthly sales meetings during which the sales force would raise --"

THE COURT:  It is alleged in that sentence that it's Mahoney as well.  Are you saying Mahoney didn't participate?

MR. GRAZIANO:  No.  I guess I misspoke.  My memory might have been off.  I thought it was those three, but I see

it's him too.  I apologize about that.

What I wanted to point out --

THE COURT:  But you see why I'm asking this question? I want to be sure that there's a coherence in the allegations. And it's not merely, you know, "I misspoke."  You misspoke because there's nowhere referenced here, and so I'm offering you the opportunity to show me in the documents themselves with a familiarity of the complaint itself.

MR. GRAZIANO:  Yes, your Honor, I'd like to point you to two more paragraphs.  There is a --

THE COURT:  You're concluded with this one?

MR. GRAZIANO:  Yes, I am concluded with this one but not this point.  There is another paragraph in the complaint --

THE COURT:  Just so we're clear, I'm going to do this linearly.  I'm going to give you the opportunity to do it, but you're not going to go back and forth --

MR. GRAZIANO:  No.

THE COURT:  -- a kind of shell game --

MR. GRAZIANO:  I'm not going to do that, your Honor.

THE COURT:  -- of Whac-A-Mole for me to try and figure out where it is that I can find this.

MR. GRAZIANO:  Yes, I will not do that, your Honor, and Paragraph 134 will explain to you why I misspoke earlier.

THE COURT:  Okay, let me go to 134.

Okay, go ahead.  This is now FE-1?

MR. GRAZIANO:  FE-1, correct, and this one also is talking about the dashboards, and this is why my memory was slightly incorrect.  So FE-1 says in the last two sentences of this paragraph that "All the defendants had access to the dashboards," but then he identifies the three, and this is where I made my mistake.  "McCarthy, Ballinger, and Meredith were discussed in the quarterly company sales-wide meetings, and it was clear throughout 2019 and 2020 that sales were coming in far below targets."  And, your Honor, we don't just stop with what these two people told us.

THE COURT:  Can I just pause to -- maybe I'm not reading this closely enough, but what I have is, the executive defendants had access to these dashboards -- and that's all of the executive defendants, that's the allegation -- and Defendants McCarthy, Ballinger, and Meredith would discuss them.

MR. GRAZIANO:  Correct.

THE COURT:  Mahoney had access to them?

MR. GRAZIANO:  Yes.

THE COURT:  He had access to the dashboard?

MR. GRAZIANO:  Yes.  He's an executive defendant.

THE COURT:  What does that mean, "access to the dashboard," that he could call somebody up and say, "Give me the dashboard"?

MR. GRAZIANO:  Yes.

THE COURT:  Okay, did he?

MR. GRAZIANO:  What he did or didn't do alone in his office, I don't know.

THE COURT:  Even alone in his office, I mean, there are people that you could call and say, "She called me."  So, you know, you're the master of your complaint.  You took a while to put it together.  It's put together as a consolidated complaint.  Now you're going to be tested on it.  And what I have here is generalized statements to the executive defendants having access to the dashboard but with no specific information that they in fact exercised that access or were obligated to exercise that access.  And now we've narrowed, as you've had to, from 204, which has Mahoney being someone who was at the monthly meetings, to McCarthy, Ballinger, and Meredith.

MR. GRAZIANO:  I do know a little bit more about Mahoney, though, and that --

THE COURT:  It may be, but it's not relevant to this particular point.

MR. GRAZIANO:  It absolutely is, your Honor.  It's Paragraph 136.

THE COURT:  136 now, okay.  Right.

MR. GRAZIANO:  So as I said earlier with regard to Paragraph 204, which we don't need to go back to, what we do know about Mahoney is circumstantial evidence that he himself was looking at the sales numbers because we know in

Paragraph 136, there is an allegation that "Former Employee No. 7 says that the divisional controller was constantly being asked questions by Defendant Mahoney himself about the LOTUS sales."  That's what I can tell you.

THE COURT:  No.  What you have is that FE-7 learned that from Mike Lang.  Is Mike Lang someone you interviewed?

MR. GRAZIANO:  I don't believe so, no, your Honor.

THE COURT:  Okay, so what I have is hearsay here.  The basis for the understanding of FE-7 is hearsay from a non-defendant, not an admission of a defendant but from a non-defendant, right?

MR. GRAZIANO:  Yes and no, your Honor.  This is absolutely hearsay.  Hearsay is something we're allowed to plead at this stage --

THE COURT:  You are, but the question is the reliability, and so I'm trying to parse this a bit.  And you say "yes and no," and the first part is to tell me that I can consider hearsay, and perhaps I will.  Of course, I'll consider the credibility of it, and then when we have to deal with scienter, I'll look at that even more harshly.  But no one talked to Mr. Lang, right?

MR. GRAZIANO:  That is correct.  It's not for lack of trying, but we do -- your Honor used the word "admission" earlier --

THE COURT:  This is not about, you know, effort.

MR. GRAZIANO:  I understand.

THE COURT:  "E for effort" kind of thing.  This is, have you done it at this point?

MR. GRAZIANO:  I understand, but, your Honor, you used the word "admissions" two questions ago.  We do have admissions from this company that completely corroborate --

THE COURT:  We may well get to them, but you're wasting your time if you're going to be using things like this as the basis for answering my question.  So go ahead with as much as you want.  I'm going to be asking these questions regarding them, and you understand now how carefully I'm going to be asking these questions.

MR. GRAZIANO:  And you understand from my position, your Honor, that the PSLRA does not require us to plead every single piece of evidence.  We obviously get as much of it as we can.  In this particular case, these former employees are one hundred percent consistent with what the defendants themselves say, and that's what I want to turn to next, which is Paragraph 183 of the complaint.  In that paragraph, for the first time, after the LOTUS product is withdrawn, after Mahoney said repeatedly how well it was going, how much it had been reordered, how consistently it was being utilized, they finally reveal the sales numbers for the product, and they are what I referred to earlier as "shockingly low."

THE COURT:  And what is the date that this was done?

MR. GRAZIANO:  This comes out in November -- let me give you the date -- it's in the complaint -- November 17 of 2020, and it's the first time that they reveal that --

THE COURT:  So what I'm supposed to do here is say they revealed it, let's say fifteen months later, and so they must have known it at the time that it was transpiring.  That's what I'm supposed to do.

MR. GRAZIANO:  Well, you're conflating falsity with scienter, right?  I mean, they said the sales were --

THE COURT:  I haven't gotten to scienter, or we haven't gotten to scienter yet.

MR. GRAZIANO:  Okay, so I don't think we need to go as far as your Honor just asked because you said "and they knew at the time."

THE COURT:  Then what are you asking me to do?  If I'm not supposed to go that far, what am I supposed to do with it?

MR. GRAZIANO:  Sure, sure.  Given their statements, their understanding was that they were selling over $200 million of this product every year.  They finally admit that the sales were so low, it was one of the reasons why they withdrew it.  It was only $60 million in 2019, on track to be $75 million in 2020.  So we know the hard numbers are way below even half of what the market understood from all their statements.  So we first have to ask ourselves not did they act with a strong inference of scienter, but is what they were

saying false?  That's just my point:  Is it false for them to have said over and over again how successful the launch was, how many reorders they had, how well it was doing, to use some of his specific statements, "going very well, going extremely well, on track to deliver 150 --"

THE COURT:  And so if you're going to get me past puffery and opinion, you're going to have to show me that they knew these specific figures at the time.  So I want to understand what I'm supposed to do to get to that, and what you're saying is that Brennan made this disclosure in November of 2020; they must have known at or about the time that those statements were made that they were way below what they had projected on this; and that consequently leads to some knowledge of falsity.

