# EXHIBIT A

2021 WL 6062622
Only the Westlaw citation is currently available.
United States Court of Appeals, First Circuit.

CONSTRUCTION INDUSTRY
AND LABORERS JOINT PENSION
TRUST, Plaintiff, Appellant,
RUBEN A. LUNA, individually and on
behalf of all others similarly situated;
VALERIE COSGROVE, derivatively on
behalf of CARBONITE, INC.; WILLIAM
FENG, individually and on behalf of all
others similarly situated; MICHAEL
RANDOLPH, derivatively on behalf
of CARBONITE, INC., Plaintiffs,
v.
CARBONITE, INC.; MOHAMAD
S. ALI; ANTHONY FOLGER,
Defendants, Appellees,
LINDA CONNLY; MARINA LEVINSON;
TODD KRASNOW; SCOTT A. DANIELS;
CHARLES F. KANE; STEPHEN
MUNFORD; DAVID FRIEND, Defendants.

No. 20-2110
|
December 22, 2021

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

**Attorneys and Law Firms**

Andrew S. Love, with whom Samuel H. Rudman, David A.
Rosenfeld, Robert D. Gerson, Philip T. Merenda, Robbins
Geller Rudman & Dowd LLP, Theodore M. Hess-Mahan, and
Hutchings Barsamian Mandelcorn, LLP were on brief, for
appellant.

Alisha Q. Nanda, with whom James R. Carroll, Immanuel R.
Foster, and Skadden, Arps, Slate, Meagher & Flom LLP were
on brief, for appellees.

Before Kayatta, Selya, and Barron, Circuit Judges.

**Opinion**

KAYATTA, Circuit Judge.

 *1  Lead plaintiff Construction Industry and Laborers' Joint
Pension Trust ("plaintiff") and other holders of common
stock of defendant Carbonite, Inc. ("Carbonite") brought
this securities fraud class action alleging that Carbonite and
certain current and former officers misled investors by touting
a new product that they knew did not even work. The
defendants moved to dismiss the complaint, arguing both that
it failed to allege facts raising a strong inference of scienter
and that it alleged no actionable material misrepresentations
or omissions. The district court agreed that plaintiff had
insufficiently pleaded scienter, so the court granted the motion
to dismiss without reaching the defendants' second argument.
Plaintiff appealed. For the following reasons, we reverse the
district court's dismissal of the complaint.

**I.**

As this case comes to us on a motion to dismiss, we accept
the factual allegations set forth in the amended complaint, as
"supplemented by certain materials the defendants filed in the
district court in support of their motion to dismiss." Mehta v.
Ocular Therapeutix, Inc., 955 F.3d 194, 198 (1st Cir. 2020)
(internal quotation marks and alteration omitted) (quoting
Brennan v. Zafgen, Inc., 853 F.3d 606, 609–10 (1st Cir.
2017)). These include "documents the authenticity of which
are not disputed by the parties," "official public records,"
and "documents sufficiently referred to in the complaint." Id.
(quoting Brennan, 853 F.3d at 610).

Carbonite is a software company headquartered in Boston
that offers cloud-based backup and data protection services.
The events leading to this suit took place during a specified
Class Period, beginning with Carbonite's October 18, 2018
launch of a new data-backup product called "Server VM
Edition" ("VME") and concluding with the July 25, 2019
announcement that VME was being withdrawn from the
market.

In October 2018, Carbonite announced the release of VME,
which would "enable[ ] businesses to select, manage[,]
and recover their [virtual machine] data from a single
location."[1] Between the October launch and the following

July, Carbonite publicly promoted VME, including through its CEO, defendant Mohamad S. Ali, and its CFO, defendant Anthony Folger.

For example, on November 1, 2018, Ali stated in a call with investors and analysts that "[VME], which includes new purpose-built server backup for virtual machines, is the first Carbonite solution directly integrated into the new platform. This significantly improves our performance for backing up virtual environments and makes us extremely competitive going after that market."

