**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE BOSTON SCIENTIFIC CORPORATION SECURITIES LITIGATION | Master File No.: 1:20-cv-12225-DPW |
| | **ORAL ARGUMENT REQUESTED** |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

**Page**

I.      PRELIMINARY STATEMENT ...........................................................................................1

II.     FACTS AND PROCEDURAL HISTORY .........................................................................3

III.    ARGUMENT......................................................................................................................7

        A.     The Proposed Class Satisfies Rule 23(a) .................................................................8

                1.     Numerosity Is Established .............................................................................8

                2.     Commonality Is Established ..........................................................................9

                3.     Typicality Is Established...............................................................................10

                4.     Adequacy Is Established ..............................................................................11

        B.     The Proposed Class Satisfies Rule 23(b)(3) ..........................................................12

                1.     Common Questions of Law and Fact Predominate ....................................12

                      a.     The Fraud-On-The-Market Presumption Applies..........................13

                      b.     Boston Scientific's NYSE Listing Is Strong Evidence of Market Efficiency .............................................................................13

                      c.     The *Cammer* and *Krogman* Factors Confirm Market Efficiency......................................................................................14

                2.     There Are No Damages Issues that Predominate ......................................19

                3.     A Class Action Is Superior to Other Available Methods for Resolving This Controversy .......................................................................19

        C.     Lead Counsel Should Be Appointed Class Counsel..............................................20

IV.     CONCLUSION.................................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)..................................................................................................12

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)................................................................................................8, 12

*In re AVEO Pharms., Inc. Sec. Litig.*,
  2017 WL 5484672 (D. Mass. Nov. 14, 2017) ...........................................8, 9, 10, 11

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)................................................................................................3, 13

*In re Boston Sci. Corp. Sec. Litig.*,
  604 F. Supp. 2d 275 (D. Mass. 2009) ............................................................. *passim*

*In re Boston Sci. Corp. Sec. Litig.*,
  2022 WL 17823837 (D. Mass. Dec. 20, 2022)...........................................1, 2, 5, 6

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ................................................................... passim

*In re Credit Suisse-AOL Sec. Litig.*,
  253 F.R.D. 17 (D. Mass. 2008).................................................................... passim

*Dahhan v. OvaScience, Inc.*,
  2020 WL 2602138 (D. Mass. May 8, 2020)....................................................10, 12

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)......................................................................................................7

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)................................................................................................12, 13

*Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
  275 F.R.D. 382 (D. Mass. 2011)..............................................................8, 9, 10, 20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)...........................................................................................13, 14, 17

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ......................................................................14, 17, 18

*Leech v. Brooks Automation, Inc.*,
  2006 WL 3690736 (D. Mass. Dec. 13, 2006)........................................................11

*Lehocky v. Tidel Techs., Inc.*,
   220 F.R.D. 491 (S.D. Tex. 2004)................................................................................18

*Levy v. Gutierrez*,
   448 F. Supp. 3d 46 (D.N.H. 2019)................................................................14, 17, 19

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015)............................................................................................8

*In re PolyMedica Corp. Sec. Litig.*,
   453 F. Supp. 2d 260 (D. Mass. 2006) ..................................................................14, 15

*Rougier v. Applied Optoelectronics, Inc.*,
   2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) .........................................................18

*In re SanDisk LLC Sec. Litig.*,
   2018 WL 4293336 (N.D. Cal. Sept. 4, 2018) ...........................................................19

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016) ...............................................................................18

*Swack v. Credit Suisse First Boston*,
   230 F.R.D 250 (D. Mass. 2005).........................................................................2, 8, 9

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
   236 F.R.D. 62 (D.N.H. 2006) ......................................................................................8

*Villella v. Chem. & Mining Co. of Chile Inc.*,
   333 F.R.D. 39 (S.D.N.Y. 2019) .................................................................................18

*In re Xcelera.com Sec. Litig.*,
   430 F.3d 503 (1st Cir. 2005)............................................................................ *passim*

## Other Authorities

Fed. R. Civ. P. 23 ................................................................................................ *passim*

H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995), *reprinted in* 1995
   U.S.C.C.A.N. 730 ......................................................................................................11

Court-appointed Lead Plaintiff Union Asset Management Holding AG ("Union") respectfully submits this memorandum of law in support of its motion pursuant to Federal Rule of Civil Procedure 23 seeking to (i) certify the action as a class action, (ii) appoint Lead Plaintiff as Class Representative, and (iii) appoint Lead Counsel Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") as Class Counsel pursuant to Federal Rule of Civil Procedure 23(g).

## I.    PRELIMINARY STATEMENT

This securities class action is ideally suited for class action treatment. The action arises out of Boston Scientific's material misrepresentations to investors between September 16, 2020 and November 16, 2020, inclusive (the "Class Period") concerning the Lotus Edge, a device used in heart procedures called transcatheter aortic valve replacement ("TAVR") that had been the Company's "biggest investment" and most promising medical device in recent years.[1]

In September and October 2020, Defendant Mahoney told investors that the Lotus Edge was and "will continue to be an important growth driver" for Boston Scientific and made strategic sense. Specifically, Defendant Mahoney made these statements to allay analyst concerns about the product and to reassure investors that the Lotus Edge would "continue to be an important growth driver for us," that the Company had planned to continuing marketing the Lotus Edge to generate revenue alongside another TAVR valve, and that this "two-valve strategy makes sense." *Boston Sci.*, 2022 WL 17823837, at *21-22, 26-27.

