UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

                                            )
                                            )
IN RE BOSTON SCIENTIFIC CORPORATION    )    Civil Action
SECURITIES LITIGATION                   )    No. 20-12225-DPW
                                            )

_____

BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE

HEARING

July 27, 2023

John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

Counsel on behalf of Union Asset Management Holding:
Salvatore J. Graziano
Lauren A. Ormsbee
Aasiya Mirza Glover
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas
New York, NY 10020
212-554-1400
Michaelb@blbglaw.com
Salvatore@blbglaw.com

Peter E. Gelhaar
Donnelly, Conroy & Gelhaar, LLP
260 Franklin Street
Suite 1600
Boston, MA 02110
617-720-2880
Peg@dcglaw.com

Counsel on behalf of Boston Scientific:
James R. Carroll
Yaw Anim
Skadden, Arps, Slate, Meagher & Flom LLP
500 Boylston Street
Boston, MA 02116
617-573-4800
James.Carroll@skadden.com
Yaw.Anim@skadden.com

Also present:

Boston Scientific
     Eileen Hunter
     Matthew Jorgenson

P R O C E E D I N G S

(Case called to order.)

COURTROOM CLERK:  Will counsel identify thelmselves for the record.

MR. GELHAAR:  Peter Gelhaar for Union Asset Management.

MS. ORMSBEE:  Lauren Ormsbee from Bernstein Litowitz Berger & Grossmann LLP, for Union Asset Management.

MR. GRAZIANO:  Salvatore Graziano, Bernstein Litowitz, for the plaintiff.

MR. CARROLL:  Good afternoon, Your Honor.  James Carroll.  With me is Yaw Anim, also for the Boston Scientific defendants.  Also present are Eileen Hunter and Matt Jorgenson from Boston Scientific.

MS. GLOVER:  Aasiya Mirza Glover from Bernstein Litowitz.

THE COURT:  All right.  So I think you all know that I was reassigned this case from another judge.  I've read all the materials on the motion for class certification, and this morning I got a motion to modify the scheduling order.

We may as well start with the scheduling order.  Do the easy ones first, right?  Are these the same dates that you asked Judge Woodlock for that he told you you couldn't have?

MS. ORMSBEE:  No, Your Honor, I don't believe so.  I think -- I wasn't on the case in January, but my understanding

of those were, early in the schedule, we had a set schedule and fact discoveries proceeded.  A few months ago we asked for an extension to that schedule, which Judge Woodlock granted.  We endeavored to meet it.

We are still reviewing documents.  About 40 percent or 20,000 documents came in in the last few days of the discovery schedule.  We're still ironing out some document disputes and third party subpoenas, so we approached the defendants and agreed that this two months was needed to review these documents, get those extant documents we're still waiting for and actually depose the individuals.

So it's a different posture than it was in January, and I don't think it's the same dates that we had asked him for before.  I haven't gone back and checked, but I don't believe it's the same dates.

THE COURT:  I thought it was interesting in the motion that you have all these dates but left those dates, no chart on those dates.  So you're asking for extensions of deadlines that have already passed, right?

MS. ORMSBEE:  No, Your Honor.  The first deadline that's upcoming is September 22, which is the close of fact discovery.  The substantial completion date of June 30 was met.  But as always or often happens in these cases, you get the production of documents, and then there's still some holes and gaps that need to be filled in.

So the first date that we'd be moving is the September 22 fact discovery completion date, and we propose that would be moved to November 21.

THE COURT:  All right.  So these all pretty much, looks like they're all extensions in the two- to three-month range?

MS. ORMSBEE:  Yes.  We tried to keep it, I think there's only -- the one date that goes to December 11 is just in cognizance of the Thanksgiving holiday to give a few extra days, but everything else is about exactly two months out.

THE COURT:  And it's a joint motion, Mr. Carroll?

MR. CARROLL:  It is, and those extensions obviated some discovery disputes, which have been ironed out in the meantime.

THE COURT:  I'll allow that.  That's fine, what you propose is fine on the schedule.

MS. ORMSBEE:  Thank you, Your Honor.

THE COURT:  And then the motion for class certification.  I read all the briefs on it.  I'm happy to hear you on it.  It looks like the big issue is atypicality based on the distinct defenses, right?

MR. CARROLL:  That's right.  Atypicality and adequacy, which are very much melded together, that's right.

THE COURT:  And they make the motion for class certification.  You oppose it.  They say your case law has been

superseded, which I think is pretty much true.  So do you want to be heard on that?

MR. CARROLL:  Very much so.

THE COURT:  Okay.  Go ahead.  I'm not used to seeing you on that side of the room, Mr. Carroll.

MR. CARROLL:  So the factual circumstance that is before Your Honor with respect to this motion is highly unusual.  And it's highly unusual not because we're here on a class cert motion.  It's not even that highly unusual with respect to the sole representative plaintiffs continuing to purchase after the alleged truth is revealed as alleged in the complaint.  That happens and there are cases on that that go both ways.

What's really unusual in this case is that the sole class representative, the one that wants to represent all the absent class members, continues to buy after raising its hand and saying, "I want to lead the charge alleging that the management of Boston Scientific have engaged in a fraud."

Not one of the cases that the plaintiffs cite has that very unusual factual situation.  And if I could hand up a couple of things.  Counsel has them already, Your Honor.

THE COURT:  Let me just ask you.  I think what they would respond to that is that it's a big company with lots of product lines and they think there was fraud on one product line, but that it's --

MR. CARROLL:  If I --

THE COURT:  -- for other reasons.

