**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| In re BOSTON SCIENTIFIC CORPORATION SECURITIES LITIGATION | Master File No. 1:20-cv-12225-ADB |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR
FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ....................................................................................................................... 3

I.      THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ......................... 3

        A.      Lead Plaintiff and Lead Counsel Have Adequately Represented the
                Settlement Class .................................................................................................. 5

        B.      The Settlement Was Reached After Arm's-Length Negotiations Between
                Experienced Counsel with the Benefit of Substantial Discovery and the
                Assistance of an Experienced Mediator .............................................................. 7

        C.      The Proposed Settlement Is Fair, Reasonable, and Adequate In Light of the
                Costs and Risks of Further Litigation and Similar Factors ................................. 9

                1.      The Risks of Establishing Liability and Damages Support
                        Approval of the Settlement ...................................................................... 11

                        (a)      Risks to Proving Liability ............................................................ 11

                        (b)      Risks Concerning Loss Causation and Damages .......................... 13

                2.      The Settlement Is Also Fair and Reasonable in Light of
                        Realistically Recoverable Damages .......................................................... 14

                3.      All Other Rule 23(e)(2)(C) Factors Also Support Approval ..................... 15

        D.      The Settlement Treats Settlement Class Members Equitably Relative to
                Each Other ......................................................................................................... 16

        E.      The Reaction of the Settlement Class ................................................................ 17

II.     THE PLAN OF ALLOCATION SHOULD BE APPROVED ...................................... 17

III.    THE NOTICE TO THE SETTLEMENT CLASS SATISFIED THE
        REQUIREMENTS OF RULE 23 AND DUE PROCESS ............................................. 19

CONCLUSION ................................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re AVEO Pharms., Inc. Sec. Litig.*,
  2017 WL 5484672 (D. Mass. Nov. 14, 2017) ..........................................................................6

*In re Bos. Sci. Corp. Sec. Litig.*,
  646 F. Supp. 3d 249 (D. Mass. 2022) ...................................................................................13

*In re Boston Scientific Corp. Sec. Litig.*,
  708 F. Supp. 2d 110 (D. Mass. 2010), *aff'd*, 649 F.3d 5 (1st Cir. 2011) ...............................12

*In re China Sunergy Sec. Litig.*,
  2011 WL 1899715 (S.D.N.Y. May 13, 2011) ........................................................................15

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d. Cir. 1974) ...............................................................................4, 5, 7, 9

*City P'Ship Co. v. Atlantic Acquisition Ltd. P'Ship*,
  100 F.3d 1041 (1st Cir. 1996) ...............................................................................................3

*Cohen v. Brown Univ.*,
  16 F.4th 935 (1st Cir. 2021) ...................................................................................................7

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
  216 F.R.D. 197 (D. Me. 2003) ...............................................................................................4

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001) .....................................................................................................8

*Duncan v. Nissan N. Am., Inc.*,
  2020 WL 5901399 (D. Mass. Aug. 25, 2020) ........................................................................8

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ..............................................................................................................19

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
  275 F.R.D. 382 (D. Mass. 2011) ............................................................................................5

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  No. 02-CV-3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ...........................................14

*Hill v. State St. Corp.*,
  2015 WL 127728 (D. Mass. Jan. 8, 2015) ..................................................................7, 10, 20

*Hochstadt v. Boston Scientific Corp.*,
  708 F. Supp. 2d 95 (D. Mass. 2010) .....................................................................................17

*Lapan v. Dick's Sporting Goods, Inc.*,
  2015 WL 8664204 (D. Mass. Dec. 11, 2015) ............................................................................8

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
  233 F.R.D. 306 (E.D.N.Y. 2006) ...........................................................................................10

*Medoff v. CVS Caremark Corp.*,
  2016 WL 632238 (D.R.I. Feb. 17, 2016) ............................................................................5, 14

*New England Biolabs, Inc. v. Miller*,
  2022 WL 20583575 (D. Mass. Oct. 26, 2022) .......................................................................17

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,
  602 F. Supp. 2d 277 (D. Mass. 2009), *aff'd*, 582 F.3d 30 (1st Cir. 2009) ...............................5

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  588 F.3d 24 (1st Cir. 2009) ......................................................................................................7

*In re Polaroid ERISA Litig.*,
  240 F.R.D. 65 (S.D.N.Y. 2006) ................................................................................................6

*Puerto Rico Dairy Farmers Ass'n v. Pagan*,
  748 F.3d 13 (1st Cir. 2014) ......................................................................................................5

*In re Relafen Antitrust Litig.*,
  231 F.R.D. 52 (D. Mass. 2005) .............................................................................................4, 5

*Rolland v. Cellucci*,
  191 F.R.D. 3 (D. Mass. 2000) ..................................................................................................9

