**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| In re BOSTON SCIENTIFIC CORPORATION SECURITIES LITIGATION | Master File No. 1:20-cv-12225-ADB |

**DECLARATION OF SALVATORE J. GRAZIANO IN SUPPORT OF**
**(I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION**
**SETTLEMENT AND PLAN OF ALLOCATION, AND (II) LEAD COUNSEL'S**
**MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

**TABLE OF CONTENTS**

TABLE OF EXHIBITS ...........................................................................................................iii

I.     INTRODUCTION ..................................................................................................... 1

II.    PROSECUTION OF THE ACTION ......................................................................... 6

       A.    Background ..................................................................................................... 6

       B.    Appointment of Lead Plaintiff and Lead Counsel, Lead Counsel's Extensive Investigation and Filing of the Operative Complaint, and the Court's Motion to Dismiss Decision........................................................................... 7

             1.    The Appointment of Lead Plaintiff, Lead Counsel, and Liaison Counsel .............................................................................................. 7

             2.    The Investigation and Filing of the Complaint ............................. 7

       C.    Defendants' Motion to Dismiss ................................................................... 10

       D.    Discovery ..................................................................................................... 13

             1.    The Pursuit of Extensive Document and Written Discovery from Defendants and Third Parties..................................................... 15

             2.    Lead Plaintiff's Review of Defendants' and Third Parties' Documents and Other Materials ................................................ 20

             3.    Defendants' Written Discovery Requests to Lead Plaintiff...................... 24

             4.    Analysis of Document Discovery and Preparation of Deposition Plan ............................................................................................ 25

             5.    Expert Discovery .......................................................................... 26

       E.    Class Certification and Modification of the Scheduling Order ........................... 28

       F.    Mediation and Settlement ............................................................................ 30

III.   RISKS OF CONTINUED LITIGATION ................................................................ 33

       A.    General Risks in Prosecuting Securities Class Actions ........................................ 34

       B.    Specific Risks Concerning this Action ................................................................. 36

             1.    Risks Associated with Proving Falsity and Materiality........................... 38

             2.    Risks Associated with Proving Scienter ................................................. 39

       3.     Risks Associated with Proving Loss Causation and Damages ................. 42

       4.     Risks After Trial ...................................................................... 43

   C.    The Settlement Amount Compared to the Likely Maximum Damages that Could Be Proved at Trial ......................................................... 45

IV.   LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE...................................... 46

V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT................................. 48

VI.   THE FEE AND EXPENSE APPLICATION .................................................... 51

   A.    The Fee Application......................................................................... 52

       1.     Lead Plaintiff Has Authorized and Support the Fee Application ............. 52

       2.     The Time and Labor of Plaintiffs' Counsel .............................. 53

       3.     The Skill and Experience of Plaintiffs' Counsel...................................... 55

       4.     Standing and Caliber of Defendants' Counsel.......................................... 55

       5.     The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases ............................... 56

       6.     The Reaction of the Settlement Class to the Fee Application ................. 57

   B.    The Litigation Expense Application .................................................... 58

VII.  CONCLUSION.................................................................................. 62

**TABLE OF EXHIBITS**

**Exhibit 1**     Declaration of Jochen Riechwald, Assistant General Counsel of Union
Asset Management Holding AG, in Support of (I) Lead Plaintiff's Motion
for Final Approval of Settlement and Plan of Allocation; and (II) Lead
Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 2**     CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS: 2023 YEAR
IN REVIEW (2024)

**Exhibit 3**     CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2023
REVIEW AND ANALYSIS (2024)

**Exhibit 4**     Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and
Claim Form; (B) Publication of the Summary Notice; and (C) Report on
Requests for Exclusion Received to Date

**Exhibit 5**     Summary of Plaintiffs' Counsel's Lodestar and Expenses

**Exhibit 5A**    Declaration of Salvatore J. Graziano on Behalf of Bernstein Litowitz Berger
& Grossmann LLP in Support of Lead Counsel's Motion for
Attorneys' Fees and Litigation Expenses

**Exhibit 5B**    Declaration of T. Christopher Donnelly on Behalf of Donnelly, Conroy &
Gelhaar, LLP in Support of Lead Counsel's Motion for Attorneys' Fees and
Litigation Expenses

**Exhibit 6**     Breakdown of Plaintiffs' Counsel's Expenses by Category

**Exhibit 7**     Compendium of Unpublished Opinions and Authority

**Exhibit 8**     *SEB Inv. Mgmt. v. Symantec Corp.*, 2021 WL 1540996 (N.D. Cal. Apr. 20,
2021)

I, SALVATORE J. GRAZIANO, declare as follows:

1.      I am an attorney admitted *pro hac vice* to this Court.  I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or "Lead Counsel").  BLB&G was appointed Lead Counsel for Lead Plaintiff Union Asset Management Holding AG ("Lead Plaintiff" or "Union") and Class Counsel for the Settlement Class in the above-captioned Action (the "Action").  I submit this declaration in support of Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Motion"), and Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee Motion").  I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of this action and could and would testify competently thereto.[1]

## I.      INTRODUCTION

2.      The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $38.5 million, plus interest, for the benefit of the Settlement Class.  The Settlement Amount has been paid into an escrow account and is earning interest.  As detailed below, the Settlement provides a significant benefit to the Settlement Class by conferring a substantial, certain, and immediate recovery while avoiding the risks of continued litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount after years of additional litigation, appeals, and delay.

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated December 14, 2023 (ECF No. 152-1) (the "Stipulation"), which was entered into by and among (i) Lead Plaintiff, on behalf of itself and the Settlement Class, and (ii) defendant Boston Scientific Corporation ("Boston Scientific") and defendants Michael F. Mahoney, Daniel J. Brennan, Shawn McCarthy, Ian Meredith, Joseph M. Fitzgerald, Kevin Ballinger, and Susan Vissers Lisa (collectively, the "Individual Defendants" and, with Boston Scientific, "Defendants").

3.      The proposed Settlement is the result of extensive efforts by Lead Plaintiff and

Lead Counsel, which included, among other things:

(i)     conducting an extensive investigation into the alleged fraud, including interviews of over 140 former employees of Boston Scientific, and a thorough review of all publicly available information about Boston Scientific, including Boston Scientific's filings with the U.S. Securities and Exchange Commission ("SEC"), analyst reports, conference call transcripts, and news articles;

(ii)    drafting a detailed consolidated complaint based on Lead Counsel's detailed factual investigation and consultation with device and industry, insider trading, and damages experts;

(iii)   opposing Defendants' motion to dismiss the Complaint, which was accompanied by more than 1,500 pages of exhibits, through detailed briefing and two hours of oral argument;

(iv)    negotiating a case schedule, joint discovery plan, and ESI protocol, and preparing and responding to extensive discovery requests, including requests for the production of documents, interrogatories, and requests for admission and serving document subpoenas on four non-parties;

(v)     reviewing and analyzing over 224,000 pages of documents obtained from Defendants and third parties, preparing numerous memoranda, chronologies, and other work product concerning the relevant evidence to support the claims alleged, and developing a deposition plan and preparing for depositions of fact witnesses;

(vi)    drafting and filing Lead Plaintiff's motion for class certification, including consulting with financial economics experts who prepared a report concerning the efficient market for Boston Scientific common stock, defending the deposition of a representative of Lead Plaintiff, drafting and filing Lead Plaintiff's reply brief in further support of class certification, and arguing Lead Plaintiff's motion for class certification;

(vii)   working extensively with experts in the areas of financial economics (including loss causation, damages, and market efficiency); insider trading; the cardiac medical device industry; transcatheter aortic valve replacement ("TAVR") procedures and products; and medical device regulations and manufacturer practices and obligations concerning their interactions with device regulators;

(viii)    participating in two mediation sessions with James E. McGuire, an experienced mediator, which included the exchange of detailed mediation statements; and

(ix)     drafting and negotiating a Term Sheet, the Stipulation setting out the terms of the Settlement, and related documentation.

4.     As a result of these efforts, Lead Plaintiff and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they achieved the proposed Settlement.  Indeed, the $38.5 million settlement represents between 18.5% to 22% of investors' maximum potentially recoverable damages under Lead Plaintiff's expert's analysis (depending on whether class members' gains on sale of pre-Class Period holdings are offset against their losses).  Defendants have vigorously denied that they made any false or misleading statements and omissions regarding the Lotus Edge device described in the pleadings, and have asserted that those statements could not have been actionable because the Company did not decide to recall the Lotus Edge until after the statements at issue in the Action.  Moreover, the SEC investigated the precise allegations here, but subsequently dropped the investigation without taking any enforcement action.  In light of the substantial recovery and the significant continuing risks of litigation, Lead Plaintiff and Lead Counsel believe that the proposed $38.5 million Settlement here is an excellent result for the Settlement Class.

5.     The Settlement was achieved only after arm's-length negotiations between the Parties, including two mediation sessions with James E. McGuire, an experienced mediator.  As described further below, the mediation process involved significant disputed issues and hard-fought, arm's-length negotiations.  In advance of each mediation session, Lead Plaintiff submitted a detailed mediation statement to Boston Scientific and Mr. McGuire, including supporting exhibits compiled from documents produced in the course of discovery.  No agreement was

3

reached at either session.  In fact, the Parties only reached an agreement in principle to settle the Action for $38.5 million following the conclusion of the second mediation session.

6.  In addition, Lead Plaintiff Union is a sophisticated institutional investor that actively participated in the Action and closely supervised the work of Lead Counsel, and Union's representatives were actively involved in overseeing the litigation and settlement negotiations.  *See* Declaration of Jochen Riechwald, Assistant General Counsel of Union Asset Management Holding AG ("Riechwald Decl."), attached hereto as Exhibit 1, at ¶¶ 2-7.  Lead Plaintiff fully endorses the approval of the Settlement.  *Id.*  ¶ 8.  Union's close attention to and oversight of this action, as well as its approval of the Settlement, support the reasonableness of the Settlement.  In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give control over securities class actions to sophisticated investors and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts by improving the quality of representation in this type of case.  H.R. Conf. Rep. No. 104-369, at *34 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 733.

7.  Lead Plaintiff and Lead Counsel believe that the Settlement is in the best interests of the Settlement Class.  Due to their substantial efforts, Lead Plaintiff and Lead Counsel are well-informed of the strengths and weaknesses of the claims and defenses in the Action, and they believe that the Settlement represents an excellent outcome for the Settlement Class.

8.  As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Lead Plaintiff's damages expert, provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court.  The proposed Plan of Allocation provides for

distribution to eligible claimants on a *pro rata* basis, fairly based on losses attributable to the wrongdoing alleged in the Complaint.

9.      Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risk.  Lead Counsel prosecuted this case on a fully contingent basis and advanced all litigation-related expenses, and thus bore substantial risk of an unfavorable result. For its efforts in achieving the Settlement, Lead Counsel is applying for an award of attorneys' fees for all Plaintiffs' Counsel[2] in the amount of 20% of the Settlement Fund.  The requested fee has been endorsed by Lead Plaintiff and is reasonable and well within the range of fees that courts in this Circuit and elsewhere have awarded in securities class actions and other complex class actions with comparable recoveries on a percentage basis.  Moreover, the requested fee is *less* than Plaintiffs' Counsel's total lodestar (i.e., the value of Counsel's work based on the amount of hours worked and Counsel's hourly rates as described herein).  Specifically, the 20% fee sought here amounts to just 90% of Plaintiffs' Counsel's lodestar—or, in other words, a "negative" 0.9 multiplier of the lodestar, which is below the range of multipliers typically awarded in class actions like this one with significant contingency risks.

10.      Lead Counsel's Fee and Expense Application also seeks payment of Litigation Expenses incurred by Plaintiffs' Counsel in connection with the institution, prosecution, and settlement of the Action, and payments to Lead Plaintiff for its costs and expenses directly related to their representation of the Settlement Class, as authorized by the PSLRA.