MR. GRAZIANO:  Well, except for "must have known," we have --

THE COURT:  How can I not look to that to say that what was false was knowingly false?  I mean, you know, you can resist it if you want, that's your business, but I really want to know your best case, and your best case is not rhetoric.  At least it isn't for me.

MR. GRAZIANO:  Your Honor, I am actually trying to answer your question.  I am not trying to resist it.  I took issue with "must have known" because we have two people independently who tell us there were these dashboards, that

Mahoney, according to one of the two people through a hearsay chain, was asking a lot of questions about them.  We know the real numbers are finally revealed in November of 2020.  They are so low.  We know when the defendants withdrew this product, they talked about how low the sales were.  So it's not just the word of the former employees that I cited you to in Paragraphs 204 and 136.  It's not just the company's admissions.  You have to put the whole thing together.

THE COURT:  That's what I'm trying to do.  It would be helpful if you could provide me with the building blocks.  It's a little like somebody says, "Hey, there's a big building there; we can imagine it."  I want to do it step by step and find the building blocks that make it possible for me to adopt or at least say that there's sufficient support for the imagination.

MR. GRAZIANO:  Well, in that case, your Honor, it is sort of unbelievable in this case that they proudly announce they're reaching their goal of opening 150 accounts in the United States, and then less than a month later they say they have less than 100 accounts.  It's just impossible to reconcile what they were saying.

THE COURT:  You know, you can flip back from one thing to another, but why I said we were going to do this linearly is to make it effective so that I can see something other than what I'll call a "pointillist" approach to a pleading.

MR. GRAZIANO: Right, I understand that, and I'm trying to -- maybe we should pick up chronologically with Mr. Mahoney. I think the last one we looked at was October of 2019. We can keep going. The underlying evidence to show falsity is going to be what I said, so I don't have to repeat it. Would you like me to continue because in February of 2020 --

THE COURT: You know what I asked. I asked what the falsity was, okay? That you've got a chronology that you've written out for yourself doesn't necessarily do it. And so I'm asking particular questions about what supports these various things. So let's maybe move on to the number of accounts, the actual number of accounts and the falsity of the number of accounts, okay? Maybe that's a way to help you focus on the things that I'm interested in.

MR. GRAZIANO: Sure. Besides saying repeatedly that they were on track, that the sales were going extremely well, Defendant Fitzgerald --

THE COURT: So let's start with that. We're at 205, are we, now?

MR. GRAZIANO: We can turn to 205, sure.

THE COURT: No, no. Are we? Is that where you want me --

MR. GRAZIANO: No. No, I wasn't referring to a specific paragraph.

THE COURT:  So 205, "The defendants repeatedly assured investors that the company was 'on track' to open 150 accounts within the first year."

"On track" means they haven't done it yet.

MR. GRAZIANO:  Correct, but --

THE COURT:  Okay.

MR. GRAZIANO:  But then they say it is --

THE COURT:  Can I finish?

MR. GRAZIANO:  Yes, your Honor.

THE COURT:  Which of the defendants are you relying on here?  Are you relying on Mahoney at this point in 205?

MR. GRAZIANO:  Not in 205.  Mr. Mahoney was one of the people who were making statements of this nature for sure, and I can give you those statements.  But in this paragraph, particularly, it is Mr. Fitzgerald, the new president of the division, who comes in and says that they have reached 150 accounts.  He does that in a couple of paragraphs identified in the complaint.  He does that in October 15 of 2020.

THE COURT:  Okay, so we're on to Fitzgerald now?

MR. GRAZIANO:  Yes.

THE COURT:  Are you leaving Mahoney behind?

MR. GRAZIANO:  I am only leaving him behind so that we can pick up on this topic that your Honor asked us to turn to.

THE COURT:  No, but you told me that this was a Mahoney topic.  Is it or isn't it?

MR. GRAZIANO:  It is because Mahoney does not -- the number -- the amounts of U.S. accounts that he talks about being on track to get there, it's --

THE COURT:  So it's the "on track," that's what we're talking about with Mahoney, "on track," right?

MR. GRAZIANO:  With him, it's a combination of "the launch going extremely well" and "being on track."  There are two things that are constantly being combined.  It's hard to separate them.  Just if you'll bear with me, your Honor --

THE COURT:  One of the distinguishing features of a legal mind has always been said to be someone who can think about two things that are inextricably intertwined and talk about one without necessarily talking about the other.  So let's try the idea of the legal mind applying itself to this topic, which is Mahoney and being on track.

MR. GRAZIANO:  Okay.

THE COURT:  Does it at any point with Mahoney go beyond "on track"?

MR. GRAZIANO:  He went beyond "on track" by saying how well it was doing in the market.  He never announced, like Fitzgerald did, that they reached the number.

THE COURT:  Okay, so "they're doing well in the market" equates with having 150 accounts?

MR. GRAZIANO:  The way he says it, it does.  I can read you some of his statements if you would like.

THE COURT:  Well, if you think they'll be helpful.

MR. GRAZIANO:  Okay, so --

THE COURT:  And point me to the paragraph.

MR. GRAZIANO:  Sure.

THE COURT:  And bear in mind that they'd better equate.

MR. GRAZIANO:  Yes.  So one example is in Paragraph 279.

(Pause.)

MR. GRAZIANO:  Oh, I'm sorry.

THE COURT:  "Remain on track."

MR. GRAZIANO:  No, I apologize.  I mean 280.  280, I'm sorry, 280.

THE COURT:  Okay, "on plan."

MR. GRAZIANO:  "LOTUS is doing very well in the market.  It's kind of on plan for --"

THE COURT:  "Kind of on plan"?

MR. GRAZIANO:  "-- for 150 accounts."

THE COURT:  Just a moment.  "Kind of on plan" equates to they had 150 accounts?

MR. GRAZIANO:  No.  He never said they had 150 accounts.

THE COURT:  I see that, and you told me that I was going to find somewhere here that Mahoney was misrepresenting, engaging in false statements about saying that they had 150

accounts, and I'm yet to see that.

MR. GRAZIANO: I misunderstood, your Honor. I didn't appreciate that was your Honor's question. The one person who talks about 150 accounts is Fitzgerald, and I can identify his paragraphs for you.

THE COURT: So we're moving on to Fitzgerald. What else do we have with Mahoney?

MR. GRAZIANO: With regard --

THE COURT: We're talking about topics now. You wanted to lead with Mahoney because he's the highest-level guy.

MR. GRAZIANO: Yes. The other --

THE COURT: Okay, so let's get to the topics that you say are false statements by Mahoney.

MR. GRAZIANO: The other topic we have with regard to Mahoney is the reorder rate. He said in Paragraph 159 that the reorder rate for the LOTUS device with regard to existing users is quite high.

THE COURT: Quite high.

MR. GRAZIANO: Yes.

THE COURT: What does that mean?

MR. GRAZIANO: It means --

THE COURT: Higher than what?