On November 15, 2018, CFO Folger spoke on behalf of Carbonite at an investor conference, where he said:

> One of the products that we did deliver also that is integrated with the console is our [VME]. So think about this as protecting your server infrastructure, but it is specifically targeting virtual machines. This is a market that we haven't been particularly strong in, in the past, we've been okay. I think we have completely overhauled the product and we have put something out that we think is just completely competitive and just a super strong product in a streamline user management, it's got a ton of APIs for monitoring.

**\*2** On December 6, 2018, Folger told another conference, "[VME is] a really important product for us, and I think it will help us address a pretty big segment of the market."

Contrary to the picture painted by senior management, the complaint alleges that VME never worked. Prior to VME's launch on October 18, 2018, several clients had tested VME on a trial basis, and the complaint alleges that "there was not one successful customer data backup before the product was released." Also pre-launch, Carbonite employees allegedly "reported internally that the product was not ready and should not be running." The software failed to back up files as scheduled by clients, resulted in corrupted files, and experienced difficulty identifying the target virtual machines.

In light of the issues with VME, the complaint alleges that Carbonite set up an internal "tiger team" focused on fixing the product in the months following the launch, and Carbonite engineers, software architects, and development-operations employees participated in a similarly focused internal group chat called "Get VME Healthy." Between the launch in October 2018 and the eventual shelving of VME the following July, Carbonite put out a "large patch" and "hundreds of bug fixes."

Nonetheless, VME allegedly "never once successfully backed up a customer's data." In early summer 2019, Carbonite decided internally to stop selling VME, several weeks before it publicly pulled the product. Then, on July 25, Carbonite announced its second quarter 2019 financial results and its revised 2019 full-year revenue projections in a press release, which also disclosed that Ali was resigning from his role as CEO, effective immediately, to pursue other opportunities.[2]

Later that day, Folger spoke on a call with analysts and investors to explain the company's reduced financial projections. During that call, he also announced that Carbonite was withdrawing VME from the market because, "[t]owards the end of the quarter, we determined that the virtual server edition of our server backup product was not at the level of quality that customers have come to expect from Carbonite." Folger reminded the analysts and investors that VME "was newly launched in Q3 of 2018 and [was] something we expected to meaningfully contribute to revenue starting in the back half of 2019 and through 2020," and he explained that "maybe a third" of the projections' reduction was attributable to VME's withdrawal. Analysts reacted negatively. From July 25 to July 26, the price of Carbonite stock dropped more than twenty-four percent -- from $23.90 per share to $18.01 per share.

The first complaint in this action was filed seven days after the press release and announcement. Several related suits were consolidated below, and plaintiff, as the sole lead, filed a consolidated amended complaint against defendants Carbonite, Ali, and Folger. Plaintiff seeks recovery under section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), codified at 15 U.S.C. § 78j(b), as implemented by Securities and Exchange Commission (SEC) Rule 10b-5, codified at 17 C.F.R. § 240.10b-5. For ease of reference, we call this the "section 10(b)" claim. Plaintiff also seeks recovery under section 20(a) of the Exchange Act, codified at 15 U.S.C. § 78t(a). Defendants moved to dismiss the amended complaint. After a hearing, the district court allowed the motion and dismissed the claims with prejudice. Plaintiff appealed.

**II.**

**\*3** This appeal turns on the viability of the section 10(b) claim. Plaintiff does not contend that its section 20(a) claim survives even if the section 10(b) claim does not. See Mehta,

955 F.3d at 210–11 ("A claim brought under section 20(a) is ... derivative of a claim alleging an underlying securities law violation."). And defendants do not provide any basis for sustaining the dismissal of the section 20(a) claim should we reverse the dismissal of the section 10(b) claim.

To successfully make out a section 10(b) claim, plaintiff was required to plead six elements: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." In re Biogen Inc. Sec. Litig., 857 F.3d 34, 41 (1st Cir. 2017) (citing Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 240 (1st Cir. 2015)). Only the first two elements of plaintiff's section 10(b) claim -- material misrepresentation or omission and scienter -- are at issue in this appeal.