As the Complaint alleges and the evidence to-date has shown, these statements were false

---

[1] The Complaint alleged a class period from February 6, 2019 through November 16, 2020 (¶341), but at this time Lead Plaintiff seeks certification of a class of investors from September 16, 2020 through November 16, 2020, in accordance with the Court's ruling on the motion to dismiss. *In re Boston Sci. Corp. Sec. Litig.*, 2022 WL 17823837, at *20-21 (D. Mass. Dec. 20, 2022). References to "¶__" are to the Amended Complaint filed on June 4, 2021 (the "Complaint") (ECF No. 44), references to "Ex. __" are to the accompanying Declaration of Salvatore J. Graziano, and all emphasis is added, and citations omitted, unless otherwise noted.

and misleading because, in truth, at the time they were made, "Boston Scientific's leadership had either already decided the Lotus platform was unsalvageable or was on the cusp of doing so in a matter of weeks." *Id.* at *21. Indeed, just two weeks after Defendant Mahoney assured investors about Lotus, Boston Scientific recalled the product and shut-down the franchise completely, triggering a significant stock price decline that resulted in substantial damages to the Class. ¶¶181-82.

Like most securities fraud class actions, this case is ideally suited for class certification because it arises from common public misrepresentations that harmed thousands of investors in a like manner. As courts have repeatedly explained, securities class actions are the "prototypical" kinds of cases suited for class action treatment. *See In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 22 (D. Mass. 2008). Indeed, this Court has previously certified a securities class action against Boston Scientific. *See In re Boston Sci. Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 276 (D. Mass. 2009). The proposed Class here readily satisfies Rule 23's requirements.

First, numerosity is easily satisfied, as there are thousands of class members. Second, this action involves numerous common questions of law and fact—including whether Defendant Mahoney's statements were false and made with scienter, whether they caused investors' losses, whether the Executive Defendants controlled Boston Scientific, and the amount of damages suffered by the Class. Third, the adequacy and typicality requirements are readily met, as proposed Class Representative Union is a sophisticated institutional investor whose claims are just like those of other class members and whose interests are aligned with other class members. In addition, Union has chosen counsel that is among the most experienced securities class action law firms in the country, and Union has and will continue to fairly and adequately represent the Class.

Fourth, this action readily satisfies the predominance requirement, as the elements of

investors' claims—falsity, materiality, scienter, and loss causation—are subject to common proof. Further, as set forth in the accompanying expert report of Chad Coffman, the Class is entitled to rely on a presumption of reliance because Boston Scientific stock trades in an efficient market, and thus the fraud-on-the-market presumption set forth in *Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988) applies.  <u>Fifth</u>, a class action is "superior" to all other methods of adjudicating these claims.  <u>Finally</u>, pursuant to Rule 23(g), Lead Counsel should be appointed as Counsel for the Class.

For these reasons, and as set forth below, Lead Plaintiff's motion should be granted.

## II.   <u>FACTS AND PROCEDURAL HISTORY</u>

Lead Plaintiff's claims arise from Boston Scientific CEO Michael Mahoney's statements concerning the Lotus Edge—Boston Scientific's "biggest investment" over the past several years, and the most promising revenue driver in the Company's most important and fastest growing division that was expected to generate hundreds of millions of dollars in revenue per year.  *See* ¶¶38-42, 202.  The Lotus Edge was a medical device used to treat a form of heart disease called aortic stenosis through a procedure called TAVR, which had become the primary standard of care in what was estimated to be an approximately $8 billion market.  ¶¶44-51.  The product was a late-comer to the TAVR market, which was dominated by two competitor devices manufactured by Edwards Life Sciences and Medtronic.  ¶¶52-53.  As a result, the Company marketed the product as providing unique advantages over its competitors—including, most significantly, its "superior ease of use" characteristics by being "fully repositionable" during TAVR implant procedures due to its highly specialized delivery system, which supposedly enabled surgeons to ensure a better "seal" and prevent a prominent TAVR risk.  ¶¶52-58.

Following its approval by the FDA in 2019, Defendant Mahoney and other Boston Scientific senior executives touted the Lotus Edge U.S. commercial launch as a success, and told

investors that the Company was on track to secure 150 accounts in the U.S.—or about one quarter of the TAVR market.  ¶¶91-97.