MR. CARROLL:  And if I may just give one to your clerk.

THE COURT:  Sure.

MR. CARROLL:  So if I could, and I put numbers in the -- letters in the upper right corner.  Start on C, if we could together, it's busy, but it's fairly straightforward.  So what C does, that's this chart, Your Honor --

THE COURT:  I have it.

MR. CARROLL:  Great.  So what C does is chart the plaintiff's purchases against key timelines in the case.  So the first black line here shows when the complaint is filed.  That's shortly after the alleged fraud is revealed and made on the public record with the complaint.  Plaintiff continues to purchase, right?

Now, we would say that those purchases in the face of fraud allegations should be enough to render them atypical and inappropriate.  But it's more than that.  It's this second black line on the right.  That's when the plaintiff steps forward and says, "The management of Boston Scientific committed a fraud, and we want to be the ones to prosecute the case."  And ultimately they were chosen to prosecute the case.

So they're making allegations of fraud against the management of Boston Scientific itself.  In not one of the

plaintiffs cases do you have that situation.  And that's highly, highly unusual and would be tremendously prejudicial to absent class members, right?  The same people saying there's a fraud, they're going to put more money into the same management that they allege defrauded them.

But it's even worse here.  If you turn it over and look at D with me, Your Honor.  What this shows, so the plaintiff is a German asset management company.  They're a fiduciary for other people.  They take other people's money and invest it, and that's what they did here.  What they tell the world out of one side of their mouth is, "We're very careful, sound fiduciaries, and look what we rely on when we're making investment decisions.  One of them is, we rely on the strength of the management team."  At the same time they're buying, they're accusing the entire, essentially the chief executive officer, chief medical officer, chief financial officer, all of being fraudsters as they're buying, and they're saying they rely on the strength of management.  That's what they're doing at the same time.

You don't need to decide whether they're insincere when they're telling investors they rely on strength of good management or whether they're insincere when they're alleging fraud in this case.  You don't have to resolve that question on this motion.  But the fact that that's a question unique to them makes them inappropriate to represent everyone else who

doesn't have that issue.

THE COURT:  Were there other candidates for the class representative in front of Judge Woodlock?

MR. CARROLL:  Yes, yeah.  They chose to proceed with this one, and they chose to bring just one.  Right?  Lots of cases, there's multiple class representatives.  And so somebody has a disabling problem like Union does here, maybe it doesn't matter so much because somebody else does it.  Here, they're going to have to come and take the stand, and I can cross-examine Hans or whoever they send and say, "Which is it?"  And the answer reasonably is the fraud allegations are probably insincere.  They're interested in doing what they say to their investors, investing in good management.  Then why are they then at the same time putting investors' money in fraud, into somebody they say is a fraudster?  It's blatantly inconsistent and it's highly unusual.

As I say, it's a different fact pattern.  It's not simply the purchasing after the so-called truth is revealed.  It's purchasing after the party itself is making a fraud allegation.  That's very different than any of the other cases.  Plaintiff argues the cases are superseded.  They're not superseded.  They're different in a very material way.

THE COURT:  You'd agree that the law is that somebody with an inconsistent defense can still be a class representative.  You're just arguing not here.

MR. CARROLL:  So I would say there are cases that have so held, and there are cases that have held otherwise.  We cite the China Automation case, we cite the Rolex case.  They go both ways.  The class certification -- and I should have started here, Your Honor.  This is a motion as to which you have very, very broad discretion.  American Honda in the First Circuit says so.  It's an abuse of discretion standard.

The district courts are given broad discretion on this to make a decision as to whether or not -- again, not what the truth is.  He's speaking out both sides of his mouth.  You don't need to decide which one is right.  The question is is this going to be a focus in the case.  And where they're the only plaintiff and have to come and testify, of course it will be, because we're going to be able to demonstrate that they're insincere.  They're either lying to the public who they solicit for money to invest on their behalf or they're insincere in making the fraud allegations here.

Who would invest money, who would invest more money with somebody that they generally believed was actively defrauding them?  No reasonable personal would do that.  That will be a focus of the litigation.  And it's unique to them.  They could have picked anybody else.  It's unique to this sole representative plaintiff.  That's the first reason why there's a unique defense to them and why they're not suitable to be a class representative.

But there's another way.  If I could direct your attention to the second sheet, A, please.  Now, at bottom, this is a securities fraud case.  It's a fraud case.  And while it's brought under the federal securities laws, it's still fundamentally a fraud case.  And in a fraud case, a plaintiff has to prove that it relied reasonably on a material misstatement to its detriment.

The complaint in this case says, Well, I don't have to show direct reliance because I'm relying on so-called efficient capital market hypothesis and, under Basic v. Levinson, the presumption of reliance that a plaintiff may have.  It's a presumption of reliance.  It does not eliminate the need to show reliance.

Under the Supreme Court's Comcast decision, the Court has to do a rigorous analysis and look at all the probative evidence before it.  And the Supreme Court even urges -- how about this from our Supreme Court -- urges district judges to use, quote, "a good dose of common sense" in evaluating that evidence.  Okay?

So what's the record here?  A lot of times in these cases you've got no idea what somebody relied on in making their investment decision.  If the plaintiff is Ms. Jones and she says, "Well, I just relied on the market price," there's no ability to contradict that.  Never going to be an issue in the case.  The capital market hypothesis controls.  Reliance is

presumed.