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2020 WL 4196468 (S.D.N.Y. July 21, 2020) .........................................................................16

*In re Sturm, Ruger, & Co. Sec. Litig.*,
  2012 WL 3589610 (D. Conn. Aug. 20, 2012) ...................................................................10, 15

*In re Tesla Inc., Sec. Litig.*,
  2023 WL 4032010 (N.D. Cal. June 14, 2023) ........................................................................12

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
  535 F. Supp. 2d 249 (D.N.H. 2007) ..................................................................................13, 17

*Vataj v. Johnson*,
  2021 WL 5161927 (N.D. Cal. Nov. 5, 2021) ..........................................................................15

*In re Veeco Instruments Inc. Sec. Litig.*,
  2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ............................................................................9

iii

*Voss v. Rolland*,
  592 F.3d 242 (1st Cir. 2010)...................................................................................................3, 4

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005)........................................................................................................19

**STATUTES**

Private Securties Litigation Reform Act of 1995 ("PSLRA"),
  15 U.S.C. § 78u-4(a)(7) ............................................................................................................19

**RULES**

Fed. R. Civ. P. 23............................................................................................................... *passim*

Lead Plaintiff Union Asset Management Holding AG ("Lead Plaintiff" or "Union"), on behalf of itself and the Settlement Class, respectfully submits this memorandum of law in support of its motion for final approval of the proposed settlement of this Action (the "Settlement") and approval of the proposed plan of allocation of the net proceeds of the Settlement (the "Plan of Allocation").[1]

## PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiff has agreed to settle all claims in this Action in exchange for a cash payment of $38.5 million—a recovery representing a substantial portion of the maximum possible damages that investors could hope to prove at trial. That recovery is all the more remarkable in light of the numerous risks investors faced in this case—including serious challenges to proving falsity and scienter—each of which could have eliminated the possibility of any recovery whatsoever. Lead Plaintiff respectfully submits that the proposed Settlement is fair, reasonable, and adequate; satisfies all the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure; and should be finally approved by the Court. As detailed in the accompanying Joint Declaration and below, the Settlement was reached only after nearly three years of hard-fought litigation, substantial motion practice, extensive discovery, and vigorous arm's-length negotiations before the Honorable James McGuire, a well-respected mediator.

Over three years of vigorous litigation, Lead Plaintiff developed a strong understanding of the strengths and weaknesses of its case which confirms the Settlement is an excellent result for

---

[1] Unless otherwise noted, all capitalized terms have the meanings given them in the Stipulation and Agreement of Settlement dated December 14, 2023 (ECF No. 152-1) (the "Stipulation"), or in the Declaration of Salvatore J. Graziano in Support of (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Graziano Declaration" or "Graziano Decl."), filed herewith. Citations herein to "¶ __" and "Ex.__" refer, respectively, to paragraphs in, and exhibits to, the Graziano Declaration.

the Settlement Class.  These efforts included:  Lead Plaintiff's extensive investigation of the alleged fraud through the review of public information such as filings with the SEC, analyst reports, conference call transcripts, and news articles (¶¶ 17-21), interviews with over 140 former Boston Scientific employees (¶ 18), the preparation of a detailed consolidated complaint (the "Complaint") (¶ 22), opposing Defendants' motion to dismiss through extensive briefing and in oral argument before the Court (¶¶ 23-28), substantial fact discovery, which included preparing and exchanging several rounds of requests for documents, interrogatories, and requests for admission, serving subpoenas on four non-parties, and obtaining and reviewing over 224,000 pages of documents from Defendants and non-parties (¶¶ 32-69), briefing and arguing class certification (¶¶ 70-76), and extensive settlement negotiations, including two separate mediation sessions overseen by an experienced, well-respected mediator (¶¶ 78-84).  As a result of this substantial litigation, Lead Plaintiff and Lead Counsel had a thorough and well-developed understanding of the strengths and weaknesses of the case when the Settlement was reached.

Lead Plaintiff and the Settlement Class faced significant risk in establishing liability and damages in the Action.  Among other things, Lead Plaintiff would have confronted substantial hurdles in showing that the alleged misstatements that the Court sustained—Defendant Mahoney's statements that the Lotus Edge device remained an "important growth driver" for Boston Scientific and that the Company's "the two-valve strategy makes sense"—were false or misleading when made or that Defendant Mahoney made them with any intent to deceive.  Defendants have asserted, and would continue to assert, that Boston Scientific's decision to shut down the Lotus Edge platform occurred only after Defendant Mahoney's statements were made, and that they should not be liable for securities fraud because the Lotus Edge did not turn out how Defendants hoped.