11.      For all of the reasons discussed in this Declaration and in the accompanying motions and declarations, including the quality of the result obtained and the numerous significant

---

[2] Plaintiffs' Counsel are Lead Counsel BLB&G and Liaison Counsel Donnelly, Conroy & Gelhaar, LLP.

litigation risks discussed fully below, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are "fair, reasonable, and adequate" in all respects, and that the Court should approve them under Federal Rule of Civil Procedure 23(e). For similar reasons, and for the additional reasons discussed below, we respectfully submit that Lead Counsel's Fee and Expense Application is also fair and reasonable and should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Background

12.    Lead Plaintiff alleges that, from September 16, 2020 through November 16, 2020, inclusive (the "Class Period"), Defendants made materially false and misleading statements concerning Boston Scientific's Lotus Edge medical device, a transcatheter aortic valve replacement ("TAVR") device used to treat patients with heart disease.

13.    Lead Plaintiff alleges that the price of Boston Scientific common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements, and that the price of the stock declined when the truth was finally revealed on November 17, 2020, when Boston Scientific announced (before the opening of the market) that it was recalling the Lotus Edge device and discontinuing the platform. *See* Complaint (ECF No. 44), at ¶¶ 181, 192. As a result of this disclosure, Boston Scientific's stock price declined by $3.00 per share, or approximately 8%, from a closing price of $38.03 on November 16, 2020, to a closing price of $35.03 per share on November 17, 2020 on the second-largest single-day trading volume in almost five years. *Id.* ¶ 192.

B.    **Appointment of Lead Plaintiff and Lead Counsel, Lead Counsel's Extensive Investigation and Filing of the Operative Complaint, and the Court's Motion to Dismiss Decision**

1.    **The Appointment of Lead Plaintiff, Lead Counsel, and Liaison Counsel**

14.    In December 2020, a class action alleging violations of the federal securities laws against Boston Scientific and certain of its officers was filed in the United States District Court for the District of Massachusetts (the "Court"). *See Errichiello v. Boston Scientific Corporation*, Case No. 1:20-cv-12225-DPW (D. Mass.). A related action was filed in the United States District Court for the Eastern District of New York and later transferred to the Court. *See Jevons v. Boston Scientific Corporation*, Case No. 1:21-cv-10033-NMG (E.D.N.Y.).

15.    On February 2, 2021, Union moved for appointment as lead plaintiff in the Action pursuant to the PSLRA and for appointment of its selected counsel as lead counsel and liaison counsel. ECF Nos. 16, 18, 24. Three other persons or entities filed competing motions for appointment as lead plaintiff the same day. ECF Nos. 17, 19-23, 25.

16.    On March 30, 2021, the Honorable Douglas P. Woodlock consolidated the actions and ordered that all future filings in the consolidated action be made in Case No. 1:20-cv-12225, under the caption *In re Boston Scientific Corporation Securities Litigation*. ECF No. 31. The Court also appointed Union as Lead Plaintiff and approved BLB&G as Lead Counsel and Donnelly, Conroy & Gelhaar, LLP as Liaison Counsel. *Id*.

2.    **The Investigation and Filing of the Complaint**

17.    Lead Counsel undertook an extensive investigation into the alleged fraud and potential claims that could be asserted by Lead Plaintiff in the Action. This investigation began prior to the Court's appointment of Lead Plaintiff and continued through preparation of the Complaint. The investigation included a careful review and analysis of: (i) Boston Scientific's public filings with the SEC; (ii) Boston Scientific press releases and other public statements;

7

(iii) transcripts of Boston Scientific investor conference calls; (iv) research reports by financial analysts and news reports concerning Boston Scientific; (v) other publicly available sources; (vi) consultations with relevant experts and consultants; and (vii) communications with and review of documents from former employees of Boston Scientific and other sources.

18. In connection with its investigation, Lead Counsel and its in-house investigators located former employees of Boston Scientific who might have relevant information pertaining to the claims asserted in the Action. This included contacting over 700 former Boston Scientific employees who were believed to have potentially relevant information. Lead Counsel and/or its in-house investigators spoke to 142 of these individuals. Lead Counsel ultimately included detailed information received from nine of these former Boston Scientific employees in the Complaint concerning the Lotus Edge's poor sales, patient safety issues, high cost, and extensive training required to use the device.

19. In connection with the preparation of the Complaint, Lead Counsel consulted with Dr. Eric Horlick of the Toronto General Hospital, who is an adult interventional cardiologist with substantial experience conducting TAVR procedures. Lead Counsel consulted with Dr. Horlick about, among other things, physician experience, clinical, regulatory, and other data related to medical devices used in TAVR procedures.

20. Lead Counsel also consulted with Daniel J. Taylor, Ph.D., Arthur Andersen Associate Professor at the Wharton School, University of Pennsylvania, who has extensive experience in corporate disclosures and insider trading. Lead Counsel consulted with Professor Taylor about, among other things, executive compensation, insider trading, and the use of Rule 10b5-1 plans at Boston Scientific.

21.    Lead Counsel further consulted with Global Economics Group, LLC, a firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of context, including securities class actions.  Lead Counsel consulted with Global Economics Group, LLC about, among other things, the impact of Defendants' alleged misstatements on the market price of Boston Scientific's common stock and the damages suffered by Boston Scientific shareholders.

22.    On June 4, 2021, Lead Plaintiff filed and served its 135-page Amended Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint").  The Complaint asserted claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act.  ECF No. 44.  Among other things, the Complaint alleged that Defendants made materially false and misleading statements about Boston Scientific's Lotus Edge medical device, including about the Lotus Edge's ability to drive revenues and the safety of the device.  Specifically, Lead Plaintiff alleged that Defendant Mahoney told investors on September 16, 2020 that the device remained an "important growth driver" for Boston Scientific—when, in truth, he knew the Company had already concluded that it would shut down the business due to the extraordinary costs of manufacturing and selling the product.  *See* Complaint ¶ 160.  Lead Plaintiff also alleged that Defendant Mahoney then told investors on October 28, 2020 that pursuing the Lotus Edge together with another heart valve (the "Acurate" valve) was strategically sound and that "the two-valve strategy makes sense"—when, in truth, the Company had already decided to terminate Lotus.  *Id*. ¶ 320.  The Complaint further alleged that the price of Boston Scientific's common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements and declined when the truth was revealed

9

at the end of the Class Period when the Company announced that it was recalling the Lotus Edge device and discontinuing the platform.

## C.   Defendants' Motion to Dismiss

23.   On July 19, 2021, Defendants filed their 35-page motion to dismiss the Complaint, together with an accompanying declaration attaching 50 exhibits totaling more than 1,500 pages of material. ECF Nos. 53-60. In their motion, Defendants attacked all parts of the Complaint as inadequate to plead securities fraud. In particular, Defendants argued that:

- Lead Plaintiff failed to allege an actionable misstatement or omission, including because Lead Plaintiff failed to allege with particularity that the decision to shut the Lotus Edge down was made earlier than November 2020 or that any Defendant intentionally delayed announcing the shutdown to avoid certain charges and mislead investors;

- many of the alleged misstatements, including statements concerning the Lotus Edge's business prospects, were non-actionable corporate optimism, opinion, forward-looking, or financial result statements;

- Defendants had no affirmative duty to disclose additional information about the Lotus Edge's sales, safety, ease of use, or manufacturability;

- the former employees that Lead Plaintiff relied on to establish falsity and scienter were only low-level, non-management employees who would not have known about Defendants' knowledge or states of mind, and in any event their allegations were insufficient because they, among other things, lacked specificity and described adverse patient outcomes that were reported to the FDA (the reports of which were publicly available);

- Lead Plaintiff's other scienter allegations failed, including because the Complaint only alleged access to information due to Defendants' positions within the Company, not Defendants' review of it, and because the vast majority of Defendants' stock sales were executed pursuant to Rule 10b5-1 trading plans; and

- the Section 20(a) claims should be dismissed for failure to plead an underlying violation.

24.   On August 30, 2021, Lead Plaintiff filed its opposition to Defendants' motion. ECF No. 61. In summary, Lead Plaintiff's opposition argued that:

10

- the Complaint sufficiently alleged that Defendants made materially false and misleading statements, including because the Lotus launch was experiencing poor results, the device was too complex, "clinically unsafe," and jeopardized patient safety, and Defendants planned to shut down the Lotus Edge;

- Defendants' statements concerning Lotus Edge's business prospects were not non-actionable puffery, protected opinions, or protected by the safe harbor, and Defendants' financial results statements were actionable;

- the Complaint adequately alleged Defendants' scienter, including through Defendants' admissions that the Company had made the decision to exit the Lotus Edge months before the recall, Defendants' denials and responses to analyst questions, Defendants' personal involvement and access to internal data showing the Lotus Edge's poor sales, the execution of Rule 10b5-1 trading plans after Boston Scientific determined that the Lotus Edge would be discontinued, Defendants' motivation to delay disclosure of the Lotus Edge's failure due to its debt load, and Defendants' resignations;

- the Complaint's allegations of scienter—including Defendants' admissions about poor Lotus Edge sales, their knowledge that the Lotus Edge was complex and unsafe, and their knowledge that the Lotus Edge was not commercially viable—were corroborated by the accounts of former employees who were involved in selling the Lotus Edge, analyzing sales numbers, manufacturing the product, attending Lotus Edge procedures and meetings with the Defendants, and developing its replacement; and

- the Complaint pleaded Section 20(a) control person claims as to all of the Individual Defendants.

25. On September 20, 2021, Defendants filed a reply in further support of their motion to dismiss, together with a supporting declaration. ECF Nos. 63-64. Defendants' reply reiterated the arguments made in their motion to dismiss and responded to the arguments in Lead Plaintiff's opposition brief.

26. On November 29, 2021, the Court held an approximately two-hour oral argument on Defendants' motion to dismiss. ECF No. 68.

27. Following oral argument, on December 23, 2021, Lead Plaintiff submitted a supplemental letter brief highlighting a recent First Circuit Court of Appeals decision bearing upon

11

the arguments raised in Defendants' motion to dismiss.  ECF No. 70.  On December 27, 2021, Defendants filed a responsive submission.  ECF No. 71.

28.    On January 3, 2022, Defendants submitted a notice informing the Court that the U.S. Securities and Exchange Commission ("SEC") concluded its investigation into whether the Company violated any federal securities laws with respect to its discontinuation of its Lotus Edge product, and that the SEC did not intend to recommend an enforcement action against the Company.  ECF No. 72.  By way of background, a month after the Company's decision to recall the Lotus Edge, the Boston Regional Office of the SEC initiated an investigation into Boston Scientific's Lotus Edge disclosures, submitting an information request for documents and information related to the statements at issue in this action and Boston Scientific's decision to recall and discontinue Lotus.  Complaint ¶ 22.  Two months later, the SEC issued a second request for documents and information.  *Id*.  On January 4, 2022, Lead Plaintiff filed a submission in response to Defendants' notice.  ECF No. 73.

29.    On December 20, 2022, the Court entered its Order denying, in part, and granting, in part, Defendants' motion to dismiss the Complaint.  ECF No. 74.  The Court denied the motion with respect to the Section 10(b) claim against Defendants Boston Scientific and Mahoney and as to the Section 20(a) claim, and granted the motion with respect to Lead Plaintiff's Section 10(b) claim against Defendants Fitzgerald, Brennan, McCarthy, Ballinger, Meredith, and Lisa.  In particular, the Court held the Complaint sufficiently alleged that Defendant Mahoney's misrepresentations in September and October 2020 were materially false and misleading in violation of Section 10(b) of the Exchange Act.  The Court held that Defendant Mahoney's positive statements about Lotus could be found to be materially false and misleading because, at the time they were made, "Defendants were in the process of critically evaluating the Lotus platform" and

12

"Boston Scientific's leadership had either already decided the Lotus platform was unsalvageable or was on the cusp of doing so in a matter of weeks." *In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 283 (D. Mass. 2022).  The Court also sustained the allegations related to Defendant Mahoney's scienter because, even though he may not have been a "party to the decision to terminate the Lotus platform," he was likely "privy to, or at least aware of, discussions surrounding Lotus during this time period." *Id.* at 289.

30.      As a result of the Court's dismissal of all but two of the dozens of misstatements initially alleged in the Complaint in its decision on Defendants' motion to dismiss, the operative class period in the Action was shortened from the 21-month period alleged in the Complaint to the period from September 16, 2020 through November 16, 2020, inclusive (the "Class Period").