MR. GRAZIANO: Higher than what the internal document we quote in the complaint says.

THE COURT: Well, okay, so let me look at it. He says

we've got a high reorder rate, okay.

MR. GRAZIANO:  I mean, all of these statements are designed to give the impression that --

THE COURT:  I know what they're designed to do or what you allege they're designed to do.  I'm trying to test to see what the basis is.  And so what you say is that he assured investors that it's going to be an important growth driver, and you see a high reorder rate for existing users.  That's what you're saying, and that is the kind of false statement, that it is quite high?

MR. GRAZIANO:  Right.

THE COURT:  What's high?

MR. GRAZIANO:  In this context, I would say high has to be more than 50 percent of the customers who --

THE COURT:  And what's the lexicography that would permit me to say "high" means more than 50 percent?

MR. GRAZIANO:  I think the best we can do is open a dictionary and try and understand what the word "high" means.

THE COURT:  And "high" will tell me more than 50 percent?

MR. GRAZIANO:  I think some definitions of the word probably will say that, yes.

THE COURT:  And that's what you're relying on?

MR. GRAZIANO:  No, it's not what I'm relying on.  No, no, that's not.  What I'm relying on is what the evidence is in

Paragraph 131.

THE COURT:  And what I'm asking is, what does it mean? I told you this was a linguistic exercise, so it has to be something that someone looking at would have a shared understanding about.  And you tell me that "quite high" means more than high, and "high" means 50 percent or more.  That's what you're telling me?

MR. GRAZIANO:  That's what I'm telling you, yes.

THE COURT:  Okay.  And I do that by looking at a dictionary?

MR. GRAZIANO:  If we're doing linguistics, that's how I would do it.

THE COURT:  No.  We're doing an evaluation of the complaint, but that's a linguistic exercise.  And if you tell me that that's how I have to read it, now I go look at a dictionary somewhere that's going to tell me more than 50 percent is high, and that something more than high is a higher rate, then I suppose that's how I make that calculation. But I want to say that these are somewhat open-texture words that have a kind of plasticity to them that maybe makes them almost infinitely elastic.

MR. GRAZIANO:  That may be true, your Honor, but they're certainly not puffery.  It's not something you can --

THE COURT:  It's puffery and opinions.  I mean, we're talking about the questions of, can someone say something that

maybe would be understood by someone in the market as puffery and opinion, and not to fall within the context of actionable forms of misrepresentation?  That's why I keep going back to this.

MR. GRAZIANO:  No, I understand, your Honor, but I think there are times when, you know, you can use those phrases in the context where they may be just, you know, puffery.  You know, "The skill of my sales staff is quite high," that's one thing, but he's talking about reorder rates for a product among existing users.

THE COURT:  He says the reorder rate is quite high.  I don't know what the, you know, "high" is except that I'm supposed to look at a dictionary.

MR. GRAZIANO:  Doesn't he say, your Honor, "among existing users"?  Doesn't he also say that?

THE COURT:  Yes, he does.

MR. GRAZIANO:  So if we look at Paragraph 131...

THE COURT:  Those are the existing users?

MR. GRAZIANO:  Only twelve of the existing users were using the device two times or more a month, and only nine of them --

THE COURT:  How many existing users were there at that point?

MR. GRAZIANO:  Well, at this time they claim to have 138 in Paragraph 305 as of August 19.  I mean, I don't believe

they ever got to 138, but that's a different point that we'll take up with Mr. Fitzgerald.

THE COURT:  So this is 308.

(Pause.)

THE COURT:  I guess, you know, I look at this and say, what's the false statement here?  It's "important growth driver."  This stuff about rates has got a whole bunch of missing links to it for Mahoney.  It may have something more for Lisa, it may have something more for Fitzgerald too, and perhaps for Brennan, although I'm not so certain about that.  But, you know, I look at 305, and Brennan is deferring to Lisa on this account rate.  Don't tie Mahoney to that, unless it's what I'll call "gestalt pleading," and that's not what 9(b) and the PSLRA provide for.

MR. GRAZIANO:  No, I was just catching up.  We were only looking at 305 because you asked me how many accounts they had as of the time that the reorder rate was purportedly quite high.  So I said to you they -- I just said they had 138.  Maybe that's not an honest statement.  It seems not to be, given what happens just a couple months later.  We can turn to that and Mr. Fitzgerald because I was just wrapping up Mr. Mahoney.  That was the last Mahoney --

THE COURT:  Okay, that's the last Mahoney topic that we're going to deal with?

MR. GRAZIANO:  Yes.

THE COURT:  So that's the Mahoney stuff, okay.

MR. GRAZIANO:  I was talking about Mahoney's statements, not his scienter, right?  So I didn't talk about his sales --

THE COURT:  Well, I mean, you don't get to scienter until you've got some statements.

MR. GRAZIANO:  Okay, so we're going to hold the scienter?  Is that what we're talking about?

THE COURT:  That's what I said.

MR. GRAZIANO:  Okay, okay, thank you.

So I want to turn now to Mr. Fitzgerald, and he is the president of this division, and in Paragraph 314, he says that he's proud to announce that they have opened more than 150 accounts in the U.S.

THE COURT:  Right.

MR. GRAZIANO:  And that's as of October 15 of 2020. He says it again in a different way in Paragraph 316, the same page, because he says, "I like what I see in terms of us being now --" it's an interesting choice of words -- "being now in 150 accounts," because just a couple of weeks later --

THE COURT:  Well, I'm not surprised that you don't point to Paragraph 279 and 305 in which we're seeing that on August 19.  He's saying, "We hit 138 accounts on August 19," and then he goes to October 15, and he says, "We have opened 150."

MR. GRAZIANO:  Right, right.

THE COURT:  So, you know, that's what I'm looking for. Get me right to it.  You know, you've spent so much time giving me an introduction to how the federal securities laws work and what kind of preferences you might receive for it.  Get me to the bottom line.

MR. GRAZIANO:  So Fitzgerald, as a bottom-line point, then says just a couple of weeks later that they're at sub 100 accounts in the U.S., and that's in Paragraph 187.

THE COURT:  All right.

MR. GRAZIANO:  And we, your Honor, cannot reconcile those statements.

THE COURT:  Okay, so that's your underlying evidence for -- whether you can reconcile is another matter -- but that's the underlying evidence that you're relying on, direct evidence you're relying on, right?

MR. GRAZIANO:  Yes.

THE COURT:  Okay, anything else with Fitzgerald?

MR. GRAZIANO:  I would just like to walk through just briefly, your Honor, how the defendants claim to reconcile the statements because I said we can't, they tried, and their attempt just makes the falsity more apparent.  They say, in Paragraph 187, Mr. Fitzgerald was talking about active accounts.  That's what they say in their brief.  I'm sorry, active accounts, yes.  And the 150 included, quote/unquote,

"inactive accounts."  And for that to be true, your Honor --

THE COURT:  Okay, let's assume I don't buy it.  Why don't you move on.  I really want to give you the opportunity to do what you should do, which is to provide me with the underlying basis for this.  I mean, I suppose I could just sit back and let you take a little bit more time, but your friends are going to have to have some time too to answer my questions.

MR. GRAZIANO:  Okay, so I would like to, continuing with the defendant-by-defendant approach with regard to statements, I would like to turn to Mr. Ballinger, and I'd like to point out two statements he made.  The first is in Paragraph 226 where he's talking about the purported simplicity of using this device.