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Mehta, 955 F.3d at 205 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). And because it alleged securities fraud, plaintiff was also required to satisfy several heightened pleading requirements. Federal Rule of Civil Procedure 9(b) requires that a plaintiff claiming fraud "must state with particularity the circumstances constituting fraud." The Private Securities Litigation Reform Act (PSLRA) further requires that plaintiffs claiming securities fraud in particular must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Additionally, as we will discuss, the PSLRA requires a complaint brought under section 10(b) to allege particular facts sufficient to give rise to a strong inference of scienter. Id. § 78u-4(b)(2)(A).

In determining whether a securities fraud complaint satisfies these requirements, "[w]e review de novo the district court's dismissal ... for failure to state a claim under Rule 12(b)(6)." Mehta, 955 F.3d at 205. In so doing, we accept well-pleaded factual allegations in the complaint as true and, while cognizant of the requirements for pleading scienter, we view all reasonable inferences in the plaintiff's favor. ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58–59 (1st Cir. 2008).

## III.

Plaintiff alleged that twelve statements made by the defendants during the Class Period were "materially false and misleading." Most prominently on appeal, it points to the November 1 and November 15 statements made by Ali and Folger, respectively, as quoted above. Otherwise, plaintiff mentions but places less weight on an October 2018 statement and nine statements made between February and June of 2019, each of which speak more generally about Carbonite's products or financial prospects and do not mention VME by name. Plaintiff does not contend that the less pointed statements might be actionable if the November statements are not. Nor do the parties describe any scenario in which the less pointed statements might affect the extent of liability if the November statements are sufficient to establish liability. Like the parties, we therefore train our attention on the two November statements that directly discuss VME.

In contesting the adequacy of the complaint vis à vis those statements, defendants advance three basic arguments, each of which would independently support dismissal: (1) the challenged statements were not material misrepresentations because they were not false statements of fact; (2) any misrepresentations were not material; and, (3) in any event, the complaint fails to allege facts eliciting a strong inference of scienter. We address each argument in turn.

## A.

**\*4** Section 10(b) prohibits the use of "manipulative or deceptive device[s]" in connection with the purchase or sale of, inter alia, registered securities. 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements that prohibition by making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b-5. A violation thus requires a false, or misleadingly omitted, statement of fact. Defendants argue that the November 2018 statements were merely optimistic opinions that are not actionable as misstatements because they may have been "genuinely held when made."

The Supreme Court has explained that the most significant difference between statements of fact and expressions of opinion is that "a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 183 (2015). Words like "I think" or "I believe" can play a role in demonstrating a lack of certainty, id. at 187, but their use does not preclude the possibility that the statement

as a whole may still mislead as to some fact, id. at 193. For example, a statement in the form of an opinion ("I believe that the proposed transaction is legal.") may convey three facts: that the speaker has such a belief; that the belief fairly aligns with the facts known to the speaker; and, if stated in the context of the securities market, that the speaker has made the type of inquiry that a reasonable investor would expect given the circumstances. Id. at 188–89.

Ali's November 1, 2018 statement that VME "improves our performance for backing up virtual environments and makes us really competitive" could be reasonably construed in context as a statement of fact, at least to the extent that it plainly implied some better "performance for backing up virtual environments." As such, it would be false as compared to the complaint's contention that as of November 1 VME could not back up virtual environments.

Folger's November 15 statement, by contrast, was presented in the form of a statement of belief: "[W]e have put something out that we think is just completely competitive and just a super strong product." Nonetheless, the statement plausibly conveyed at least three facts: first, that Folger actually believed VME to be "completely competitive" and "super strong"; second, that his opinion "fairly align[ed] with the information" that Folger possessed at the time; and third, that his opinion was based on the type of reasonable inquiry that an investor in context would expect to have been made. See id. The complaint's description of the state of the VME product plausibly alleges that at least one and possibly all three of these facts must be false. It thereby sufficiently alleges that Folger misled investors.

Defendants' fallback argument that investors would have understood Folger's statement to be only "an opinion about future potential," and thus not a statement of present or historical fact, simply mischaracterizes the statement. (Emphasis added.) As we discuss further in addressing the element of scienter, infra, Folger used the present tense to describe Carbonite's beliefs about the then-existing status of a product that the company had already "put out" into the market. Retrospectively asserting that this was somehow a forward-looking statement does not make it so.

Accordingly, the complaint adequately alleges that Ali and Folger each made a misleading statement.