Unknown to investors, however, the Lotus Edge launch was a disaster.  To start, the device was complicated and impossible to use, with a complex delivery system that led to frequent device malfunctions and adverse events which were far greater than those of Lotus Edge's competitors. ¶118. One such event, a "twisted post"—a life-threatening malfunction that was identified internally as the "main problem" with the device—was so prevalent and severe that it was addressed in weekly meetings with Boston Scientific sales staff beginning no later than June 2020. ¶¶107-12.  At the same time, the Lotus Edge was never commercially viable, and had a prohibitively unsustainable cost profile that secretly generated hundreds of millions of dollars in losses.  ¶¶138, 140-42.  Defendants' internal documents confirm these unacceptable economics, which Defendants knew would "████████████████████████████."  Ex. F (BSC-LOTUS-0000453) at -457.

As the Lotus franchise was failing—and projected to result in ████████████████ ████████ over the next several years—Defendant Mahoney made a series of misstatements that falsely reassured investors the product was and would remain a "key growth driver."  When an analyst questioned Defendant Mahoney whether the capital raise Boston Scientific conducted in May 2020—its largest capital raise ever—signaled problems with the Lotus Edge during a September 16, 2020 investor conference, Defendant Mahoney said it did not, stating that the "Lotus will continue to be an important growth driver" for the Company.  ¶¶158-59.

Then, on October 28, 2020, during the Company's third quarter earnings call, Defendant Mahoney continued misrepresenting the Company's plans for the Lotus Edge and its other TAVR valve, the Acurate Neo2.  When an analyst asked Defendant Mahoney about the Company's two

TAVR platform strategy, he stated that "that the two-valve strategy makes sense." ¶177.

After these false reassurances, Boston Scientific stock rose to $35.06 on November 3, triggering the sale of $9 million in shares under Defendant Mahoney's unusual Rule 10b-5 trading plan. ¶¶218-19.

Just two weeks later, however, on November 17, 2020, Defendants stunned investors by disclosing a global recall of the Lotus Edge and revealing they were shutting down the business line entirely. ¶¶181,184, 192. During the conference call held to disclose the recall, an analyst asked Defendants to "clarify whether this decision was driven primarily by manufacturing challenges and your ability to make the delivery system, or was it pushback from customers who found it too complex to deploy?" ¶185. In response, Defendant Fitzgerald identified a list of problems with the Lotus Edge that had been concealed from investors—and omitted from Defendant Mahoney's reassurances that the Lotus Edge would remain a "growth driver" and "made sense"—that led Boston Scientific to "kill" the product and shut down the business. ¶185. In response to these disclosures, Boston Scientific's stock price fell over 8% on the second-largest single-day trading volume for the Company's stock since 2015. ¶¶188-89, 192.

Lead Plaintiff Union was appointed Lead Plaintiff by the Court on March 30, 2021 (ECF No. 31) and filed the Complaint on June 4, 2021. ECF No. 44. After briefing and oral argument, the Court issued a decision denying in part Defendants' motion to dismiss, sustaining investors' claims that Defendant Mahoney's misrepresentations in September and October 2020 were materially false and misleading in violation of Section 10(b) of the Securities and Exchange Act. *Boston Sci.*, 2022 WL 17823837, at *21. The Court also found that Lead Plaintiff adequately alleged Defendant Mahoney's scienter—or culpable intent to deceive—because, even though he may not have been a "party to the decision to terminate the Lotus platform," he was likely "privy

to, or at least aware of, discussions surrounding Lotus during this time period." *Id.* at *27.

Since the Court's opinion on the motion to dismiss, Lead Plaintiff has pursued discovery, including serving and responding to discovery requests. While discovery is ongoing, documents produced to date by Defendants corroborate Lead Plaintiff's core allegations. For example, draft presentations prepared by Defendant Fitzgerald in October 2020 for Boston Scientific's Board and discussing disclosure of the recall and the termination decision show that at the time Defendant Mahoney was touting the Lotus Edge as a "growth driver" and reassuring investors that the Company's two-valve strategy "made sense," the Company had already determined the device was not ██████████████████████████████████████. *See* Ex. G (BSC-LOTUS-0000568) at -577. For example, one draft presentation prepared before Defendant Mahoney's false statement on October 28, 2020, makes clear that the Lotus Edge was <u>not</u> a growth driver because, in "█████," the high costs of manufacturing the device would "████████████████████████████████████████████████████████████████████████████████████████████████████." Ex. F at -457. Not only was the current Lotus Edge ███████████████████████████████████████████████████████████████████████████████████████████████." *Id.* ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. For example, Defendants' documents show that the Company's public characterization was specifically designed to highlight the ███████ ████████████████████████████████████████████████████████████████████████████████. Ex. I (BSC-LOTUS-

0123062). In reality, Defendants Mahoney and Fitzgerald told Boston Scientific's Board that the ██████████████████████ highlighted in the Complaint ██████████████████ ████████████████████████████████████████ ██████████████████████████. ." Ex. G at -572, 579.

In fact, a week before Defendant Mahoney's October 28, 2020 statement reaffirming the Lotus Edge as a strategic priority, Boston Scientific internally discussed ███████ and documented the "███████" ████████—including that the design for the Lotus Edge as approved by the FDA was "████████████████████ ████████████████████████████████████ ████████████████████████████████████████████. ." Ex. J (BSC-LOTUS-0010944) at -944-45. Internal documents reviewed by Defendant Mahoney and dated before his October 28 alleged false statement acknowledged that investors did not ████████ ████████████████████████████████████████ ████████████████████████████████. ." Ex. H (BSC-LOTUS-0003374) at -376.