Nothing could be more different here.  So here, we've got a professional asset manager that leaves detailed footprints explaining the bases of its case.  Now, keep in mind, the case is that they relied on two statements -- because the case has been very much narrowed, as Your Honor I'm sure knows.  They relied on two statements by Mr. Mahoney about the Lotus Edge product that were made in September and October of 2000.  That's the case.  That's what they have to say that they relied upon.  The documentary evidence shows that they did not.

On the left side of A is the memos from their files explaining the rationale for their purchases prior to the alleged fraud being revealed.  There's no reference at all to Lotus.  There's reference to other products, particularly this Watchman product, and there's references to the product pipeline, future products that Union expects them to bring to market.  That's how they explained the bases for the purchases.  Zero reference to Lotus.

Lotus has been in the market for some time by the time of the purchases that are at issue here.  It's not one of the new products that are in the pipeline.  It's already in the market.  And they're saying this is why they bought.  Then, in the middle of the case I put the November 17 date.  That's the so-called revelation of truth when Lotus is removed from the market and they keep buying, and they keep explaining why they

keep buying.  And it's the same reasons it was before, about the new product pipeline, different products that they expect to come out in the future and, in particular, the Watchman device which they put their greatest emphasis on.  Nothing about Lotus.

What does this do?  This rebuts the presumption of reliance.  This is evidence in the record Your Honor has to consider that rebuts the presumption that they actually relied on Mr. Mahoney's statements.  Of course they didn't, right?  Because they said what they did rely on, and anyone who relied on those statements and thought they had been defrauded wouldn't put more money in.

We took the deposition of Union.  There's seven different portfolio managers there who bought Boston Scientific stock.  Not one of them claims to have been defrauded.  The 30(b)(6), went and talked to them all.  None of them said they were defrauded.  None of them told the 30(b)(6) witness that they bought in any way because of Lotus, much less any misrepresentation about Lotus.  That's in the record attached to Mr. Anim's declaration, that testimony.  It's directly contrary to the theory the plaintiffs as class rep wish to urge the Court.

You don't have to decide on this motion whether or not the presumption of reliance has been rebutted.  I think it has, but you don't have to decide that now.  The question is much

easier than that, respectfully.  It's simply is this going to be an issue in the case?  Is this going to be an issue in the case that's unique to them?

Why would any absent class member want to be represented by somebody who is subject to an argument that the presumption of reliance has been rebutted?  Of course they wouldn't.  Just like they wouldn't want to be represented by somebody who keeps piling money in and invests with people they allege are fraudsters.

So you started, Your Honor, by saying, "Plaintiff said your cases are superseded."  There are cases that go both ways on the subject of post-disclosure purchases.  None of their cases deal with this factual scenario, which is highly, highly unusual.  In the more than three decades I've been doing these cases, I've only seen it once before where the representative plaintiff continued to buy after alleging fraud.  That was a case before Judge Keeton in 1999.  And we were digging it out, and I would like to submit materials to you from that case so you can see it.  It's not a clear -- it was a classic Judge Keeton practice and procedure order decision.

But in that case, the representative plaintiffs continued to buy after alleging fraud, and Judge Keeton dismissed it and wouldn't grant certification.  The decision is not perfectly clear.  It's not published.  I'll send it in along with the briefs so you can see what the parties said, but

that's the only circumstance.  These post-disclosure cases are not on point with respect to these facts.  These are highly unusual where you have these kind of footprints, right?  And it makes this representative plaintiff uniquely poor to represent anybody else.

Now, that doesn't end the case.  They're going to claim millions of dollars in losses and they can continue on with the case, and that's fair game.  But they're not appropriate to be a class representative, and the choices that they made to go forward with these ones, they have to have the repercussions of those.  Thank you.

MS. ORMSBEE:  Good morning, Your Honor.  I have a lot to say in response, but I'll start with Mr. Carroll's argument about post-class period trades and disclosures.  Sorry, reading glasses.

It is not atypical.  It's actually incredibly typical and normal.  And Mr. Carroll says he hasn't seen a case since 1999.  We see it all the time.  Large investment funds have never had a plaintiff blacklist a company that it sued and said, "We're not going to buy any shares after suing."

And I have more points to make on this, but just to address the case law, if I could, briefly.  There's cases that we cite in our brief that are not in that handout, and they involve post-class period, post-disclosure trades.  Some of them are not clear about whether those post-disclosure trades

occurred after the lead plaintiff filed a complaint, but there's one that is, and that's the one that's on their chart. And In re Petrobras Securities Litigation, Judge Rakoff decided, and that was in 2016, on page 360 -- now I need my glasses again -- he discussed this exact defense that defendants have raised here, and he said, "found irrelevant that defendants argue that the plaintiff is atypical because they made some additional purchases in June 2015 after Petrobras had made corrective disclosures and plaintiffs had filed the consolidated amended complaint in this case."

They make purchases after they filed the consolidated amended complaint in this case.  Defendants here are quibbling because we made 20,000 share purchase, this is a 360 billion euro managed fund, three days after filing for lead plaintiff. Nothing to do with even when we filed the consolidated or amended complaint, which is in June.

But many of these cases and I can say most of these cases you're going to have large, sophisticated institutional investors, just like Union, which is the preferred class representative as deemed by Congress in 1995 under the PSLRA continue to make purchases once the stock price has been corrected.  That ties into the second statement.