In the absence of the Settlement, Lead Plaintiff and the Settlement Class would face these risks throughout subsequent stages of the litigation, including the completion of fact discovery, substantial expert discovery, motions for summary judgment, trial, and post-trial motions on both liability and damages, as well as the inevitable additional appeals.  The Settlement avoids these significant risks and delays while providing a meaningful, certain, and near-term benefit of $38.5 million to the Settlement Class.

The Settlement has the full support of Lead Plaintiff—an experienced and sophisticated institutional investor—and the reaction of the Settlement Class to date has also been positive. While the deadline for objections has not yet passed, to date, no objections to the Settlement have been received.  ¶ 126.

Given these considerations and the other factors discussed below, Lead Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court.  Additionally, Lead Plaintiff requests that the Court approve the Plan of Allocation, which was set forth in the Notice mailed to potential Settlement Class Members. The Plan of Allocation, which Lead Counsel developed in consultation with Lead Plaintiff's damages expert, provides a reasonable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims based on damages they suffered on purchases of Boston Scientific common stock that were attributable to the alleged fraud.

## ARGUMENT

### I.    THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class-action claims.  *See* Fed. R. Civ. P. 23(e).  A class-action settlement warrants approval where the court finds it "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *see also Voss v. Rolland*, 592 F.3d 242, 251 (1st Cir. 2010); *City P'Ship Co. v. Atlantic Acquisition*

*Ltd. P'Ship*, 100 F.3d 1041, 1043 (1st Cir. 1996).

Courts "enjoy great discretion to 'balance [a settlement's] benefits and costs' and apply this general standard." *Voss*, 592 F.3d at 251. In determining whether a settlement is fair, reasonable, and adequate, courts consider both "the negotiating process by which the settlement was reached and the substantive fairness of the terms of the settlement compared to the result likely to be reached at trial." *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 72 (D. Mass. 2005). Courts should not "prejudge the merits of the case" or "second-guess the settlement." *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 211 (D. Me. 2003). Instead, the Court's role is limited to "determin[ing] if the parties' conclusion is reasonable." *Id.*

Rule 23(e)(2), as amended in 2018, provides that courts should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). In addition, courts in the First Circuit had historically considered the following factors from *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), in evaluating class settlements:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 602 F. Supp. 2d 277, 280-81 (D. Mass. 2009) (quoting *Grinnell*, 495 F.2d at 463), *aff'd*, 582 F.3d 30 (1st Cir. 2009); *Relafen*, 231 F.R.D. at 72 (same).  The four factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by a Court of Appeals, but "rather [seek] to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."  Fed. R. Civ. P. 23(e)(2) Advisory Committee Notes to 2018 Amendment.  Accordingly, Lead Plaintiff will discuss the Settlement's "fairness, reasonableness, and adequacy" principally under the four factors listed in Rule 23(e)(2), while also discussing relevant and non-duplicative *Grinnell* factors.

In evaluating the settlement, the Court should also consider the strong public policy favoring settlement, particularly in class actions.  *See Puerto Rico Dairy Farmers Ass'n v. Pagan*, 748 F.3d 13, 20 (1st Cir. 2014) (noting the "strong public policy in favor of settlements"); *Medoff v. CVS Caremark Corp.,* 2016 WL 632238, at \*5 (D.R.I. Feb. 17, 2016) ("The court performs this analysis in the shadow of the 'strong public policy in favor of settlements, . . . particularly in class action litigation.").

### A.    Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class

In weighing approval, a court should first consider whether "the class representatives and class counsel have adequately represented the class."  Fed. R. Civ. P. 23(e)(2)(A); *see also In re Evergreen Ultra Short Opportunities Fund Sec. Litig.,* 275 F.R.D. 382, 391 (D. Mass. 2011) (the adequacy requirement is met where "the interests of the representative party will not conflict with the interests of the class members" and "counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation").

Here, Lead Plaintiff's claims are typical of and coextensive with those of the Settlement Class, and it does not have any interests that are antagonistic to the interest of other members of the Settlement Class. *See In re AVEO Pharms., Inc. Sec. Litig.*, 2017 WL 5484672, at *4 (D. Mass. Nov. 14, 2017). Lead Plaintiff—like all other Settlement Class Members—has an interest in obtaining the largest possible recovery from Defendants. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members."). Indeed, in appointing Union as Lead Plaintiff, the Court found that Lead Plaintiff was the "most adequate plaintiff." ECF No. 25, at ¶ 3.