31.      On January 20, 2023, Defendants filed their answer to the Complaint.  ECF No. 81. Defendants strongly denied all allegations against them, as well as any liability to Lead Plaintiff and the class, and asserted 24 affirmative defenses, including (among other things) that (i) Defendants did not misrepresent any alleged fact or omit any alleged fact that Defendants were under a duty to disclose; (ii) even if such misrepresentations and were made, they were not material to the investment decisions of a reasonable investor; and (iii) there was no loss causation or damages.

### D.      Discovery

32.      Following the Court's decision on the motion to dismiss, the Parties immediately began to negotiate several matters set forth in their Joint Statement pursuant to Rules 16(b) and 26(f) of the Federal Rules of Civil Procedure and Local Rule 16, which was filed on January 20, 2023.  ECF No. 80.  As reflected in the Joint Statement, the Parties had significant disputes as to several key issues, including the deadlines to be set in this case for discovery and pre-trial motions. Lead Plaintiff's proposed schedule provided approximately 12 months for fact and expert

discovery, while Defendants' proposed schedule provided approximately 12 months for fact and expert discovery as well as dispositive motion practice. The Parties also disagreed on whether the discovery event limitations set forth in Local Rule 26.1(c) should apply. Lead Plaintiff proposed 25 interrogatories, five separate sets of requests for production, 100 requests for admission, and 20 depositions per side, while Defendants believed that the discovery limitations set forth in Local Rule 26.1(c) should apply. In support of their positions, Defendants argued that the Court's December 20, 2022 decision on Defendants' motion to dismiss substantially narrowed the scope of the case, noting that the Court "held actionable only *two* of the sixty-three statements that Plaintiff alleged to be false and misleading in its amended complaint." ECF No. 80 at 2.

33.    On January 23, 2023, the Court held a conference during which the Parties presented argument on their positions concerning the disputed pretrial matters set forth in the Joint Statement. At the conference, the Court accepted Defendants' proposed deadlines for class certification briefing, written discovery requests, the completion of fact discovery, and expert disclosures. The Court further ordered the Parties to file a joint status report by April 14, 2023 and scheduled another status conference for April 18, 2023. *See* ECF No. 82.

34.    At around the same time, the Parties began negotiating a protocol for the production of electronically stored information ("ESI") and a protective order governing the treatment of documents and other information produced in discovery. The Parties submitted the ESI protocol and protective order to the Court on February 28, 2023 (ECF No. 85), which the Court entered on March 7, 2023 (ECF Nos. 86-88).

1.      **The Pursuit of Extensive Document and Written Discovery from Defendants and Third Parties**

35.     As provided in the schedule approved by the Court at the initial discovery conference on January 23, 2023, the Parties began pursuing fact discovery immediately after the Court decided Defendants' motion to dismiss.

36.     On January 17, 2023, the Parties exchanged their Initial Disclosures pursuant to Rules 26 and 23 of the Federal Rules of Civil Procedure.  Due in part to Lead Plaintiff's extensive investigation into the claims alleged in the Complaint, at the very outset of discovery, Lead Plaintiff was able to identify 33 current and former Boston Scientific employees who Lead Plaintiff believed were likely to have discoverable information concerning the allegations in the Complaint. By contrast, Defendants did not identify any witnesses beyond the named Defendants, thus requiring Lead Plaintiff to conduct extensive additional discovery to identify relevant individuals and documents.

37.     On January 27, 2023, Lead Plaintiff served its first requests for the production of documents on Defendants. Lead Plaintiff requested that Defendants produce documents concerning, among other things, the Lotus Edge recall, including the decision to recall the Lotus Edge; the commercial launch and performance of the Lotus Edge; and the manufacturing of the Lotus Edge.  After determining that it needed certain documents from prior to the Class Period to effectively litigate the case, Lead Plaintiff sought documents from a time period of approximately 17 months, extending from November 1, 2019 through March 30, 2021.  On the same day, Lead Plaintiff also served its first set of interrogatories on Defendants.  Lead Plaintiff's initial interrogatories focused on identifying additional custodians, including individuals involved in (i) the decision to recall the Lotus Edge, (ii) forecasting or analyzing of the Lotus Edge's commercial viability, investigating adverse event reports, and (iii) overseeing or managing the

15

commercial launch of the Lotus Edge.  Lead Plaintiff's interrogatories also requested all custodial locations of documents and communications responsive to Lead Plaintiff's first set of requests for production of documents, including email, messaging, chat, shared drives, and other electronic storage locations.  Likewise, Lead Plaintiff's interrogatories requested all "noncustodial" locations of electronic or hard-copy materials that may contain responsive documents.

38.     On February 27, 2023, Defendants served their responses and objections to Lead Plaintiff's first requests for production.  Defendants also served responses and objections to Lead Plaintiff's first set of interrogatories, largely refusing to provide answers to them.

39.     In the months that followed, Lead Counsel engaged in numerous meet-and-confers and extensive negotiations with Defendants' counsel over the scope and adequacy of Defendants' discovery responses, including relating to search terms to be used, custodians whose documents should be searched, the types of documents that should be searched, the applicable timeframe, and other parameters.

40.     In connection with these and other discovery negotiations, the Parties had several significant discovery disputes.  At a high level, Lead Plaintiff sought several categories of documents, including, among other things, documents related to patient safety issues, adverse events, physician training and proctoring, and employee, doctor, or patient complaints concerning the Lotus Edge; Defendants' compensation and trading in Boston Scientific stock; and controls and procedures applicable to Boston Scientific's disclosure of the recall, while Defendants aggressively sought to limit production of documents and materials, arguing (among other things) that discovery should focus on when Defendant Mahoney became aware that a decision had been reached to terminate the Lotus platform.  In particular, Defendants refused to produce documents concerning patient safety and adverse events involving the Lotus Edge, arguing (among other

16

things) that the Court had found Lead Plaintiff's allegations relating to those issues insufficient, and that those issues were outside the scope of the case. *See In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d at 279-81. Defendants also sought to limit their production of documents and materials to a time period extending to two and a half months prior to Defendant Mahoney's first statement. In addition to these overarching differences in position, the Parties contested numerous specific details bearing on the scope of discovery, such as the appropriate sets of custodians and search criteria to apply in identifying potentially relevant documents. Further, Defendants refused to search and produce personal emails and text messages. The Parties' disputes concerning the scope of document discovery were discussed in four meet-and-confers and in eleven letters from January through April 2023.

41.    While the Parties were able to reach agreement on certain issues, including the production of documents concerning patient safety issues and adverse events involving the Lotus Edge, they were forced to bring several others to the Court. Months into discovery, the Parties continued to dispute the appropriate time period for Defendants' productions and whether the collection, searching, and review of personal emails and text messages should be included in Defendants' custodial review. The Parties also disagreed on a modification of the Court's schedule for discovery and pre-trial motions previously entered on January 23, 2023. *See* ECF No. 82. At that point, Defendants had only made one production of documents on March 31, 2023, which consisted of documents Defendants had already produced to the SEC as part of the SEC's investigation into Boston Scientific's Lotus Edge disclosures. Importantly, Defendants had refused to produce these documents throughout February 2023, despite Lead Plaintiff's request for them to do so. Accordingly, Lead Plaintiff proposed a modest extension of the schedule to account for a new document completion deadline of May 31, 2023, while maintaining all of the remaining

17

deadlines under the same "intervals" that were approved by the Court in its January 23, 2023 scheduling order. The Parties were unable to reach agreement on these issues, and they set forth these disputes in the joint status report filed by the parties on April 14, 2023, in advance of the April 18, 2023 scheduling conference. ECF No. 89.

42.     On April 14, 2023, Lead Plaintiff served its second set of interrogatories on Defendants. These sought detailed information concerning (among other things) the Company's policies and controls applicable to complaints received for the Lotus Edge, the Company's policies and controls applicable to corrective actions taken with respect to any Class III medical device, and the Company's process for post-market surveillance of the Lotus Edge, as well as the bases of Defendants' affirmative defenses. Defendants served responses and objections to Lead Plaintiff's second set of interrogatories on June 2, 2023.

43.     In addition to serving two sets of interrogatories, on April 14, 2023, Lead Plaintiff served its first set of requests for admission on Defendants. Lead Plaintiff's requests for admission focused on, among other things, the performance and profitability of the Lotus Edge, the adverse events associated with the Lotus Edge's product design and patient safety risks, and Defendant Mahoney's stock sales, as well as arguments Lead Plaintiff anticipated making in its motion for class certification. On June 2, 2023, Defendants responded and objected to those requests for admission.

44.     Lead Plaintiff carefully reviewed Defendants' responses to the interrogatories and requests for admission to tailor Lead Plaintiff's discovery efforts, shape and inform Lead Plaintiff's factual and expert analyses, and refine Lead Plaintiff's arguments in support of the motion for class certification.

45.    On April 18, 2023, the Court held a conference by Zoom, during which the Parties presented argument on their positions concerning the disputed pretrial matters set forth in the Joint Status Report.  The Court declined to adjust the January 23, 2023 scheduling order and stated that the Court would not entertain any motion practice or other initiatives related to the discovery schedule and its scope prior to June 14, 2023.  ECF No. 90.  After the conference, the Parties continued to work diligently and in good faith to complete fact discovery and resolve all outstanding discovery disputes.

46.    Ultimately, as described above, after weeks of negotiations, numerous meet-and-confers, and, in certain instances, bringing discovery issues to the Court, Lead Plaintiff succeeded in obtaining a large volume of documentary evidence from Defendants.  Notably, Lead Plaintiff obtained agreements from Defendants to produce personal emails and text messages following the April 18, 2023 conference.  This was a significant victory for Lead Plaintiff and a direct result of Lead Plaintiff's diligence in discovery.

47.    As Lead Counsel continued to receive and review documents from Defendants, Lead Counsel identified several third parties who it determined likely had relevant information. Thus, in addition to seeking discovery from Defendants, Lead Plaintiff served subpoenas on four third parties.  These third parties included former Boston Scientific employees and regulatory agencies, including the U.S. Food and Drug Administration, and these documents proved important to Lead Plaintiff's prosecution of the action.  For example, documents from Boston Scientific's regulator helped bolster evidence supporting Lead Plaintiff's falsity arguments, and text messages obtained from former employees helped bolster evidence supporting Lead Plaintiff's scienter arguments.

19

48. In total, Defendants and third parties together produced over 224,000 pages of documents to Lead Plaintiff. As Lead Counsel received documents, it reviewed and analyzed those documents through regular team meetings, running targeted searches aimed at locating the most relevant documents, analyzing the document trail on several key issues, and creating timelines of events and memoranda concerning key themes germane to the case. The magnitude and complexity of the documents was substantial, and included, among other things, emails, text messages, presentations, regulatory documentation, internal financial analyses, and board materials.

### 2. Lead Plaintiff's Review of Defendants' and Third Parties' Documents and Other Materials

49. As part of its discovery efforts, Lead Counsel assembled a team of ten staff attorneys. This team included many lawyers who have worked with Lead Counsel for years and have substantial experience on other significant class actions. Their biographies, along with those of all lawyers who worked on this case, are attached hereto in Exhibit 5A-3. As explained below, this team was integral in helping Lead Counsel review and analyze the documentary record, assist expert witnesses, and compile the strongest evidentiary support for Lead Plaintiff's claims.

50. Throughout this process, Lead Counsel ensured that the review and analysis of documents was conducted efficiently. Lead Counsel eschewed a "linear" review, whereby Lead Plaintiff's review team would attempt to review each and every document Defendants and third parties produced. Instead, Lead Plaintiff constructed a highly focused process by creating searches to identify documents likely to be related to key themes that were relevant to specific claims at issue in the case. Lead Plaintiff developed this process by closely reviewing notes from its pre-Complaint investigation and numerous other materials, such as information provided by Defendants in their interrogatory responses and during the course of meet-and-confers and

20

information provided by Lead Plaintiff's experts.  Lead Plaintiff further continuously updated the search protocols as it discovered more information throughout the course of discovery.  Thus, Lead Plaintiff took significant steps to ensure that its review of materials produced in this litigation was highly focused and efficient and would not waste time or other resources.