THE COURT:  Right, let's assume that I, because I want to move this along to get to the core things, let's assume I think that's opinion, okay?  So "It's real easy to use," that's a good marketing job, I suppose.

MR. GRAZIANO:  We have a number of employees that used to work at the company that --

THE COURT:  Right, who say it's not, okay, so that's their opinion.  Let's move on.  Let's get to hard stuff, hard stuff.  You know, really, you're wasting your time.

MR. GRAZIANO:  One last point on this, your Honor, and then we will get to the next defendant.  When the company withdrew the product, it also admitted that the difficulty of

using it was why they withdrew it, among other reasons.

THE COURT:  I understand that.

MR. GRAZIANO:  So I don't agree with your Honor that this is opinion, but I'd like to move on to now Defendant Lisa. She also makes similar statements.  Your Honor may find them to be opinion as well, but one of the --

THE COURT:  No, I don't.  I pointed it out to you.

MR. GRAZIANO:  Okay.

THE COURT:  You know, where she says specifically, "We had 138 accounts on August 19."

MR. GRAZIANO:  Right.  And she also says in Paragraph 275, "We're really pleased with how the launch is going."

THE COURT:  Right, you don't think that's opinion, at least the way I'm looking at it?

MR. GRAZIANO:  I think --

THE COURT:  "We're really pleased."  I mean, please.

MR. GRAZIANO:  I think, even if you call that opinion, your Honor, the problem the defendants have in this case is that an opinion has to be based on a reasonable investigation. There is just no way -- and we don't have the discovery now, we don't have original documents, but there is just no way, given the way the sales were going --

THE COURT:  Any other defendants?

MR. GRAZIANO:  Yes.

THE COURT:  I mean, I'm sorry to be so rough, but, frankly, you're not using your time effectively; and if you can't bring yourself to do it, I'll try to point you in the direction of where you will make the most impact in terms of the amount of time that I'm offering for oral argument.

MR. GRAZIANO:  Yes, I am just seeing who I haven't spoken about yet.  I can turn to Mr. McCarthy in Paragraph 244.  He is again making a statement that I would refer to as an "ease of use" false statement.

THE COURT:  Okay, let's assume that I'm not really intrigued by the "ease of use" ones, but I'll look at them.  I understand that that's something that you say is appropriate, but let's move on to something else.

MR. GRAZIANO:  Okay, he also claimed that they would launch this product in such a way to carefully train the physicians before they released it, and we have allegations that that was not true; that the sales reps were trained with just less than 25 procedures each, and that was far different than the competitors, Medtronic and Edwards.

I'm just trying to think if I have anyone -- oh, I have Mr. Brennan.  I haven't spoken about a statement that he made, so just bear with me.

I think, with regard to Mr. Brennan, the statement that I would identify is in Paragraph 292, and this statement is as of March 3 of 2020, and he is making the "on track" type

of statement we've already talked about.

THE COURT:  Remind me.  Is March 3, 2020, within the class period?

MR. GRAZIANO:  Yes, because the class period starts in 1999 and ends in November of 2020.

THE COURT:  Okay.

MR. GRAZIANO:  But certainly, your Honor, some defendants speak more than others, and Mr. Brennan spoke a lot less publicly about this than some of the others.

THE COURT:  It may be so.  The question is not quantity but quality.  And so I should look at 292?

MR. GRAZIANO:  For Mr. Brennan, correct.

THE COURT:  "We're on track"?

MR. GRAZIANO:  Yes, yes.  And then he also talks about that there's a heavy emphasis on proctoring, making sure folks are a hundred percent able and ready to use the valve, and we were hearing different things from the former employees that we have in the complaint.

THE COURT:  Right, but conclusory.

MR. GRAZIANO:  Well, I don't know if I would agree with your Honor that they were conclusory.

THE COURT:  Well, do they identify by name, by place, by time, by circumstance, who it was who told them these things?

MR. GRAZIANO:  I think -- yeah, I think some of them

do.  I don't think we've talked about --

THE COURT:  Which ones?  On this one?

MR. GRAZIANO:  Yes.  Or on this one, I thought we were talking about complexity.  On complexity generally.  I don't know about on this --

THE COURT:  Complexity generally sounds conclusory to me.

MR. GRAZIANO:  Well --

THE COURT:  So let's see which one of the informants talked about a specific person who told them this contradictory information.

MR. GRAZIANO:  Yeah, I think we could look at Paragraph 113, and this paragraph refers to the former employee No. 4 who was describing the complexity of using the product, the lack of training and support for the sales force as of mid-summer 2020.  You know, they had a low level, only 21 out of 85, that could support the sites.  And, you know, they only --

THE COURT:  So I see what you say there.

MR. GRAZIANO:  Okay, that's what I wanted to point your Honor to.  So with that, I think I've made my points as to statements made by each of the people.

THE COURT:  Well, each of the people?

MR. GRAZIANO:  I think so.

THE COURT:  Let me be sure that we've touched on every

one of the defendants here that have been specifically named. We've talked about Mr. Mahoney. We talked about Mr. Brennan. We talked about Mr. Fitzgerald. We've talked about McCarthy. We talked about Ballinger. We haven't talked about Meredith, and we have talked about Lisa.

MR. GRAZIANO: We did Lisa for sure, but Meredith --

THE COURT: We have talked about Lisa. Meredith I don't believe you've mentioned.

MR. GRAZIANO: I think Meredith I may have overlooked. So that would be in Paragraph 263. And Meredith is the chief medical officer, and he, I think consistent with Mr. Brennan, makes a very small amount of statements. So apologies for the oversight, but he doesn't speak very often about this. But when he does, you know, he again talks about the planned controlled release of the device, the importance of training; and the former employee we were just looking at suggests the opposite was actually happening at the time.

THE COURT: Okay, so let me hear from the defendant. Let me now focus you on the more salient ones so that we can develop --

MR. GRAZIANO: Thank you, your Honor.

THE COURT: Thank you -- develop the discussion a little bit more clearly. First, I want to focus on Lisa and Mahoney and Fitzgerald to some degree, in particular the fairly specific information that Ms. Lisa offers that they hit 138

accounts.  That's Lisa on August 19, but then to Fitzgerald on October 15, "that we have opened more than 150 accounts here," that is not false because they opened them and closed them?  They opened them and they were inactive?  Is that the thrust of what you have to say?

MR. CARROLL:  Yes, but it requires slightly more explanation, if I might.

THE COURT:  Well, it may.  On the other hand, I'm looking at a document that I read in the light most favorable to the plaintiff here.

I'm sorry.  Lee, whenever there's a problem, just talk to me directly.  That's fine.  Go ahead.

(Discussion off the record.)

MR. CARROLL:  The only metric the company ever publicly stated with respect to the launch of the LOTUS Edge product was their target for number of accounts opened during the launch.

THE COURT:  Right.  Okay, so where is it that I say target means anytime opened?

MR. CARROLL:  Right.  They say at the very beginning, and it's Tab 11, the June 16, 2019, they say what the goal is.  The goal is for there to be roughly 150 accounts, and they say, our focus is going to be to drive what's called "sticky adoption" in those accounts.  That's the metric they give to the market.

THE COURT:  That means that includes not so sticky, like inactive?