**B.**

Defendants argue that even if the challenged statements made by Ali and Folger were misleading, they were not material. This argument fares no better.

**\*5** A fact is material if it is substantially likely "that the disclosure of the omitted [or misrepresented] fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). Here, we have no trouble finding that the complaint adequately alleges facts raising a reasonable inference that VME's ability to perform was a significant part of the mix of information considered in evaluating Carbonite as an investment.

As described in the complaint, VME was an important product for Carbonite -- we need only take CFO Folger's word for it: "[W]e've got a new offering out, Carbonite Server Virtual Edition which I think is a really important product for us, and I think it will help us address a pretty big segment of the market." Carbonite described VME's simultaneous launch with Carbonite's flagship console as "the culmination of one of our largest cross-functional efforts." CEO Ali bolstered the product's importance by stating that VME "significantly improves our performance for backing up virtual environments and makes us extremely competitive going after that market." And this is a market that Folger had described as one "we haven't been particularly strong in, in the past, we've been okay." That Carbonite's most senior officers promoted this new product to investors as shoring up one of the company's weaker market segments further reinforces the conclusion that the complaint adequately alleges that the product's basic inability to function would have been viewed by investors as a significant part of the total mix of information in valuing Carbonite.

**C.**

We turn finally to the element of scienter. To establish scienter, plaintiff must "show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." Kader v. Sarepta Therapeutics, Inc., 887 F.3d 48, 57 (1st Cir. 2018) (quoting Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002)). Recklessness

in this context requires " 'a highly unreasonable omission' constituting '... an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " Mehta, 955 F.3d at 206 (quoting Brennan, 853 F.3d at 613).

The PSLRA's heightened pleading standards require that complaints brought under section 10(b) "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(2)(A). The "strong inference" for purposes of the PSLRA means that "an inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Mehta, 955 F.3d at 206 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007)).

Defendants argue, and the district court found below, that plaintiff failed to meet this statutorily enhanced threshold for successfully pleading scienter. We disagree.

Plaintiff's primary argument for a "strong inference" of scienter is that the defendants "must have known that VME was not functional," because the product's professed importance to the company strongly implied that senior officers at the company were following it closely and thus were aware of its failings. Relatedly, plaintiff advances the alternative theory that defendants were at least highly reckless in promoting VME because, if defendants were not aware of VME's issues, then they repeatedly and with apparent premeditation promoted it as important to the company without at least checking that it had ever worked. We find that the complaint adequately alleges facts giving rise to these alternative inferences.

 *6  We have said that "the importance of a particular item to a defendant can support an inference that the defendant is 'paying close attention' to that item," if "that close attention would have revealed an incongruity so glaring as to make the need for further inquiry obvious." Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc., 838 F.3d 76, 82 (1st Cir. 2016) (quoting Institutional Invs. Grp. v. Avaya, Inc., 564 F.3d 242, 271 (3d Cir. 2009)). And as we have already explained, the complaint certainly alleges sufficiently compelling facts showing that VME was viewed by Carbonite as an important product.

Defendants argue in response that the company did not consider VME so critical because it was one of Carbonite's many offerings, because the complaint does not allege that investors "clamored for updates on VME," and because the withdrawal of VME did not have an "outsized impact on Carbonite's revenue projections." But the relevant point here is not that VME was the only or the most "outsized" Carbonite product. Rather, the point is that, as pleaded in the complaint, the company thought it important enough to warrant two specific plugs from top management, thereby creating a very strong inference that the senior executives who gave those apparently prepared remarks touting the product would have paid at least some attention to the product's status. This inference is cogent because a company certainly can consider a product important long before it contributes substantial revenue, such as when a product has the potential to "make[ ] [a company] extremely competitive going after [a weak] market." Similarly, the absence of express market "clamor" about a new product does not preclude the inference that management thought the product important; direct allegations in the form of their own words can do the trick just as well.