Lead Plaintiff now moves for class certification under Rule 23.

## III.  ARGUMENT

The Supreme Court and First Circuit have long-recognized that securities actions are well-suited for class action treatment. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) ("The securities statutes seek to maintain public confidence in the marketplace. They do so by deterring fraud, in part, through the availability of private securities fraud actions."); *see also Boston Sci.*, 604 F. Supp. 2d at 280 ("Courts have recognized that class actions may be particularly appropriate in the context of securities litigation."). Indeed, "investors seeking damages for violations of federal securities are often considered the prototypical class action plaintiffs," and

"an erroneous failure to certify a class where individual claims are small may deprive plaintiffs of the only realistic mechanism to vindicate meritorious claims." *Credit Suisse-AOL*, 253 F.R.D. at 22.

To obtain class certification, parties must satisfy Federal Rule of Civil Procedure 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3). *Boston Sci.*, 604 F. Supp. 2d at 279-80. "Once plaintiffs have made their initial showing, defendants have the burden of producing sufficient evidence to rebut the plaintiff's showing." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) (internal citations omitted).

While courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Instead, courts "should inquire into the merits of the action only to the extent that the merits overlap the Rule 23 criteria." *In re AVEO Pharms., Inc. Sec. Litig.*, 2017 WL 5484672, at *3 (D. Mass. Nov. 14, 2017). Each Rule 23 requirement is satisfied here.

### A.    The Proposed Class Satisfies Rule 23(a)

#### 1.    Numerosity Is Established

The numerosity requirement is satisfied when "the class [must be] so numerous that joinder of all members is impracticable." *In re Tyco Int'l, Ltd. Multidistrict Litig.,* 236 F.R.D. 62, 67 (D.N.H. 2006). A plaintiff need not allege the exact number or identity of class members. *Swack v. Credit Suisse First Boston*, 230 F.R.D 250, 258 (D. Mass. 2005); *see also Evergreen Ultra Short Opportunities Fund Sec. Litig.,* 275 F.R.D. 382, 388 (D. Mass. 2011) ("forty class members generally establishes numerosity"). Moreover, in a securities fraud case, "the class size may be reasonably inferred to be in the hundreds or thousands when there are millions of shares outstanding" and where there is substantial trading activity. *AVEO Pharms.,* 2017 WL 5484672,

at *3; *see also Boston Sci.,* 604 F. Supp. 2d at 281.

The proposed Class easily satisfies the numerosity requirement.  Boston Scientific traded on the national New York Stock Exchange ("NYSE"), had more than 1.3 billion shares of common stock issued and outstanding during the Class Period, and had an average of 55.16 million shares traded weekly.  *See* Ex. B ("Coffman Rep.") ¶28, Ex. 12.  Accordingly, the numerosity requirement is readily satisfied.  *See Evergreen,* 275 F.R.D. at 388 (with millions of shares outstanding and millions of transactions during the class period, one can "reasonably infer that there are at least hundreds, if not thousands of class members"); *Credit Suisse-AOL,* 253 F.R.D. at 22 ("The volume of shares traded and the rate of turnover during the class period make joinder impracticable.").

### 2.     Commonality Is Established

Commonality is satisfied when there is "a *single* common legal or factual issue."  *Swack*, 230 F.R.D. at 259; *AVEO Pharms.,* 2017 WL 5484672, at *4 ("even a single common legal or factual issue can suffice").  Accordingly, the commonality requirement "ordinarily is easily met." *Swack*, 230 F.R.D. at 259.  In securities class actions, courts have found commonality where "the statements Plaintiffs allege were misleading due to material omissions were made to all of the class members."  *AVEO Pharms.,* 2017 WL 5484672, at *4; *see also Boston Sci.*, 604 F. Supp. 2d at 281 (common questions included falsity, scienter, and whether a presumption of reliance applied).

The common questions of law and fact in this case are numerous and include: (i) whether Defendant Mahoney's statements were materially false and misleading when made; (ii) whether he acted with scienter; (iii) whether the price of Boston Scientific's common stock was artificially inflated during the Class Period due to these alleged misstatements; and (iv) whether these misrepresentations and omissions caused Class members to suffer economic losses when the truth was revealed.  Courts routinely certify classes in securities fraud cases involving these common questions. *See, e.g., Dahhan v. OvaScience, Inc.*, 2020 WL 2602138, at *3 (D. Mass. May 8, 2020)

(commonality established where statements and omissions were "distributed to all the class members during the class period resulting in an artificially inflated stock price").