But the whole purpose of an efficient market and the fraud on the market theory upon which reliance is presumed is that when the truth comes out, and the truth here happened on

November 17, when defendants came out and weeks after touting their Lotus Edge product as being a growth driver and the future of the company and investing in it, they recalled the product.  The product was gone.

It's not like a case like Petrobras, which involved a huge criminal scandal in another country.  And even there, even though that was ongoing and still being unraveled, post-complaint purchases were fine and not atypical in any way, here, the device, the Lotus Edge is removed from the company. It is no longer artificially inflating the stock.  And investors often will make purchases after that to try to recoup their losses because the stock price is now lowered.  And in fact, that's exactly what Union did.

In one of the exhibits that they have, I believe it's Exhibit 5, they have a January 12, 2001 blurb from an investment analyst, not manager who made investment decisions but an analyst who worked for Union who is talking about Boston Scientific post-recall, and he's saying, talking about the recall saying, "Fears have been aroused about this company," but he, not knowing all that we know now and not knowing all that ended up in the complaint, being just an investment analyst who has public information from the company says, "But I think it's an opportunity for a cheap buy-in, Lotus still a buy."  It's cheap now because the stock is finally trading at a price that's not inflated by corrective disclosures.

Our case is that the executives, including the CEO, Mr. Mahoney, made false and misleading statements to the public about the Lotus Edge.  I do not know whether Mr. Mahoney is a fraudster in all aspects of his life or in all aspects of how he represents Boston Scientific to investors.  I hope he is not.  That is not our case.  He made statements about Lotus Edge that were false and misleading.

And if you would, Your Honor, I could pass up, my colleague here will pass up some slides that we handed over to defendants earlier.  What was not known to the market is substantial.  Mr. Mahoney made two statements.  Mr. Carroll references two statements in this case.  And if you turn to the third slide that we've presented here, it's a pretty brief encapsulation about what investors knew, and those investors included Union, and what investors didn't know when Mr. Mahoney was making these two statements.

On September 18, he told investors, which included Union, that, "Lotus will continue to be an important product for us.  It's a significant market.  It remains a key growth driver for us.  We're continuing to invest in it, and the reorder rate for existing users is quite high."

If you look below the middle line, this is just an example, a small example of the type of information that investors, including Union, didn't know.  Those statements artificially inflated the price, but investors didn't know that

days before that statement, Mr. Mahoney initiated a Project Platinum, which was launched to review pulling Lotus from the market.

Even before that, Mr. Mahoney reviewed a presentation, a strategic plan that involved discussions of how Lotus is significantly unprofitable and requires restructuring or exit. Even before that, on August 24, you can see a text exchange between Mr. Mahoney and his CFO, Mr. Fitzgerald, after a call with doctors discussing the Lotus Edge, and Fitzgerald texts him and says, "Oh, that was a tough question.  Almost said we need to defocus Lotus, cancel mantra," which was the next stage of Lotus.

All these statements investors didn't know, Union didn't know, that that false statement inflated the price.  And under Basic and under Halliburton, all investors are entitled to a presumption of reliance because the stock price was artificially inflated by those statements.  It doesn't matter whether Union's single analyst who did not make investment decisions but just wrote his blurbs, the analyst didn't prioritize in his one-page summary the word "Lotus."

Our deponent, Mr. Riechwald, who is in the general counsel's office of Union, testified that when he went back and asked the investment managers why they invested in Lotus, they said it was because of the product pipeline, it has good products.  Lotus was one of those products.  So even though the

reliance is not relevant here, it is presumed, and a rebuttable presumption is very rare, and it occurs in kind of situations where maybe they had actual inside information that was contrary to the information known to investors, or they had information and they came out after the truth was revealed.

They're like, "That's meaningless to me."  It wasn't meaningless to them.  They had a whole analyst report on January 12 saying, "Wow, fears were really aroused by this recall.  It's a cheap buy-in now.  We think management can recover."  That is a typical fact pattern.  It is not atypical. There's no typicality defense here that they're pointing to that passes muster.

And if you look at the other cases we cite in our brief, which include the Wyeth case, the Blackberry case, the Pfizer case and Pelletier case, which are all cited in our reply brief, they discuss over and over how making purchases after a corrective disclosure, some don't say whether it matters whether it's after a complaint, but they usually just don't make a difference to the analysis, and they don't discuss it either way, discuss where a lead plaintiff ban an acquisition after a corrective disclosure and may have a change in incentives, including to minimize the price impact of the disclosures.  And that's in the Pelletier case at 476.

So these kind of post-class period transactions are simply not typical.  They don't defeat reliance.  They don't

defeat the basic presumption.  And one other statement to correct is, Mr. Carroll said in his deposition Mr. Riechwald went back to all the investment managers and asked them if they felt defrauded.  There's two problems with that.  That's not what he testified to.  He said he didn't raise it with them because he was asking them about the investment during the class period into Lotus.

What they now feel, they haven't read the complaint, they haven't filed this action.  They're not legal gurus.  They're investment managers in Germany who have moved on.  He said, "I didn't ask them if they felt defrauded."  No one came running to him and said, "I felt defrauded," but they were managing $360 billion in assets and it may not have been something they've been thinking about since 2020.  It's simply also not relevant.  They don't know this information.