Further, Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class in their vigorous prosecution of the Action over the past three years and in the negotiation and achievement of the proposed Settlement. Lead Plaintiff Union is a highly experienced institutional investor that played an active role in supervising and participating in the litigation, and retained counsel who have successfully prosecuted many complex securities class actions throughout the United States. *See* Ex. 5A-3 (Lead Counsel's firm resume). Lead Plaintiff and Plaintiffs' Counsel vigorously prosecuted the Settlement Class's claims, including by (i) conducting an extensive investigation into the alleged fraud; (ii) drafting a detailed Complaint based on the investigation; (iii) opposing Defendants' motion to dismiss through extensive briefing; (iv) conducting substantial fact discovery, (v) briefing and arguing Lead Plaintiff's motion for class certification; (vi) consulting extensively with experts in the medical device industry, insider trading, and financial economics, and (vii) participating in extended arm's length settlement negotiations, including two full-day mediation sessions with a well-respected mediator. ¶¶ 14-84. Accordingly, this factor strongly supports approval of the Settlement.

6

**B.      The Settlement Was Reached After Arm's-Length Negotiations Between Experienced Counsel with the Benefit of Substantial Discovery and the Assistance of an Experienced Mediator**

The Court should also consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).  Courts have traditionally considered other related circumstances in determining the "procedural" fairness of a settlement, including counsel's understanding of the strengths and weakness of the case based on factors such as "the stage of the proceedings and the amount of discovery completed," *Grinnell*, 495 F.2d at 462-63, as well as the involvement of a mediator.  All of these circumstances strongly support the approval of the Settlement, as the Parties reached the Settlement only after months of arm's-length negotiations by experienced counsel with the benefit of substantial discovery and the assistance of an experienced mediator.

Indeed, the First Circuit has long held that there is a presumption in favor of finding a settlement fair and reasonable where, as here, the settlement is reached after significant discovery and arm's-length negotiations between experienced counsel.  *See, e.g.*, *Cohen v. Brown Univ.*, 16 F.4th 935, 951 (1st Cir. 2021) (where "the parties negotiated at arm's length and conducted sufficient discovery, the district court must presume the settlement is reasonable"); *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 32-33 (1st Cir. 2009) (same); *Hill v. State St. Corp.*, 2015 WL 127728, at *7 (D. Mass. Jan. 8, 2015) (same).

Beginning in early 2023, the Parties explored the possibility of seeking to resolve the Action by engaging in mediation.  The Parties retained James McGuire, an experienced mediator with JAMS, to act as mediator in the Action, and held two full-day mediation sessions with Mr. McGuire, in March 2023 and September 2023.  ¶¶ 79-82.  The mediation process included the exchange of detailed mediation statements that addressed the issues of liability and damages. ¶¶ 80-81.  The Parties did not reach an agreement at either of the mediation sessions, but the Parties

7

made progress and continued their intense settlement negotiations in the evening and next day following the second session to reach an agreement.  ¶ 82.

The active role played in the settlement negotiations by an experienced mediator such as Mr. McGuire also strongly supports a finding that the Settlement is fair.  *See, e.g., Duncan v. Nissan N. Am., Inc.,* 2020 WL 5901399, at *1 (D. Mass. Aug. 25, 2020) (settlement was fair where it was the "result of arm's-length negotiation by experienced counsel before an experienced neutral mediator after multiple days of mediation"); *Lapan v. Dick's Sporting Goods, Inc.*, 2015 WL 8664204, at *1 (D. Mass. Dec. 11, 2015) ("The assistance of an experienced mediator . . . reinforces that the Settlement Agreement is non-collusive."); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a mediator's involvement in settlement negotiations "helps to ensure that the proceedings were free of collusion and undue pressure").

Moreover, as discussed above, the Parties and their counsel were well informed about the strengths and weaknesses of the case before they agreed to settle.  Here, for example, Lead Plaintiff and Lead Counsel conducted a thorough pre-filing investigation by extensively reviewing SEC filings, analyst reports, investor call transcripts, and news articles, and by interviewing dozens of former Boston Scientific employees regarding the events at issue.  ¶¶ 17-18.  In addition, Lead Plaintiff and Lead Counsel consulted extensively with experts in the medical device industry and financial economics and conducted extensive research.  ¶¶ 19-21.  Lead Plaintiff also conducted substantial fact discovery resulting in the production of over 224,000 pages of documents and fully briefed its motion for class certification.  ¶¶ 32-76.  Accordingly, when the Parties reached their agreement to settle the Action, Lead Plaintiff and Lead Counsel had sufficient information to evaluate their case and the adequacy of the proposed Settlement.

Lead Plaintiff Union strongly supports the Settlement, which further weighs in favor of approval. *See* Riechwald Decl. (Ex. 1) at ¶ 8. A settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor" such as Lead Plaintiff Union here is "'entitled to an even greater presumption of reasonableness.'" *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007). Likewise, the informed judgment of Lead Counsel, which is highly experienced in securities litigation, is entitled to "significant weight." *See Rolland v. Cellucci*, 191 F.R.D. 3, 10 (D. Mass. 2000) ("When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight.").