51.    As part of this process, Lead Counsel reviewed, analyzed, and categorized the documents in the case's electronic database.  Before beginning, Lead Counsel developed a review protocol, issue "tags," and guidelines for identifying "hot" documents, as well as a written manual with guidelines for the review and "coding" of documents.  Using these tools, Lead Counsel tasked its attorneys with reviewing documents, with the documents most likely to be "hot" put into prioritized batches for review.  Lead Counsel's review and analysis of those documents included substantive analytical determinations as to the importance and relevance of each document— including whether each document was "hot," "highly relevant," "relevant," or "irrelevant."  For important case documents, attorneys documented their substantive analysis of the documents' relevance and import by making notations on the document review system, explaining what portions of the documents were important, how they related to the issues in the case, and why the attorney believed that information to be significant.  Attorneys also "tagged" the specific issues that were involved in each document, such as product design, patient safety, the profitability of the Lotus Edge, and the two-valve strategy.

52.    Throughout its review, Lead Counsel also analyzed the adequacy and scope of the document productions by Defendants and third parties.  For example, attorneys reviewed privilege redactions and entries in Defendants' privilege logs to assess whether Defendants redacted or withheld potentially non-privileged information.  Lead Counsel also reviewed the productions to determine whether they substantively tracked what had been agreed to be produced in response to

document requests.  Where Lead Counsel identified deficiencies in a document production, Lead Counsel challenged Defendants or the producing party to set forth the basis for privilege or otherwise address and correct the deficiency.

53.     In addition to regular communications that occurred throughout the review process, attorneys who primarily focused on the document review participated in weekly meetings with the full litigation team.  In advance of these meetings, "hot" documents and documents that raised questions for discussion that had recently been reviewed and analyzed were compiled and circulated to the broader team.  At the meetings, Lead Counsel discussed those documents, including the reasons they were identified as "hot," attorneys asked questions and discussed similar documents that had been reviewed, and the team generated ideas for research projects and work product following up on open issues.  These efforts ensured that the entire litigation team learned of and understood the documentary evidence being developed, provided an opportunity for Lead Counsel to further refine its legal and factual theories, focused the document-review team on developing other supporting evidence, and enabled Lead Counsel to ensure that documents were reviewed consistently.  Lead Counsel also often conducted follow-up research and drafted analyses concerning topics of interest that arose at these meetings.  In total, Lead Counsel's team research concerned dozens of discrete issues, including in-depth analyses concerning, among other things, the evolution of the Lotus Edge business, the timing of Boston Scientific executives' decision to shut down the Lotus program, and patient injuries and deaths associated with a repeating adverse event.

54.     In addition, Lead Counsel's document review efforts supported Lead Plaintiff's efforts to resolve a number of the Parties' discovery disputes.  As just one example, on July 21, 2023, Defendants informed Lead Plaintiff that they sought to claw back portions of certain

documents that Defendants claimed were privileged. Pursuant to the Parties' stipulated protective order, Lead Counsel reviewed the designated redactions to the documents and, upon review, disagreed with Defendants' privilege assertions for two documents. On August 21, 2023, Lead Plaintiff requested the Court's direction for resolving this discovery dispute concerning Defendants' privilege assertions, and on August 22, 2023, the dispute was referred to Magistrate Judge Jennifer C. Boal. ECF No. 132. That same day, Defendants filed a responsive submission, and Magistrate Judge Boal ordered Defendants to file a motion for protective order in connection with the privilege dispute no later than September 1, 2023 and further ordered that Lead Plaintiff's response would be due within 14 days of the date on which Defendants filed the motion. ECF Nos. 133-34. On September 1, 2023, Defendants filed a motion for protective order concerning the two documents. ECF Nos. 136-38. After the Parties jointly requested a one-week extension for Lead Plaintiff to file its response to the motion, which the Court granted on September 18, 2023 (ECF Nos. 142-44), on September 22, 2023, Defendants withdrew their pending motion for a protective order (ECF No. 145).

55. Further, Lead Counsel prepared chronologies of events, and maintained a central repository of key documents organized by issue, which it continually updated and refined as the team's knowledge of issues expanded. This step enabled attorneys to quickly and efficiently access critical documents necessary to prepare for depositions.

56. At the outset of Lead Counsel's document review efforts, Lead Counsel determined that it would be most efficient to utilize in-house litigation support resources at BLB&G, which provided a far more cost-effective document review platform and algorithm-based "technology-assisted review" ("TAR") (also known as "predictive coding") than those provided by third-party vendors. The TAR software enabled Lead Counsel to further streamline the review by "learning"

23

the coding of documents as they were reviewed and applying that information to subsequently prioritize further review. While Lead Counsel could not rely on this algorithm to identify all of the necessary documents to prosecute this Action, it did use the algorithm to further streamline its review and to prioritize the review of documents most likely to be relevant to the claims at issue in the case.

### 3.    Defendants' Written Discovery Requests to Lead Plaintiff

57.    Defendants served their first set of document requests to Lead Plaintiff, comprising 28 document requests, on January 17, 2023. Lead Plaintiff responded and objected to those requests on February 16, 2023. In connection with Defendants' document requests, Lead Plaintiff engaged in extensive meet-and-confers and exchanged correspondence with Defendants to discuss the scope of Lead Plaintiff's responsive document production.

58.    Despite significant disagreements on the scope of Lead Plaintiff's responsive document production, Lead Plaintiff immediately began gathering potentially relevant and responsive materials in order to meet the March 31, 2023 deadline for the substantial completion of document production. While negotiating the scope of Lead Plaintiff's document production with Defendants, Lead Counsel worked with Union to gather these potentially relevant and responsive materials and conducted a robust collection. Lead Counsel then reviewed those documents carefully, including translating certain German-language documents into English. Because Union is an asset manager based in Germany, a significant portion of Union's potentially relevant and responsive materials were in German. Accordingly, several members of the team of staff attorneys assembled for this case possess German language expertise. After this review, Lead Counsel subsequently produced the relevant, responsive, nonprivileged documents in Lead Plaintiff's possession.

24

59.    Lead Plaintiff made its first production of documents to Defendants on March 31, 2023, its second production on May 5, 2023, its third production on May 8, 2023, its fourth production on May 12, 2023, its fifth production on May 25, 2023, and its sixth production on June 27, 2023.  In total, Lead Plaintiff produced over 16,800 pages of documents to Defendants.

60.    Simultaneously, Defendants served their first set of interrogatories to Lead Plaintiff on January 17, 2023.  Lead Plaintiff responded and objected to those interrogatories on February 16, 2023.  On April 14, 2023, Defendants served their second set of interrogatories to Lead Plaintiff.  Lead Plaintiff responded and objected to those interrogatories on June 2, 2023.  The Parties met and conferred over the scope of Lead Plaintiff's interrogatory responses throughout discovery.  As a result of these negotiations, Lead Plaintiff served amended responses to Defendants' first set of interrogatories on March 28, 2023.

### 4.    Analysis of Document Discovery and Preparation of Deposition Plan

61.    The Parties reached a settlement in principle shortly before Lead Plaintiff was scheduled to take its first fact depositions.  Up to that point, however, Lead Plaintiff had prepared extensively for depositions in the case.  Indeed, Lead Plaintiff had prepared a full deposition program, including an order of deponents and schedule, had secured dates for certain depositions, and were in the process of negotiating dates for others with Defendants.  To build an efficient and effective deposition program, Lead Counsel constructed "key players" lists compiled from various sources, including: (i) its investigation in connection with the Complaint; (ii) document searches, including analyses of hot documents; and (iii) Defendants' interrogatory responses.

62.    Once deponents were identified, effectively preparing for depositions required that Lead Counsel devote substantial time, effort, and resources.

63.    One of Lead Counsel's most significant projects in preparation for the depositions—both in terms of time and effort as well as substantive importance—was the

preparation of detailed "deposition kits."  These kits typically consisted of dozens of documents with an index summary.  The kits also included a detailed memorandum analyzing those documents and the witness's background, likely areas of knowledge, and role in the events at issue in the case.  In addition, as noted above, the attorney team prepared analyses and chronologies concerning several key issues in the case, which were used to prepare for the depositions of each witness who was involved with that issue.

64.     Lead Counsel prepared deposition kits for numerous fact witnesses.  Preparing deposition kits required a comprehensive, deep dive into each witness's associated materials, including their: (i) custodial documents, i.e., documents the deponent drafted, received, or maintained in their files; (ii) role in the events at issue, including with respect to information in relevant documents they may not have personally reviewed; (iii) prior relevant testimony or interviews; and (iv) information gleaned from public searches.  The preparation of each kit required the analysis of myriad documents in the particular context of each witness, as well as the exercise of professional judgment in narrowing down which documents to present to that deponent. As the kits were prepared and refined, the attorneys preparing to take the depositions worked closely with the attorneys tasked with creating the relevant kits.

### 5.     Expert Discovery

65.     Lead Plaintiff also undertook extensive work with experts in connection with its prosecution of the case.  Lead Counsel worked with its experts closely throughout each step of expert discovery to analyze the strengths and weaknesses of the case.  This process involved careful analysis of the documents produced by Defendants and third parties, as well as critical and strategic thinking about how best to use the evidence gathered throughout discovery to survive summary judgment and prove Lead Plaintiff's claims at trial.

66.    As described above, in connection with investigating the claims asserted in the Complaint, Lead Counsel consulted with Dr. Eric Horlick, Daniel J. Taylor, Ph.D., and Global Economics Group, LLC.  Specifically, Dr. Horlick provided expertise on medical devices used in TAVR procedures, including physician experience, clinical, regulatory, and other data; Professor Taylor consulted on executive compensation, insider trading, and the use of Rule 10b5-1 plans at Boston Scientific; and Global Economics Group, LLC provided analysis on class-wide damages suffered by Boston Scientific shareholders.

67.    Soon after discovery commenced, Lead Plaintiff retained Peter A. Crosby, a medical device consultant with more than 40 years of industry experience and the former Chief Executive Officer of six medical device companies in four different countries.  Mr. Crosby provided Lead Plaintiff with background information concerning the management of Class III medical device product recalls, the metrics used to track medical device market success, and the training requirements and proctoring of surgeons for complex implantable medical devices.  Mr. Crosby was in the process of putting together an expert report concerning Boston Scientific's management of the Lotus Edge recall at the time the Parties reached an agreement to settle the case in principle.

68.    Lead Plaintiff also retained Lori A. Carr, a regulatory compliance consultant to medical device companies and a former FDA investigator with more than 30 years of experience on both sides of the regulatory fence, specializing in medical device reviews.  Ms. Carr provided Lead Plaintiff with background information concerning the regulations that cover Class III medical devices, including how Class III medical devices are approved and recalled.  Ms. Carr was in the process of providing Lead Plaintiff with her assessment of Boston Scientific's compliance with

applicable regulations for the approval and recall of the Lotus Edge at the time the Parties reached an agreement to settle the case in principle.

69.     Lead Plaintiff also worked closely with Chad W. Coffman, CFA, a financial economist and experienced testifying expert, to analyze class certification and damages issues, as discussed in more detail below.

**E.        Class Certification and Modification of the Scheduling Order**

70.     On April 21, 2023, Lead Plaintiff filed its motion for class certification and appointment of class representative and class counsel, requesting that the Court certify a class comprising all persons and entities who purchased or otherwise acquired Boston Scientific common stock during the period from September 16, 2020 through November 16, 2020, inclusive, and were damaged thereby.  ECF Nos. 91-93.  Lead Plaintiff's motion was supported by the expert report of Chad W. Coffman, CFA, who opined that the market for Boston Scientific common stock was efficient throughout the Class Period, and that damages for class members could be calculated through a common methodology.  ECF No. 93-2.

71.     In connection with their opposition to Lead Plaintiff's class certification motion, Defendants deposed one representative from Lead Plaintiff: Jochen Riechwald, Union's Assistant General Counsel.  Defendants did not depose Mr. Coffman.  Lead Counsel reviewed Union's documents, prepared Mr. Riechwald for his deposition, and defended the deposition, which occurred in New York City on May 16, 2023.