MR. CARROLL:  Yes, indeed, because --

THE COURT:  Okay, so let's assume that I don't buy that, all right?  Let's assume that I say that there are accounts, the assumption is that they're active in some fashion, that you can't just say, "We had somebody, and they wandered away on that," and that there's no basis for this, what else do you have to say about falsity here?

MR. CARROLL:  What I say is, on the face of the documents, there is no falsity because there is no inconsistency between saying at various points in time, "We've opened this many accounts," and no inconsistency with Mr. Fitzgerald saying in November 17, 2020, "We're sub 100 accounts today."  It's not that the accounts fall away and are closed.  It's that the doctors once they're trained -- because getting to an open account requires a lot of training with this product -- the doctors determine, after giving it a test drive or not, that they're not going to use it as part of their practice.

So when Fitzgerald in November is explaining to the market in context the reason why they decided to shut the program down, he's explaining that they didn't get enough uptake, the sticky accounts that he refers to; and it's referred to repeatedly, including in June, of accounts that are

going to order the product and reorder and reorder. Opening accounts is necessary because without an open account, you can't buy the product, but it's not sufficient. Opening the accounts doesn't tell you anything about sales, and the company never made any public statements about sales, no projections, no forecasts, no point-in-time statements. They just said at various points, "We think the launch is going well, and sales in the sites that are using us is strong."

THE COURT: Okay, I think we ought to move on with respect to that. So let's then turn to the question of Mahoney, and here I'm really interested in the idea of the continuing assertions that it's a key growth driver and a viable investment, which it was until it wasn't.

MR. CARROLL: That's right, and, your Honor, the argument there, as your Honor appreciates, no doubt, is these are optimistic, forward-looking statements, most of them protected by the statutory safe harbor, and the rest are optimistic puffery statements.

THE COURT: Do I have to reject them, the view that Judge Young offered in *Allaire*, to adopt your view?

MR. CARROLL: I don't believe so. I think --

THE COURT: That was a fueling growth case as opposed to a key growth driver?

MR. CARROLL: So I think this is, respectfully, what we have here is very similar to Judge Lasker's *Boston Tech* case

and Judge Burroughs' *LogMein* case.  One said, "We have strong cash reserves."  Another one said, "We have strong deferred revenues."  Mahoney says, "We think we have strong sales." It's very similar --

THE COURT:  Both?

MR. CARROLL:  Pardon me, your Honor?

THE COURT:  Both?

MR. CARROLL:  Yes, both.

THE COURT:  Okay, so I reject Judge Young's view.  I mean, you know, it's not that I adopt everything my colleagues say, but I want to understand what the implication is.  The implication, as I understand it, is -- I mean, I understand it's a different case, a different company, but it appears to me to be pretty much on all fours that it could not have been believed, if I adopt Judge Young's view, by its maker, at least not without recklessness on his part.

MR. CARROLL:  In response, I'd respectfully submit that there aren't specific facts alleged and tied to Mahoney.

THE COURT:  Okay, so that's conclusory.  What else do I need to know that distinguishes your case from *Allaire*?

MR. CARROLL:  Specific facts that would suggest that when Mahoney says he thinks this can be a growth driver in the future, he had reason to know that wasn't so.

THE COURT:  Well, he says a key growth driver --

(Unidentified loud noise.)

(Discussion off the record.)

(A recess was taken, 12:00 p.m.)

(Resumed, 12:11 p.m.)

THE COURT:  I apologize for the interruption which took some of your time, but given that, I would proceed with this.  Is there anything really more to be said regarding the dispute with respect to Mr. Mahoney that I've focused on right here; that is, that some cases have said "yes," and some cases have said "no"?

MR. CARROLL:  I would only try to answer your Honor's question from before the intermission.

THE COURT:  Right.

MR. CARROLL:  The way I would distinguish Judge Young's *Allaire* decision is that, having looked at it during the break, the quality and specificity of the factual allegations there, there it was a software product that did not work and never worked, very different from what we have here, which is to say an FDA-approved product that clearly worked, just wasn't uptaken in the way by cardiac surgeons that --

THE COURT:  Is that the standard, I mean, that it's been approved by the FDA?

MR. CARROLL:  Pardon me, your Honor?

THE COURT:  Is that the standard, it's been approved by the FDA?  I mean, the assumption is, you wouldn't be selling one of these things if it hadn't been.  The question is whether

or not the representations you're making regarding the quality of the device is accurate or not.  So, yes, it's the software, and this is a device, but beyond that?

MR. CARROLL:  What I'm suggesting as the difference between the two cases is that this isn't a case with a product that never worked.  This was a product that once out in the marketplace wasn't uptaken by the cardiac surgeons --

THE COURT:  No, but that's -- yes, it wasn't, and so the issue is whether or not there were misrepresentations made really concerning -- I'll put it in a larger sense.  We have a key growth driver for Boston Scientific.  Could anybody really believe that at the time on the basis of evidence that's before me and as alleged in the complaint?

MR. CARROLL:  Yes, your Honor, yes, and --

THE COURT:  Just a second.

(Discussion off the record.)

THE COURT:  Go ahead.

MR. CARROLL:  What I would point to in that regard, your Honor, is that the optimism was well-founded in the success in the clinical trials, the results of the FDA approval, and the record that's unrebutted that in some cases this leads to extraordinary results for extraordinarily sick people.  Doctors found it in practice too difficult for them to use, but that's not something that was known or knowable until it was out in the market in sites --

THE COURT:  No, but that's the stuff of discovery, I think, perhaps.  And so the defense is, the FDA approved it and -- defense on the complaint itself, that the FDA approved it, and some people used it.  I'm not sure that's going to be enough.  So, in any event, I understand the theory.  I want to afford the opportunity to deal with the question of scienter here, so I'm going to turn to your friend.

So let's talk about scienter, and let's focus because the time has been made more compressed.

MR. GRAZIANO:  I want to start with Mr. Fitzgerald specifically because we heard something new today, that he was referring to quote/unquote "sticky accounts," and I want to show you his statements in Paragraph 170.  It's a block quote, and specifically he says as of October 15 of 2020, "I like what I see in terms of us being now in 150 accounts in the United States."  In the next paragraph at the end where it's underlined, he says, "So we're going to continue this.  This is now a ground game where we are expanding our footprint in the U.S.  Each month we're growing actual procedures per center per month."

There is no way --

THE COURT:  Well, those are two things.  I just want to be sure that I've got this right.  The first paragraph, "We are now in 150 accounts," I suppose they can say -- that's what they've argued -- that whether you're inactive or whether it is

active or inactive accounts, they're in 150 accounts.  But you got me on this one.  They say they're in 150 accounts.  That's not 149 in desuetude and one active.

Then the second one is, "We're expanding our footprint.  We're growing actual procedures per center per month," and as to that, I think I want to understand what information I have about the actual number of procedures being performed.

MR. GRAZIANO:  The way I hear those words linguistically is, every one of those 150 accounts is an active account.

THE COURT:  Okay, let's assume I don't hear it that way.  So where do we have information, specific information about the number of actual procedures per center per month?

MR. GRAZIANO:  We talked about that before in Paragraph 130, and I showed you the internal document that said only twelve accounts were implanting two a month, and only nine were implanting an average rate of two and a half a month, and that was an internal document that we received at the eleventh hour from one of the former employees.