Of course, it is not enough to say that senior management would have paid some attention to the product that they were raving about; the complaint must allege particular facts strongly suggesting that that attention exposed them to information that either rendered their public statements false or necessarily invited further investigation. For example, in Vertex, we found that the defendants' paying attention to a drug study would not have revealed any obvious incongruity in the publicly announced study results that turned out to be erroneous, in part because the complaint did not allege that "scientists in general, much less those at Vertex, regarded the reported results as implausible." 838 F.3d at 81–83; see also Metzler Asset Mgmt. GmbH v. Kingsley, 928 F.3d 151, 165 (1st Cir. 2019) (finding plaintiffs' theory for attributing knowledge to corporate officers was insufficient where plaintiffs failed to allege "that anyone in the company had knowledge regarding the drug's safety profile and sales that contradicted the company's public representations" (emphasis added)).

Here, we need not guess at the scientific community's understanding of complex biological data to identify a red flag -- it does not require a PhD to know that a product cannot be "super strong" if it has never once done what it is supposed to do. Nor does the complaint leave open the possibility that Carbonite management was somehow in the dark about VME's true status. The complaint states

that Carbonite employees working on VME had reported internally before the launch that the product was not ready for market. And the trial runs for VME, a data-backup product, had allegedly produced not one successful backup.

**\*7** In sum, the complaint alleges facts raising a strong inference that Ali and Folger either inquired about VME before deciding to promote it to investors or were reckless in failing to do so. Further, the complaint alleges facts that, if true, make it clear that the Carbonite employees familiar with the product knew that it did not work yet. Finally, nothing in the alleged facts renders less than sufficiently compelling the conclusion that Ali and Folger would have known of the product's status had they inquired.

In an effort to undercut the legal significance of this reasoning, defendants argue that a court cannot properly infer that they paid some attention to a product simply because they considered it important and chose to tout it to investors. But they cite only inapposite authority for this position. They point us first to Maldonado v. Dominguez, where we recited the uncontroversial proposition that "the pleading of scienter 'may not rest on a bare inference that a defendant "must have had" knowledge of the facts.' " 137 F.3d 1, 9–10 (1st Cir. 1998) (quoting Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 497 (7th Cir. 1986)). But the complaint in Maldonado had failed to plead any "specific allegations of fact" that could give rise to an inference of scienter and relied only on conclusory allegations that the defendants "were aware of the risk of margin calls." Id. at 10. Defendants' invocation of Metzler is similarly misplaced. As we have noted, supra, the complaint there failed to allege that anyone in the company was aware of facts contrary to the allegedly misleading public statements, so it could hardly present a strong inference that the senior officer defendants possessed such knowledge, regardless of the relevant product's import. See Metzler, 928 F.3d at 165.

Defendants also urge us to adopt, as the district court did, a competing, non-culpable inference from Carbonite's efforts to remedy the issues with VME: "[C]reating varied teams and rushing out software patches suggests a sincere belief that VME could be made operational with enough work," such that "Carbonite believed VME was fixable." But both Ali's and Folger's statements from this period were framed in the present tense: "[W]e have put something out that we think is just completely competitive and just a super strong product"; "[VME] significantly improves our performance ... and makes us extremely competitive." (Emphases added.) These were not projections of hoped-for future performance. Rather, they were flat-out claims about the product as it then stood.[3]

## IV.

For the foregoing reasons, we find that the complaint sufficiently pleads that the statements of Ali and Folger on November 1 and 15, 2018, were material misrepresentations made with scienter. There being no other claimed basis for dismissing the complaint, we therefore **reverse** the judgment of the district court granting the motion to dismiss, and **remand** for further proceedings in accord with this opinion.

**All Citations**

--- F.4th ----, 2021 WL 6062622

Footnotes

1    A "virtual machine" is a digital computing environment that replicates the functionality of a physical computer's operating system. Virtual machines can be hosted on one physical computer and operated remotely by a user of another physical computer.

2    The same day, International Data Group, Inc., a large technology media company, announced that Ali had been named its CEO.

3    Plaintiff also argued that scienter could be inferred from Ali's and Folger's sales of Carbonite stocks during the Class Period, as well as from Ali's resigning simultaneously with the withdrawal of VME from the market. Because we find that scienter was otherwise sufficiently pleaded, we need not consider these additional proffered bases.

**End of Document**                                                      © 2021 Thomson Reuters. No claim to original U.S. Government Works.