### 3. Typicality Is Established

Typicality is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Boston Sci.*, 604 F. Supp. 2d at 281-82. A plaintiff "meet[s] this requirement by showing that its injuries arise from the same events or course of conduct as do the injuries of the class, and that its claims are based on the same legal theory as those of the class." *Id*. Moreover, a class representative's claims are considered typical "even where there is some factual variation among the claims of different class members." *Evergreen*, 275 F.R.D. at 390. Ultimately, typicality is satisfied where "all members of the class are purchasers of [Defendants'] stock which they allege was inflated in price due to Defendants' material omissions and were harmed by the later revelations that cured the omission." *AVEO Pharms.*, 2017 WL 5484672, at *4; *see also OvaScience*, 2020 WL 2602138, at *4.

Here, Lead Plaintiff's claims arise from the same alleged course of conduct that gives rise to claims of other Class members, are based on the same legal theory, and will be proven by the same set of operative facts. Like all Class members, Lead Plaintiff purchased Boston Scientific common stock during the Class Period unaware that Defendants had made materially false and misleading statements that artificially inflated the price of Boston Scientific common stock. *See* ¶325. Proof of these allegations will be common to all Class Members. Further, damages can be calculated on a class-wide basis. Coffman Rep. ¶86. The typicality requirement is thus satisfied. *See Boston Sci.*, 604 F. Supp. 2d at 282 (finding typicality where plaintiff "purchased Boston Scientific stock at a time when the price was alleged to have been artificially inflated due to defendants' misleading statements, and was subsequently harmed by the drop in stock price"); *Credit Suisse-AOL*, 253 F.R.D. at 24.

### 4.    Adequacy Is Established

Adequacy is satisfied where a plaintiff demonstrates that it "will fairly and adequately protect the interests of the class." *AVEO Pharms.*, 2017 WL 5484672, at *4.  Adequacy requires a "two-part showing," where, first, the plaintiff's interests will not conflict with the interests of the class members, and second, the plaintiff's chosen counsel is qualified, experienced and able to vigorously conduct the proposed litigation. *Boston Sci.*, 604 F. Supp. 2d at 282; *see also AVEO Pharms.*, 2017 WL 5484672, at *4 (same).

Lead Plaintiff satisfies both prongs.  First, Lead Plaintiff possesses the same interests as the other Class members, and no actual or potential conflicts exist.  With substantial losses in Boston Scientific stock during the Class Period, Lead Plaintiff is incentivized to prove all the elements that support the claims that could be asserted by other Class members who suffered losses from purchasing Boston Scientific shares at artificially inflated prices during the Class Period.

Second, Lead Plaintiff has been actively involved in this litigation and has previously certified its willingness to serve as representative party.  ECF No. 24-2.  Lead Plaintiff has also demonstrated its commitment to lead this action for the Class, including by, *inter alia*, retaining and overseeing experienced counsel; filing a detailed amended complaint; successfully opposing in part Defendants' motion to dismiss; propounding and responding to discovery requests; and filing the instant motion for class certification.  Lead Plaintiff will continue to actively participate in and supervise the litigation through trial.  Ex. A (Union Decl.) ¶6.  Moreover, Lead Plaintiff Union is an experienced institutional investor—precisely the type of plaintiff favored by Congress to lead securities class actions under the PSLRA.  *See Leech v. Brooks Automation, Inc.*, 2006 WL 3690736, at *3 (D. Mass. Dec. 13, 2006); H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733.

Moreover, Lead Counsel Bernstein Litowitz has extensive experience and success in

prosecuting securities litigation, is capable of vigorously prosecuting this action, and satisfy the requirements of Rule 23(g). *See* Ex. C. Given the lack of conflict and the retention of competent counsel, Lead Plaintiff satisfies the adequacy requirements of Rule 23(a)(4).

### B.    The Proposed Class Satisfies Rule 23(b)(3)

Rule 23(b)(3) requires that (i) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (ii) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both requirements are met here.

### 1.    Common Questions of Law and Fact Predominate

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The Supreme Court has recognized that "[p]redominance is a test readily met" in securities fraud cases like this one. *Id.* at 625. Numerous common questions of law and fact predominate over any individual questions here.

Whether common issues predominate begins with the elements of the underlying causes of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*"). To establish a violation of Section 10(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen*, 568 U.S. at 460-61.

All Class members have common Section 10(b) claims, which require a showing of reliance. "With the exception of reliance, the elements of the § 10(b) and Rule 10b-5 claims brought here are amenable to common proof." *OvaScience*, 2020 WL 2602138, at *5. Thus, here, like in most securities fraud cases, "the question of predominance here boils down to the element

- 12 -

of reliance"—one that is readily established here.  *Credit Suisse-AOL*, 253 F.R.D. at 25.[2]

### a.    The Fraud-On-The-Market Presumption Applies

Lead Plaintiff satisfies reliance through the presumption of class-wide reliance that the

Supreme Court established under the *Basic* fraud-on-the-market theory.  *Basic Inc. v. Levinson*,

485 U.S. 224, 241 (1988).  That presumption is based on the well-founded principle, adopted by

the Supreme Court, that "a public, material misrepresentation will distort the price of stock traded

in an efficient market, and that anyone who purchases the stock at the market price may be

considered to have done so in reliance on the misrepresentation."  *Halliburton Co. v. Erica P. John*

*Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*").  When this "fraud-on-the-market"

presumption applies, investors do not need to demonstrate individual reliance.  *Halliburton I*, 563

U.S. at 811; *see also Credit Suisse-AOL*, 253 F.R.D. at 31.