If you go to the next statement, on October 28, this one is, really you see a lot of realtime discordant information.  Mr. Mahoney goes to the market and says, "We're seeing strong results in the cites that are using Lotus," and allays any fears and says, "We do believe that the two-valve strategy makes sense.  The two-valve strategy is Lotus and another valve, Accurate."  And investors wanted to know if both were successful, both were part of the future, and he says, "That strategy makes sense."

Well, five days before, he directed Mr. Brennan and

Mr. Fitzgerald, both defendants here, to "re-look at shutting down Lotus, and be realistic, given the operating losses." Minutes, and I really do mean minutes after that investor call, Mahoney texts defendant Fitzgerald again, minutes after the call, and in that text he states, "Investors have no idea how much we are losing on Lotus."  And there's other presentations and texts on October 28 with the language "Kill Lotus."

The next day, Project Platinum 2.0 was launched, and Mahoney directed and made the decision along with some of his other executives to retire Lotus.  A decision that they formally made after they got their ducks in a row on November 14 and announced it to the public.

So everything in that grey box is what investors and Union didn't know.  And the reason you have, under Basic and Halliburton, reliance on the fraud on the market presumption is that the price of a stock is meant to incorporate, maybe not perfectly, but incorporate all the public information that's out there.  Those two statements were what was incorporated into the price.  Whether or not Union's single investment analyst decided to write Lotus in a statement instead of product pipeline.

But all this information under here was not known to investors.  And the fraud, the relevant truth that came out when they recalled Lotus was at least enough to inform investors that those two statements were not quite right.  They

were not true when they were made, but you don't make statements like that and a few weeks later decide to kill an entire product. And that's what the public knew.

But we're the lawyers. We analyzed the claims. We did an investigation. We're now reviewing documents. It's still revealing how much fraud there was going on, but what was important to the public is that the stock price corrected itself once Lotus was removed from the equation and people realized what they had been told about the prosperity of this product and its future were not right.

But to say that Union is atypical in any way, they are exactly in the same boat as every other investor. They did not know the truth. When truth came out, they lost millions upon millions of dollars in investments. And as a fiduciary to the class now and to their thousands of investors, they decided to take action to stand up and put themselves forward as lead plaintiff.

It's a public service. They're not doing this for any remuneration. They would get the same amount of settlement as anyone else, but they're here to oversee their counsel and to bring this case forward. And in so doing that, they are typical and adequate.

And this whole case law about how the -- sorry -- the basic resumption is easily rebuttable and it's going to be a key defense here, it's not true. The rebuttable presumption

can only be rebut if you have information that severs that information, what investors were told and something Union knew, something Union knew that was so different than any other investor.  It's not there.  They didn't know anything, and defendants don't argue they do.

There's not a single case in that one paragraph they discuss Halliburton in their brief.  They don't actually say that there's anything that severs the clause.  They're just throwing out defenses, and they're hoping one would stick.  And that is what Judge Woodlock in his Swack opinion and other courts have found is simply not enough to ever defeat class certification.  They have to be actual colorable defenses that threaten to overtake the entirety of the litigation, become the focus of the litigation.

And respectfully, I think all of these statements in the grey box, they're going to be the focus of the litigation.  And if defendants try to make Union's knowledge about those the focus, they don't even argue they could.  They can't.  Union had no idea.  No one did.  That's why we have this case.

There's one other argument that defendants raised about typicality.  Their cases, George and Rolex, I just want to point out those cases are largely superseded about the post-class period discussions.  And Your Honor is right.  Many cases have called them into question.  All of the cases that they cite in this handout to you are simply not in opposite,

and they discuss post-class period trades.

They make one other argument about us not establishing our trading losses.  If Your Honor wants to hear on that, I can.  But I think if you go to the last slide of this page, you can see that there is copious evidence that was known to defendants throughout this litigation from the first day we filed our lead plaintiff motion and through discovery that quantified and just provided absolute evidence that Union suffered losses.  They suffered about $50 million of losses, which was in the lead plaintiff motion during the larger class period.

And even under the shortened class period, as we showed in our reply brief but as was patently evident to defendants throughout this litigation, they suffered about $3 million of losses in the shortened class period.  One dollar would make them an adequate lead plaintiff.  They suffered millions of dollars, and that makes them far more adequate.  And that's even more than I think any other moving lead plaintiff at the time suffered in the larger class period.  So they would still be the most adequate and presumptive lead plaintiff under the PSLRA any way you look at it.

And the fact that there's no other multiple clients, we have no other client that suffered so great a loss and so Union is the adequate and typical lead plaintiff to bring this case forward.  If you have any other questions, Your Honor, I'm

happy to answer them.

MR. CARROLL:  Yes.  Counsel's very able argument I respectfully submit blurs a couple of things with respect to the presumption of reliance.

This is not a 12(b)(6) standard.  The standard applicable here on this motion is, the Court is required to do, pursuant to the Supreme Court's decision, a rigorous analysis and to probe the evidence before it.  It is not enough on a class certification motion where reliance is challenged to say, "We simply rely on presumption of reliance."

Counsel says we haven't come forward with anything to rebut the presumption.  We have.  We have shown both word and deed what rebuts the presumption.  The word is what they say to the world about the basis for their investments.  You see that on the chart where they explain why they invest.  Nothing about Lotus.  And you see it doesn't change afterwards.  That's the word.

The deed is what they actually do and continue to invest in the same management team after alleging fraud.  Counsel said, "Well, Lotus was pulled from the market."  Well, the executive team isn't pulled from the market.  That's the same people running the company.  They say they invest based upon strength of management, and they continue to invest.  That's unique to them.