### C. The Proposed Settlement Is Fair, Reasonable, and Adequate In Light of the Costs and Risks of Further Litigation and Similar Factors

In determining whether a class action settlement is "fair, reasonable, and adequate," the Court must also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C). In most cases, this will be the most important factor in analyzing a proposed settlement. *See Grinnell*, 495 F.2d at 455 ("most important factor" is "strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.").[2]

Here, the Settlement avoids the risks and delays of further litigation, while providing a

---

[2] Indeed, this factor under Rule 23(e)(2)(C) essentially encompasses at least six of the nine factors of the traditional *Grinnell* analysis. *See Grinnell*, 495 F.2d at 463 ("(1) the complexity, expense and likely duration of the litigation; . . . (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; . . . (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation").

substantial, certain, and immediate benefit to the Settlement Class in the form of a $38.5 million cash payment. This is not a claims-made settlement, and the $38.5 million has already been deposited into an escrow account and is earning interest for the benefit of the Settlement Class.[3]

Courts have long recognized that securities class action litigation is complex and uncertain, and that these factors support the reasonableness of settlement. *See State Street*, 2015 WL 127728, at *7 ("The complexity of this [securities class action] and the expense and delay that would result if this case were litigated through further motion practice, trial and appeals strongly support approval of the Settlement."); *In re Sturm, Ruger, & Co. Sec. Litig.*, 2012 WL 3589610, at *5 (D. Conn. Aug. 20, 2012) ("In evaluating the settlement of a securities class action, federal courts . . . have long recognized that such litigation is notably difficult and notoriously uncertain."). Such suits "readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006). This case was no exception.

Absent the Settlement, the continued litigation of the Action would have required the Lead Plaintiff to complete fact discovery, engage in substantial expert discovery, defeat any motions for summary judgment by Defendants, and overcome *Daubert* challenges to expert testimony. Even assuming Lead Plaintiff successfully overcame these challenges, Lead Plaintiff would still need to prevail at trial and on pre- and post-trial motions. Lead Plaintiff faced these numerous and significant risks, which necessarily involved substantial costs and delays, all without any assurance of obtaining a better (or indeed any) recovery. ¶¶ 86-120. Given these meaningful litigation risks, and the immediacy and amount of the $38.5 million recovery, Lead Plaintiff and Lead Counsel

---

[3] Because this is not a claims-made settlement, Defendants have no right to the return of any portion of Settlement based on the number or amount of Claims submitted. *See* Stipulation ¶ 13.

believe that the Settlement is fair, reasonable, and adequate, and is in the best interest of the Settlement Class.  ¶¶ 7, 120.

### 1.    The Risks of Establishing Liability and Damages Support Approval of the Settlement

Lead Plaintiff believes that its claims are meritorious but recognizes that this Action presented several substantial risks to establishing both liability and damages.  Indeed, the Court had dismissed all but two of the dozens of misstatements initially alleged in the Complaint in ruling on the motion to dismiss, and Defendants continued to vigorously deny any liability with respect to the two statements which survived dismissal.

### (a)    Risks to Proving Liability

To prevail through litigation, Lead Plaintiff would have been required to prove (i) that Defendant Mahoney's statements in September and October 2020 that Lotus Edge was and "will continue to be an important growth driver" for Boston Scientific and that the Company's two-valve strategy "makes sense" were materially false and misleading when made; (ii) that Defendant Mahoney knew or recklessly disregarded that his statements were false when made; (iii) that the revelation of the truth concerning the alleged misstatement caused the loss suffered by Lead Plaintiff and the Settlement Class (*i.e.*, loss causation); and (iv) the amount of class-wide damages. Defendants would have had substantial arguments concerning each of these issues.

First, Defendants have argued, and would continue to argue, that Defendant Mahoney's statements were not false or misleading.  ¶¶ 98-99.  Defendants would have argued that Boston Scientific had devoted significant resources to the Lotus Edge before and after the commercial launch of the product in the United States, and that the Company's decision to shut down the Lotus Edge platform occurred after Defendant Mahoney's statements.  ¶ 99.  In support of these contentions, Defendants likely would have pointed to certain internal documents showing that the

11

final decision to recall the Lotus Edge was made after Defendant Mahoney's statements, as well as documents reflecting the efforts the Company made to address Lotus Edge performance issues and improve the success of the launch. *Id.* In doing so, Defendants would undoubtedly draw parallels between the facts of this case and another securities case against Boston Scientific that was dismissed at summary judgment, where the court found no reasonable jury could conclude that "[d]efendants were aware of a significant prospect for recalls until shortly before those recalls were undertaken" in light of evidence of the seemingly positive impact of several "corrective actions" the company had taken prior to the recall. *In re Boston Scientific Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 126 (D. Mass. 2010), *aff'd*, 649 F.3d 5 (1st Cir. 2011).