72.     On May 26, 2023, Defendants opposed Lead Plaintiff's motion for class certification.  ECF Nos. 109-110.  Defendants argued that Union was subject to unique defenses and thus failed to meet the typical and adequacy requirements of Rule 23(a) of the Federal Rules of Civil Procedure.  Among other things, Defendants argued that they had rebutted the *Basic* presumption of reliance because Union continued to purchase Boston Scientific stock after the

alleged corrective disclosure, and therefore Union did not rely on the alleged misrepresentations concerning the Lotus Edge in making its purchases.  Defendants also argued that Lead Plaintiff was subject to unique defenses due to Union's involvement in this litigation.  Finally, Defendants argued that Lead Plaintiff provided no evidence that it suffered losses during the Class Period.

73.     Lead Plaintiff responded to Defendants' arguments in its reply in further support of its class certification motion, which was filed on June 23, 2023.  ECF Nos. 119-20.  Lead Plaintiff argued that Union was a typical and adequate plaintiff, Union's post-Class Period purchases and involvement in this litigation raised no unique defenses, and Union provided accurate, unrebutted evidence of its Class Period losses.  Lead Plaintiff supported this last argument with a declaration by Mr. Coffman, which calculated Union's Class Period losses based on the trading and holding information contained in Union's certification and charts setting forth calculations of Union's losses that had been submitted with Union's motion for appointment as lead plaintiff on February 2, 2021.  *See* ECF No. 120-1.

74.     After briefing on Lead Plaintiff's class certification motion was completed, on June 28, 2023, this case was reassigned to the Honorable Allison D. Burroughs.  ECF No. 123.

75.     At around the same time, the Parties began discussions to modify the remaining deadlines in the discovery and pre-trial motions schedule adopted by the Court on January 23, 2023.  While the Parties continued to work diligently and in good faith to complete fact discovery and resolve all outstanding discovery disputes and had begun the process of scheduling fact depositions, the Parties anticipated the need for an additional two months to complete document production, resolve any remaining discovery disputes, and take fact depositions.  On July 27, 2023, the Parties filed a joint stipulation and proposed order modifying the deadlines for completion of document productions, fact discovery, expert discovery, and dispositive motions.  ECF No. 126.

29

76.    On July 27, 2023, the Court held an approximately one-hour oral argument during which the Court addressed the Parties' proposed modifications to the remaining deadlines in the discovery and pre-trial motions schedule and Lead Plaintiff's class certification motion.  The Court entered the Parties' proposed schedule and took Lead Plaintiff's class certification motion under advisement.  ECF Nos. 127-28.

77.    On December 18, 2023, following Lead Plaintiff's filing of its motion for preliminary approval of the Settlement on December 15, the Court denied Lead Plaintiff's motion for class certification as moot.  ECF No. 154.

### F.    Mediation and Settlement

78.    In early 2023—with fact discovery underway, and class certification briefing on the horizon—the Parties agreed to try to resolve this case through private mediation.  The Parties retained James E. McGuire, Esq., a highly experienced mediator with JAMS, Inc., to act as mediator for the Action.

79.    After retaining Mr. McGuire, the Parties scheduled a full-day mediation session on March 27, 2023.  Union's representatives, Dr. Carsten Fischer, Mr. Jochen Riechwald, and Ms. Julia Luther, communicated with Lead Counsel and were updated on the progress of the Parties' negotiations throughout the mediation process.

80.    In advance of this mediation session, the Parties exchanged detailed mediation submissions concerning the liability and damages issues in the case, and submitted those mediation statements to Mr. McGuire together with numerous exhibits.  Through this briefing, and during the first mediation session, which was held by Zoom, it was clear that the disagreements between the Parties were many, and the Parties remained extremely far apart.  The counsel engaged in extensive discussions at the March 27, 2023 mediation session, but no agreement was reached at that mediation session.

81.    Following the completion of class certification briefing and oral argument on the motion for class certification, and in advance of the beginning of fact depositions, the Parties recognized that there was an opportunity to re-engage about a potential resolution to the case.  The Parties agreed to engage in a second full-day session before the Mediator on September 8, 2023. In advance of the mediation session, Lead Plaintiff submitted a detailed supplemental mediation statement to Boston Scientific and Mr. McGuire, and included supporting exhibits compiled from documents produced in the course of discovery.

82.    The participants in the September 8, 2023 mediation session, which was held in person in Boston, included, as in the first session, (i) attorneys from BLB&G; (ii) attorneys from counsel for Defendants, Skadden, Arps, Slate, Meagher & Flom LLP; (iii) attorneys for Defendants' insurance carriers; and (iv) in-house counsel from Boston Scientific.  At the September 8, 2023 mediation session, the Parties again engaged in robust negotiations regarding their clients' positions in the litigation. These negotiations were extremely hard fought, and no agreement was reached during the formal mediation session that day.  In fact, it was only during further settlement discussions that continued into the evening following the conclusion of the formal mediation session, and only after further discussions that continued through the next day, that the Parties reached an agreement in principle to settle the Action for $38.5 million.

83.    The Parties' agreement in principle was memorialized in a term sheet executed on October 23, 2023 (the "Term Sheet").  The Term Sheet set forth, among other things, the Parties' agreement to settle and release all claims against Defendants in the Action in return for a cash payment of $38,500,000 for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers.

31

84.    Following the execution of the Term Sheet, the Parties negotiated the final terms of the Settlement and drafted the Stipulation and Agreement of Settlement and related settlement papers.  On December 14, 2023, the Parties executed the Stipulation, which embodies the final and binding agreement to settle the Action.  *See* ECF No. 152-1.  On December 15, 2023, Lead Plaintiff submitted the Parties' Stipulation to the Court as part of its motion for preliminary approval of the Settlement.  ECF Nos. 152-153.

85.    On December 27, 2023, the Court entered its Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement (ECF No. 155) ("Preliminary Approval Order"), which, among other things: (1) preliminarily approved the Settlement; (2) approved the form of Notice, Summary Notice, and Claim Form, and authorized notice of the Settlement to be given to potential Settlement Class Members through mailing of the Notice and Claim Form, posting the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *The Wall Street Journal* and over the *PR Newswire*; (3) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or the fee and expense application; and (4) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application.  The Preliminary Approval Order also scheduled the Settlement Hearing for April 23, 2024 at 9:00 a.m. to determine, among other things, whether the Settlement should be finally approved.

## III.    RISKS OF CONTINUED LITIGATION

86.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $38.5 million cash payment.  Lead Plaintiff and Lead Counsel believe that the proposed Settlement is an excellent result for the Settlement Class.

87.    As explained below, Lead Plaintiff faced significant risks with respect to proving liability and recovering full damages in this case.  To prevail in this case, Lead Plaintiff had the burden to convince a unanimous jury by a preponderance of the evidence of each of the elements of its claims, including that (i) Defendants made misstatements; (ii) the misstatements were material; (iii) the misstatements were made with scienter (i.e., knowingly or with deliberate recklessness); (iv) investors relied upon the misstatements; and (v) Defendants' fraud caused investors' losses.

88.    Moreover, absent a settlement, Lead Plaintiff would still need to prevail at several additional stages of the litigation, including defeating Defendants' opposition to Lead Plaintiff's motion for class certification, Defendants' anticipated motion for summary judgment, at trial, and on appeal.  At each of these stages, Lead Plaintiff would have faced significant risks related to establishing liability and full damages, including, among other things, overcoming Defendants' falsity, scienter, and loss causation challenges.  Even after any trial, Lead Plaintiff would have faced post-trial motions, including a potential motion for judgment as a matter of law, as well as further appeals that might have prevented Lead Plaintiff from successfully obtaining a recovery for the Settlement Class.

89.    The Settlement Amount—$38.5 million in cash, plus interest—represents a significant recovery for the Settlement Class.  As discussed below, it also represents a significant portion of the recoverable damages in the Action as determined by Lead Plaintiff's damages

33

expert—particularly after considering Defendants' substantial arguments with respect to liability and damages. These arguments created a significant risk that, after years of protracted litigation, Lead Plaintiff and the Settlement Class would have achieved no recovery at all, or a smaller recovery than the Settlement Amount.

## A. General Risks in Prosecuting Securities Class Actions

90. In recent years, securities class actions have become riskier and more difficult to prove given changes in the law, including numerous United States Supreme Court decisions. For example, data from Cornerstone Research show that, in each year from 2014 and 2020, approximately half of all securities class actions filed were dismissed. See CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS: 2023 YEAR IN REVIEW (2024), attached hereto as Exhibit 2, at 19.

91. Even when they have survived motions to dismiss, securities class actions can be defeated either at the class certification stage, in connection with *Daubert* motions, or at summary judgment. For example, class certification has been denied in numerous cases in recent years. *See, e.g., In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017), *reconsideration denied*, 2018 WL 3472334 (N.D. Cal. Jan. 18, 2018), *and leave to appeal denied, Oklahoma Firefighters Pension & Ret. Sys. v. Finisar Corp.*, 2018 WL 3472714 (9th Cir. July 13, 2018); *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193 (S.D.N.Y. Mar. 19, 2015); *Sicav v. James Jun Wang*, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013); *George v. China Auto. Sys., Inc.*, 2013 WL 3357170 (S.D.N.Y. July 3, 2013); *Colman v. Theranos, Inc.*, 325 F.R.D. 629, 651 (N.D. Cal. 2018); *Smyth v. China Agritech, Inc.*, 2013 WL 12136605 (C.D. Cal. Sept. 26, 2013); *In re STEC Inc. Sec. Litig.*, 2012 WL 6965372 (C.D. Cal. Mar. 7, 2012).

92.    Multiple securities class actions also recently have been dismissed at the summary judgment stage, including in an action against the same corporate defendant, Boston Scientific, and particularly in cases involving alleged misconduct by drug and device manufacturers.  *See In re Bos. Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 113 (D. Mass. 2010), *aff'd sub nom. Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 649 F.3d 5 (1st Cir. 2011); *see also, e.g., In re Mylan N.V. Sec. Litig.,* 2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023) (granting summary judgment after approximately six years of litigation); *In re Allergan PLC Sec. Litig.*, 2022 WL 17584155 (S.D.N.Y. Dec. 12, 2022) (granting summary judgment after approximately four years of litigation); *Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at \*6 (D. Or. May 24, 2021) (granting summary judgment after approximately five years of litigation); *In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690 (D. Minn. 2009) (granting summary judgment on loss causation grounds after seven years of litigation); *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305 (S.D.N.Y. September 13, 2017) (summary judgment granted after eight years of litigation); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) (summary judgment granted after six years of litigation); *see also In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448 (D. Conn. 2013), *aff'd,* 766 F.3d 172 (2d Cir. 2014); *Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878 (D. Nev. Jan. 3, 2017), *aff'd sub nom., Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018); *Perrin v. Sw. Water Co.*, 2014 WL 10979865 (C.D. Cal. July 2, 2014); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1015 (S.D. Cal. 2011); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010).  Even cases that have survived summary judgment have been dismissed prior to trial in connection with *Daubert* motions.  *See, e.g., Bricklayers and Trowel*

*Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of defendants after finding that plaintiffs' expert was unreliable).

93.    Even when securities class action plaintiffs are successful in certifying a class, prevailing at summary judgment, and overcoming *Daubert* motions, there remain significant risks that a jury will not find the defendants liable or award expected damages. *See, e.g., In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010 (N.D. Cal. June 14, 2023) (jury verdict for defense delivered in securities class action involving Elon Musk's tweets about taking Tesla private even though that court had already found the tweets were false and Musk acted recklessly in issuing them, and the same conduct had resulted in SEC charges and a settlement).  Further, post-trial motions, based on a complete record, also present substantial risks.  For example, in *In re BankAtlantic Bancorp, Inc. Securities Litigation*, a jury rendered a verdict in plaintiffs' favor on liability in 2010.  2011 WL 1585605, at *6 (S.D. Fla. Apr. 25, 2011).  In 2011, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims.  *Id*. at *38.  In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient evidence to support a finding of loss causation.  *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012).

94.    In sum, securities class actions face serious risks of dismissal and non-recovery at all stages of the litigation.