THE COURT:  The eleventh hour is before the complaint was filed.

MR. GRAZIANO:  Yes.

THE COURT:  So that's what I'm looking at.

MR. GRAZIANO:  Yes.

THE COURT:  So let me tie the loop on this to be sure I've got it.  131 says there's an internal nonpublic document. Who says that?

MR. GRAZIANO:  We received the document from a former employee, one of the former employees that's cited in the complaint.

THE COURT:  Who?

MR. GRAZIANO:  No. 4.

THE COURT:  Where does it say No. 4 provided it?

MR. GRAZIANO:  I don't think the complaint alleges that the document --

THE COURT:  Well, that's what --

MR. GRAZIANO:  -- based on No. 4.  But, your Honor, if I could just finish --

THE COURT:  No, just if I can.  That's what I'm looking for in all of this is being able to tie it together. That it's eleventh hour only means, as far as I'm concerned, that it hasn't been alleged properly.  So this is not a "gotcha" kind of thing.  I am really looking as carefully as I can, because that's what I'm obligated to do, at the complaint itself, and what I have is an internal document of uncertain providence?  Who knows where it came from?

MR. GRAZIANO:  Well, except that I was going to say that the complaint describes it as an internal, nonpublic company document --

THE COURT:  No, but what that means is, the lawyer said that that's what it was.

MR. GRAZIANO:  Right, and that was the point I was going to make, which is the --

THE COURT:  Is this a verified complaint on the part of the lawyer?

MR. GRAZIANO:  No, but the PSLRA doesn't require it to be verified.  The lawyers are entitled to make allegations --

THE COURT:  They are, but they've got to be tying them to specific people and specific events.  That's the whole point, who, what, where, when.

MR. GRAZIANO:  The other point I was going to make with regard to Mr. Fitzgerald sticking with this 150-accounts point is, in Paragraph 194 he says something that's very interesting and cannot be reconciled with the "sticky" defense we heard today because he's now talking about when they made the decision to withdraw the product.

THE COURT:  Hold on a second.  Let me just get it up.

Okay, go ahead.

MR. GRAZIANO:  He's being asked when they made the decision to withdraw the product because, frankly, the market is surprised, and he says on Page 75, "The decision we came to after thousands of implants, we launched about 100 accounts in the U.S., was that LOTUS was going to remain a niche, a really important niche for a subset of patients."

So now he's saying they made the decision to withdraw after launching about 100 accounts.  So he's not talking about launching sticky accounts, he's saying after 100 accounts; and either interpretation points to a problem for the defendants here.  If they were accurate with their numbers, which we don't believe they were, that 100 accounts would have been in the spring of 2020, because they claim 138 by August, they claim 150 by October, and that's quite a statement to say we knew we were withdrawing this product in the spring of 2020.  If what he means is, they only launched 100 accounts in October and November when they decided to withdraw the product, well, that just confirms the falsity of his 150.  There's no --

THE COURT:  Okay, and that goes to falsity.

MR. GRAZIANO:  Yes.  Well, no, no, I think on this one, falsity and scienter are tethered together.

THE COURT:  So scienter, as far as you're concerned, for Fitzgerald is evidenced by the degree of falsity here and the disparity between the two statements?

MR. GRAZIANO:  Correct.

THE COURT:  Okay, what else about scienter?

MR. GRAZIANO:  And with regard to scienter, I did not yet mention the meeting that was held over the Thanksgiving weekend where three of the named defendants attended, and that would be Defendants Ballinger, McCarthy, and Meredith.  And there they were talking specifically with the entire LOTUS

sales force about the low sales of the product, the difficulty of using the product, and that's in Paragraph 206, among other places.  So that would be those three people.

THE COURT:  Okay, hold on a second with that.

(Pause.)

THE COURT:  Fitzgerald is not at that meeting, right?

MR. GRAZIANO:  No, he is not.  And the meeting is further detailed in Paragraph 137.

(Pause.)

THE COURT:  Okay, so this would go to the scienter of Ballinger, McCarthy, and Meredith, if they were speaking about either the number of outcomes or the number of implants and outcomes.

MR. GRAZIANO:  And also the port sales being well behind target.

THE COURT:  Did any of those three make representations about numbers of sales?

MR. GRAZIANO:  I'll just cross-reference the names, your Honor.

You asked if they made statements about --

THE COURT:  Sales.

MR. GRAZIANO:  Sales, okay.

(Pause.)

MR. GRAZIANO:  Sorry, your Honor.  I'm just trying to reconcile the names.  Bear with me.

What I'm finding right now is these individuals making statements more about the purported ease of use of the product than sales, so that's what I'm seeing on my --

THE COURT:  Okay, so let's move on to, anything further with respect to Mr. Fitzgerald?

MR. GRAZIANO:  No.  I think we covered Mr. Fitzgerald.  I was going to move on to --

THE COURT:  On the question of scienter is what I'm --

MR. GRAZIANO:  Yes, I think it's the juxtaposition of his different statements, the most important two just four weeks apart.

THE COURT:  Okay, so the question for Fitzgerald's trading during the class period is not scienter because it was not particularly unusual?

MR. GRAZIANO:  Mr. Fitzgerald, I don't believe he is a reporting officer.  I don't know if we have --

THE COURT:  Does it make a difference if he was a reporting officer if we're talking about insider trading, and maybe he's got mechanisms for --

MR. GRAZIANO:  Oh, okay.  Yes, we actually do have his stuff.  I misspoke.  There are three of the six defendants who --

THE COURT:  There are seven defendants.

MR. GRAZIANO:  There are three of them who are not reporting, meaning we don't know their sales at all, but we do

have Mr. Fitzgerald's.  I misspoke.  And in the class period, he is selling about $10.8 million of stock as compared to, you know, a prior time period of equal length where it was just $2.2 million of stock, and that's in Paragraph --

THE COURT:  So the amount makes the difference?

MR. GRAZIANO:  The amount is more.  It's, you know, many more shares.  Does that alone carry the day?

THE COURT:  So the amount of shares that he purchases increases during this time period, increased his holdings too?

MR. GRAZIANO:  I don't know if I have the amount of shares he acquired, but I wouldn't use the word "purchased" because he --

THE COURT:  Okay, well, increased his holdings.  I mean, you know, there's insider trading and there's insider trading, and the question is, is it improper, is it unusual, is it somehow suspicious?  Let's call it suspicious, and that's what I'm looking at with respect to him.  I've afforded, as I pointed out to you, he did make sales, something that you hadn't noted.

MR. GRAZIANO:  Well, I didn't note it because I was planning to note only one of the defendant's sales.  It is a fact that he sold --

THE COURT:  Okay, but the question is, is that scienter?  I've afforded you the opportunity to convince me that it is.  I think I'm not putting words in your mouth; I'm

offering you the opportunity to offer your own words, but that's not scienter, is it, for Mr. Fitzgerald?

MR. GRAZIANO:  Okay, I don't think that's a fair question.  I would have to say it is, but it is because you look at the facts collectively.

THE COURT:  Okay, I'll look at the facts collectively.

MR. GRAZIANO:  Okay, collectively, this man sold five times as many shares as he did during the control period.  Does that add to the strong inference?  By the way, it's an inference.  It's not proof of scienter because we don't --

THE COURT:  I understand that, but it's something more than simply making an allegation conclusorily that he traded; therefore, as a consequence of which, he knew what he was doing was something that --

MR. GRAZIANO:  Correct.