In the First Circuit, and as adopted by the Supreme Court in *Halliburton II*, a market is

deemed efficient for purposes of the fraud-on-the-market presumption if it is "informationally

efficient."  *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 508 (1st Cir. 2005); *Halliburton II*, 573

U.S. at 270-74.  This means that market prices "respond so quickly to new information that it is

impossible for traders to make trading profits on the basis of that information."  *Xcelera.com*, 430

F.3d at 508.

### b.    Boston Scientific's NYSE Listing Is Strong Evidence of Market Efficiency

Market efficiency is established under the First Circuit's framework.  Courts in the First

Circuit consider whether the security at issue trades on a major national exchange.  *See, e.g., In re*

---

[2] Significantly, while the fraud-on-the-market presumption is rebuttable, Defendants declined to disclose a market efficiency or other class certification expert on the deadline for such disclosures as ordered by the Court, suggesting they will not seek to rebut the presumption.  ECF No. 82.

*PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 266 (D. Mass. 2006) (listing on an exchange "indisputably improves the market structure for trading in a particular stock," therefore "one would be hard-pressed to deny the relevance of this fact in an efficiency analysis"). Here, Boston Scientific common stock actively traded on NYSE, a presumptively efficient market. *See Halliburton II*, 573 U.S. at 268 ("[T]he market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.").

> ### c.    The *Cammer* and *Krogman* Factors Confirm Market Efficiency

In assessing efficiency, courts also consider the five so-called "*Cammer* factors" set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-88 (D.N.J. 1989): (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration Form S-3; and (5) stock price reaction to unexpected, material disclosures. *See Credit Suisse-AOL*, 253 F.R.D. at 27 ("In determining whether the market for a specific security is efficient, the First Circuit uses the factors laid out by the court in *Cammer*."); *Boston Sci.*, 604 F. Supp. 2d at 284-87. Courts often further consider the so-called "*Krogman* factors," which include: (1) the company's market capitalization; (2) the float for the company's stock; and (3) the bid-ask spread for stock sales. *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001); *see also Levy v. Gutierrez*, 448 F. Supp. 3d 46, 57 (D.N.H. 2019) (finding market efficiency was established by Lead Plaintiff's expert's application of *Cammer* and *Krogman* factors). These factors are an analytical tool, and no one factor is dispositive. *Xcelera.com*, 430 F.3d at 518. The *Cammer* and *Krogman* factors overwhelmingly support the conclusion that Boston Scientific's shares traded in an efficient market here.

**High Weekly Trading Volume (*Cammer* Factor 1)**: Courts find that weekly turnover—

measured by average weekly trading—of greater than 1% justifies a "substantial presumption" of market efficiency. *Cammer*, 711 F. Supp. at 1286. Here, an average of 3.85% of Boston Scientific's shares outstanding—i.e., approximately 55.16 million shares—traded each week. Coffman Rep. ¶28. Thus, Boston Scientific's weekly trading volume justifies a "substantial presumption" of market efficiency. *Cammer*, 711 F. Supp. at 1286; *Boston Sci.*, 604 F. Supp. 2d at 284 (finding market efficiency where Boston Scientific stock "was actively traded on the NYSE" and the "average weekly trading volume was approximately 22.3 million shares").

**Significant Analyst Coverage (*Cammer* Factor 2)**: Courts find that analyst coverage supports market efficiency because when a company's financial disclosures are "closely reviewed by investment professionals" who "make buy/sell recommendations to client investors," the market price fluctuations reflect the financial disclosures "as interpreted by the securities analysts." *Cammer*, 711 F. Supp. at 1286. Here, securities analysts from at least 27 well-known investment firms—including Barclays, Credit Suisse, and Goldman Sachs—followed and reported on Boston Scientific during the Class Period, publishing 96 analyst reports on Boston Scientific during the Class Period, further demonstrating market efficiency. Coffman Rep. ¶36, Ex. 4; *see also Boston Sci.*, 604 F. Supp. 2d at 284 (finding market efficiency with 17 analyst coverage). Courts have repeatedly held that far sparser coverage than Boston Scientific's coverage during the Class Period satisfies the second *Cammer* factor. *See, e.g., PolyMedica*, 453 F. Supp. 2d at 266 (seven analysts favored a finding of market efficiency); *see also Xcelera.com*, 430 F.3d at 514-15 (one analyst sufficient where the firm attracted indirect media attention during the class period).