Counsel says, "Well, institutions do that all the

time."  Perhaps they do.  But institutions don't come forward and say all the time, "I want to lead the charge and be the single representative plaintiff prosecuting these people for fraud."  It's not enough to say, "We rely on the presumption of reliance," when there's information contradicting it in the record.  It is simply not enough.

We read the Petrobras decision differently.  Your Honor will be the arbiter of that.  That decision doesn't make clear that there were purchases after the same purchaser made an allegation of fraud.  But Your Honor in your office will make that decision.

I'd like to hand up, because there was also a dispute raised about what the testimony actually was from the plaintiff, I have an excerpt of it here.  It's in the record, but here is the critical testimony, if I may, on these points. None of the Union people suggested that they had been defrauded, and none of the Union people suggested that they made their purchase based upon Lotus.  Of course not.

THE COURT:  These are the same, right?  You just gave me two of the same.

MR. CARROLL:  If I gave you two, it was a mistake.

THE COURT:  You didn't mean to give me two different things?

MR. CARROLL:  No.

THE COURT:  Okay.

MR. CARROLL:  Counsel walked through the alleged misstatements in the case by Mr. Mahoney that have survived the statement from Judge Woodlock.  Fair enough.  Those are the misstatements.  But the question through which you have to look at those misstatements is, is there anything on the record that suggested this representative plaintiff relied on them in making their decision?  This motion doesn't decide whether Mr. Mahoney's statements were correct or incorrect or ask you to make a decision.  The question we're raising is, is there anything in the record that suggests they relied on them?  They say, "Well, we're just relying on the presumption," right, though it's a 12(b)(6), you say that and you're done.  The evidence in the record is that they didn't.  There was nothing that comes back to rebut that, not a thing.

THE COURT:  She says when they talk about pipeline, they're talking about Lotus.

MR. CARROLL:  So if you look at the -- the documents are all there attached to Mr. Anim's declaration.  We've quoted them.  They're talking about the pipeline, new products, and they're talking about a particular product called Watchman.  They never say anything about Lotus.  They do talk about other things.

But then, and this is the critical part, Your Honor, when Lotus is withdrawn from the market in November, this is the -- referring to what I've marked as A in the upper right

corner, when Lotus is withdrawn, nothing changes, right? They're continuing to do it and their explanation doesn't change. They're looking at Watchman, and they're looking at a pipeline of new products.

Lotus in some form or fashion was on the market since 2016. The Lotus Edge was the then current iteration of Lotus. And even that had been on the market since 2019, right? So when they're talking about new products, they're not talking about Lotus. They're talking about what they say they're talking about. That's the evidence, that's the evidence on the record here that you can't simply ignore in the face of somebody saying, "Well, we're just going to go with the presumption of reliance." That is a rebuttable presumption of reliance.

Judge Young in a federal securities case found that presumption rebutted in the face of evidence that people made their decisions on something other than the alleged misrepresentations. Again, at bottom, it's a fraud case.

THE COURT: Which case was that?

MR. CARROLL: That's a case called Continental Cablevision. He just did it on the record. He didn't write an opinion on it. It was a case I was involved in where he found the presumption of reliance rebutted because evidence had come in demonstrating that the plaintiffs had relied on other things.

In any event, the plaintiffs have the burden on the motion. It's their motion. Saying we rely on the presumption of evidence in the face of contrary facts that are themselves unrebutted doesn't get them anywhere close.

Further, and I'll stop after this, Your Honor. I made a little bit of fun of it, right, the Supreme Court of all people are telling district judges to use their common sense, but think about it from a common sense point of view. You've got one plaintiff. That's who is going to come here. They're going to have to get on the stand, and they are going to have to say, "Even though we allege this management team are a bunch of fraudsters, we continued to put not just their money in, their investors' money in."

They're fiduciaries for third parties. They continued to put other people's money into a company that they say is run by fraudsters? Of course that's a unique issue to this plaintiff. No other plaintiff is going to have that issue, and it will be a focus of the litigation.

It's not just the claims that the Court has to consider. It's also the defenses to those claims that are fair game on our Rule 23 motion. So the plaintiff has made the choices it has made with respect to who to bring forward, how many class representatives to have and whether or not they want to have a professional who leaves the footprints behind as to why they do things. This motion, I would respectfully submit,

did not come close to satisfying the Rule 23 standards, and it ought to be denied.  Thank you.

MS. ORMSBEE:  Your Honor, if I may.

THE COURT:  Let me just ask a question.  I am going to hear from you.  I just want to ask you a question.  You probably all know this is not the area in which I practiced law, so I'm sure I'll ask my share of stupid questions as this chugs along.  But if you added another class representative, doesn't this just moot this all?  Isn't that the safest way to do it?

MS. ORMSBEE:  Sorry?

THE COURT:  It's such a stupid question that I've shell-shocked everyone into silence.

MR. CARROLL:  I didn't know if you were asking me.

THE COURT:  No.  I was asking her.

MS. ORMSBEE:  Sorry, Your Honor.  There's no reason to add another class representative.  You're right.  If for some reason the Court deemed that Union was atypical or inadequate, that is the solution.  Union Asset Management Holdings is not atypical or inadequate.  But you're right, it could moot the issue.

THE COURT:  Look, I'm not passing judgment on whether you're atypical or inadequate.  I'm just saying either I'm going to get this right or I'm going to get it wrong, right?

MS. ORMSBEE:  Right.