Further, Defendants likely would have argued that Mahoney's challenged statements were not material, and were statements of opinion and forward-looking, and thus not actionable as a matter of law. ¶ 100. *See, e.g., In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010, at *7-8 (N.D. Cal. June 14, 2023) (sustaining jury verdict for defendants on materiality grounds even though falsity had been established, noting that "substantial evidence at trial supported the conclusion that the Tweets were not material"). Underscoring these risks is the fact that the SEC examined the same alleged misstatements and conduct at issue here and declined to bring any enforcement action. ¶ 96.

In addition, Defendants would continue to argue that the alleged misstatements were not made with "scienter" as required under the Exchange Act. If Defendants had been able to show that the Company's decision to recall the Lotus Edge took place after Defendant Mahoney's last statement, that would undercut Lead Plaintiff's scienter arguments as well as their falsity arguments. Defendants would have argued Boston Scientific had taken various corrective measures and other actions to address Lotus Edge performance, and that Boston Scientific senior

12

executives only learned of significant problems with the device (or were unable to fix them) until after Defendant Mahoney's statements were made, and that he thus had a reasonable basis to describe the product as a "growth driver" that "made sense."  In addition, Defendants would have argued that Defendant Mahoney had no motive to engage in fraud because his stock sales during the Class Period were made pursuant to a Rule 10b5-1 stock trading plan which, as Judge Woodlock ruled at the motion to dismiss, were thus not indicative of scienter or suspicious under relevant case law.  *See In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 287 (D. Mass. 2022).

### (b)    Risks Concerning Loss Causation and Damages

Lead Plaintiff also faced substantial risks to establishing loss causation and proving damages.  Indeed, in the motion to dismiss opinion, Judge Woodlock held that one of the two alleged corrective disclosures was not actionable because, he explained, the alleged corrective disclosure did not "relate *to the same subject matter* as the alleged misrepresentation" and failed to demonstrate "a causal connection between the loss and the actionable misstatements."  *In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d. at 291-92 (emphasis in original).  Following this same reasoning, Defendants would likely have continued to argue that not all of the decline in the price of Boston Scientific common stock following the November 17, 2020 recall announcement was recoverable as damages based on revelation of the falsity of Mahoney's earlier statements.  ¶ 109.

Indeed, Defendants would undoubtedly have presented a well-qualified expert who would opine that the Settlement Class's damages were small or nonexistent.  While Lead Plaintiff would have had their own well-qualified expert on these issues, there is no way to predict with any degree of certainty which expert's opinions the jury would have accepted.  Had the jury accepted some or all of Defendants' expert's views, damages would been materially reduced, and potentially eliminated.  *See In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 260-61 (D.N.H. 2007) ("even if the jury agreed to impose liability, the trial would likely involve a confusing 'battle

of the experts' over damages"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400, 2010 WL 4537550, at *18 (S.D.N.Y. Nov. 8, 2010) ("The jury's verdict with respect to damages would thus depend on its reaction to the complex testimony of experts, a reaction that is inherently uncertain and unpredictable.").    The Settlement eliminates those risks and provides a certain recovery for the Settlement Class.

*      *      *

In sum, Lead Plaintiff and the class faced substantial risks to proving the liability, including loss causation, and damages.    The presence of such risks further weighs strongly in favor of approving the Settlement.

### 2.    The Settlement Is Also Fair and Reasonable in Light of Realistically Recoverable Damages

Lead Plaintiff submits that the $38.5 million Settlement is also a very favorable result when considered in relation to the maximum damages could realistically be establish at trial.    Lead Plaintiff's damages expert has estimated that ***maximum*** potential damages in this case are approximately $176 million to $207 million.    ¶ 118.    This estimated amount assumes Lead Plaintiff's complete success in establishing Defendants' liability on the remaining misstatements in the case, and that the trier of fact would reject Defendants' loss causation and damages arguments.    *Id*.    The $38.5 million Settlement therefore represents 18.5% to 22% of the maximum reasonably recoverable damages, which represents a very positive result in light of the Action's significant litigation risks.

Indeed, the recovery in this case is far higher than settlements routinely approved in other securities class actions—despite the unique risks present here.    *See, e.g.*, *CVS Caremark*, 2016 WL 632238, at *6 (approving settlement recovering 5.33% of maximum damages and noting that it was "well above the median percentage of settlement recoveries in comparable securities class

14

action cases"); *Vataj v. Johnson*, 2021 WL 5161927, at *6 (N.D. Cal. Nov. 5, 2021) (approving settlement recovering "slightly more than 2% of [] estimated damages" as "consistent with the 2-3% average recovery that the parties identified in other securities class action settlements"); *Sturm, Ruger, & Co.*, 2012 WL 3589610, at *7 (approving settlement representing approximately 3.5% of estimated damages, which exceeded the average recovery in securities cases); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) ("average settlement amounts in securities fraud class actions where investors sustained losses over the past decade . . . have ranged from 3% to 7% of the class members' estimated losses").