### B.    Specific Risks Concerning this Action

95.    While Lead Plaintiff believes that its claims have merit, Lead Plaintiff faced substantial risks that Defendants would succeed in eliminating all or part of the case in connection with summary judgment, pre-trial motions, at trial, or on post-trial appeal.

36

96.    From a "big picture" perspective, such risks were heightened here because this case lacked certain obvious badges of fraud that can provide significant tailwinds for Lead Plaintiff's discovery efforts and overall case.    In particular, the SEC decided not to recommend an enforcement action against Boston Scientific after examining the same alleged misstatements and conduct at issue in this case, even though the SEC could have asserted claims that did not require it to prove scienter.    Thus, with the SEC not recommending an enforcement action against Boston Scientific, Lead Plaintiff faced an uphill battle in successfully prosecuting securities fraud class claims in this context.    In the face of this challenge, Lead Plaintiff and Lead Counsel committed significant resources to this case and achieved success.    As set forth in more detail below, Lead Plaintiff faced substantial challenges to proving liability for its claims and to proving significant damages.

97.    Although Lead Counsel respectfully submits that, by the time of the mediation, ample discovery had been taken to allow all parties to reasonably assess the fairness of the proposed Settlement, they were also aware that deposition discovery of Defendants still remained to be completed absent the Settlement.    In addition, formal expert discovery on hotly contested liability issues had not yet begun, and the Parties faced the further risks and expense of complex summary judgment motions and trial.    Accordingly, although both sides were able to present information that supported their respective claims and defenses, there was clearly substantial risk as to how the further testimony of fact and expert witnesses would ultimately play out.    In light of these risks, the significant, immediate benefit of the $38.5 million Settlement is a particularly strong result for the Settlement Class.    *See In re StockerYale, Inc. Sec. Litig.*, 2007 WL 4589772, at *3 (D.N.H. Dec. 18, 2007) (fact that "various defenses could result in no liability and zero recovery for the class" favors approval of the settlement).

### 1.    Risks Associated with Proving Falsity and Materiality

98.    The alleged false and misleading statements remaining in this case were Defendant Mahoney's September 16, 2020 statement that the Lotus Edge was and "will continue to be an important growth driver," and his October 28, 2020 statement that the Company's two-valve strategy "makes sense."  In their motion to dismiss and in their opposition to Lead Plaintiff's class certification motion, Defendants argued that these statements were neither false nor material to investors.  While these two misstatements were sustained at the motion to dismiss stage, Defendants would have remained free to relitigate any of their arguments at summary judgment or trial, where the applicable standards would likely have been more challenging for Lead Plaintiff.

99.    To begin, Defendants likely would have argued that Defendant Mahoney's statements that the Lotus Edge would continue to be a "growth driver" and part of the Company's two-valve strategy were either true, or that he reasonably believed them at the time he made them. Defendants likely would have also argued that Boston Scientific had devoted significant resources to the Lotus Edge before and after the commercial launch of the product in the United States, and that the Company's decision to shut down the Lotus Edge platform occurred well after Defendant Mahoney's statements.  In support of these contentions, Defendants likely would have pointed to certain internal documents showing that the final decision to recall the Lotus Edge was made after Defendant Mahoney's statements, internal documents reflecting the efforts the Company made to ensure the success of the Lotus Edge launch and to address the challenges the product faced during the launch, as well as documents reflecting that senior executives only learned of certain problems with the device (and the Company's inability to adequately address them) just prior to the recall decision.

100.    Further, Defendants likely would have argued that Mahoney's challenged statements were not material, and were statements of opinion and forward-looking statements

38

about the Lotus Edge, and thus were not actionable as a matter of law. *See, e.g., In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010, at \*7-8 (N.D. Cal. June 14, 2023) (sustaining jury verdict for defendants on materiality grounds even though falsity had been established, noting that "substantial evidence at trial supported the conclusion that the Tweets were not material"). That defense was particularly significant in this case, as Defendants would be able to argue at summary judgment and at trial that Defendant Mahoney's positive statements about the Lotus Edge were inherently vague "soft" statements that did not lend themselves to objective verification. *See, e.g., In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d. at 283 (describing sustained statements as actionable opinions that were "adequately alleged to have been materially misleading when viewed in the light most favorable to Plaintiff").

101.    While Lead Plaintiff believes it had significant arguments supported by discovery to make in response, there was a significant risk that the Court or a factfinder could have credited them at either summary judgment or trial. In sum, there was a significant risk that Lead Plaintiff would not be able to establish the material falsity of both challenged statements at trial, and that one or both statements could be dismissed. Had that happened, recovery for Lead Plaintiff and the Settlement Class would have either been severely reduced or eliminated entirely.

### 2.    Risks Associated with Proving Scienter

102.    Even if Lead Plaintiff had been able to establish falsity and materiality, it would have faced significant risk in establishing Defendant Mahoney's scienter.

103.    As an initial matter, the Court sustained Lead Plaintiff's scienter allegations as to Defendant Mahoney based on the temporal proximity between Defendant Mahoney's September 16, 2020 and October 28, 2020 statements and the November 17, 2020 announcement of the Lotus Edge recall. *See generally In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d at 282. If, as discussed above, Defendants had been able to show that the decision to recall the Lotus Edge took place after

Defendant Mahoney's last statement, that would have severely limited Lead Plaintiff's scienter arguments as well as their falsity arguments. Defendants likely would have further argued Boston Scientific had taken various corrective measures to address Lotus Edge adverse events and otherwise address its performance, that certain problems with the Lotus Edge (and the Company's inability to adequately address them) only became known to senior executives just prior to the recall decision, and that Defendant Mahoney therefore had a reasonable basis to expect that the product could be successful and "made sense" when the statements were made. As the Court noted in the motion to dismiss decision, Defendant Fitzgerald publicly stated that it took "about 12 months after full launch [in the fall of 2019] to fully evaluate" the Lotus Edge and reach a decision about the platform—crediting Defendants' argument about the timing of the recall decision and that Company executives could not be found liable for securities fraud simply for taking time to "evaluate" a product's potential. *Id*.

104.    Specifically, in another securities case against Boston Scientific, *In re Boston Scientific Corp. Sec. Litig.*, 708 F. Supp. 2d 110 (D. Mass. 2010), the court dismissed investors' claims following discovery because the court determined no reasonable jury could conclude that "[d]efendants were aware of a significant prospect for recalls until shortly before those recalls were undertaken" in light of evidence of the seemingly positive impact of several "corrective and preventive actions" the company had taken prior to the recall. *Id*. at 126. Here, Defendants likely would have argued Boston Scientific took similar corrective measures and other steps to address Lotus Edge's performance, giving Defendants confidence in the Lotus Edge's prospects that reflect "a reasonable effort in light of developing information to address, rather than ignore, risks inherent in the launch of a product" like the Lotus Edge. *Id.* at 128.

40

105.    In addition, Defendants likely would have argued that Defendant Mahoney's stock sales were made pursuant to a Rule 10b5-1 stock trading plan and were not suspicious in timing under relevant case law, and thus did not provide any motive that would support a finding of scienter.

106.    Had Lead Plaintiff failed to create a triable issue regarding scienter at summary judgment, or failed to prevail on establishing scienter at trial, the Settlement Class would not be able to recovery anything in this Action.

107.    There is also the risk that an intervening change in the law can result in the dismissal of a case after significant effort has been expended.  The Supreme Court has heard several securities cases in recent years, often announcing holdings that dramatically changed the law in the midst of long-running cases—including after trial.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014); *Comcast Corp. v Behrend*, 569 U.S. 27 (2013); *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010) ("*Morrison*").  As a result, many cases have been lost after thousands of hours have been invested in briefing and discovery.  For example, in *In re Vivendi Universal, S.A. Securities Litigation*, after a verdict for class plaintiffs, the district court granted judgment for defendants following a change in the law announced in *Morrison*, dismissing claims that had been proven at trial for the vast majority of the class.  765 F. Supp. 2d 512, 524, 533 (S.D.N.Y. 2011).  Changes in law at the Circuit level has similarly upended pending cases; for example, in *Murphy v. Precision Castparts Corp.*, the court reconsidered its denial of summary judgment and granted it for defendants based explicitly on an intervening Ninth Circuit decision.  2021 WL 2080016, at *6.

41

### 3.   Risks Associated with Proving Loss Causation and Damages

108.   Even if Lead Plaintiff had successfully established Defendants' material misrepresentations and scienter, it would still have faced meaningful challenges in establishing loss causation and damages in this Action.

109.   While Defendants did not challenge Lead Plaintiff's loss causation allegations at the motion to dismiss or class certification stages, Defendants could have argued at a later stage in the case that not all of the decline in the price of Boston Scientific common stock following the November 17, 2020 recall announcement was recoverable as damages.   To advance this argument, Defendants could have introduced expert testimony about the level of artificial inflation in the stock that could be attributed to the two sustained misrepresentations, and that could have played out in a difficult-to-predict "battle of the experts" at summary judgment or trial.   If accepted, this argument would have reduced damages very substantially, or eliminated them entirely.

110.   Defendants could have further argued that any damages resulting from the price decline triggered by the announcement of the Lotus Edge recall must be significantly discounted because the fact of the Lotus Edge's poor performance was generally known to the market before the alleged corrective disclosure.   If accepted, this argument would have reduced damages very substantially.

111.   Along similar lines, Defendants could have also argued that the nature of the alleged misstatements here were too generic to support price impact (as required for class certification) or that the announcement of the Lotus recall did not sufficiently "correct" any false impression created by the alleged false statements (as required for loss causation).   Indeed, at the motion to dismiss stage, the Court dismissed one of two alleged corrective disclosures, reasoning that the first alleged corrective disclosure—the announcement that Lotus Edge failed to obtain FDA approval for an expanded indication—did not "relate *to the same subject matter* as the alleged

42

misrepresentation" and failed to demonstrate "a causal connection between the loss and the actionable misstatements." *In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d at 291-92 (emphasis in original).  In addition, following the parties' briefing on the motion for class certification, the Second Circuit issued its decision in *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, decertifying the previously certified class on the ground that Goldman's allegedly false statements were too "generic" to support price impact, and there was an "insufficient link between the corrective disclosures and the alleged misrepresentations."  77 F.4th 74, 96-105 (2d Cir. 2023).  Here, Defendants could have relied on the Court's ruling on the motion to dismiss and the *Goldman* decision to argue that Defendant Mahoney's statements about Lotus being a "growth driver" and a strategy that "made sense" were too generic, and the subsequent announcement of the Lotus Edge recall insufficiently "corrective" of those generic statements, to support price impact or loss causation—arguments that, if accepted, could have eliminated any recovery whatsoever.

### 4.    Risks After Trial

112.    Even if Lead Plaintiff overcame all the above risks and prevailed at trial, Defendants would have appealed any judgment in Lead Plaintiff's and the class's favor.  Such an appeal could have taken years, and could have been successful.  For example, in *Glickenhaus & Co. v. Household Int'l Inc.*, 787 F.3d 408 (7th Cir. 2015), a securities fraud class action alleging a massive predatory lending scheme, the plaintiffs won a trial verdict.  Defendants appealed, challenging loss causation, as well as a jury instruction about who legally "made" a statement for liability purposes.  Defendants prevailed, and the Seventh Circuit set aside the judgment that plaintiffs had won.

113.    Moreover, even if a judgment in Lead Plaintiff's favor was affirmed on appeal, Defendants could then have challenged the reliance and damages of each class member, including

Lead Plaintiff, in an extended series of individual proceedings. That process could have taken multiple additional years, and could have severely reduced any recovery to the class as Defendants "picked off" class members. For example, in *In re Vivendi Universal SA Securities Litigation*, the district court acknowledged that in any post-trial proceedings, "Vivendi is entitled to rebut the presumption of reliance on an individual basis," and that "any attempt to rebut the presumption of reliance on such grounds would call for separate inquiries into the individual circumstances of particular class members." 765 F. Supp. 2d 520, 583-584 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016). Over the course of several years, Vivendi indeed successfully challenged several class members' damages in individual proceedings.