THE COURT:  -- supported this willful violation.

MR. GRAZIANO:  Correct, your Honor, and you didn't hear me say that, but it is a factor that this gentleman sold five times more --

THE COURT:  Okay, that --

MR. GRAZIANO:  That's my point.  I wasn't going to emphasize it, and you brought it up.  And you pointed out that I didn't bring it up, and I'm trying to explain to you why I didn't.  Is it a smoking gun?  No, it's not a smoking gun.

THE COURT:  No, I'm not even sure there's much issuing

from the gun itself, but, in any event --

MR. GRAZIANO:  The one person --

THE COURT:  Yes, go ahead, go ahead.

MR. GRAZIANO:  -- who sold in a very unusual manner is the CEO, Mr. Mahoney, and that's what I was going to point out.

THE COURT:  Okay, so we'll move to Mr. Mahoney, but I take it that there's not anything else with respect to Ms. Lisa?

MR. GRAZIANO:  That is correct.

THE COURT:  Okay, so let's talk about Mr. Mahoney and his trading activity.

MR. GRAZIANO:  Right.  So in particular, it's one of his trades that we want to focus on.  It's the block trade that is executed on November 3 of 2020.  It's just a couple of weeks after there is a claim that they reached 150 accounts in the United States.  It's just two weeks before the product is completely withdrawn from the market.  And the product was withdrawn because of poor sales, complexity, difficulty of use, difficulty of manufacturing.  I mean, every reason is given by the company to show what a difficult product and experience this was for the company.  And Mr. Mahoney times it just right and sells a very substantial amount of new sales.  They weren't in a prior 10b5-1 plan.  Instead, he set up a new 10b5-1 plan on August 25 of 2020.

THE COURT:  So the appropriate time to think about it

is August 25, right?

MR. GRAZIANO:  I think so.

THE COURT:  Okay.  So as of August 25, he has this new plan, and so we have to say, did he as of August 25 know that they were going to can the program?

MR. GRAZIANO:  Right.  And we know that they claim they made the decision to can the program when they reached about 100 accounts in the U.S., according to Mr. Fitzgerald. We know that on August 19, the company says it hit 138 accounts.  So if Mr. Fitzgerald was telling the truth, "We decided to pull the plug once we got to 100 accounts in the U.S." -- that's what he says -- they're at 100 accounts by August 19, no question.

THE COURT:  Do we have any information about where they actually were?  Because my reading on its face of Mr. Fitzgerald's characterizations are that they're just unballasted by fact.

MR. GRAZIANO:  No, we don't know, your Honor.

THE COURT:  We don't know whether as of August 25 they had 100 accounts, and then by November 15 they had 138?

MR. GRAZIANO:  We know their statements cannot be reconciled.

THE COURT:  No, I mean, they're inconsistent.  I understand that part.

MR. GRAZIANO:  Right.  We are using their statements

to see what they were saying at the time --

THE COURT:  You're using Fitzgerald's statements to impeach Mahoney's --

MR. GRAZIANO:  Well, actually, yeah, the 138 doesn't come from Fitzgerald.  It's in --

THE COURT:  It's Lisa.

MR. GRAZIANO:  Yes, it's Lisa.  So she's a spokesperson for the company.

THE COURT:  No, I understand, but it's someone else's statement that is meant to indicate that as of that time, they must have had at least 100 accounts.  I think that's what it is.

MR. GRAZIANO:  Our view of the evidence, if your Honor is asking, is, that statement was not true; Mr. Mahoney knew it not to be true, and he entered into a 10b5 plan just days later to sell a very large amount of stock because he enters his plan August 25.

THE COURT:  Okay, I --

MR. GRAZIANO:  That's what we were saying here.  And then he sets the price to sell these shares at a price lower than it was trading on August 25, signaling to us that he's trying to dispose of the stock and --

THE COURT:  I've got it.  I've got it.  Now, let me deal with the larger question before I listen to what your friend has to say.  Let's assume that I look at this and say

there are some of the seven named defendants for whom, whether there are false statements or lack of false statements or lack of scienter, who shouldn't be in the case any longer, do I grant a motion to dismiss as to those individuals?  I think I do the way I framed that issue.  Any disagreement with that?

MR. GRAZIANO:  What we've seen in these cases is that, yes, sometimes that happens; and then the real question is, is the Court granting that motion with prejudice or without prejudice?  Because what we've also seen, unfortunately, time and time again is, when we finally do get discovery, we can fix those holes in a way that would satisfy the most critical judge.

THE COURT:  So, okay.  Well, yes, I've seen critical judges and critical judges.  I'm interested in the issue of effective judicial administration.  Part of what you're suggesting to me is that I would be confronted at the back end with the potential that somebody is going to be invited back in, into the case because of your discovery, or, alternatively, that I'd say, "Bring another lawsuit as to them and face the question of statute of limitations."

MR. GRAZIANO:  Right, and also there would be a second issue with another lawsuit, which is, you know, there undoubtedly would be a dispute over confidentiality.  The documents may not be usable in another lawsuit.

THE COURT:  I don't know why, but, in any event, I

think I understand you to say, "Keep us alive because something might turn up."

MR. GRAZIANO:  I think, your Honor, if you kept us alive, we would make a most effective case; and whether that is limited to the people you've left in the case or not, I don't know, but you can also set a timetable, a limit as to when any amendment can occur, and that's another way we've seen --

THE COURT:  Okay, so let me ask the further question. I do it with trepidation, but this is your best and final offer right now, right?

MR. GRAZIANO:  It is, your Honor.

THE COURT:  Okay, so if I grant a motion to dismiss, there's no re-pleading on this, re-pleading of this case. There may be a new case that's brought because the motion to dismiss presumably would be without prejudice at this point.

MR. GRAZIANO:  Right.  I mean, you know, what we would love is if there was a complete dismissal --

THE COURT:  Don't come to me for love.

MR. GRAZIANO:  Right.

THE COURT:  Just come to me for --

MR. GRAZIANO:  I'm trying to be practical.  I'm trying to be practical here.  What we would always appreciate is an ability to replead, even if there was a complete dismissal, but I would hesitate to have your Honor wait, if your Honor thinks it's going to sustain at least part of the case, because we

would really like to move --

THE COURT:  It's not "mother, may I" or you saying the same thing to me.  If this is your last, best, and final offer, I understand that, you know, you've got what you've got, and the prospects of getting more immediately in a timely fashion are not there.  I'm going to try and deal with this as promptly as I can.

MR. GRAZIANO:  The only thing that's out there that we can't predict is that the SEC launched an investigation immediately after, given the massive inconsistencies with what these defendants were saying.  We don't know what that will result in.  So we could leave here today and read the news in a week and then regret saying, "This is our last and best offer."  That --

THE COURT:  Regret, again, is not the issue.  The issue is, is there a meaningful likelihood that there's going to be a change?  I'm not --

MR. GRAZIANO:  At this moment in time, this is the best effort we can do.  Thank you, your Honor.

THE COURT:  Okay.  So let me ask one additional question.  I think I presaged it.  There's nothing against the corporation if all of the named defendants go out, is there?