**Substantial Market Maker/Arbitrage Activity (*Cammer* Factor 3)**: Courts find that the existence of market makers supports market efficiency. Market makers ensure that investors "react swiftly to company news and reported financial results by buying or selling stock and driving it to

a changed price level." *Cammer*, 711 F. Supp. at 1286-87; *see also Boston Sci.*, 604 F. Supp. 2d at 284 (finding market efficiency where "Boston Scientific stocks were assigned to a specialist who acted as a market maker, facilitating a high level of trading"); *Credit Suisse-AOL*, 253 F.R.D. at 27 (finding market efficiency where stock "had numerous market makers").  During the Class Period, there were at least 92 market makers for Boston Scientific common stock (Coffman Rep. ¶44), establishing that investors were able to, and did, "react swiftly" to public information by trading in Boston Scientific stock, driving price changes.  *Cammer*, 711 F. Supp. at 1286-87.

**S-3 Registration Eligibility (*Cammer* Factor 4)**: Courts find that a corporation's eligibility to use SEC Form S-3 "is an important factor weighing in favor" of efficiency, as it reflects the SEC's belief that the market operates efficiently for eligible companies, i.e., all public information "has already been disseminated and accounted for by the market place."  *Cammer*, 711 F. Supp. at 1284-85.  Throughout the Class Period, Boston Scientific met the float requirement to file a Form S-3, and filed Forms S-3 both before and after the Class Period.  Coffman Rep. ¶47; *see also Boston Sci.*, 604 F. Supp. 2d at 284.

**Reaction of Stock to New Company-Specific Information (*Cammer* Factor 5)**: In addition, Lead Plaintiff's expert has performed an event study that establishes there was a strong "cause and effect relationship between company disclosures and resulting movements in stock price," *Cammer*, 711 F. Supp. at 1291, which is a strong indicator of market efficiency. *Xcelera.com*, 430 F.3d at 512.

Specifically, Lead Plaintiff's expert conducted an event study on daily stock prices that demonstrates that Boston Scientific stock reacted to new, value-relevant information, which strongly indicates that Boston Scientific common stock traded in an efficient market.  Coffman Rep. ¶¶48-67.  Here, Lead Plaintiff's event study demonstrates that Boston Scientific's public

disclosure of new, value-relevant information caused immediate and significant common stock price reactions. Coffman Rep. ¶¶58-63; *see Xcelera.com*, 430 F.3d at 513, n.11 (finding market efficiency where "event study capture[d] the same-day reaction of Xcelera's stock price to company-specific events"). Lead Plaintiff's expert found that Boston Scientific's stock reacted in a manner consistent with an efficient market. Coffman Rep. ¶¶58-66. Further, the alleged corrective disclosure resulted in a price decline that was statistically significant at the 99% confidence level. *Id.* ¶16 n.18.

Therefore, Boston Scientific's stock traded in an efficient market, and its price responded efficiently to the specific disclosures at issue. *Boston Sci.*, 604 F. Supp. 2d at 284 (finding market efficiency where plaintiff's expert "demonstrated in her report that during the Class Period Boston Scientific's stock price changed quickly in response to new information").[3]

**Market Capitalization (*Krogman* Factor 1)**: In addition to the *Cammer* factors, courts recognize that higher market capitalization is also indicative of market efficiency because "there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. Boston Scientific's market capitalization during the Class Period was over $50 billion, placing it within the 97th to 98th percentile of all NYSE and NASDAQ stocks. Coffman Rep. ¶70. This supports a finding that Boston Scientific common stock traded in an efficient market. *Krogman*, 202 F.R.D. at 478.

**Large Public Float (*Krogman* Factor 2)**: Courts also consider the size of an issuer's float (i.e., shares outstanding not held by insiders) in assessing efficiency. A large public float may indicate market efficiency because the price of the stock is more "likely to accurately reflect all

---

[3] Lead Plaintiff's expert event study follows those commonly used to assess market efficiency in securities fraud cases and approved by courts in this Circuit. *See, e.g., Halliburton II*, 573 U.S. at 280; *Levy*, 448 F. Supp. 3d at 64-67 (citing Coffman report in finding market efficiency).

available information about the security." *Krogman*, 202 F.R.D. at 478.  Over the Class Period, on average, insiders held less than 1% of the shares outstanding, meaning 99% of the float was public during the Class Period, which supports a finding of market efficiency.  Coffman Rep. ¶74.

**Small Bid-Ask Spread (*Krogman* Factor 3)**: "A narrow bid-ask spread is indicative of higher trading volume and courts consider it as a factor for determining market efficiency." *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *13 (S.D. Tex. Nov. 13, 2019); *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 317 (S.D.N.Y. 2016) ("The markets for companies with higher market capitalizations and shares with a smaller bid-ask spread are more likely to be efficient.").  During the Class Period, the daily bid-ask spread for Boston Scientific stock ranged from 0.004% to 0.013% each month, which was well below the mean and median bid-ask spread of a random sample of 100 other common stocks trading during that time.  Coffman Rep. ¶73.  This low bid-ask spread supports a finding of market efficiency.