THE COURT:  If I keep you in, and if I grant the motion and that turns out to be wrong, we've compromised everything that comes afterwards, which is going to be long and expensive, right?

MS. ORMSBEE:  Your Honor, that's completely fair to say.  We do not believe you'd be wrong if you certified the class.

THE COURT:  I know, but he thinks I'd be wrong.  You're both excellent lawyers.  You're doing an excellent job on behalf of your clients.  How do I want to refer to this?  Like a little CYA, right?  Why aren't we just, belt and suspenders, making sure that regardless of whether I get it right or wrong, it doesn't compromise what comes later.

MR. CARROLL:  May I --

MS. ORMSBEE:  If I can answer first.  Your Honor, the PSLRA is not designed that way, CYA, unless you feel you really feel like you have an actual issue with the client that you've brought forward.  Union Asset Management has recovered over a billion dollars in funds for investors just in past the five years, as defendants themselves pointed out.

And we know the case law.  This is what we do day in and day out at my law firm.  There's no specific evidence that Union, based on one analyst report, one point in time, didn't rely on the product pipeline.  And that's their whole case, that there has to be direct reliance pretty much.  Well, direct

reliance, Your Honor, if you read Basic v. Levinson, if you read Halliburton in the Supreme Court, direct reliance is not the law under Basic or Halliburton, and that's just not on a 12(b)(6) standard or any standard.  That's through trial, reliance is presumed.

At no point would we have to come and show that we relied on their statements on September 16 or October 28 in order to bring this case forward.  Mr. Carroll keeps saying it's a rebuttable presumption, and that is entirely true.  But in the language of Halliburton, the Supreme Court, "A public material misrepresentation will distort the price of stock traded in an efficient market and anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation."

In our opening brief we provided evidence backed up by an expert report that Boston Scientific's stock traded in an efficient market, and defendants effectively concede that. They did not depose our expert.  They did not produce an expert report.  And they don't even mention the efficient market in their entire brief.  The market for Boston Scientific stock was efficient.

So if they are going to come forward with a defense that says the presumption is rebutted, it's not that they didn't mention the word Lotus in one single analyst report, that one analyst, who had no investment authority, mentioned in

his report.  It is when you have insider information, "I talked to the CEO and he told me Lotus was going down but I invested anyway."  That might be an example of a rebuttable fact that would sever the reliance on the fraud on the market presumption.  That does not exist here.  By no stretch of imagination does that exist here.

If you look at I believe the deposition excerpts that were handed up to Your Honor and you go through those, you'll see Mr. Riechwald asked each of his actual investment managers generally why did they invest in Lotus.  And many of them said the product pipeline.  Mr. Carroll has his interpretation of what the product pipeline means, but the Lotus was just launched in 2019.  In 2020, it's a fresh product on the market that they are talking about on their calls because it's still developing.  They're still trying to get to 150 call centers.  They're still trying to enlist doctors and hospitals to accept this device and to bring it forward and to use it in their patients.  It is part of the pipeline.

THE COURT:  Not in January?

MS. ORMSBEE:  Sorry.  Throughout 2020.

THE COURT:  But not in January 2021?

MS. ORMSBEE:  No.  In January 2021, Lotus was dead. In January 2021, Lotus is off the market because it's been recalled in November 2020.  But throughout 2020, they're still trying to get Lotus approved in other countries, in Ireland

where it was not approved, in China, in Asia.  It's not even launched in those countries yet.  It's still in the clinical trial phase.

So he's making an interpretation of what pipeline means that is not consistent with the fact that Lotus is an emerging product that they're still trying to get off the ground after it was just launched in 2019.  And he went and asked each of his managers, and again, they said, "the product pipeline, the product pipeline."  That's in those pages.  He very clearly said he didn't ask them whether they felt defrauded.

THE COURT:  But back in January 2021, I think his point is that they don't say, "It's a great pipeline even without Lotus."  I think that's the point he's trying to make.

MS. ORMSBEE:  If you turn to Exhibit 5, which is the January 2021 analyst blurb, I would say, it's a few paragraphs, they cite to the bottom of it, which is core items.  And that's talking about products that are going forward.  Lotus is not mentioned there because Lotus is dead.  But the whole first paragraph of this analyst's report, it looks like this, under Investment Case, is all about Lotus.  They have, a whole half of this report is dedicated to talking about Lotus, that after the product withdrawal in the United States with an artificial heart valve, fears were aroused here.  He believed -- this is the analyst, not the person who actually made the investments.

He believed what the company was saying; that this recall wasn't -- what does he say?  He says that the recall was for commercial reasons, not because of production difficulties, not because of safety concerns.

As we show and will show in this case going forward, that's not all true.  The truth was still coming out.  But that's what the analyst believed.  Then he says, "Conclusion, opportunity for a relatively cheap buy-in."  Half of this report is about Lotus.  He's allaying the fears of his other investment managers who were concerned that the stock price dropped and that the Lotus was recalled, and half of this report is about Lotus.

And yes, core items, next steps, he's talking about what's still positive about the company.  Of course he's not discussing Lotus.  Lotus is dead.  But the first half of this investment report is about Lotus.

So the whole rationale that they're pointing to, that they're still saying, "Look, they're still talking about these positive products," yes, Boston Scientific is a huge company.  And while he keeps saying we're investing in fraudsters, I hope not.  I hope Mr. Mahoney only lied about Lotus Edge.  I hope the company does not make it a pattern and practice about misleading investors about all of its products.  I fervently hope that's true, even though this is the third securities class action in this court in the past ten years, but I hope

that's true.