### 3.    All Other Rule 23(e)(2)(C) Factors Also Support Approval

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). These factors also support final approval.

First, the procedures for processing Settlement Class Members' claims and distributing the Settlement's proceeds to eligible claimants here are well-established methods that have been used in hundreds of other securities class actions. The net proceeds of the Settlement proceeds will be distributed to eligible Settlement Class Members who submit required Claim Forms and supporting documentation to the Court-appointed Claims Administrator, JND Legal Administration ("JND")—an experienced claims administration firm. JND will (a) review and process the submitted Claims under the supervision of Lead Counsel, (b) provide Claimants with an opportunity to cure any deficiencies and bring any unresolved Claims disputes to the Court, and (c) ultimately send claimants their *pro rata* share of the Net Settlement Fund. This type of claims processing is standard in securities class actions because neither Lead Plaintiff nor Boston

Scientific possess individual investors' trading data that would otherwise allow the Parties to create a "claims-free" process to distribute the Settlement funds.

Second, the relief provided by the Settlement remains adequate upon consideration of the terms of the proposed award of attorneys' fees. As discussed in the accompanying Fee Memorandum, the requested attorneys' fees of 20% of the Settlement Fund, to be paid upon the Court's approval, are fair and reasonable. Of particular note, the approval of the attorneys' fee award is separate from the approval of the Settlement, and neither Lead Plaintiff nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 16.

Last, as previously disclosed, the only agreement the Parties entered into in addition to the initial Term Sheet and the Stipulation was a confidential Supplemental Agreement entered into between Lead Plaintiff and Boston Scientific that provides Boston Scientific with the option to terminate the Settlement in the event that Settlement Class Members who timely and validly request exclusion from the Settlement Class meet a certain threshold. *See* Stipulation ¶ 37. This type of agreement is "a standard provision in securities class actions and has no negative impact on the fairness of the Settlement." *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020).

### D.    The Settlement Treats Settlement Class Members Equitably Relative to Each Other

Rule 23(e)(2)(D) requires that the Court assess whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). As discussed below in Part II, under the proposed Plan of Allocation, eligible Claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on the amount and timing of their transactions in Boston Scientific common stock. Lead Plaintiff will receive the same level of *pro rata* recovery,

16

calculated under the same Plan of Allocation provisions, as all other Settlement Class Members.

###### E.    The Reaction of the Settlement Class

The reaction of the Settlement Class to date also supports approval of the Settlement.  As of March 15, 2024, JND had mailed a total of 126,685 copies of the Notice Packet (consisting of the Notice and Claim Form) to potential Settlement Class Members and their nominees.  *See* Segura Decl. (Ex. 4), at ¶ 9. The Notice set out the essential terms of the Settlement and informed potential Settlement Class Members of, among other things, their right to opt out of the Settlement Class or object to any aspect of the Settlement.  While the deadline to request exclusion or object has not yet passed, to date, no objections to the Settlement or the Plan of Allocation and only three requests for exclusion have been received.  The deadline for submitting objections and requests for exclusion is April 2, 2024.  As provided in the Preliminary Approval Order, Lead Plaintiff will file reply papers on April 16, 2024 addressing all requests for exclusion and any objections that may be received.

### II.    THE PLAN OF ALLOCATION SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate.  *See Tyco*, 535 F. Supp. 2d at 262; *Hochstadt v. Boston Scientific Corp.*, 708 F. Supp. 2d 95, 109 (D. Mass. 2010).  A plan of allocation is fair and reasonable as long as it has a "reasonable, rational basis." *New England Biolabs, Inc. v. Miller,* 2022 WL 20583575, at *4 (D. Mass. Oct. 26, 2022).  In determining whether a plan of allocation is reasonable, "courts give great weight to the opinion of experienced counsel." *Id.*

Here, the proposed Plan of Allocation (or "Plan") was developed by Lead Counsel in consultation with Lead Plaintiff's damages expert and was set forth in full in the Notice mailed to potential Settlement Class Members.  *See* Segura Decl. (Ex. 4), Ex. A, at 17-21.  Lead Counsel respectfully submits that the Plan provides a fair and reasonable method to allocate the Net

Settlement Fund among Settlement Class Members who submit valid Claim Forms, based on the damages they suffered related to the alleged fraud.  ¶ 128.