114. In addition, as noted above, the risk of an intervening change in the law is particularly relevant here.

115. Thus, even if Lead Plaintiff and the class prevailed at trial, the subsequent processes of an appeal, challenges to individual class members, and intervening changes in the law could have severely reduced or even eliminated any recovery—and, at minimum, could have added several years of further delay.

116. The Settlement eliminates these significant litigation risks and provides a substantial and certain recovery for the Settlement Class. *See Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *13 (S.D.N.Y. Oct. 16, 2019) ("The Parties developed and would have presented competing evidence on these issues, including competing expert evidence. While Lead Plaintiff proceeded as though it had the better arguments, the risk remained that Defendants could have defeated loss causation, or significantly diminished damages[.]").

44

**C.     The Settlement Amount Compared to the Likely Maximum Damages that Could Be Proved at Trial**

117.    The Settlement Amount—$38.5 million in cash, plus interest—represents a significant recovery for the Settlement Class.  The Settlement is more than two and half times the size of the median securities class-action settlement in the First Circuit from 2014 to 2023 ($14.1 million).  *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2023 REVIEW AND ANALYSIS (2024), attached hereto as Exhibit 3, at 20.

118.    The $38.5 million Settlement is also a very favorable result when it is considered in relation to the maximum amount of damages that could be reasonably established at trial, in the event that Lead Plaintiff prevailed on class certification and liability issues, including falsity and scienter, at summary judgment.  Assuming Lead Plaintiff prevailed on all class certification and liability issues, its damages expert had determined that that *maximum* reasonably recoverable damages at trial would be approximately $176 million to $207 million (depending on whether class members' gains on their sales of shares purchased before the Class Period are offset against their losses on shares purchased during the Class Period).

119.    Importantly, this estimated range assumes Lead Plaintiff's complete success in establishing Defendants' liability on the remaining claims, and that the trier of fact would reject Defendants' loss causation and damages arguments.  Thus, the $38.5 million Settlement represents 18.5% to 22% of the maximum recoverable damages, which is many multiples above the median percentage recovery seen in comparable cases.  *See, e.g., Medoff v. CVS Caremark Corp.*, 2016 WL 632238, at *6 (D.R.I. Feb. 17, 2016) (approving settlement recovering 5.33% of maximum damages and noting that it was "well above the median percentage of settlement recoveries in comparable securities class action cases"); *In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.*, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (settlement representing 6.25% of

45

estimated maximum damages was at the "higher end of the range of reasonableness of recovery in class action securities litigations").

120.    Given the meaningful litigation risks, and the immediacy and amount of the $38,500,000 recovery for the Settlement Class, Lead Plaintiff and Lead Counsel believe that the Settlement is an excellent result; fair, reasonable, and adequate; and in the best interest of the Settlement Class.

## IV.    LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

121.    The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Settlement Class.  The Preliminary Approval Order also set an April 2, 2022 deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set a final approval hearing date of April 23, 2024.

122.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed JND Legal Administration ("JND"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 20% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $700,000.  To disseminate the

Notice, JND obtained information from Boston Scientific and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members. *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Segura Decl."), attached hereto as Exhibit 4, at ¶¶ 3-9.

123.    JND began mailing copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominee owners on January 19, 2024. *See* Segura Decl. ¶¶ 3-6. As of March 15, 2024, JND had disseminated a total of 126,685 Notice Packets to potential Settlement Class Members and nominees. *Id*. ¶ 9.

124.    On February 6, 2024, in accordance with the Preliminary Approval Order, JND caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the *PR Newswire*. *Id*. ¶ 10.

125.    Lead Counsel also caused JND to establish a dedicated settlement website, www.BostonScientificSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as the Stipulation, Preliminary Approval Order, and Amended Complaint. *See* Segura Decl. ¶ 11. That website became operational on January 19, 2024. *Id*. Lead Counsel also made copies of the Notice and Claim Form and other documents available on its own website, www.blbglaw.com.

126.    As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, and/or Fee and Expense Application, or to request exclusion from the Settlement Class is April 2, 2024. To date, just three requests for exclusion have been received. *See* Segura Decl. ¶ 13. In addition, no objections to the Settlement, Plan of Allocation,

47

or Lead Counsel's Fee and Expense Application have been received. Lead Counsel will file reply papers on or before April 16, 2024 that will address all requests for exclusion and any objections that may be received.

## V.      ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

127.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to be eligible to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form with all required information postmarked (if mailed) or submitted online no later than May 28, 2024. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

128.    Lead Counsel consulted with Lead Plaintiff's damages expert in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation"). Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action.

129.    The Plan of Allocation is set forth at pages 17 to 21 of the Notice. *See* Segura Decl., Ex. A at pp. 17-21. As described in the Notice, the objective of the Plan of Allocation is to distribute the Settlement proceeds equitably among those Settlement Class Members who suffered economic losses as a proximate result of the alleged wrongdoing. The calculations under the Plan of Allocation are intended as a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *See* Notice ¶ 77.

48

130.    In developing the Plan of Allocation, Lead Plaintiff's damages expert calculated the estimated amount of artificial inflation in the per-share price of Boston Scientific common stock which allegedly was proximately caused by Defendants' alleged materially false and misleading statements and omissions during the Class Period. *See* Notice ¶ 78. In calculating the estimated artificial inflation allegedly caused by those misrepresentations and omissions, Lead Plaintiff's damages expert considered the price change in Boston Scientific common stock in reaction to the public disclosure on November 17, 2020 that allegedly corrected the alleged misrepresentations and omissions, adjusting for price changes attributable to market or industry factors that day. *Id.* Based on these calculations, there was a total of $2.77 in estimated artificial inflation per share in the Boston Scientific common stock price that was removed on November 17, 2020. *Id.*

131.    In order to have recoverable damages in connection with purchases or acquisitions of Boston Scientific common stock during the Class Period, the disclosure of the alleged misrepresentations or omissions must be the cause of the decline in the price of the Boston Scientific common stock. In this case, Lead Plaintiff alleges that Defendants made false statements and omitted material facts during the Class Period (September 16, 2020 through November 16, 2020), which had the effect of artificially inflating the prices of Boston Scientific common stock, and that the artificial inflation was removed from the price of Boston Scientific common stock as the result of the alleged corrective disclosure that occurred before the opening of trading on November 17, 2020. Thus, in order to be eligible under the Plan of Allocation, shares of Boston Scientific common stock must have been purchased or otherwise acquired during the Class Period and held through the end of the Class Period. *See* Notice ¶¶ 79, 82.A.

49

132.    Recognized Loss Amounts are calculated under the Plan of Allocation for each purchase or acquisition of Boston Scientific common stock during the Class Period that is listed on a Claimant's Claim Form and for which adequate documentation is provided.  For shares purchased during the Class Period and sold during the Class Period, the Recognized Loss Amount is zero, because, as discussed above, those shares were not damaged by the alleged fraud.  *See* Notice ¶ 82.A.  For shares purchased during the Class Period and sold during the 90-day period after the Class Period, Recognized Loss Amounts are calculated as *the least of*: (a) the amount of alleged artificial inflation in Boston Scientific common stock ($2.77 per share), (b) the difference between the purchase price and the sale price; or (c) the difference between the purchase price and the average closing price of Boston Scientific from November 17, 2020 and the date of sale.  See Notice ¶ 82.B.  For shares purchased during the Class Period and held until the end of 90-day period after the Class Period (February 12, 2021) or longer, the Recognized Loss Amount is the lesser of: (a) the amount of alleged artificial inflation in Boston Scientific common stock ($2.77) per share, or (b) the difference between the purchase price and the average closing price of Boston Scientific during the 90-day period ($35.63 per share).  *See* Notice ¶ 82.C.

133.    The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases of Boston Scientific common stock during the Class Period is the Claimant's "Recognized Claim."  Notice ¶ 83.  The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  Notice ¶¶ 90-91.  If an Authorized Claimant's *pro rata* distribution amount calculates to less than ten dollars, no payment will be made to that Authorized Claimant.  *Id*. ¶ 92.  Those funds will be included in the distribution to the Authorized Claimants whose payments exceed the ten-dollar minimum.

134. One hundred percent of the Net Settlement Fund will be distributed to Authorized Claimants. If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions to Authorized Claimants will be conducted. Notice ¶ 93. Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective (for example, where the administrative costs of conducting the additional distribution would largely subsume the funds available), will those funds be donated to one or more non-sectarian, not-for-profit, 501(c)(3) organizations to be selected by Lead Counsel and approved by the Court. *See id*.

135. In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases of Boston Scientific common stock that were attributable to the misconduct alleged in the Action. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court. To date, no objections to the proposed Plan of Allocation have been received.

## VI.    THE FEE AND EXPENSE APPLICATION

136. In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court, on behalf of Plaintiffs' Counsel, for an award of attorneys' fees of 20% of the Settlement Fund, plus interest earned at the same rate as the Settlement Fund (the "Fee Application"). Lead Counsel also requests payment for litigation expenses incurred by Plaintiffs' Counsel in connection with the prosecution and settlement of the Action in the amount of $391,399.98. Lead Counsel further requests reimbursement to Lead Plaintiff of $74,250 in costs and expenses that Lead Plaintiff incurred directly related to its representation of the Settlement Class, as permitted by the PSLRA, 15 U.S.C. § 78u-4(a)(4). The requested attorneys' fees,

litigation expenses, and PSLRA award are to be paid from the Settlement Fund.  The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Memorandum.  The primary factual bases for the requested fee and expenses are summarized below.

### A.    The Fee Application

137.    Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Lead Plaintiff and the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances and taking into account the litigation risks faced in a class action.  Use of the percentage method has been recognized as appropriate by the First Circuit in comparable cases.

138.    Based on the quality of the result achieved, the extent and quality of the work performed by Lead Counsel and Liaison Counsel, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 20% fee award is fair and reasonable for attorneys' fees in common fund cases such as this and is well within the range of percentages awarded in securities class actions in this Circuit with comparable settlements.

### 1.    Lead Plaintiff Has Authorized and Support the Fee Application

139.    Lead Plaintiff is a sophisticated institutional investor that closely supervised and monitored the prosecution and settlement of the Action.  *See* Riechwald Decl. (Ex. 1), at ¶¶ 2-7. Lead Plaintiff fully supports Lead Counsel's requested fee of 20% of the Settlement Fund.  Lead Plaintiff negotiated and approved that fee, subject to Court approval, pursuant to a retention

agreement providing for different levels of percentage fees based on the state of litigation at which settlement was reached.  That retention agreement was entered into in January 2021, at the outset of the Action.  Following the agreement to settle the Action, Lead Plaintiff carefully evaluated the Fee Application and believes that it is fair and reasonable in light of the result obtained for the Settlement Class, the substantial risks in the litigation, and the work performed by Plaintiffs' Counsel.  *See* Riechwald Decl. ¶ 9.  Lead Plaintiff's endorsement of Lead Counsel's fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2.    The Time and Labor of Plaintiffs' Counsel

140.    The time and labor expended by Plaintiffs' Counsel in pursuing this Action and achieving the Settlement support the reasonableness of the requested fee.  Attached as Exhibits 5A and 5B are my declaration on behalf of BLB&G and the declaration of T. Christopher Donnelly on behalf of Liaison Counsel Donnelly, Conroy & Gelhaar, LLP in support of the motion for attorneys' fees and litigation expenses ("Fee and Expense Declarations").  The Fee and Expense Declarations indicate the amount of time spent by each attorney and the professional support staff employed by each firm on the Action from its inception through December 14, 2023 (the date the Stipulation was signed), and the lodestar calculations based on their 2023 hourly rates.  The Fee and Expense Declarations also include schedules of expenses incurred by each firm, delineated by category.  These Declarations were prepared from contemporaneous daily time records and expense records regularly maintained and prepared by the respective firms, which are available at the request of the Court.

141.    As set forth in the Fee and Expense Declarations, Plaintiffs' Counsel have collectively expended 17,064.1 hours in the prosecution of this Action, with a total lodestar of $8,550,922.50.  The requested fee of 20% of the Settlement Fund is $7,700,000, plus interest.