MR. GRAZIANO:  There are a couple of statements that are made by, you know, spokespersons other than Defendant Lisa; but I do think I agree with the Court, that you need an

executive with knowledge and scienter being responsible for those statements.

THE COURT:  Okay, I appreciate the refinement of the answer there because I was looking through it to try to see if there was something there that is missing.

Okay, so let me hear from the defendant here.

MR. CARROLL:  Thank you, your Honor.  Just a couple of points.  Paragraph 194 of the complaint, respectfully, does not say that the decision to terminate was made upon getting to 100 accounts.  What Mr. Fitzgerald is quoted there as saying, "The decision we came to after thousands of implants, we launched about 100 accounts in the U.S., was that LOTUS was going to remain a niche, a really important niche for a subset of patients," and it goes on.  It doesn't say, "When we hit 100 accounts, we made the decision at that time to terminate." That temporal connection isn't in the allegation --

THE COURT:  No, you know, I think that's a contorted reading of it.  Maybe he will actually take the witness stand and say that and be subject to cross-examination about that reconfiguration of plain language.

MR. CARROLL:  Two points in addition, your Honor. One, Mr. McCarthy increased his holdings during the class period, the argument is rendered, well, that doesn't matter because he paid for them with his efforts as opposed to with writing a check in cash.  The law in this district doesn't

support that, no support for that at all.

THE COURT:  Right.

MR. CARROLL:  And if your Honor would like to hear it, I would like, if you find it interesting, I would make several points with respect to the criticisms of Mr. Mahoney's 10b5-1.

THE COURT:  Yes, I want to hear that.

MR. CARROLL:  Good.  So the complaint with respect to Mr. Mahoney is that he entered into a 10b5-1 plan close in time to a negative announcement.  The plan was entered into more than 60 days prior to the announcement.  The criticism in the complaint of his plan is based upon -- there's a footnote in the complaint that cites to an academic article in some online publication, not a peer-reviewed publication.

THE COURT:  I take it that "academic" is not meant to be a term of honor or an encomium.  It's a suggestion of lack of familiarity with the real world?

MR. CARROLL:  In my world, it is.

THE COURT:  Right, but I don't think I can indulge that --

MR. CARROLL:  To be sure, and it's never been cited by any court, more importantly, this article.

THE COURT:  So the courts are peer-review entities, is that it, for academic articles?  Please, you know, as I said to your brother, focus on the things that might be persuasive under these circumstances.

MR. CARROLL:  Okay.  So that article, which is what the plaintiffs use to say that Mr. Mahoney's plan was somehow unusual, sets forth three considerations that it says are red flags.

THE COURT:  Right.

MR. CARROLL:  One is inadequate cooling-off periods, and the article says it has to be 60 days.  It's more than 60 days here.  It's --

THE COURT:  So but, you know, let's assume that he sees the writing on the wall, says that, you know, "Come fall, we're going to have to can this thing, and I might as well get my trading plan in place," and it's more than 60 days, I mean, the real question is, can it fairly be inferred from this that this evidences his knowledge of false and misleading statements?  And so 60 days, whether it's said by an academic or it's said by the Commission in setting up the safe harbor, is probably a matter of indifference to me.  If you've got the safe harbor, you've got some protection.  If you don't, then I have to look at the circumstances.

So let's assume, just for present circumstances, that he knew what was going on, that he set up this plan more than 60 days ahead of time, and I say that's not going to disable a finding of scienter, what else?

MR. CARROLL:  Well, if that's the case, effectively, if you enter into the 10b5-1 plan on not a clear day, then you

get no protection from the plan.

THE COURT:  On --

MR. CARROLL:  On a day that's not a clear day, if you're in possession of material nonpublic information.

THE COURT:  Right, right.

MR. CARROLL:  The other point, and I'll just dwell on it very quickly, that the article views is important, it says 10b5-1 plans are suspicious if you enter into the plan and it executes during the same quarter -- that is to say, before an earnings release for that quarter -- and that's not true of Mr. Mahoney's plan.  It's also not true that it was a single-trade plan.

THE COURT:  Well, but it really has to do with earnings release, that aspect of it, because I have read the article and tried to understand it, but that aspect of it doesn't really resolve the matter either.  So you don't know that or you didn't know that it's not going to be the quarter reported.  On the other hand, you know inside information about what's going to be reported when there is a reporting, and there is outstanding representations that have to do with this being a growth -- what's the language? -- "key growth driver in a viable investment."

MR. CARROLL:  I am not arguing, your Honor, that a 10b5-1 plan provides protection for someone who's entered into it with material nonpublic information, that they know what's

going to happen.  That's not the argument whatsoever.  I'm making the point, it doesn't qualify as one that draws red flags.

The second point, your Honor, and subject to your questions will be the last one I'll make unless you'd like me to, is the plaintiff points repeatedly to this Paragraph 131 quoting the purported internal document.

THE COURT:  Right.

MR. CARROLL:  There is nothing in that paragraph that ties it to any individual defendant.  And, your Honor, when you started this argument and you wanted to talk about proceeding by talking about individual defendants and what statements are attached to them and what alleged facts show their scienter, you can't do it, respectfully, in this complaint because it lumps them all together and indeed uses a defined term --

THE COURT:  Well, I tried -- I mean, what I'm trying to do and the purpose that I had in mind, anyway, for this argument is to try and disaggregate those generalized statements of the executive defendants.  That doesn't mean that there isn't something in here, but I've tried to figure out what it is.  I, like you, look at 131 and say, "I can't tie it to anybody in particular here."  And more than that, I don't even know where this document came from, or I can't say that the document came from anything other than a lawyer was given it, he put it into the complaint, but then didn't say who could

attest to it, who could say something about it, that sort of thing.  So I said this was literary deconstruction.  That's one metaphor, I suppose.  Another metaphor is that I'm titrating to see if there's anything here.

MR. CARROLL:  I'd even offer a further metaphor which someone in my position sometimes uses:  You throw it all up against the wall and see if something sticks.

THE COURT:  Yes, and mostly people don't titrate that kind of material, but that all having been said, the real issue is, is there enough here?  You know, it's long, that's for sure.  On the other hand, there are portions of it -- I've tried to identify the strongest ones -- that have captured my attention.  I will look at them more carefully.  That's the purpose of this.

So we've reached the time period, although you involuntarily had some of it taken away from you, but I think I have an idea of what the parties' positions are with respect to the critical allegations that I ought to be looking at here, and I'll try to get it out as promptly as I can.

MR. CARROLL:  Your Honor, thank you, and thank you for having us in person.

THE COURT:  Oh, yes.  No, that's why I stayed on the bench when we had this howling stuff going on.  I want to be in the courtroom.  Everybody wants to be in the courtroom.  You get a better sense of what people are saying and talking, and

you can respond, as I tend to do in a provocative and aggressive fashion, but people can see that I'm actually a human being, not an avatar on TV.  Okay?  Thank you very much. We'll be in recess.

MR. GRAZIANO:  Thank you, your Honor.

MR. CARROLL:  Thank you, your Honor.

(Adjourned, 12:47 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 67 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 20-12225-DPW, In Re Boston Scientific Corporation Securities Litigation, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

Dated this 28th day of November, 2021.


/s/ Lee A. Marzilli
_____
LEE A. MARZILLI, CRR
OFFICIAL COURT REPORTER