***Absence of Autocorrelation***: In addition to the *Cammer* and *Krogman* factors, courts sometimes consider whether a security's prices exhibit autocorrelation, which is when a security's historical price changes can predict future price changes.  *See Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 54-55 (S.D.N.Y. 2019).  This is because, in efficient market, "the market should be reacting quickly to new information, and new prices are being set quickly based upon the new information," and thus a serial correlation in the stock prices would tend to show market inefficiency.  *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 506-07 (S.D. Tex. 2004) (cited with approval on other issues by *Xcelera*.com, 430 F.3d at 513; *Boston Sci.*, 604 F. Supp. 2d at 286).  There was no persistent and systemic autocorrelation for Boston Scientific here, further supporting a finding of market efficiency.  Coffman Rep. ¶79.

The market for Boston Scientific shares was efficient throughout the Class Period.

Accordingly, Lead Plaintiff is entitled to the "fraud-on-the-market" presumption of reliance.

### 2.    There Are No Damages Issues that Predominate

Courts in this Circuit and elsewhere nearly uniformly hold that determining damages in securities class actions is subject to a common methodology because damages can be calculated on a class-wide basis using an event study that measures investors' out-of-pocket damages. *See, e.g., Levy*, 448 F. Supp. 3d at 64-67 (holding that the "out-of-pocket" methodology proposed by Lead Plaintiff's expert, Chad Coffman, CFA, showed that damages could be calculated classwide).

As Lead Plaintiff's expert explains, a common methodology may be used to determine damages traceable to Defendants' misrepresentations and omissions using the standard event study and "out-of-pocket" methodology. Coffman Rep. ¶81. Here, damages will be measured as the difference between the amount of stock price inflation at purchase and the amount of inflation in the stock price at sale—the same methodology employed in nearly every securities fraud class action, and one that has been widely endorsed by courts in this Circuit and throughout the country. *See, e.g.*, *Levy*, 448 F. Supp. 3d at 64-67; *In re SanDisk LLC Sec. Litig.*, 2018 WL 4293336, at *2 (N.D. Cal. Sept. 4, 2018) ("damages can be determined without excessive difficulty and attributed to [the plaintiffs'] theory of liability"). Accordingly, common questions of law or fact predominate, and the first prong of Rule 23(b)(3) is satisfied.

### 3.    A Class Action Is Superior to Other Available Methods for Resolving This Controversy

Rule 23(b)(3) also requires Lead Plaintiff to demonstrate that class resolution will be "superior to other available methods for fairly and efficiently adjudicating the controversy" by assessing class members' interests in individually controlling the prosecution of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the

particular forum; and the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3).

Each of these factors demonstrates the superiority of a class action here.  First, the number of Class members is far too numerous, and the typical claim is generally too small, for each individual Class member to have an interest in maintaining a separate action—a finding this Court applied in another securities class action against Boston Scientific.  *See Boston Sci.*, 604 F. Supp. 2d at 287-88; *see also Evergreen*, 275 F.R.D. at 393.  Second, Lead Plaintiff is aware of no other action against Defendants relating to investors' purchases of Boston Scientific common stock during the Class Period.  Third, this action should be ligated in this forum, where Boston Scientific maintains its headquarters, and where much of the misconduct occurred.  Finally, there are no management difficulties that would preclude this action from being maintained as a class action.

### C.    Lead Counsel Should Be Appointed Class Counsel

Lead Plaintiff also respectfully requests that the Court appoint Lead Counsel as Class Counsel under Rule 23(g).  To date, under Lead Plaintiff's supervision and direction, Lead Counsel has vigorously prosecuted this case, including by, among things: analyzing, researching and investigating the securities law claims here; drafting a detailed complaint; opposing Defendants' motion to dismiss; conducting ongoing fact discovery; and assembling a dedicated and highly-skilled team to prosecute the Action.  Lead Counsel has significant experience prosecuting complex securities class actions, deep knowledge of the applicable securities laws, an exemplary record of success, and will well serve the interests of the Class in this case.  *See* Ex. C.

### IV.    <u>CONCLUSION</u>

As set forth above, Lead Plaintiff respectfully requests that the Court certify this Action as a class action pursuant to Rule 23, appoint Lead Plaintiff as Class Representative, and approve Bernstein Litowitz as Class Counsel.

Dated: April 21, 2023

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
*/s/ Salvatore J. Graziano*
Salvatore J. Graziano (admitted *pro hac vice*)
Mark Lebovitch (admitted *pro hac vice*)
Michael D. Blatchley (admitted *pro hac vice*)
Lauren A. Ormsbee (*pro hac vice* forthcoming)
Alexander T. Payne (admitted *pro hac vice*)
Emily A. Tu (*pro hac vice* forthcoming)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
markl@blblgaw.com
michaelb@blbglaw.com
laureno@blbglaw.com
alex.payne@blbglaw.com
emily.tu@blbglaw.com

*Lead Counsel for Lead Plaintiff and the Class*

**DONNELLY, CONROY & GELHAAR LLP**
T. Christopher Donnelly (BBO #129930)
Peter E. Gelhaar (BBO #18830)
Peter K. Levitt (BBO #565761)
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
Telephone: (617) 720-2880
Facsimile: (617) 720-3554
tcd@dcglaw.com
peg@dcglaw.com
pkl@dcglaw.com

*Liaison Counsel for Lead Plaintiff*