And our case is not that these people can't be trusted to run a company and they have to be out.  Whether that's true or not, I don't know.  But our case is about Lotus Edge.  Union is the sole -- sorry, reading a note -- Union is sole lead plaintiff.  Sorry.

THE COURT:  You can go on --

MR. GRAZIANO:  Your Honor, I'm sorry, because my colleague has covered everything superbly.

THE COURT:  She's done a great job.  That doesn't mean if you want to add something --

MR. GRAZIANO:  I just want to bring up something completely unrelated.  Maybe it's the grey hair.  It's not as simple as adding another plaintiff.  I think this is a very important point to make under the PSLRA.

There was a contest, a fight, three other firms, three other motions.  We can't just add the plaintiff.  What role does that plaintiff have?  Does that plaintiff become the lead plaintiff?  That will not fly without numerous firms coming back to the Court and saying, "No, they're the biggest, because under the PSLRA the biggest lead plaintiff gets to be the sole lead plaintiff.

So we can't just do that on our own.  It would lead to multiple firms coming before Your Honor trying to oust Union, trying to oust our firm.  And when this has happened, and it's

really rare, we have seen the courts do an up or down vote on lead plaintiff.  And then literally a notice goes out, a press release, and we reopen the lead plaintiff motion practice, which is, by federal law, 60-day window, notice has to go out. So it's not as easy as it sounds.  I just want to make that point.

MR. CARROLL:  Could I be heard on that, Your Honor?

THE COURT:  Yes.  You guys, I know you were speaking. I let him kind of interrupt you.  Were you done?

MS. ORMSBEE:  Thank you, Your Honor.  He did not interrupt but just added, all positive.  No, I have nothing more, just the same arguments we've already put forth I think.

MR. CARROLL:  A couple of points.  Respectfully, it's not the Court's role to facilitate class actions.  On this motion, the decision is has the plaintiff met its burden with respect to the Rule 23 requirements.

We've heard them say they're relying on the presumption of reliance.  They have not come forward with any evidence to rebut what's before you.  Counsel very much made my point in talking about, well, they don't say anything about Lotus.  They invest for the same reasons, the future product pipeline before, and then they do it afterwards.  Nothing wrong with that.  That's fine.

But if you're going to be a representative plaintiff, you have to be able to say, "I relied on the alleged

misrepresentation that you're saying is the fraud."  That's what you have to be able to do.  The evidence says they can't.  Not just by the continued purchases, although that's plenty after alleging fraud by what they say was their rationale.  They're explaining what they rely on.  They never mention Lotus, not once, not once.  That's the record before Your Honor.

If they meet the Rule 23 requirement, so be it, but if they don't, so be it.  Mr. Graziano's desire to figure out whether he can stay in the case and find another plaintiff, that's not for the Court, certainly not on this motion.  You meet the requirements or you don't.  And here they don't.  And so I think that's best left for another day.

It's not like the case goes away, right?  You're hearing this discussed in language that suggests the case goes away.  There's a plaintiff, Union.  They can proceed with the fraud case, that's what they've brought, if they wish.  It doesn't dismiss the case.  It just says they can't be a representative of a bunch of absent parties.  Thank you, Your Honor.

MS. ORMSBEE:  Your Honor, at the risk of restating it, I will just say again that Mr. Carroll is simply misstating the state of the law on the presumption of reliance.  There is no requirement ever that an individual lead plaintiff needs to come and testify and present evidence that this statement

changed my mind, I relied on this statement.  That is why the Supreme Court in all its knowledge in Basic and Halliburton created the rebuttable presumption.  There is nothing that rebuts that presumption.

And Mr. Carroll says the case will go on.  Maybe it could go on for Union.  Not for the hundreds, the thousands of other investors that were equally harmed that Union stands here in the place of.  So it is, you know, not quite so simple and not quite so easy.

But the main point is he's just misstating the law, Your Honor, and I think a clear and close reading of Basic and Halliburton and all the cases we've presented in our briefing show that he's wrong on the law and on the facts because there is ample evidence that they relied on the price of the security and the statements that were made.  And you can also look at all the other analysts' reports.  This is one Union analyst working for one fund.  There's analysts that are in our complaint that discuss the Lotus Edge and found it informative, and the market price incorporates all of that.  Both the public statement, the analyst commentary, that is what all investors, including Union, are allowed to rely on in making investment decisions.

THE COURT:  Okay.  I am going to give her the last word because it's her burden.  I'm hoping we don't need another round.  All right.  We'll take this under advisement, and we'll

get out an opinion as soon as we can, which I hope is not that long.

MR. CARROLL:  Thank you, Your Honor, very much.

MS. ORMSBEE:  Thank you, Your Honor.

THE COURT:  Thank you, everyone.  The case is recessed.

(Adjourned, 12:07 p.m.)

CERTIFICATE OF OFFICIAL REPORTER


            I, Kelly Mortellite, Registered Merit Reporter

and Certified Realtime Reporter, in and for the United States

District Court for the District of Massachusetts, do hereby

certify that the foregoing transcript is a true and correct

transcript of the stenographically reported proceedings held in

the above-entitled matter to the best of my skill and ability.

                    Dated this 31st day of July, 2023.


                    /s/ Kelly Mortellite

                    _____

                    Kelly Mortellite, RMR, CRR

                    Official Court Reporter