The Plan calculates a Recognized Loss Amount for each purchase or acquisition of Boston Scientific common stock during the Class Period.  ¶ 132.  Lead Plaintiff's damages expert calculated the estimated amount of artificial inflation in the price of Boston Scientific common stock during the Class Period that allegedly was proximately caused by Defendants' alleged materially false and misleading statements and omissions by considering the price change in Boston Scientific common stock in reaction to the alleged corrective disclosure on November 17, 2020, adjusting for price changes attributable to market or industry factors that day.  ¶ 130.

In general, Recognized Loss Amounts under the Plan are calculated as the lesser of: (a) the difference between the amount of alleged artificial inflation at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price for the shares.  ¶ 132.  Claimants who purchased and sold all their Boston Scientific shares before the corrective disclosure occurred on November 17, 2020 will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions, because any loss suffered on those sales would not be the result of the alleged misstatements in the Action.  ¶¶ 131-132.[4]

The sum of a claimant's Recognized Loss Amounts for all purchases and acquisitions of Boston Scientific common stock during the Class Period is the Claimant's "Recognized Claim," and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  ¶ 133.

---

[4] In addition, consistent with PSLRA, Recognized Loss Amounts for shares of Boston Scientific common stock sold during the 90-day period after the end of the Class Period, or held to the end of that 90-day period, are further limited to the difference between the purchase price and the average closing price of the stock during that period.  ¶ 132.

Under the Plan of Allocation, the entire Net Settlement Fund will be distributed to Authorized Claimants. If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent distributions to Authorized Claimants will be conducted. Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective, will those funds be donated to one or more non-sectarian, not-for-profit, 501(c)(3) organizations, to be recommended by Lead Counsel and approved by the Court. ¶ 134.

Lead Counsel believes that the proposed Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Action. ¶ 128. Moreover, as noted above, following mailing of more than 126,000 copies of the Notice, which contained the Plan of Allocation, no objections to the Plan have been received. *See* ¶ 135; Segura Decl. ¶ 9.

## III.   THE NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice to the Settlement Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974). The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable"—i.e., it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 114 (2d Cir. 2005).

Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards. The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C.

§ 78u-4(a)(7), including: (i) an explanation of the nature of the Action and the claims asserted; (ii) the definition of the Settlement Class; (iii) the amount of the Settlement; (iv) a description of the Plan of Allocation; (v) an explanation of the reasons why the Parties are proposing the Settlement; (vi) a statement indicating the attorneys' fees and costs that will be sought; (vii) a description of Settlement Class Members' right to opt-out of the Settlement Class or to object to the Settlement, the Plan of Allocation, or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on Settlement Class Members.

As noted above, in accordance with the Court's Preliminary Approval Order, the Court-approved Claims Administrator began mailing copies of the Notice Packet to potential Settlement Class Members on January 19, 2024. *See* Segura Decl. ¶¶ 3-6. As of March 15, 2024, JND had disseminated 126,685 copies of the Notice Packet to potential Settlement Class Members and nominees. *See id*. ¶ 9. In addition, JND caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on February 6, 2024. *See id*. ¶ 10. Copies of the Notice, Claim Form, Stipulation, Preliminary Approval Order, and Complaint were made available on the settlement website maintained by JND beginning on January 19, 2024, *see id.* ¶ 11, as well as on Lead Counsel's website, *see* Graziano Decl. ¶ 125.

This combination of individual mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely circulated publication, transmitted over the newswire, and set forth on internet websites, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *State St.*, 2015 WL 127728, at *14 (approving similar notice program).

## **CONCLUSION**

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and the proposed Plan of Allocation as fair, reasonable, and adequate.

Dated: March 19, 2024

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

*/s/ Salvatore J. Graziano*
Salvatore J. Graziano (admitted *pro hac vice*)
Michael D. Blatchley (admitted *pro hac vice*)
Lauren A. Ormsbee (admitted *pro hac vice*)
Aasiya F. Mirza Glover (admitted *pro hac vice*)
Emily A. Tu (admitted *pro hac vice*)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
michaelb@blbglaw.com
lauren@blbglaw.com
aasiya.glover@blbglaw.com
emily.tu@blbglaw.com

*Lead Counsel for Lead Plaintiff
and the Settlement Class*


**DONNELLY, CONROY & GELHAAR, LLP**
T. Christopher Donnelly (BBO #129930)
Peter E. Gelhaar (BBO #18830)
Peter K. Levitt (BBO #565761)
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
Telephone: (617) 720-2880
Facsimile: (617) 720-3554
tcd@dcglaw.com
peg@dcglaw.com
pkl@dcglaw.com

*Liaison Counsel for Lead Plaintiff*

21