53

Accordingly, the requested fee is slightly less than Plaintiffs' Counsel's lodestar.  Specifically, the fee sought amounts to just 90% of Plaintiffs' Counsel's lodestar—or, in other words, a "negative" 0.9 multiplier of the lodestar.  As discussed in the Fee Memorandum, the fact the fee sought is below counsel's lodestar strongly supports the reasonableness of the requested fees.  Indeed, in comparable securities class actions and in other class actions, a *positive* multiplier of counsel's lodestar is typically awarded to recognize the significant contingency risks in such cases.

142.    As described above in greater detail, the work that Plaintiffs' Counsel performed in this Action included: (i) conducting an extensive investigation into the claims asserted, including through a detailed review of public documents and interviews with over 140 witnesses believed to potentially have information about the claims at issue in the Action; (ii) researching and drafting a detailed consolidated Complaint based on this investigation; (iii) fully briefing and arguing Lead Plaintiff's opposition to Defendants' motion to dismiss the Complaint; (iv) conducting extensive fact discovery, which included preparing and responding to requests for the production of documents, interrogatories, and requests for admission; serving document subpoenas on four non-parties; and obtaining and reviewing over 224,000 pages of documents obtained from Defendants and third parties; (v) filing and fully briefing Lead Plaintiff's motion for class certification, which included an accompanying expert report from Lead Plaintiff's financial economics expert on the efficiency of the market for Boston Scientific common stock and the calculation of damages on a class-wide basis; (vi) defending the deposition of a representative of Lead Plaintiff in connection with class certification; (vii) consulting extensively throughout the litigation with a variety of experts and consultants, including experts in the medical device industry and regulation and experts in market efficiency, loss causation, and damages; and (viii) engaging in extensive arm's-

length settlement negotiations to achieve the Settlement, including two mediation sessions with Mr. McGuire of JAMS.

143. As detailed above, throughout this case, Plaintiffs' Counsel devoted substantial time to the prosecution of the Action. I maintained control of and monitored the work performed by other lawyers at BLB&G. While I personally devoted substantial time to this case, other experienced attorneys at my firm were involved throughout the litigation. More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Plaintiffs' Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

### 3. The Skill and Experience of Plaintiffs' Counsel

144. The skill and expertise of Lead Counsel and the other Plaintiffs' Counsel also support the requested fee. As demonstrated by the firm resume attached as Exhibit 5A-3 hereto, Lead Counsel is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases. BLB&G is consistently ranked among the top plaintiffs' firms in the country. Further, BLB&G has taken complex cases such as this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions. Liaison Counsel Donnelly, Conroy & Gelhaar, LLP is also high skilled and extremely knowledgeable counsel. I believe Plaintiffs' Counsel's skill and their willingness and ability to prosecute the claims vigorously through trial, if necessary, added valuable leverage in the settlement negotiations.

### 4. Standing and Caliber of Defendants' Counsel

145. The quality of the work performed by Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of its opposition. Defendants were represented by attorneys from Skadden, Arps, Slate, Meagher & Flom LLP—a highly experienced and highly

skilled law firm that zealously represented its clients.  In the face of this skillful and well-financed opposition, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the case on terms that will significantly benefit the Settlement Class.

>**5.      The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases**

146.      The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Plaintiffs' Counsel in bringing this Action to a successful conclusion are described above.  Those risks are relevant to the Court's evaluation of an award of attorneys' fees.  Here, the risks assumed by Plaintiffs' Counsel, and the time and expenses incurred without any payment, were extensive.

147.      From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that vigorous prosecution of the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands.  Because complex securities litigation generally proceeds for several years before reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel have received no compensation during the three-year duration of this Action and no reimbursement of out-of-pocket expenses, yet they have devoted more than 17,000 hours and incurred more than $390,000 in expenses in prosecuting this Action for the benefit of Boston Scientific investors.

148.    Plaintiffs' Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset this case presented a number of significant risks and uncertainties.

149.    As noted above, the Settlement was reached only after Lead Counsel had overcome Defendants' motion to dismiss, conducted substantial fact discovery, and fully briefed and argued Lead Plaintiff's class certification motion.  However, had the Settlement not been reached when it was and this litigation continued, Lead Counsel would have been required to complete fact and discovery (including taking depositions of the Individual Defendants and several other Boston Scientific officers); conduct substantial expert discovery; oppose Defendants' motions for summary judgment; and prepare and take the case to trial.  Moreover, even if the jury returned a favorable verdict after trial, it is likely that any verdict would be the subject of post-trial motions and appeals.

150.    Lead Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class.  In light of this recovery and Plaintiffs' Counsel's investment of time and resources over the course of the litigation, Lead Counsel believes the requested attorneys' fee is fair and reasonable and should be approved.

### 6.        The Reaction of the Settlement Class to the Fee Application

151.    As noted above, as of March 15, 2024, over 126,000 Notice Packets had been sent to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 20% of the Settlement Fund.  *See* Segura Decl. ¶ 9 and Ex. A (Notice ¶¶ 5, 57).  In addition, the Court-approved Summary Notice has been published in *The Wall Street Journal* and transmitted over the *PR Newswire*.  *See* Segura Decl. ¶ 10.  To date, no objections to the request for attorneys' fees have been received.

152.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success.

Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that the requested fee is fair and reasonable.

### B.   The Litigation Expense Application

153.   Lead Counsel also seeks payment from the Settlement Fund of $391,399.98 for litigation expenses reasonably incurred by Plaintiffs' Counsel in connection with the prosecution and resolution of the Action (the "Expense Application").

154.   From the outset of the Action, Plaintiffs' Counsel have been aware that they might not recover any of their expenses (if the litigation was unsuccessful), and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years.  Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action.  Consequently, Plaintiffs' Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

155.   As set forth in the Fee and Expense Declarations included in Exhibit 5, Plaintiffs' Counsel have incurred a total of $391,399.98 in unreimbursed litigation expenses in connection with the prosecution of the Action.  The expenses are summarized in Exhibit 6, which identifies each category of expense, *e.g.*, expert fees, mediation fees, on-line legal and factual research, document management costs, telephone, and travel costs, and the amount incurred for each category.  These expenses are reflected on the books and records maintained by Plaintiffs' Counsel, which are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.  These expenses are recorded separately by Plaintiffs' Counsel and are not duplicated by the firms' hourly rates.

58

156.     Of the total amount of expenses, $233,938.74, or approximately 60%, was expended for the retention of experts.  As discussed above, Lead Counsel consulted with industry experts and financial economics experts during its investigation and the preparation of the Complaint and during the course of discovery.  These experts' advice was instrumental in Lead Counsel's appraisal of the claims and in helping achieve the favorable result.

157.     The cost of on-line factual research was $53,936.28 and the cost for on-line legal research was $47,254.82, which together account for approximately 26% of the total expenses.

158.     Lead Plaintiff's share of the mediation costs paid to JAMS for the services of Mr. McGuire were $14,906.61 or 4% of the total expenses.

159.     Another significant cost was the expense of document management and litigation support, which included the costs of creating and maintaining the database containing the documents produced in the Action and producing Lead Plaintiff's documents.  These document management costs in total came to $19,089.81, or approximately 5% of the total expenses.

160.     The other expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court fees, travel costs, service of process costs telephone charges, postage, and delivery expenses.

161.     In addition, Lead Plaintiff Union seeks reimbursement of $74,250 for the reasonable costs and expenses that it incurred directly in connection with its representation of the Settlement Class, based on the substantial time dedicated to the Action by its employees.  Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum at 19-20.

162.    The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $700,000, which might include a PLSRA award for Lead Plaintiff.  Notice ¶¶ 5, 57.  The total amount requested, $465,649.98, which includes $391,399.98 for Plaintiffs' Counsel's litigation expenses and $74,250 for Lead Plaintiff's requested PSLRA award, is well below the $700,000 that Settlement Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

163.    The expenses incurred by Plaintiffs' Counsel and Lead Plaintiff were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submits that the application for payment of Litigation Expenses from the Settlement Fund should be approved.

164.    Attached hereto as Exhibit 7 is a compendium of true and correct copies of the following unpublished opinions and authority cited in the Fee Memorandum:

Ex. 7A:    *Machado v. Endurance Int'l Grp. Holdings, Inc.*, Case No. 1:15-cv-11775-GAO, slip op. (D. Mass. Sept. 13, 2019), ECF No. 98

Ex. 7B    *Gerneth v. Chiasma, Inc.*, No. 1:16-cv-11082-DJC, slip op. (D. Mass. June 27, 2019), ECF No. 225

Ex. 7C    *Godinez v. Alere Inc.*, No. 1:16-cv-10766-PBS, slip op. (D. Mass. June 6, 2019), ECF No. 283

Ex. 7D    *In re CVS Corp. Sec. Litig.*, No. 01-11464 (JLT), slip op. (D. Mass. Sept. 7, 2005), ECF No. 195

Ex. 7E    Edward Flores & Svetlana Starykh, RECENT TRENDS IN SECURITIES CLASS ACTION LITIGATION: 2023 FULL YEAR REVIEW (NERA Economic Consulting, Jan. 23, 2024)

Ex. 7F    *Levy v. Gutierrez*, Civil No. 14-cv-443-JL, slip op. (D.N.H. Aug. 27. 2020), ECF No. 266

60

Ex. 7G   *In re Endo Int'l, plc*, Case No. 22-22549 (JLG), Fourth Interim Fee Application of Skadden, Arps, Slate, Meagher & Flom LLP (Bankr. S.D.N.Y. Feb. 14, 2024), ECF No. 3672 (excerpts)

Ex. 7H   *Ahearn v. Credit Suisse First Boston LLC*, No. 03-CV-10956 (JLT), slip op. (D. Mass. June 7, 2006), ECF No. 82

Ex. 7I   *In re Kraft Heinz Sec. Litig.*, Case No. 1:19-cv-01339, slip op. (N.D. Ill. Sept. 19, 2023), ECF. No. 493

Ex. 7J   *In re Oracle Corp. Sec. Litig.*, Case No. 5:18-cv-04844-BLF, slip op. (N.D. Cal. Jan. 13, 2023), ECF. No. 147

165.    As BLB&G previously submitted to the Court at the time that Lead Plaintiff filed its motion for class certification (ECF Nos. 93, 93-4) and when Lead Plaintiff filed its motion for preliminary approval of the Settlement (ECF Nos. 152-3, 153), attached hereto as Exhibit 8 is a true and correct copy of an order issued by the United States District Court for the Northern District of California in April 2021 in an unrelated action where BLB&G served as lead counsel for a different lead plaintiff, SEB Investment Management, and as class counsel for a certified class. *See SEB Inv. Mgmt. v. Symantec Corp.*, 2021 WL 1540996 (N.D. Cal. Apr. 20, 2021).  As reflected in the order, counsel for a lead plaintiff movant (that was not appointed) raised questions about BLB&G's hiring of a former employee of the lead plaintiff in that case.  Following discovery and extensive briefing, the court found that the evidence did not establish a *quid pro quo*, and allowed BLB&G to continue as class counsel.  *See id.* at *1-2.  The *Symantec* action was subsequently resolved with a $70 million settlement for the benefit of the class, and the settlement was approved by the court, with Judge Alsup commenting on the record that counsel "did a good job, so thank you for that."  *See SEB Inv. Mgmt. AB v. Symantec Corp.,* No. 3:18-cv-2902-WHA, ECF No. 425 at 18 (N.D. Cal. Feb. 10, 2022).  The court nevertheless ordered BLB&G to bring the order to the attention of any court in which BLB&G seeks appointment as class counsel.  *See id*. at *2. Accordingly, because BLB&G seeks appointment as class counsel for the Settlement Class in

connection with final approval of the Settlement, BLB&G is again bringing the Order to the Court's attention.

## VII.    CONCLUSION

166.    For all the reasons set forth above, Lead Plaintiff respectfully submits that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submits that the requested fee in the amount of 20% of the Settlement Fund should be approved as fair and reasonable, and the request for payment of total Litigation Expenses in the amount of $465,649.98, should also be approved.

I declare, under penalty of perjury that the foregoing is true and correct.

Dated: March 19, 2024                         Respectfully submitted,


                                                        */s/ Salvatore J. Graziano*
                                                        Salvatore J. Graziano